**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MERLY JEWIK, Individually and on behalf of all others similarly situated, | Case No. 1:25-cv-10385-LTS |
| Plaintiff, | Hon. Leo T. Sorokin |
| v. | <u>CLASS ACTION</u> |
| TRANSMEDICS GROUP, INC., WALEED HASSANEIN, and STEPHEN GORDON, | **ORAL ARGUMENT REQUESTED** |
| Defendants. | |
| PATRICK COLLINS, on Behalf Himself and All Others Similarly Situated, | Case No. 1:25-cv-10778-LTS |
| Plaintiff, | Hon. Leo T. Sorokin |
| v. | <u>CLASS ACTION</u> |
| TRANSMEDICS GROUP, INC., WALEED HASSANEIN, and STEPHEN GORDON, | **ORAL ARGUMENT REQUESTED** |
| Defendants. | |

**MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE MOTION OF THE TRANSMEDICS INVESTORS FOR CONSOLIDATION, APPOINTMENT AS LEAD PLAINTIFF, AND APPROVAL OF SELECTION OF LEAD COUNSEL, AND <u>IN OPPOSITION TO THE COMPETING MOTION</u>**

**TABLE OF CONTENTS**

I.   PRELIMINARY STATEMENT ................................................................................. 1

II.  Legal Standards..................................................................................................... 4

     A.   Courts Analyze Financial Interest Under All Four *Lax-Olsten* Factors ..................4

     B.   Groups of Unrelated Investors Cannot Displace the Movant With the
          Largest Financial Interest...................................................................................4

     C.   Courts Overwhelmingly Adopt LIFO and Reject FIFO .........................................5

     D.   Congress and Courts Prefer Sophisticated Institutional Investors...........................7

III. ARGUMENT............................................................................................................ 8

     A.   The TransMedics Investors Should Be Appointed Lead Plaintiff...........................8

          1.   The TransMedics Investors Have the Largest Financial Interest.................8

               a.   Georgia Peace Officers Alone—the Only Institution Before
                    the Court—Has the Largest Financial Interest................................9

               b.   The TransMedics Investors Also Have the Largest
                    Financial Interest Under Every Other *Lax-Olsten* Factor ..............12

          2.   The Presumption in Favor of the TransMedics Investors'
               Appointment as Lead Plaintiff Cannot Be Rebutted..................................14

     B.   The Court Should Not Aggregate the Levine-Caccavales Group's Losses...........15

          1.   Levine Is Not Adequate .............................................................................15

          2.   Neither Levine Nor the Caccavales Can Effectively Monitor
               Counsel ....................................................................................................19

          3.   Levine and the Caccavales Present No Evidence of Cohesion..................20

IV.  CONCLUSION....................................................................................................... 20

**TABLE OF AUTHORITIES**

**PAGE(S)**

**Cases**

*Ark. Tchr. Ret. Sys. v. Insulet Corp.*,
177 F. Supp. 3d 618 (D. Mass. 2016) ................................................................ 5, 14

*Berger v. Compaq Computer Corp.*,
257 F.3d 475 (5th Cir. 2001) ................................................................................ 19

*Carvelli v. Ocwen Fin. Corp.*,
No. 17-cv-80500, 2017 WL 11068524 (S.D. Fla. July 14, 2017) ....................... 7, 12

*Cha v. Kinross Gold Corp.*,
No. 12-cv-1203, 2012 WL 2025850 (S.D.N.Y. May 31, 2012) .............................. 6

*City of Hollywood Firefighters' Pension Fund v. TransDigm Grp., Inc.*,
No 17-cv-1677, 2017 WL 6028213 (N.D. Ohio Dec. 5, 2017) .............................. 13

*Clifton v. Willis*,
No. 22-cv-3161, 2024 WL 1508832 (D. Colo. Mar. 5, 2024) ................................ 18

*Diabat v. Credit Suisse Grp. AG*,
No. 23-cv-5874, 2024 WL 4566372 (S.D.N.Y. Oct. 24, 2024) .............................. 16

*Duhaime v. John Hancock Mut. Life Ins. Co.*,
183 F.3d 1 (1st Cir. 1999) ..................................................................................... 15

*Greebel v. FTP Software, Inc.*,
939 F. Supp. 57 (D. Mass. 1996) ............................................................................ 7

*Hirtenstein v. Cempra, Inc.*,
No. 16-cv-1303, 2017 WL 2874588 (M.D.N.C. July 5, 2017) ................................ 5

*Howard Gunty Profit Sharing Plan v. CareMatrix Corp.*,
354 F. Supp. 2d 18 (D. Mass. 2000) ..................................................... 15, 16, 17, 20

*Hwang v. Smith & Wesson Holding Corp.*,
No. 07-cv-30238, 2008 WL 11637862 (D. Mass. Apr. 15, 2008) ......................... 5, 11

*In re Cendant Corp. Litig.*,
264 F.3d 201 (3d Cir. 2001) ................................................................................... 4

*In re eSpeed, Inc. Sec. Litig.*,
232 F.R.D. 95 (S.D.N.Y. 2005) .............................................................................. 5

ii

*In re Galileo Corp. S'holders Litig.*,
    127 F. Supp. 2d 251 (D. Mass. 2001) ......................................................................... 19

*In re Host Am. Corp. Sec. Litig.*,
    236 F.R.D. 102 (D. Conn. 2006).................................................................................. 12

*In re Lernout & Hauspie Sec. Litig.*,
    138 F. Supp. 2d 39 (D. Mass. 2001) ............................................................... 4, 15, 20

*In re Network Assocs., Inc., Sec. Litig.*,
    76 F. Supp. 2d 1017 (N.D. Cal. 1999) ....................................................................... 17

*In re Olsten Corp. Sec. Litig.*,
    3 F. Supp. 2d 286 (E.D.N.Y.1998) ............................................................................... 4

*In re Organogenesis Sec. Litig.*,
    241 F.R.D. 397 (D. Mass. 2007)............................................................................... 6, 9

*In re Oxford Health Plans, Inc. Sec. Litig.*,
    182 F.R.D. 42 (S.D.N.Y. 1998) ................................................................................. 15

*In re Proxima Corp. Sec. Litig.*,
    No. 93-cv-1139, 1994 WL 374306 (S.D. Cal. May 3, 1994) ............................... 17, 18

*In re Surebeam Corp. Sec. Litig.*,
    No. 03-cv-1721, 2004 WL 5159061 (S.D. Cal. Jan. 5, 2004) .................................... 17

*In re Waste Mgmt., Inc. Sec. Litig.*,
    128 F. Supp. 2d 401 (S.D. Tex. 2000) ....................................................................... 15

*Ishak v. WM Technology, Inc.*,
    No. 24-cv-8959, 2025 WL 791270 (C.D. Cal. Mar. 11, 2025)......................... 4, 8, 13

*Jastram v. Nextera Energy, Inc.*,
    No. 23-cv-80833, 2023 WL 11885983 (S.D. Fla. Oct. 26, 2023) .............. 4, 8, 13, 14

*Johnson v. Dana Corp.*,
    236 F.R.D. 349 (N.D. Ohio 2006) ............................................................................... 6

*Juliar v. Sunopta Inc.*,
    No. 08-cv-933, 2009 WL 1955237 (S.D.N.Y. Jan. 30, 2009) ............................... 7, 12

*Kornick v. Talley*,
    86 F.R.D. 715 (N.D. Ga. 1980)................................................................................... 18

iii

*Lako v. Loandepot, Inc.*,
   No. 21-cv-1449, 2022 WL 1314463 (C.D. Cal. May 2, 2022)............................................ 15, 20

*Leech v. Brooks Automation, Inc.*,
   No. 06-cv-11068, 2006 WL 3690736 (D. Mass. Dec. 13, 2006)...................................... 1, 4, 8

*Levy v. Gutierrez*,
   No. 14-cv-00443, 2015 WL 13648077 (D.N.H. May 20, 2015) ................................................ 5

*Luongo v. Desktop Metal, Inc.*,
   No. 21-cv-12099, 2022 WL 2532498 (D. Mass. July 7, 2022) .......................................... 2, 6, 9

*Makhlouf v. Tailored Brands, Inc.*,
   No. 16-cv-0838, 2017 WL 1092311 (S.D. Tex. Mar. 23, 2017) ......................................... 5, 11

*Metzler Asset Mgmt. GmbH v. Kingsley*,
   No. 16-cv-12101, 2017 WL 438731 (D. Mass. Feb. 1, 2017) .......................................... 14, 15

*Nakamura v. BRF S.A.*,
   No. 18-cv-2213, 2018 WL 3217412 (S.D.N.Y. July 2, 2018).................................................. 15

*OFI Risk Arbitrages v. Cooper Tire & Rubber Co.*,
   63 F. Supp. 3d 394 (D. Del. 2014)............................................................................................ 7

*Pardi v. Tricida, Inc.*,
   No. 21-cv-76, 2021 WL 1381271 (N.D. Cal. Apr. 2, 2021).................................................... 19

*Pelletier v. Endo Int'l PLC*,
   316 F. Supp. 3d 846 (E.D. Pa. 2018) ..................................................................................... 12

*Police & Fire Ret. Sys. of Detroit v. Safenet, Inc.*,
   No. 06-cv-5797 2007 WL 7952453 (S.D.N.Y. Feb. 21, 2007) .............................................. 14

*Randall v. Fifth St. Fin. Corp.*,
   No. 15-cv-7759, 2016 WL 462479 (S.D.N.Y. Feb. 1, 2016) .............................................. 7, 12

*Richman v. Goldman Sachs Grp., Inc.*,
   274 F.R.D. 473 (S.D.N.Y. 2011) .............................................................................................. 7

*Sayce v. Forescout Techs., Inc.*,
   No. 20-cv-76, 2020 WL 6802469, n.10 (N.D. Cal. Nov. 19, 2020) ....................................... 18

*Schleicher v. Wendt*,
   No. 02-cv-1332, 2009 WL 761157 (S.D. Ind. Mar. 20, 2009) ............................................... 18

*Sneed v. AcelRx Pharms., Inc.*,
   No. 21-cv-4353, 2021 WL 5964596 (N.D. Cal. Dec. 16, 2021)................................................. 18

*Tan v. NIO Inc.*,
   No. 19-cv-1424, 2020 WL 1031489 (E.D.N.Y. Mar. 3, 2020)..................................................... 5

*Tsirekidze v. Syntax-Brillian Corp.*,
   No. 07-cv-2204, 2008 WL 942273 (D. Ariz. Apr. 7, 2008) ...................................................... 19

*United Food & Com. Workers Union v. Zuckerberg*,
   262 A.3d 1034 (Del. 2021) ....................................................................................................... 17

*Vladimir v. Bioenvision, Inc.*,
   No. 07-cv-6416, 2007 WL 4526532 (S.D.N.Y. Dec. 21, 2007) .................................................. 6

*Westchester Putnam Cntys. Heavy & Hwy. Laborers Local 60 Benefit Funds v. Brixmor Prop.
   Grp.*,
   No. 16-cv-2400, 2016 WL 11648466 (S.D.N.Y. Nov. 29, 2016)..................................... 4, 8, 14

*Zemel Fam. Tr. v. Philips Int'l Realty Corp.*,
   205 F.R.D. 434 (S.D.N.Y. 2002) ............................................................................................... 17

**Statutes**

15 U.S.C. § 78u-4(a)(3)(B)(iii) ........................................................................................................ 4

## I.    **PRELIMINARY STATEMENT**

Two competing motions for appointment as Lead Plaintiff pursuant to the PSLRA are pending before this court.[1] ECF Nos. 20, 23.  The TransMedics Investors are composed of Georgia Peace Officers—a public pension fund benefitting Georgia law enforcement officers that has recovered $135 million on behalf of a class of investors as co-lead plaintiff in a prior securities class action—and Oguzhan Altun, a sophisticated individual investor.  The only competing movant, the Levine-Caccavales Group, are three individual investors, including a married couple.

The TransMedics Investors are the presumptive lead plaintiff because they have the largest financial interest under the well-established *Lax-Olsten* factors, including total and net shares purchased, net funds expended, and approximate losses.  *See*, *e.g.*, *Leech v. Brooks Automation, Inc.*, No. 06-cv-11068, 2006 WL 3690736, at *2 (D. Mass. Dec. 13, 2006).  The TransMedics Investors suffered a $578,637 loss under the prevailing last-in, first-out ("LIFO") loss calculation method, and they purchased more total and net shares, and expended more funds, than the Levine-Caccavales Group.  Georgia Peace Officers alone has the largest financial interest of ***any*** movant group member and purchased more net and total shares than Levine and the Caccavales ***combined***. Accordingly, and because they are adequate and typical under Rule 23, the TransMedics Investors are the presumptive "most adequate plaintiff" and should be appointed Lead Plaintiff.

The Levine-Caccavales Group claims a slightly higher aggregate loss than the TransMedics Investors but cannot trigger the most adequate plaintiff presumption for several reasons.

---

[1] Defined terms take their meanings from the TransMedics Investors' opening brief, ECF No. 21. Internal quotations and citations are omitted.  All emphasis is added unless otherwise noted.  The only competing movant is Dr. Scott D. Levine ("Levine") and Joseph Caccavale and Mary Lou Caccavale (the "Caccavales," and together with Levine, the "Levine-Caccavales Group") (ECF No. 23).  The other movants filed notices of withdrawal or non-opposition.  *See* ECF Nos. 26, 27.

*First*, the Levine-Caccavales Group overstates its loss by using a loss calculation method that (1) does not offset class period sales against class period purchases, and (2), as a result, inflates the number of shares retained at the end of the Class Period.  Specifically, they inflate their claimed financial interest by using the disfavored and widely criticized first-in, first-out ("FIFO") method. For the past two decades, courts in this District and across the country adopt LIFO and reject FIFO at the lead plaintiff stage because it can exaggerate a movant's financial interest.  *See*, *e.g.*, *Luongo v. Desktop Metal, Inc.*, No. 21-cv-12099, 2022 WL 2532498, at *4 (D. Mass. July 7, 2022) ("FIFO has the potential to exaggerate losses").  Here, FIFO inflates the Levine-Caccavales Group's claimed financial interest by not accounting for 5,000 shares of stock that Levine sold for proceeds of $390,350, ***inflating Levine's claimed loss by over $47,000***.  Under LIFO, Levine's sales are matched with his Class Period purchases, including proceeds from the 5,000 shares sold, yielding a $348,507 LIFO loss—less than the $374,395 LIFO loss suffered by Georgia Peace Officers.



2

***Second***, the largest financial interest analysis does not turn solely on a review of comparative claimed losses. Rather, courts conduct a holistic evaluation of the movants' financial interests using all four *Lax-Olsten* factors. Under this test, the TransMedics Investors have the largest financial interest, with the most total and net shares purchased, the most net expenditures, and approximately the same loss as the Levine-Caccavales Group. Georgia Peace Officers, the only institution seeking appointment, purchased more total shares and net shares than the Levine-Caccavales Group, and expended ***over $88,000 more than Levine*** and ***over $466,000 more than the Caccavales*** on a net basis. Under the *Lax-Olsten* factors, the TransMedics Investors have the greatest overall financial stake.

***Third***, the Levine-Caccavales Group has not carried its burden to show that it is a cohesive group that can effectively represent investors. While courts in this District have allowed groups of investors to serve as lead plaintiff, they have done so only where the proposed group has presented evidence showing that they can effectively and cohesively represent the putative class. Moreover, scrutiny of aggregation is further heightened where it would lead to the displacement of the entity with the largest individual financial interest: Georgia Peace Officers. In this case, the Levine-Caccavales Group failed to disclose to the Court that Levine served as a director of a public company that was prosecuted by the SEC. Levine later admitted that despite his obligations as a director, he was little more than a rubber stamp for the officers of the company and failed to even review documents before signing them. On this record, the Levine-Caccavales Group has not carried its burden to justify aggregation. Therefore, the financial interests of Levine and the Caccavales should be evaluated separately, rather than as a group.

Accordingly, and for the reasons stated in their opening brief, the Court should grant the motion of the TransMedics Investors and deny the remaining competing motion.

3

## II.    LEGAL STANDARDS

### A.    Courts Analyze Financial Interest Under All Four *Lax-Olsten* Factors

The PSLRA establishes a strong presumption that the lead plaintiff is the movant that "has the largest financial interest" and "otherwise satisfies the requirements of Rule 23."  15 U.S.C. § 78u-4(a)(3)(B)(iii)(I).   To determine which movant has the largest financial interest, courts consider the *Lax-Olsten* factors: (1) total shares purchased; (2) net shares purchased; (3) net funds expended; and (4) approximate losses suffered.  *Brooks Automation*, 2006 WL 3690736, at \*2 (citing *In re Olsten Corp. Sec. Litig.*, 3 F. Supp. 2d 286, 296 (E.D.N.Y.1998)); *see also In re Cendant Corp. Litig.*, 264 F.3d 201, 262 (3d Cir. 2001) (adopting *Lax-Olsten* factors).

Where, as here, the difference in the movants' aggregate losses is de minimis, courts analyze all four *Lax-Olsten* factors holistically to find the largest financial interest.  For example, in *Ishak v. WM Technology, Inc.*, the court explained that when movants' losses are "roughly equal, courts treat those losses as equivalent and look to the other three *Lax* factors to determine which movant has the largest financial interest."  No. 24-cv-8959, 2025 WL 791270, at \*4 (C.D. Cal. Mar. 11, 2025); *see also Westchester Putnam Cntys. Heavy & Hwy. Laborers Local 60 Benefit Funds v. Brixmor Prop. Grp.*, No. 16-cv-2400, 2016 WL 11648466, at \*1 (S.D.N.Y. Nov. 29, 2016) (finding that where loss difference was minimal, *Lax-Olsten* factors "provide a more objective assessment of a movant's financial interest than the losses suffered"); *Jastram v. Nextera Energy, Inc.*, No. 23-cv-80833, 2023 WL 11885983, at \*2 (S.D. Fla. Oct. 26, 2023) (same).

### B.    Groups of Unrelated Investors Cannot Displace the Movant With the Largest Financial Interest

Courts have appointed groups **only** upon finding that a group member, like Georgia Peace Officers, claimed the largest financial interest.  *See In re Lernout & Hauspie Sec. Litig.*, 138 F. Supp. 2d 39, 44 (D. Mass. 2001) (evaluating "whether the grouping is sufficiently coherent to

4

control the litigation" is "made somewhat easier by the undisputed evidence that [group member] has by far the most significant financial stake, even without aggregation"); *Ark. Tchr. Ret. Sys. v. Insulet Corp.*, 177 F. Supp. 3d 618, 623 n.2, 626 (D. Mass. 2016) (appointing pension fund group after finding that one member alone had "the largest financial interest in this action"); *Hirtenstein v. Cempra, Inc.*, No. 16-cv-1303, 2017 WL 2874588, at *4 (M.D.N.C. July 5, 2017) (appointing group with individual who "suffered the largest loss of any individual movant").

When considering claimed losses of competing groups, courts have declined to displace the movant with the largest individual loss. For example, in *Hwang v. Smith & Wesson Holding Corp.*, the Court rejected a movant group claiming the largest aggregate loss and appointed a pension fund that "suffered by far the largest alleged individual loss." No. 07-cv-30238, 2008 WL 11637862, at *1 (D. Mass. Apr. 15, 2008). Similarly, in *In re eSpeed, Inc. Sec. Litig.*, the Court explained that "unrelated investors should not be considered as lead plaintiff when that group would displace the institutional investor preferred by the PSLRA." 232 F.R.D. 95, 100 (S.D.N.Y. 2005) (finding that a "group of unrelated investors may serve as lead plaintiff" only "where aggregation would not displace an institutional investor"); *see also Makhlouf v. Tailored Brands, Inc.*, No. 16-cv-0838, 2017 WL 1092311, at *8, *10 (S.D. Tex. Mar. 23, 2017) (appointing pension fund with "the largest individual loss"); *Tan v. NIO Inc.*, No. 19-cv-1424, 2020 WL 1031489, at *3-5 (E.D.N.Y. Mar. 3, 2020) (appointing movant with the largest individual loss); *Levy v. Gutierrez*, No. 14-cv-00443, 2015 WL 13648077, at *2-5 (D.N.H. May 20, 2015) (same).

### C.     Courts Overwhelmingly Adopt LIFO and Reject FIFO

There are two methods for calculating movant losses: the first-in, first-out (FIFO) method and the last-in, first-out (LIFO) method. Under FIFO, shares of stock that were acquired first are assumed to be sold first for the purpose of loss calculations. Under LIFO, shares that were acquired

most recently (*i.e.*, last) are assumed to be sold first.  *See, e.g.*, *Johnson v. Dana Corp.*, 236 F.R.D. 349, 352-53 (N.D. Ohio 2006) (discussing the differences between FIFO and LIFO).  Courts in this District and across the country have generally adopted the LIFO method and rejected the FIFO method because FIFO can overstate movant losses.  As the Court in *Luongo* explained:

> One reason LIFO is the preferred methodology is because ***FIFO has the potential to exaggerate losses, by failing to take into account gains that an investor might have made on the stock that were attributable to its artificial inflation as a result of the alleged fraud***, while LIFO takes into account such gains.  LIFO allows the court to exclude[] in-and-out transactions, purchases and sales that occur during the class period, *i.e.*, after the stock price was fraudulently inflated and before it dropped due to a corrective disclosure.  Any gain or loss due to such transactions is reasonably read to reflect price fluctuations attributable to factors other than the fraud, and thus should be excluded from the PSLRA loss calculus.

2022 WL 2532498, at \*4 (alterations in the original); *see also Vladimir v. Bioenvision, Inc.*, No. 07-cv-6416, 2007 WL 4526532, at \*5 (S.D.N.Y. Dec. 21, 2007) ("LIFO takes into account gains and can disregard losses that are not causally related to the misstatement claims."); *Dana Corp.*, 236 F.R.D. at 352 ("[U]nder FIFO, many plaintiffs will show damages from defendant's alleged misconduct when those plaintiffs actually profited from the misconduct.").[2]

Recognizing these faults of the FIFO method, courts have consistently endorsed LIFO for the past two decades.  *See In re Organogenesis Sec. Litig.*, 241 F.R.D. 397, 402 (D. Mass. 2007) ("Like other courts that have examined the issue, this court concludes as a matter of law that LIFO is the preferred approach for assessing class period damage."); *Luongo*, 2022 WL 2532498, at \*3-

---

[2] While FIFO is used for federal tax purposes and in class action settlements, LIFO is the prevailing method used to assess losses at the lead plaintiff stage.  As observed in *Cha v. Kinross Gold Corp.*, "the IRS utilizes FIFO not because it is more precise than LIFO, but because it maximizes taxable income and forces taxpayers to recognize gains that they would prefer to defer or avoid," and "judicial review of [the] nicety of settlement methodology tends to be less searching; the proper inquiry for the Court at this stage is which methodology yields the more reliable results. . . .  The answer is, clearly, LIFO."  No. 12-cv-1203, 2012 WL 2025850, at \*4 (S.D.N.Y. May 31, 2012).

4 (recognizing LIFO as the preferred methodology); *Richman v. Goldman Sachs Grp., Inc.*, 274 F.R.D. 473, 476 (S.D.N.Y. 2011) ("Southern District of New York courts have a very strong preference for the LIFO method"); *OFI Risk Arbitrages v. Cooper Tire & Rubber Co.*, 63 F. Supp. 3d 394, 400 n.1 (D. Del. 2014) ( "the overwhelming trend . . . nationwide has been to use LIFO).

### D.    Congress and Courts Prefer Sophisticated Institutional Investors

Both Congress and courts prefer that sophisticated institutional investors like Georgia Peace Officers serve as Lead Plaintiff.  *See, e.g.*, *Greebel v. FTP Software, Inc.*, 939 F. Supp. 57, 63 (D. Mass. 1996) ("provisions of the PSLRA . . . suggest a presumption that institutional investors be appointed lead plaintiff").  In appointing institutions over individuals, courts highlight their experience and resources.  *See Randall v. Fifth St. Fin. Corp.*, No. 15-cv-7759, 2016 WL 462479, at *3 (S.D.N.Y. Feb. 1, 2016) (rejecting two individuals "bearing in mind the failure of either [] to show any . . . investment and litigation experience" and appointing pension fund, "the only movant that is an institutional investor."); *Carvelli v. Ocwen Fin. Corp.*, No. 17-cv-80500, 2017 WL 11068524, at *7 (S.D. Fla. July 14, 2017) (appointing pension fund over two individuals, noting the fund's staff, resources, experience, and "long-standing relationship" with counsel).

This is especially true where, as here, competing individuals lack the largest individual financial interest and do not satisfy Rule 23.  *See*, *e.g.*, *Juliar v. Sunopta Inc.*, No. 08-cv-933, 2009 WL 1955237, at *2 (S.D.N.Y. Jan. 30, 2009) (finding institution's loss differential of $30,000 with group of individuals is "minimal and . . . does not overcome a presumption . . . that institutional investors serve as better lead plaintiffs"); *Ocwen*, 2017 WL 11068524, at *5 (appointing pension fund movant where loss difference with individual movant was "minimal" and following the "presumption inherent in Congress' enactment of the PSLRA that institutional investors serve as better lead plaintiffs"), *objections overruled*, 2017 WL 3473482 (S.D. Fla. Aug. 14, 2017).

**III.    ARGUMENT**

  **A. The TransMedics Investors Should Be Appointed Lead Plaintiff**

  The TransMedics Investors are the presumptive Lead Plaintiff because they have the largest financial interest when properly calculated under the near-universally endorsed LIFO method, do not displace another investor with a larger individual loss, and are the only movant that satisfies Rule 23's adequacy and typicality prerequisites for appointment.

  **1. The TransMedics Investors Have the Largest Financial Interest**

  Courts in this District are guided by the *Lax-Olsten* factors in analyzing financial interest: (1) the total number of shares purchased; (2) the number of net shares purchased; (3) the net funds expended; and (4) the approximate loss suffered. *Brooks Automation*, 2006 WL 3690736, at *2. As discussed further below, the TransMedics Investors' financial interest, considered holistically under all four *Lax-Olsten* factors, exceeds that of any movant. The TransMedics Investors suffered a $578,637 loss under the prevailing LIFO method, and they purchased more net and total shares of TransMedics common stock and expended more net funds than any other movant.[3] Indeed, Georgia Peace Officers alone purchased more total and net shares than Levine and the Caccavales ***combined***, and Georgia Peace Officers expended more net funds on its purchases than Levine.

---

[3] As discussed above, *supra* Section II.A, the de minimis difference in the movants' respective approximate losses warrants examination under all four *Lax-Olsten* factors. When calculated under LIFO, the difference between the TransMedics Investors and the Levine-Caccavales Group's total approximate loss is only $29,654, or less than 5%. *See* White Decl., Ex. B (chart reflecting the Levine-Caccavales Group's transactions and estimated losses under LIFO). Even under the Levine-Caccavales Group's FIFO calculation—which this Court should not credit— there is only a $76,712, or 11.71%, difference. These loss differences are consistent with those found by courts to be nearly equivalent or minimally different. *See WM Tech.*, 2025 WL 791270, at *4 (finding movants' FIFO and LIFO loss differences of 12.42% and 7.24%, respectively, "roughly equal" and turning to the other factors to determine the largest financial interest); *Brixmor*, 2016 WL 11648466, at *1 (finding 16% LIFO loss difference not determinative when other factors favor institutional investor group movant); *Nextera*, 2023 WL 11885983, at *3 (finding LIFO loss difference of 5.5% not determinative and considering remaining *Lax* factors).

| MOVANT | TOTAL SHARES PURCHASED | NET SHARES PURCHASED | NET FUNDS EXPENDED | APPROXIMATE LOSS |
|---|---|---|---|---|
| **TransMedics Investors** | **27,887** | **6,014** | **$988,531** | **$578,637 LIFO** |
| Georgia Peace Officers | 14,737 | 5,614 | $759,843 | $374,395 |
| Mr. Altun | 13,150 | 400 | $228,687 | $204,242 |
| **Levine-Caccavales Group** | **12,200** | **5,200** | **$964,202** | **$608,292 LIFO ($654,167 FIFO)** |
| Levine | 9,700 | 4,700 | $671,202 | $348,507 LIFO ($395,564 FIFO) |
| Joseph Caccavale | 1,000 | 0 | $106,440 | $106,440 |
| Joseph and Mary Lou Caccavale Joint | 1,000 | 0 | $100,260 | $100,260 |
| Mary Lou Caccavale | 500 | 500 | $86,300 | $53,085 |

> **a.    Georgia Peace Officers Alone—the Only Institution Before the Court—Has the Largest Financial Interest**

As discussed above, the vast majority of courts, including in this District, apply the LIFO method to assess the approximate losses of lead plaintiff movants.  Courts reject FIFO, employed by Levine and the Caccavales, due to its ability to overstate financial interest.  *See Organogenesis*, 241 F.R.D. at 402; *Luongo,* 2022 WL 2532498, at *3-4.  Under LIFO, Georgia Peace Officers suffered the largest individual loss of $374,395—$25,888 more than Levine's $348,507 loss.

The overstatement of Levine's claimed loss by $47,057 ($395,564 FIFO versus $348,507 LIFO) results from two differences between the FIFO and LIFO methods, reflected in the diagram below and detailed in White Decl., Ex. A.  ***First***, under FIFO, the 5,000 shares Levine sold are offset against his earliest purchases—his substantial pre-Class Period holdings (*i.e.*, opening balance) of 6,000 shares.  Because those proceeds match to pre-Class Period purchases, when the stock was not alleged to be artificially inflated by fraud, the proceeds from those sales are valued at $0 and do not offset the $1,113,250 Levine spent purchasing stock during the Class Period.

Under LIFO, the 5,000 shares Levine sold are matched to Class Period purchases, and the proceeds from those sales are valued at $390,350 (which reduces Levine's net cost to $722,900).

*Second*, because Levine's sales are offset against pre-Class Period holdings under FIFO, Levine "retains" all 9,700 shares purchased during the Class Period at the end of the Class Period. Under the PSLRA, those shares are valued at $665,987, using the so-called "lookback price," or the average price during the 90-day lookback period (here, $68.66). By contrast, the LIFO method reflects reality: Levine retained 4,700 shares purchased during the Class Period, which are valued at $322,694 (because sales are offset against the most recent Class Period purchases).



Levine's loss calculation highlights the concern that courts have with FIFO. The $390,350 in proceeds from Levine's Class Period sales are not counted against his total purchase price as

they would be under LIFO, which matches sales against the most recent Class Period purchases. *See* White Decl., Ex. A (chart explaining the difference in Levine's LIFO/FIFO loss). Instead, the 5,000 shares Levine sold during the Class Period are treated as "retained" shares and valued at the 90-day lookback price following the Class Period, totaling $343,292 (*i.e.*, the difference between the $665,987 value that considers all 9,700 shares under FIFO and the $322,694 value of the 4,700 retained shares under LIFO). These differences overstate Levine's total loss by $47,057.[4]

Thus, the TransMedics Investors include the movant with the largest individual loss, Georgia Peace Officers. Recognizing that securities class actions are best led by institutional investors with experience, resources, and sophistication, courts regularly refuse to displace institutional investor movants who claim the largest individual loss. *See Smith & Wesson*, 2008 WL 11637862, at *1 (appointing pension fund claiming "the largest alleged individual loss" that also "possesses the sophistication, resources and long-standing relationship with counsel to insure that it will intelligently manage this litigation on behalf of the class"); *Tailored Brands*, 2017 WL 1092311, at *10 (appointing pension fund that "individually" had "the largest financial interest").

Moreover, even where an institutional investor claimed a smaller loss than an individual or group of individuals, courts have opted to follow the PSLRA's preference for institutions. Recognizing the "presumption inherent in Congress" that institutional investors "serve as better lead plaintiffs," courts have reasoned that appointing them serves the PSLRA's aims of preventing

---

[4] FIFO's distorting effect on Levine's sales is apparent in the treatment of his June 25, 2024 sale of 1,000 shares at $145.50 per share, for which he received $145,500 in proceeds. Under LIFO, those sale proceeds count against his loss and are matched to 1,000 shares purchased on June 21, 2024 (during the Class Period). Under FIFO, those sales are matched to Levine's pre-Class Period holdings and assigned no value. The June 21, 2024 purchase against which the sale is offset under LIFO (and no longer retained) is instead treated as retained under FIFO and valued at the significantly lower lookback price of $68.78 per share. These contrasting methods result in *a $76,720 difference* in the loss calculation related to the June 21 purchase and the June 25 sale.

11

lawyer-driven litigation and having sophisticated institutions with resources and experience oversee complex litigation. *See Sunopta*, 2009 WL 1955237, at \*2 (appointing pension fund group per the PSLRA presumption); *Carvelli*, 2017 WL 11068524, at \*5 (same); *Pelletier v. Endo Int'l PLC*, 316 F. Supp. 3d 846, 855 (E.D. Pa. 2018) (holding that "slight variance" in losses tipped in favor of appointing pension fund movant); *Fifth St. Fin.*, 2016 WL 462479, at \*3 (finding contested loss differential between group of individuals and pension fund "minimal" and appointing "the only movant that is an institutional investor," a pension fund, per the "clear" PSLRA preference).

The same result is warranted here, where the TransMedics Investors include the only institutional movant before the Court, Georgia Peace Officers, a defined-benefit pension fund with more than 20,000 members and more than $1 billion in assets under management, with experience overseeing counsel in a securities class action and achieving a $135 million recovery for injured investors. *See* ECF Nos. 21 at 14, and 22-3 at 3. (brief and joint declaration). In addition, the TransMedics Investors include a sophisticated individual investor. *See, e.g.*, *In re Host Am. Corp. Sec. Litig.*, 236 F.R.D. 102, 106 (D. Conn. 2006) (appointing institutional and individual investors provides "diversity of representation reflective of the makeup of the class as a whole").

### b.    The TransMedics Investors Also Have the Largest Financial Interest Under Every Other *Lax-Olsten* Factor

In addition to having the largest individual loss, the TransMedics Investors have the most "skin in the game" under all three other *Lax-Olsten* factors. The first three factors—total and net shares purchased and net funds expended—are especially instructive in cases such as this, where the claimed approximate losses are nearly equipoise. Last month, the court in *WM Technology*, when assessing two movants claiming LIFO losses that differed by only 7.42%, found them to be "roughly equal" and turned to the other factors for "a more objective assessment" of financial interest, finding a movant's lead on LIFO losses was "not enough to outweigh" the appointed

movant's advantage on the other factors.  2025 WL 791270, at *4; *see also Nextera*, 2023 WL 11885983, at *2 ("Looking beyond approximate losses suffered is especially appropriate in cases where the approximate loss differential is minimal."); *City of Hollywood Firefighters' Pension Fund v. TransDigm Grp., Inc.*, No 17-cv-1677, 2017 WL 6028213, at *2 (N.D. Ohio Dec. 5, 2017) (giving all of the Lax factors "equal weight" in determining the largest financial interest).

The TransMedics Investors have a greater financial interest than the Levine-Caccavales Group under the holistic approach courts regularly employ when the approximate loss factor is not determinative on its own, purchasing more Class Period shares, holding more shares on a net basis, and expending more funds on a net basis.  *Compare* ECF Nos. 22-2 and 25-3 (movant loss charts), and White Decl., Ex. B.  As reflected above, the TransMedics Investors purchased 6,014 net shares, more than the Levine-Caccavales Group's 5,200 net shares.  Georgia Peace Officers alone purchased 5,614 net shares, more than Levine and the Caccavales combined.  *See Nextera*, 2023 WL 11885983, at *3 (finding movant pension fund group's "greater number of net shares is indicative of a higher potential recovery of damages attributed to the alleged fraud").  Additionally, the TransMedics Investors expended net funds of $988,531, compared to $964,202 for the Levine-Caccavales Group.[5]  Georgia Peace Officers alone expended more net funds than any other movant individually, $759,843, as compared to Levine's $671,202.  Finally, the TransMedics Investors purchased a total of 27,877 share, more than double the Levine-Caccavales Group's 12,200 shares purchased, with both Georgia Peace Officers and Mr. Altun each purchasing more shares than Levine and the Caccavales combined.

---

[5] The Levine-Caccavales Group's loss chart also includes an unexplained discrepancy regarding Levine's P80 01/19/24 Options: while the chart claims that 1,000 shares were assigned, only 700 shares were purchased. *See* ECF No. 25-3 at 2.

In short, the TransMedics Investors' superior financial interest is underscored by their total shares purchased, net shares purchased, and net funds expended. When courts have found losses not to be determinative, they have looked to the other factors to determine financial interest. *See Police & Fire Ret. Sys. of Detroit v. Safenet, Inc.*, No. 06-cv-5797 2007 WL 7952453, at \*2 (S.D.N.Y. Feb. 21, 2007) (finding "gross purchases, net purchases, and net funds expended, all favor the [institutional group movant]" where $40,000 approximate loss difference is "roughly equal," and appointing the group); *Brixmor*, 2016 WL 11648466, at \*2 (appointing institutional investor group that purchased more net shares and expended more net funds than competing group, "a more objective assessment of a movant's interest than the losses suffered," where there was a $20,884 or 16% difference in competing movants' LIFO losses); *Nextera*, 2023 WL 11885983, at \*3 (appointing institutional movant group with "decisive lead with respect to the remaining factors" where competing movant with approximate loss lead not determinative).

### 2.    The Presumption in Favor of the TransMedics Investors' Appointment as Lead Plaintiff Cannot Be Rebutted

Courts in this District routinely appoint institutional investors that demonstrate their ability to fairly and adequately represent class interests and have noted the benefits of having an institutional investor and sophisticated individual investor, like Georgia Peace Officers and Mr. Altun, take a leadership role. *See, e.g.*, *Insulet Corp.*, 177 F. Supp. 3d at 622 (appointing group of "the type of institutional investors the PSLRA encourages be appointed lead plaintiff" while also noting that "[m]any courts have recognized the benefits of having both private and institutional lead plaintiffs in securities class actions."); *Metzler Asset Mgmt. GmbH v. Kingsley*, No. 16-cv-12101, 2017 WL 438731, at \*4 (D. Mass. Feb. 1, 2017) (appointing pair of institutional investors).

To overcome the strong presumption entitling the TransMedics Investors to appointment, the PSLRA requires that the competing movant present "proof" that the TransMedics Investors are

14

atypical or inadequate.  15 U.S.C. § 78u-4(a)(3)(B)(iii)(II); *see also  Kingsley*, 2017 WL 438731, at \*4.  No such proof exists.  Consequently, the Court should grant the TransMedics Investors' motion and deny the competing motions.  *See id.* (appointing the "presumptively most adequate lead plaintiff" institutional investor group where "[n]o such proof has been presented").

## B.      The Court Should Not Aggregate the Levine-Caccavales Group's Losses

Although Courts allow unrelated individuals to seek group appointment, the Court "should not blindly aggregate the losses of unrelated plaintiffs to confer lead plaintiff status on a group without considering whether the grouping is sufficiently coherent to control the litigation." *Lernout*, 138 F. Supp. 2d at 44.  In particular, the Court should "evaluate the structure of the group to ensure that the lead plaintiffs, not the attorneys, are in the driver's seat."  *Id.*  "A proposed plaintiff group has the burden of showing that aggregation is appropriate."  *Nakamura v. BRF S.A.*, No. 18-cv-2213, 2018 WL 3217412, at \*3 (S.D.N.Y. July 2, 2018); *see also Lako v. Loandepot, Inc.*, No. 21-cv-1449, 2022 WL 1314463, at \*6 (C.D. Cal. May 2, 2022) (group has "burden to demonstrate that each individual member, and the group collectively, satisfies Rule 23's adequacy and typicality requirements"); *In re Waste Mgmt., Inc. Sec. Litig.*, 128 F. Supp. 2d 401, 413 (S.D. Tex. 2000) ("burden is on those seeking to aggregate to demonstrate the[ir] cohesiveness").  Here, Levine and the Caccavales do not come close to meeting their burden for aggregating their losses.

### 1.      Levine Is Not Adequate

A PSLRA lead plaintiff must be able to "fairly and adequately protect the interests of the class."  15 U.S.C. §78u-4(a)(3)(B)(III)(ii).  "A class representative, once designated by the Court, is a fiduciary for the absent class members."  *In re Oxford Health Plans, Inc. Sec. Litig.*, 182 F.R.D. 42, 46 (S.D.N.Y. 1998); *see Duhaime v. John Hancock Mut. Life Ins. Co.*, 183 F.3d 1, 7 (1st Cir. 1999) (noting "class representatives' fiduciary duties"); *Howard Gunty Profit Sharing Plan v. CareMatrix Corp.*, 354 F. Supp. 2d 18, 23-24 (D. Mass. 2000) (recognizing "fiduciary duty the

15

lead plaintiff has to the proposed class of plaintiffs it is representing"). Thus, "the proof needed to rebut the [lead plaintiff] presumption need not establish a plaintiff's inadequacy with absolute certainty; instead it is enough that it presents a colorable risk of inadequacy." *Diabat v. Credit Suisse Grp. AG*, No. 23-cv-5874, 2024 WL 4566372, at *4 (S.D.N.Y. Oct. 24, 2024). Here, the evidence—most notably, Levine's own sworn testimony—strongly suggests the "potential" that Levine "will not fairly and adequately protect the interests of the class[,]" and accordingly, he should not be permitted to serve as lead plaintiff, including as part of a group. *Id.*

While Levine was still a practicing doctor, he invested in a public company, Freedom Environmental Services, Inc. ("Freedom")—traded on the over the counter ("OTC") "Pink Sheets"—at the behest of one of his patients, Michael Borish, Freedom's CEO. *See* White Decl., Ex. C (Levine Depo.), at 12:5-15:21. Borish appointed Levine to Freedom's Board of Directors, despite Levine's lack of qualifications. *Id.* at 29:19-30:16. Within months, Freedom had filed for bankruptcy and was sued by the SEC and placed in receivership. *Id.* at 29:23-25, 32:8-11, 59:15-18. The SEC alleged that the company made "repeated ongoing misstatements or omissions" to the SEC—while Levine was on Freedom's Board—and that Freedom executives misappropriated company funds. *See* White Decl., Ex. D (SEC Compl.), ¶¶ 1, 38, 56-59, 63-73.

Levine candidly admitted in sworn testimony that he was in essence a sham director and that he acted solely under the thumb of Freedom's executives in his Board role:

- "***I was probably put on the board just to be [Borish's] lackey to sign shit, and I didn't even know what it was***." White Decl., Ex. C (Levine Depo.), at 62:8-10.
- "I did nothing as a board member except sign that resolution and perhaps sign something else I shouldn't have." *Id.* at 75:16-18.
- "***I was given no information other than I was asked to sign probably two documents***." *Id.* at 31:6-7.
- "Borish made me a board member. Did he give me any information? No. ***He just said, you'll be a board member***. I didn't get paid for it and ***I got no information other***

16

> *than for him to have me sign things on an urgent basis* that I was probably lied to." *Id.* at 30:3-7.

- He emailed inaccurate information to the SEC receiver's counsel on the say-so of a Freedom executive and "*never verified anything*." *Id.* at 40:21-22.

Directors are fiduciaries, and Levine's testimony establishes that he breached his fiduciary duties to Freedom and its shareholders.[6]

Levine now seeks to act as a fiduciary for absent Class members, who will rely on him to safeguard their interests in this litigation and maximize the recovery of their investment losses. But given Levine's prior admitted failures when previously serving as a fiduciary for Freedom and its shareholders, there is an acute risk that he will not fairly and adequately represent the Class here. Indeed, "courts have found that an individual is an inadequate lead plaintiff due to unrelated misconduct which implicates the individual's ability to serve as a fiduciary." *In re Surebeam Corp. Sec. Litig.*, No. 03-cv-1721, 2004 WL 5159061, at *7 (S.D. Cal. Jan. 5, 2004) (finding corporate movant inadequate where its principal representative was the subject of numerous investor complaints); *Zemel Fam. Tr. v. Philips Int'l Realty Corp.*, 205 F.R.D. 434, 436-37 (S.D.N.Y. 2002) (finding proposed plaintiff inadequate in securities class action where he had "significant involvement" in companies sanctioned by SEC, even though he "was not named individually in . . . SEC cease and desist orders"); *In re Network Assocs., Inc., Sec. Litig.*, 76 F. Supp. 2d 1017, 1029 (N.D. Cal. 1999) (finding presumptive lead plaintiff inadequate due to unrelated fraud investigation). Moreover, Levine's "admission of wrongdoing here distinguishes this case from those cases in which courts typically certify class representatives in the face of mere allegations of misconduct or unlawful activity." *In re Proxima Corp. Sec. Litig.*, No. 93-cv-1139,

---

[6] *See, e.g.*, *United Food & Com. Workers Union v. Zuckerberg*, 262 A.3d 1034, 1049-50 (Del. 2021) (explaining fiduciary duty of care "requires that [directors] inform themselves of material information before making a business decision and act prudently in carrying out their duties").

1994 WL 374306, at *17 (S.D. Cal. May 3, 1994); *see Sayce v. Forescout Techs., Inc.*, No. 20-cv-76, 2020 WL 6802469, at *8, n.10 (N.D. Cal. Nov. 19, 2020) (disqualifying lead plaintiff movant group where group member "was previously found in breach of fiduciary duty by a[] court").

In *Kornick v. Talley*, co-trustees who sought to lead a securities fraud lawsuit testified that they "loaned money to themselves from the trust assets which they failed to repay or repaid without interest." 86 F.R.D. 715, 721 (N.D. Ga. 1980). Despite that "the trustees' conduct of the affairs of the trust has not been the subject of any lawsuit," the court concluded that "the trustees' **own admissions** justify a finding that they breached their fiduciary duty to place the interests of the trust above their own personal interests" and thus were inadequate. *Id.* The same is true of Levine: "he has admitted to . . . breach[ing] fiduciary duties and now seeks to serve as a fiduciary." *Proxima*, 1994 WL 374306, at *17 (finding plaintiff inadequate, where he admitted to conspiring to breach fiduciary duties, given that if he "were certified as a class representative, he would be charged with upholding the same standards of conduct that he failed to meet"). This Court should "not force class members to rely on a representative who has admitted to" breaching his fiduciary duties. *Schleicher v. Wendt*, No. 02-cv-1332, 2009 WL 761157, at *3 (S.D. Ind. Mar. 20, 2009), *aff'd*, 618 F.3d 679 (7th Cir. 2010).

Making matters worse, Levine **disclosed none of this** to the Court, despite trumpeting both his "prior investing experience" and "prior experience working with legal counsel." ECF No. 25-4, ¶ 4. Class members deserve to know if an applicant vying to represent them has previously breached his fiduciary duties. Yet this would have remained hidden if not for the investigation by the TransMedics Investors. Levine's lack of candor only underscores his inadequacy.[7]

---

[7] *See Clifton v. Willis*, No. 22-cv-3161, 2024 WL 1508832, at *4 (D. Colo. Mar. 5, 2024) (finding a movant's lack of candor and failure to disclose his criminal history "troubling"); *Sneed v. AcelRx*

Levine's inadequacy alone dooms the cohesiveness of the Levine-Caccavales Group and precludes aggregation. *See  Pardi v. Tricida, Inc.*, No. 21-cv-76, 2021 WL 1381271, at *2 (N.D. Cal. Apr. 2, 2021) (refusing to appoint group that "highlighted its lack of cohesion when one of its members" filed two competing lead plaintiff motions); *Tsirekidze v. Syntax-Brillian Corp.*, No. 07-cv-2204, 2008 WL 942273, at *4 (D. Ariz. Apr. 7, 2008) ("questions about adequacy" and typicality of one group member "establish that his group should not represent the class").

### 2.    Neither Levine Nor the Caccavales Can Effectively Monitor Counsel

Levine's admitted conduct also raises serious doubts that he can effectively monitor his counsel and control the litigation.  The PSLRA was intended to "empower investors so that they—not their lawyers—exercise primary control over private securities litigation." *In re Galileo Corp. S'holders Litig.*, 127 F. Supp. 2d 251, 260 (D. Mass. 2001).  Thus, as the Fifth Circuit has instructed, in PSLRA cases, "the adequacy standard must reflect the governing principles of the Act and, particularly, Congress's emphatic command that competent plaintiffs, rather than lawyers, direct such cases." *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 481, 484 (5th Cir. 2001).  Levine's prior sworn testimony is replete with examples of him blindly deferring to others, while refusing to do any independent diligence.  From investing hundreds of thousands of dollars in Freedom on the say-so of its executive without even reading the company's SEC filings, to signing Board resolutions lacking documentation at the behest of Freedom executives without doing any diligence, to emailing inaccurate information dictated to him by a Freedom executive without verifying that information to counsel for the SEC receiver, Levine played the willing pawn at every step in his involvement with Freedom, helping Freedom's executives lie to the SEC and

---

*Pharms., Inc.*, No. 21-cv-4353, 2021 WL 5964596, at *4 (N.D. Cal. Dec. 16, 2021) (finding "serious concerns" about a movant's candor to his attorney and the court about his misconduct).

loot the company. *See* White Decl., Ex. C (Levine Depo.), at 17:5-18, 26:13-23, 31:4-15, 34:21-36:5. Levine thus cannot effectively monitor counsel in this action.

Nor do the Caccavales present sufficient evidence of their own ability to effectively control this litigation or monitor counsel. For example, both Caccavales state in their Joint Declaration that they have "prior experience working with legal counsel," but provide no details about that experience, such as the type of litigation in which they have worked with counsel.

### 3.    Levine and the Caccavales Present No Evidence of Cohesion

Finally, the barebones Joint Declaration of Levine and the Caccavales underscores their lack of cohesion. *See* ECF No. 24-5. Given Levine's inadequacy and the Caccavales' apparent lack of experience in complex litigation, they do not come to close to providing an "explanation of how" they "would function collectively." *Lernout*, 138 F. Supp. 2d at 44; *see CareMatrix*, 354 F. Supp. 2d at 24 ("proposed lead plaintiff[] group" should "explain . . . how they would work together" and "[a]bsent sufficient explanation, their motion to be lead plaintiff should be denied"); *Lako*, 2022 WL 1314463, at *6 (rejecting proposed group that used "inappropriate methodology for loss calculation" and had a "member who potentially faces unique defenses").

## IV.    CONCLUSION

The PSLRA has established that the investor with the largest financial interest that also satisfies the requirements of Rule 23 is entitled to the most adequate plaintiff presumption. The remaining competing movants do not possess the largest financial interest and, therefore, cannot trigger the presumption and cannot rebut with proof the presumption that the TransMedics Investors are the most adequate plaintiff. Accordingly, the TransMedics Investors respectfully submit that their motion should be granted, and the competing motion should be denied.

Dated: April 29, 2025                                Respectfully submitted,

                                                          **SAXENA WHITE P.A.**

By: */s/ Joseph E. White, III*
Joseph E. White, III (BBO# 648498)
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
Fax: (561) 394-3382
jwhite@saxenawhite.com

**SAXENA WHITE P.A.**
Marco A. Dueñas (*pro hac vice*
forthcoming)
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.: (914) 437-8551
Fax: (888) 216-2220
mduenas@saxenawhite.com

**SCOTT+SCOTT ATTORNEYS AT
LAW LLP**
Amanda F. Lawrence (BBO# 568737)
156 S. Main Street, P.O. Box 192
Colchester, CT 06415
Tel.: (860) 531-2645
Fax: (860) 537-4432
alawrence@scott-scott.com

**SCOTT+SCOTT ATTORNEYS AT
LAW LLP**
Thomas L. Laughlin, IV (*pro hac vice*
forthcoming)
Jonathan Zimmerman (*pro hac vice*
forthcoming)
Nicholas S. Bruno (*pro hac vice*
forthcoming)
230 Park Avenue, 24th Floor
New York, NY 10169
Tel.: (212) 223-6444
Fax: (212) 223-6334
tlaughlin@scott-scott.com
jzimmerman@scott-scott.com
nbruno@scott-scott.com

*Counsel for the TransMedics Investors, and
Proposed Lead Counsel for the Class*

21

**THE SCHALL LAW FIRM**
Brian J. Schall (*pro hac vice* forthcoming)
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Tel.: (310) 301-3335
Fax: (310) 388-0192
brian@schallfirm.com

*Additional Counsel for Oghuzan Altun*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on April 29, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notice of electronic filing to all registered users.

*/s/ Joseph E. White, III*
Joseph E. White, III
