**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| MERLY JEWIK, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TRANSMEDICS GROUP, INC., WALEED HASSANEIN, and STEPHEN GORDON,<br><br>Defendants. | Case No.: 1:25-cv-10385-LTS<br><br>Hon. Leo T. Sorokin<br><br><u>CLASS ACTION</u><br><br>**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |
| PATRICK COLLINS, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>TRANSMEDICS GROUP, INC., WALEED HASSANEIN, and STEPHEN GORDON,<br><br>Defendants. | Case No. 1:25-cv-10778-LTS<br><br>Hon. Leo T. Sorokin |

## TABLE OF CONTENTS

**Page**

I.    PRELIMINARY STATEMENT .................................................................... 2

II.   JURISDICTION AND VENUE ..................................................................11

III.  PARTIES ................................................................................................. 12

    A.    Lead Plaintiffs .............................................................................. 12

    B.    Defendants ................................................................................... 12

IV.  OVERVIEW OF THE FRAUD ................................................................. 13

    A.    TransMedics' OCS Technology Expands The Transplant Market, Fueling Rapid Growth ............................................................................. 13

    B.    TransMedics Launches "The Amazon Prime Of Organ Transplant".................. 15

    C.    Throughout The Class Period Defendants Assured Investors That They Were Delivering Highly "Cost-Effective" Transplant Services, And That TransMedics' Costs Were Of No Concern To Hospitals Because They Were "Fully Reimbursed" ......................................................... 17

    D.    Defendants Supercharge The NOP—And Their Fraud—By Purchasing Their Own Fleet Of Private Planes For Personnel And Organ Transport ............ 19

    E.    The Truth Begins To Emerge ...................................................... 21

        1.    A U.S. Congressman Accuses TransMedics Of Forcing Its Services Onto Transplant Hospitals, But Defendants Emphatically Deny The Claims, Insisting That Hospitals Always Have "The Final Say," And That TransMedics' Revenue Growth Was "Not Based On Anything Else" Other Than Its Highly Effective Products And Efficient Services ............................................... 21

        2.    A Surprise Decline In Revenue Raises Further Doubts, But Defendants Assure Investors That There Is "No Clear Reason" For The Decline Other Than "Summer Seasonality" ...................................... 25

    F.    The Truth Emerges As Scorpion Capital Publishes Its Bombshell Report .......... 28

        1.    The Scorpion Report Revealed That, Contrary To Defendants' Statements, Transplant Centers That Used The OCS Device Were Forced To Also Use TransMedics' Expensive NOP Services .................. 29

        2.    The Scorpion Report Revealed That TransMedics "Held [Transplant Centers] Hostage" To Pay For Their Excessive Services, And Engaged In Rampant Waste And Abuse Through Excessive Use Of Their Private Planes, Dramatically Increasing Costs For Hospitals ...................................................................... 32

   3. The Scorpion Report Revealed That, Contrary To Defendants' Claims, Transplant Centers Expressed Major Concerns About TransMedics' Costs, And Some Either Reduced Or Eliminated Their Use Of TransMedics' Services As A Result ..................................... 36

 G. Former Employees And Other Transplant Professionals Corroborate Key Allegations From The Scorpion Report .................................................................... 44

 H. Independent Data Analysis Further Supports The Conclusion That TransMedics' NOP Services Dramatically Increased Hospitals' Costs ............... 53

 I. Defendants Sold Over $45 Million Worth Of Stock In Highly Suspicious Sales During The Class Period ................................................................................ 56

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ......................................................................................................... 58

 A. TransMedics' 2023 Annual Report Filed On Form 10-K ..................................... 58

 B. TransMedics' Presentations At The March 6, 2023 Cowen Healthcare Conference And March 13, 2023 Oppenheimer Conference ................................. 59

 C. The September 11, 2023 Morgan Stanley Annual Global Healthcare Conference ............................................................................................................. 62

 D. TransMedics' 3Q 2023 Earnings Call .................................................................. 63

 E. TransMedics' February 26, 2024 Response Letter And Q4 2023 Earnings Report ..................................................................................................................... 64

 F. The March 4, 2024 Cowen Healthcare Conference And March 12, 2024 Oppenheimer Healthcare Conference ................................................................... 67

 G. TransMedics' Q1 2024 Earnings Call .................................................................. 70

 H. TransMedics' 2Q 2024 Earnings Call And September 2024 Morgan Stanley Healthcare Conference Presentation ....................................................... 71

 I. TransMedics' 3Q 2024 Earnings Call .................................................................. 74

 J. TransMedics' December 2024 Piper Sandler Conference Presentation And December 2024 Analyst Day .............................................................................. 76

VI. ADDITIONAL ALLEGATIONS OF SCIENTER ......................................................... 77

VII. LOSS CAUSATION ....................................................................................................... 81

 A. February 22, 2024 Corrective Disclosure ............................................................ 82

 B. October 28, 2024 Corrective Disclosure .............................................................. 83

 C. December 2, 2024 Corrective Disclosure ............................................................ 84

 D. January 10, 2025 Corrective Disclosure .............................................................. 85

VIII. PRESUMPTION OF RELIANCE .................................................................................. 86

IX.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE
       BESPEAKS CAUTION DOCTRINE ................................................................ 87

X.     CLASS ACTION ALLEGATIONS ................................................................ 88

XI.    CLAIMS FOR RELIEF ................................................................ 90

XII.   PRAYER FOR RELIEF ................................................................ 94

XIII.  JURY DEMAND ................................................................ 95

Lead Plaintiffs the Peace Officers' Annuity and Benefit Fund of Georgia and Oguzhan Altun (collectively, "Lead Plaintiffs"), by and through the undersigned counsel, bring this action for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-5, 17 C.F.R. § 240.10b-5, against TransMedics Group, Inc. ("TransMedics" or the "Company") and certain of its officers (collectively, "Defendants"). Lead Plaintiffs bring these claims on behalf of all persons or entities who purchased or otherwise acquired publicly traded TransMedics securities between February 28, 2023 and January 10, 2025, inclusive (the "Class Period"), and were damaged thereby.

Lead Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters. Lead Plaintiffs' information and belief as to allegations concerning matters other than themselves and their own acts are based upon, among other things, the investigation of Lead Plaintiffs and their counsel, which includes, without limitation: (a) review and analysis of public filings made by TransMedics with the U.S. Securities and Exchange Commission (the "SEC"); (b) review and analysis of press releases and other publications disseminated by Defendants (defined below) and other parties; (c) review of news articles, shareholder communications, conference calls, and postings on TransMedics' website concerning Defendants' public statements; (d) interviews with former TransMedics employees and other professionals within the organ transplant and procurement industry; (e) a letter dated February 21,2024 from U.S. Representative Paul A. Gosar to Defendant Waleed Hassanein; (f) a report concerning TransMedics published by Scorpion Capital on January 10, 2024; (g) data analysis provided by Lead Plaintiffs' healthcare economics expert; and (h) review of other publicly available information concerning the Company and the Individual Defendants.

1

Lead Plaintiffs' investigation into the factual allegations contained in this complaint is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Lead Plaintiffs believe that substantial additional evidentiary support will exist for the allegations in this complaint after a reasonable opportunity for discovery.

## I.    PRELIMINARY STATEMENT

1.    TransMedics is a medical technology company focused on the organ transplant industry. TransMedics' entire business is built around its Organ Care System ("OCS"), a portable, perfusion-based device designed to keep donated organs alive and functioning outside the human body until they reach their recipients. According to TransMedics, by keeping organs viable for longer than traditional cold storage, the OCS expands the pool of available organ donors for transplant patients and improves outcomes. Roughly 90% of TransMedics' business comes from its products designed for heart and liver transplants.

2.    Leading up to the Class Period, adoption of the OCS by transplant hospitals grew rapidly, and TransMedics revenue growth soared. However, TransMedics developed a major second revenue stream alongside its OCS product—a bundle of organ retrieval, transport and logistics services that it referred to as the National OCS Program ("NOP"). Through the NOP, TransMedics would not only offer its OCS devices to preserve donated organs, but would provide end-to-end logistics and transport of those organs, from providing surgeons to remove the organs, to flying the organs on TransMedics-owned private planes, to assisting with the OCS device at the transplant site. As such, by 2023, Defendants boasted that TransMedics had become "***the Amazon Prime of organ transplant***" through their NOP business.

3.    TransMedics' NOP business model proved to be highly lucrative—generating tens or even hundreds of thousands of additional dollars in revenue per transplant. Consequently,

2

TransMedics' service revenue—revenue from the NOP—grew faster than its product revenue, and thus by the beginning of 2024 made up nearly 40% of the Company's total revenue.

4.      Throughout the Class Period, Defendants assured investors that their "Amazon Prime" style NOP business model and rapid revenue growth were highly sustainable, and that TransMedics was primed for long-term success due to its "cost-efficient" model.  Indeed, Defendants repeatedly boasted of having "***the most cost-effective transportation in the history of organ transplant, period, full stop***."

5.      Moreover, to quell any concerns about whether transplant centers would continue to pay TransMedics' high costs, TransMedics' CEO, Defendant Hassanein repeatedly assured investors that such costs were no issue whatsoever for TransMedics' hospital customers, because all of those costs, no matter how high, were "***fully reimbursed***" by Medicare and private insurance. Indeed, in investor calls throughout the Class Period, Hassanein repeatedly insisted that "***[e]very NOP service charge is fully reimbursed. It's not even a close call***[.]"  Hassanein asserted that "***every charge around the NOP, from technology to surgical procurement to clinical management to transportation costs are all covered under the existing reimbursement mechanisms for organ transplant. So that is a fact***."  And even as analysts raised questions about whether high costs could hamper business, Hassanein only doubled down on his claims, insisting that "***[t]here is no limit***…***it's fully reimbursed. It's not a question of reimbursement***."

6.      Cracks in the Company's NOP business model began to show on February 22, 2024, when U.S. Representative Paul A. Gosar published a letter to Defendant Hassanein (the "Gosar Letter") that alleged that TransMedics was "***h[olding] hostage" a "lifesaving technology***" at excessive prices.  Among other things, the letter accused TransMedics of forcing hospitals to use their expensive NOP transportation and services if they wanted access to the Company's OCS

devices.  For example, as the letter charged, TransMedics would "***hold its device hostage, withholding access to their lifesaving technology unless hospitals agree to utilize TransMedics aviation's costly planes***" to transport organs and staff.

7.    However, Defendant Hassanein vehemently denied the Gosar Letter's allegations. As Hassanein insisted in a response letter, while "[y]our letter accused TransMedics of pressuring hospitals to utilize our more expensive logistics… ***[t]his couldn't be further from the truth.***" Instead, Hassanein insisted, hospitals had full control over whether they wanted to use TransMedics' NOP services because "TransMedics presents the logistics quotation to transplant centers using our NOP service," and "***[t]he transplant centers then have the final say on whether they want to use our services or not.***"

8.    Indeed, Defendant Hassanein assured investors that the sole reasons for the NOP's success were its purported cost-efficiency and superior outcomes, and that the program's growth was "***not based on anything else.***"  Specifically, Hassanein explained that the  "***sustained growth and success of [the] NOP is based solely on the operational efficiency to grow transplant volumes, highest level of clinical care of donor organs and the overall cost efficiency*** experienced by transplant programs across the United States.....The success of OCS NOP program is based on better clinical, economic and operational outcomes experienced by the transplant centers and ***not based on anything else.***"  And Defendants repeated similar reassurances throughout the ensuing months, insisting that "we are leaving the final decisions ***completely in the hands of the transplant program*** … ***it's up to the transplant program to say yay or nay whether or not they want to use TransMedics logistics***[.]"  And moreover, Defendants repeatedly assured investors that they were *"**not trying to gouge the system***[,]" with their pricing, and that "we don't look at transplantation as an opportunity for pricing leverage."

9.     Fueled by Defendants' representations, TransMedics' stock price achieved a Class Period high of $177.37 on August 23, 2024.  And Defendants profited handsomely, selling $45 million worth of their TransMedics' common stock—including several suspiciously timed, unplanned sales worth millions of dollars at prices near Class Period and all-time highs.

10.    However, Defendants' statements were entirely false and misleading.  In reality, as would soon be revealed, TransMedics' business model was not "the most cost-effective transportation in the history of organ transplant, period, full stop," or even close to it.  Moreover, TransMedics' success was not built "on better clinical, economic and operational outcomes experienced by the transplant centers" and "[nothing]… else."  And TransMedics' customers did not have the "final decisions" about whether to use the NOP "completely in [their] hands."

11.    Instead, just as the Gosar Letter had charged, TransMedics was engaged in a scheme to juice its revenue by *forcing* any transplant center that wanted access to its OCS technology to also use its NOP services.  Indeed, in many cases, TransMedics' transplant hospital customers were effectively "***held hostage***" to use those services, as they would be given little to no time to accept or reject an organ already in TransMedics' possession, and meanwhile TransMedics would give them no advance warning of the total logistics costs they would be billed for.  Nor were these costs "fully reimbursed" with "no limit," as many liver and heart transplant patients' insurances were in fact limiting the amount reimbursed to transplant centers for organ procurement services, thus harming hospitals' bottom line when they used TransMedics' expensive services, and raising the ire of surgeons and hospital administrators.

12.    The truth began to emerge on October 28, 2024, when Defendants reported a surprise ***5% sequential decline in their revenue***, as well as a decline in their profit margin.  Particularly striking was that Defendants had no clear explanation for the decline, blaming it solely

on "seasonality" in transplants, although seasonality had never previously been an issue for the Company's business.

13.   On this news, TransMedics' stock price plummeted $37.74 per share, or nearly 30%, from $126.24 on October 28, 2024, to close at $88.50 on October 29, 2024.

14.   Analysts raised concerns that TransMedics might be losing market share or business due to high costs or competition.  However, Defendants insisted that the decline had nothing whatsoever to do with any customers having issues with the high costs of TransMedics' services.  Instead, Hassanein claimed that TransMedics' revenue decline was "directly in line with the decline in national transplant volumes," and asserted that there were no other causes for the decline. As Hassanein emphatically stated, "*I want to make it crystal clear. We have not seen any fundamental or competitive dynamics playing any role* in the slight sequential decline in case volume for OCS in Q3*.  Let me repeat it again, there has not been or we have not seen any fundamental or competitive dynamics playing any role* in the slight sequential decline in case volume for OCS in Q3."   Indeed, seeking to remove any doubt, Hassanein "*caution[ed] the Street from trying to create something out of nothing*," because, as he insisted, "[p]rice elasticity or pricing pressure has nothing to do with what happened in Q3[.]"

15.   However, further cracks emerged when, just six weeks later, on December 2, 2024, TransMedics suddenly and unexpectedly announced that its CFO, Defendant Gordon, had been removed from his position *effective immediately* and had already been replaced with a new CFO. On this news, TransMedics' stock price fell another 16%.  Multiple analysts reported their "*surprise*" at the sudden removal, noting that "*CFO transitions are typically not good*" and that "*[t]he last six weeks were turbulent for TMDX*," particularly due to the "*weaker 3Q earnings*" reported on October 28, 2024 "*and a last minute CFO change*."

16.     The full truth emerged on January 10, 2025, when an established short-seller and researcher known as Scorpion Capital published a bombshell report (the "Scorpion Report") exposing that TransMedics' business was built on unsustainable and improper business practices. The Scorpion Report spanned over 340 pages and was based on a six-month investigation comprising interviews with over 30 transplant surgeons, major hospital executives, organ procurement professionals and former TransMedics employees.  In exacting detail, the Scorpion Report revealed that, in direct contrast to Defendants' claims that "[t]he success of OCS NOP program is based on better clinical, economic and operational outcomes experienced by the transplant centers and *not based on anything else*[,]" the exact opposite was true:  TransMedics was engaged in a bevy of improper practices that juiced its revenues in the short term but were alienating transplant hospitals and harming business long term.

17.     For example, the Scorpion Report revealed that, contrary to Defendants' repeated insistence that it was "up to the transplant program to say yay or nay whether or not they want to use TransMedics logistics," in reality TransMedics' customers were *required* to use its entire suite of NOP services—from TransMedics' surgeons and technicians to its expensive private jets—if they wanted access to the OCS technology.   A former TransMedics' reimbursement executive stated that this was "*policy*" of TransMedics, *i.e.* that transplant centers "*were not allowed to buy [TransMedics' OCS products] unless they used the national program [i.e. the NOP]*."  Similarly, one transplant director interviewed lamented that TransMedics was "*charging a lot of money for not only the device but also their NOP program, their aviation company - all the stuff that they've rolled in and they tried to force it down everybody's throat* that to use their liver device, you had to do everything."  The transplant director analogized it to "*a price-fixed dinner [where] you couldn't do a la carte*," because TransMedics would not allow use of their devices without the

overpriced NOP services.  And a transplant cardiologist corroborated these practices, noting that they were causing his hospital to move away from using TransMedics, i.e. "thing that's *really driven us away* is *they were essentially mandating, requiring you to use their surgeons and their procurement teams for these hearts*."

18.    Additionally, the Scorpion Report revealed that TransMedics engaged in rampant waste and abuse with their NOP logistics program, including excessive use of their expensive private planes, and that TransMedics' customers were "*held hostage*" to pay for these excessive costs, often without even knowing in advance what the charges would be.  Indeed as one organ procurement executive explained, TransMedics "*won't move a finger unless somebody commits [in advance] to paying, not just for [TransMedics] but all the extra mystery fees that you might get…it's all these mystery fees that you don't really know how many flights you're going to pay* for until they tell you how many flights they've used."  Indeed, in one such case, TransMedics ran up $300,000-$400,000 in unexpected invoices and, when the hospital had yet to pay, Hassanein personally called the hospital and "*g[ave] them 48 hours to pay all of these flight charges that they never agreed to pay…And essentially t[old] them that they [we]re going to shut off access to the [OCS] machine to them*."

19.    A University of California-San Francisco hospital administrator complained that he "*hate[d] paying for private jets to fly [TransMedics'] surgeons all over.*"  As he elaborated, "the transportation *felt ridiculous because they couldn't tell us what the rates were.* Basically, we just get a piece of paper, an invoice that says you owe us [] for this flight going from here to here. It doesn't say anything about what kind of aircraft it was, how long was it in the air—all this stuff. It's just a number*. They could have just made it up.*"  And a former TransMedics OCS specialist similarly confirmed this practice of widespread, seemingly nonsensical use of excessive airplane

flights just for the sake of billing more to customers.  As the OCS specialist put it, "*[w]hy are you flying a team from Texas or from California when we have a full team of 10 people up here waiting to do cases*?"  The answer was clear: "*they are utilizing their aircraft to bill for the aircraft…[i]t's just entirely unethical*."

20.     Moreover, contrary to Defendants' repeated claims that their costs were no issue whatsoever for hospitals because they were "fully reimbursed," numerous witnesses interviewed by Scorpion Capital told the opposite story.  Indeed, a Vanderbilt University transplant surgeon expressly and directly contradicted these claims, explaining: "*I understand that TransMedics, they're going to tell you, this is going to be covered by Medicare and by private insurance and yadda, yadda*[,]" but that "*[t]he reality is that right now… you get paid about 50-60% of the cost*."  The surgeon emphasized that this was "*not sustainable for a transplant center*."  And other surgeons and hospital administrators similarly confirmed that they would "lose money" if they used TransMedics too much, and that hospitals "*could be eroding a significant amount of [their] profit at the transplant center if [they] were using their NOP program soup-to-nuts*."  Indeed, several hospitals were reported to be "*getting away from [TransMedics] because it's just so darn expensive*," and even "*making an effort to not use it at all*."

21.     And significantly, the Scorpion Report revealed that hospitals raised these concerns directly with Defendant Hassanein—who rebuffed them.  Indeed, Duke University Hospital even made a presentation at a meeting attended by Hassanein concerning the massive "hit" they took to their bottom line from TransMedics' services.  And a Massachusetts General Hospital executive described how he had had "very candid conversations" with TransMedics' senior executives on a regular basis about TransMedics' overcharging and improper forcing of services, whereby he

would "***go straight up to their leadership, and say, this is not what we discussed***, ***and we either need to end this or address this***[.]"

22.     On the revelations of the Scorpion Report, TransMedics' stock price plummeted another 12%, from $72.55 per share to $64.05 per share—thus falling to just 36% of its Class Period high mere months earlier.

23.     Additional confidential witnesses—including former TransMedics employees and prominent transplant surgeons and professionals—have only further corroborated the details of the Scorpion Report.  For example, a UPMC Operations Director confirmed that it was absolutely not the case that TransMedics' exorbitantly priced services were "fully reimbursed" by commercial insurance, which in reality insurance only paid a fixed rate per transplant, *i.e.*, "***[t]he problem is when you go to your commercial insurances, they don't care what your expenses to get the organ, they're still going to pay you the same case rate they agreed to. Our reimbursement number currently doesn't change***."  The UPMC director explained that, due to TransMedics' requirement that hospitals use their logistics services, "***[t]he costs are night and day***[,]" between TransMedics and other options, because, even if an organ is locally available, "I have to fly a TransMedics team in…where[as] if I have a local team, I'm eliminating the flight and the cost of [TransMedics'] machine and really the cost of their surgeon, too, and doing it for much less***."***

24.     A director at Buckeye Transplant Services similarly confirmed that, in direct contrast to TransMedics' claims that "it's up to the transplant program to say yay or nay whether or not they want to use TransMedics logistics," the exact opposite was true, *i.e.* "…***[y]ou cannot just have the device, you have to have their specialists.*** No matter what, you're going to have their specialist fly out to the organ recovery and either meet your team who's doing the recovery and fly back, or you're going to pay for their surgeon to go out and do that, and both are very

expensive." An organ coordinator at a major southern United States hospital referred to TransMedics as the "**TransMedics Mob**" due to their "**strongarming**" tactics, and described flight charges of $50,000 or even $75,000, plus an additional $20,000 for TransMedics surgeons, in situations where his hospital could have sent its own surgeons at cost and paid only $15,000 for third-party flight services. And a former TransMedics OCS specialist confirmed that, due to these high logistics costs, hospitals in a major market had reduced or cancelled their TransMedics usage in 3Q 2024, contributing to the steep revenue decline reported on October 28, 2024.

25.    In total, Defendants' fraud wiped out over $3.6 billion of market capitalization. This action seeks redress for investors' losses.

## II.    JURISDICTION AND VENUE

26.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

27.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

28.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b), Section 27 of the Exchange Act (15 U.S.C. § 78aa(a)). TransMedics maintains its headquarters in this jurisdiction, and many of the acts and transactions alleged herein, including the dissemination of materially false and misleading statements, occurred in substantial part in this District.

29.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchanges.

### III.    PARTIES

#### A.    Lead Plaintiffs

30.    Lead Plaintiff the Peace Officers' Annuity and Benefit Fund of Georgia ("Georgia Peace Officers") is a defined-benefit public pension fund that provides pension and other benefits for more than 20,000 current and former state peace officers and their beneficiaries.  Georgia Peace Officers manages approximately $920 million in assets.  As reflected in its PSLRA certification (ECF No. 22-1), Georgia Peace Officers purchased TransMedics securities during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

31.    Lead Plaintiff Oguzhan Altun is an individual and resident of Geneva, Switzerland. As reflected in his PSLRA certification (ECF No. 22-1), Mr. Altun purchased TransMedics securities during the Class Period and suffered damages as a result of the federal securities laws violations and false and/or misleading statements and/or material omissions alleged herein.

#### B.    Defendants

32.    Defendant TransMedics is incorporated under the laws of Massachusetts with its principal executive offices located in Andover, Massachusetts.  The Company's shares trade on the NASDAQ under the ticker symbol "TMDX".

33.    Defendant Waleed Hassanein, M.D. ("Hassanein") served as the Company's Chief Executive Officer ("CEO") and President at all relevant times.  He also founded the Company.

34.    Defendant Stephen Gordon ("Gordon") served as the Company's Chief Financial Officer ("CFO") until he was removed from that position on or about December 2, 2024.

35.    Defendants Hassanein and Gordon are collectively referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions in the Company, possessed the power and authority to control the contents of the Company's reports to the SEC,

press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors. Each of the Individual Defendants was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

## IV.    OVERVIEW OF THE FRAUD

### A.    TransMedics' OCS Technology Expands The Transplant Market, Fueling Rapid Growth

36.    TransMedics is a commercial-stage medical technology company whose sole product is the Organ Care System ("OCS")—a device designed to preserve donated organs for transplantation.  The OCS uses a process known as normothermic perfusion to replicate certain aspects of the organ's natural functioning while it is outside of the human body, so that organs can travel longer distances and remain outside of a body for longer periods of time before transplant, and enables the potential use of organs that might otherwise have been considered unsuitable for transplantation.

37.    The OCS system includes a portable electromechanical console, which houses and controls the perfusion process, and a single-use perfusion set (also called a "cassette") that contains and circulates blood or perfusate through the organ. TransMedics' product revenue is driven primarily by the sale of these disposable perfusion sets, which are reportedly priced at approximately $60,000 each.

13

38.     TransMedics has FDA-approved OCS devices for three organs: heart, lungs, and liver.  TransMedics' revenue is driven primarily by the liver and heart platforms, with liver accounting for more than 60% of revenue, heart for more than 30%, and lung for less than 10%.

39.     The liver and heart transplant markets are particularly significant for OCS because of the nature of the devices and the ways in which they impact transplants. Specifically, until recent years, all heart transplants and most liver transplants were performed using organs from donors declared dead by neurological criteria—also known as donation after brain death ("DBD").  In DBD cases, after a patient is declared brain dead, circulation is maintained through life support until the heart or liver can be recovered, preserving the organ's viability through continued oxygenated blood flow.

40.     However, brain death occurs relatively infrequently and therefore significantly limits the donor pool for heart and liver transplants. In most hospital deaths, patients experience circulatory death—cardiac arrest—before meeting criteria for brain death.  In these cases, once the heart stops, warm ischemia—the deprivation of oxygenated blood at body temperature—rapidly damages the heart and, to a lesser extent, the liver, often rendering them unsuitable for transplantation using conventional preservation methods.  Thus, TransMedics' OCS device has engendered greater use of organs donated after circulatory death ("DCD"), because it allows clinicians to preserve, assess, and in some cases resuscitate DCD organs that would otherwise have been deemed unsuitable for transplant.

41.     Consequently, after TransMedics' OCS devices were approved (in 2021 for liver and in 2022 for heart), the market for DCD liver and heart transplants grew rapidly, and TransMedics' revenue skyrocketed.  Indeed, from 2021 to 2022, TransMedics' product revenue

increased by nearly 170%—from roughly $30 million to roughly $80 million—and then grew another 120% in 2023, to $176 million.

42.     TransMedics' costs are paid by the transplant hospital serving the patient that receives the organ transplant.  TransMedics' costs are then indirectly reimbursed (to the transplant hospital) by either Medicare or commercial insurance.  While Medicare reimburses for "reasonable costs" related to organ acquisition and transport, commercial insurance providers more typically pay a capped amount per transplant, regardless of costs.

**B.     TransMedics Launches "The Amazon Prime Of Organ Transplant"**

43.     While sales of OCS products were lucrative for TransMedics and fueled revenue growth, by 2023, TransMedics had created a substantial additional revenue stream.  Specifically, TransMedics had developed a full-service program for retrieval and transport of donor organs.  TransMedics dubbed its transplant logistics and services program the "National OCS Program" or "NOP."

44.     Through the NOP, TransMedics would purportedly provide full-service, end-to-end retrieval and delivery of donor organs to their recipients—sending surgeons and technicians to remove the organs, providing air and ground transport for the organ from the donor site to the recipient site, and offering additional on-site assistance with the OCS machine at the recipient site.  As such, by 2023, Defendants proclaimed that, through the NOP, TransMedics had become "***the Amazon Prime of organ transplant.***"

45.     Indeed, in a January 12, 2023 investor conference, Defendants announced that they were no longer merely in the business of selling their OCS devices but that they had created "***a whole new paradigm***[,]" with NOP.   As Defendant Hassanein explained:

> [W]e developed a technology, we FDA approved it. We demonstrated significant clinical value, but we didn't stop here, and this is very important for us and near and dear to us. We didn't stop here because we recognized very quickly with the commercialization of our

15

first organ, which was the lung that the system doesn't have enough resources to be able to double the organ transplant market with the current way or the historical way of doing organ transplant. So TransMedics jumped in as we always do and ***created a whole new paradigm***. Think of what I'm going to talk about now, which we're calling the NOP or the National OCS program. ***Simply stated, TransMedics is creating the Amazon Prime model for organ transplant under the NOP***, that is what we are doing.

46.    Hassanein further explained that this model would help to "maximize transplant volume" for transplant centers while "enhanc[ing] their clinical outcome[s]" and "reduc[ing] the learning curve that happens when you're using a very sophisticated technology in the hands of a very busy transplant program[,]" (i.e. by providing TransMedics' own staff to operate the device). Consequently, Hassanein assured investors that transplant centers would flock to use TransMedics' NOP service because it would lead to "significant revenue and volume growth" for the transplant centers "without the historical limitations that existed in transplantation, time, distance, infrastructure barriers, resource barriers."

47.    Hassanein emphasized that this "Amazon Prime model" would provide everything needed for "the entire process" of transplants from beginning to end, from a surgeon to obtain the organ from the donor, to air and ground logistics to transport it, to personnel to assist with the OCS device and the transplant on site.  As Hassanein explained:

> ***This is the Amazon Prime of organ transplant***. TransMedics is working hand in hand with major transplant programs across the United [States] and major organ procurement organizations across the United States...We get a call, we mobilize 3 things. We mobilize a surgeon, a clinical specialist technology and organize all logistics, air and ground. We go to Anchorage, Alaska to procure heart, lungs and liver, bring them all the way to Tampa... ***We take care of the entire process***.

48.    Moreover, Hassanein claimed this program would supercharge revenue and profitability, given the "premium" the Company charged for the service costs.  And, indeed, Hassanein assured that there was no reason to be concerned about whether hospitals would pay

these costs, because "all" of the associated costs were "***reimbursed 100%***" as a "pass-through" to either Medicare or private insurance.  As he explained:

> … [F]rom a business model perspective, ***we charge for our technology costs. In addition, we have a premium for the service cost. The logistics cost air and ground is a pass-through to the transplant program as they do today. All the costs associated with the NOP technology and service are all reimbursed 100%*** by both CMS and commercial payers. There are reimbursement mechanisms in place. We don't have to create a new DRG or a new CPT or anything like that. Organ transplant is very unique because of the huge economical benefit of an organ transplant, and ***everything we talked about is fully reimbursed***.

49.    Consequently, Hassanein touted the NOP as "***the major catalyst for our growth in 2022***[,]" and would only fuel further growth going forward, such that the Company was "just getting started":

> So, you see the growth. You say, okay, TransMedics is this it? ***Did you reach the pinnacle? We think absolutely not. We're just getting started***. This performance that I just shared with you represent less than 5% penetration of the existing market. And we have a long runway to even double that market. To give you an example, the current market is about 15,000 transplants between lung, heart and liver. We're going to probably end 2022 with 1,000 or 1,100 transplant. That gives you the magnitude. ***We have a long runway of growth***.

50.    As such, Hassanein concluded his remarks by touting both the purportedly "disruptive technology" and also the "first and best of its kind, unique, integrated NOP solution that nobody can replicate easily[,]" meaning that it was "just the beginning of a multiyear long runway of growth for TransMedics" with a "multibillion-dollar market opportunity[.]"

**C.    Throughout The Class Period Defendants Assured Investors That They Were Delivering Highly "Cost-Effective" Transplant Services, And That TransMedics' Costs Were Of No Concern To Hospitals Because They Were "Fully Reimbursed"**

51.    Throughout the Class Period, Defendants repeatedly insisted on the "cost-effectiveness" of their NOP services, even touting the NOP as "***the most cost-effective transportation in the history of organ transplant, period, full stop***."  Moreover, Defendants repeatedly sought to quell any concerns that the costs of their NOP services might be too high for

some hospitals, insisting that "*[e]very NOP service charge is fully reimbursed. It's not even a close call*[.]"

52.    For example, at the start of the Class Period, on February 27, 2023, in the Company's 2022 annual report filed on Form 10-K with the SEC, TransMedics boasted that providing cost-efficiency to transplant centers was the entire purpose of the NOP, i.e. that "*[o]ur National OCS Program was developed to provide a more efficient process to procure donor organs with the OCS*."

53.    Defendants also repeatedly assured concerned analysts that hospitals had no problem whatsoever getting reimbursed for NOP costs, such that those costs were a non-issue for TransMedics' revenue growth.  For example, on March 6, 2023, at the Cowen Healthcare Conference, an analyst wondered about "[transplant] centers potentially being worried, I mean *everyone is worried about getting paid for expenses and on the NOP side, specifically the service fees*."  But Hassanein responded that this was a non-issue for TransMedics and its customers because "*[e]very NOP service charge is fully reimbursed. It's not even a close call,* everything we do in the service model is exactly what the transplant programs have been doing for the last four decades. *So, that's not a question at all*."  And similarly, a week later at the March 13, 2023 Oppenheimer Healthcare Conference, Hassanein insisted that "one important fact [is] that *every charge around the NOP, from technology to surgical procurement to clinical management to transportation costs are all covered under the existing reimbursement mechanisms for organ transplant. So that is a fact*."

54.    Meanwhile, the NOP became a critical source of revenue growth for TransMedics. Indeed, service revenue grew far faster than product revenue, and, by the end of 2023, growth in service revenue (i.e. revenue from the NOP) made up the majority of TransMedics' revenue

growth.  As such, service revenue grew from 15% of total revenue in 2022 to roughly 36% of total revenue by the end of 2023.

| | Total Revenue (in millions) | Product Revenue | Product Revenue Percent of Total | Service Revenue | Service Revenue Percent of Total |
|---|---|---|---|---|---|
| FY 2022 | $93.46 | $79.23 | 84.78% | $14.23 | 15.22% |
| Q1 2023 | $41.55 | $33.99 | 81.80% | $7.56 | 18.20% |
| Q2 2023 | $52.47 | $42.46 | 80.93% | $10.00 | 19.07% |
| Q3 2023 | $66.43 | $47.74 | 71.87% | $18.69 | 28.13% |
| Q4 2023 | $81.20 | $51.90 | 63.92% | $29.30 | 36.08% |

**D.    Defendants Supercharge The NOP—And Their Fraud—By Purchasing Their Own Fleet Of Private Planes For Personnel And Organ Transport**

55.    On August 1, 2023, TransMedics announced another major step in its purported transformation into the "Amazon Prime of organ transplant."  Specifically, TransMedics announced that it had signed a definitive agreement to acquire Summit Aviation, a charter flight operator, such that TransMedics would now be able to offer its own planes to fly organs to transplant sites, and to fly its own teams of technicians and surgeons to donor sites.  At roughly the same time, TransMedics also acquired two new fixed-wing airplanes (and would subsequently acquire roughly 18 additional airplanes over the course of the Class Period).

56.    In a press release issued on August 1, 2023, Defendants Hassanein touted the Summit Aviation acquisition as creating, within TransMedics, "the first national provider of air logistics dedicated to organ transplantation in the U.S.,"—which it dubbed TransMedics Aviation.[1]

57.    In the Company's first earnings call following the acquisition, on August 3, 2023, Defendants touted the new aviation business as critical to the growth of the NOP and the Company's revenue.  As Defendant Hassanein explained, "[o]ur goal is to control the entire end-

---

[1] The acquisition would close just two weeks later, on August 15, 2023.

to-end process of donor to recipient logistics, to directly manage all NOP transplant volume in the U.S. by the second half of 2024." To that end, TransMedics was creating "8 dedicated aviation hubs" from which a growing fleet of TransMedics-owned planes would be deployed to donor and transplant sites, which would be "capable of covering 100% of the Continental U.S."

58. Critically, the addition of TransMedics' own fleet was designed to supercharge their own revenue and profit, as, now, instead of merely chartering planes from others and charging a "premium" for the service, TransMedics owned and controlled the entire process from end-to-end, and thus could purportedly earn higher margins by billing for flights on its own private jets.

59. In light of the high costs of these services, analysts continued to express concern as to whether Medicare or commercial insurance might deny reimbursement for some of these costs, and, in turn, whether hospitals might balk at using TransMedics' NOP due to cost. But in response to these analyst concerns, Defendants continued to adamantly reassure investors that there was no risk to their revenue or business model because every service TransMedics provided was "*fully reimbursed*."

60. For example, on November 6, 2023, during the Company's Q3 2023 earnings call, a Canaccord Genuity analyst asked Defendant Hassanein to give a clearer explanation of how much revenue hospitals could expect to pass through to commercial or government payors for reimbursement when it came to the Company's aviation services. In response, Defendant Hassanein adamantly insisted that aviation was "*fully reimbursed*" and, indeed, that "*there is no limit*" on reimbursement:

> **William John Plovanic, Canaccord Genuity Corp**.: And I mean, we don't have visibility into the metrics, but just a ballpark. On average, what's a typical case revenue that gets -- that you've seen kind of push through the hospitals to reimburse for an average case … the revenue for aviation specifically, how should we think about that?
>
> **Hassanein**: *This is not a question. This is a fact of organ transplant. Old aviation and logistics transport are fully reimbursed through the same mechanism of organ*

*acquisition. There's no limit per se*. In fact, we are doing this because we believe we could be more efficient and pass some of the efficiencies back to the transplant program. So *I do not want anybody on this call to think that the aviation business is not reimbursed through normal mechanisms of organ transplant. There is no limit. There is no specifics*. If the center feels that it's too expensive, they would ask for another [quote] or get from another vendor. *But it's fully reimbursed. It's not a question of reimbursement*. It's a question of making sure that we have the fleet, the efficiencies, the support team to be able to cover the missions.

**E.    The Truth Begins To Emerge**

        **1.    A U.S. Congressman Accuses TransMedics Of Forcing Its Services Onto Transplant Hospitals, But Defendants Emphatically Deny The Claims, Insisting That Hospitals Always Have "The Final Say," And That TransMedics' Revenue Growth Was "Not Based On Anything Else" Other Than Its Highly Effective Products And Efficient Services**

61.    On February 21, 2024, U.S. Representative Paul A. Gosar of Arizona ("Rep. Gosar") sent and published a letter to TransMedics (and personally addressed to Defendant Hassanein) raising serious concerns that TransMedics was engaging in "anti-competitive business practices" and was "h[olding] hostage" a "lifesaving technology."  The Gosar Letter was released to the news website The Daily Caller, which published the letter and an article about its contents on the morning of February 22, 2024.

62.    The Gosar Letter raised several serious charges about TransMedics' practices. *First*, the Gosar Letter alleged that TransMedics had instituted minimum volume requirements, whereby transplant centers who had participated in trials of the OCS "were then mandated by TransMedics to utilize the OCS no less than three to five times per month," and, among other things, would not be offered more one-time use perfusion cassettes for purchase if they failed to maintain the volume.  *Second*, the Gosar Letter stated that TransMedics dramatically hiked the price of its disposable perfusion cassettes to more than $60,000 per disposable cassette once its FDA trials were completed.

63.    *Third*, the Gosar Letter stated that, rather than continuing to train transplant center employees to use the OCS, TransMedics was now requiring them to use TransMedics' "own team of individuals as the sole source for any initiation of the OCS device" under the NOP, including surgical recovery teams that, alone, added $20,000 to the cost.  *Fourth*, the Gosar Letter charged that "*[i]n addition to the significantly increased costs borne by transplant centers to utilize the device itself, TransMedics is pressuring hospitals to utilize their more expensive aircraft*, not only for transportation of organs, but also for the convenient movement of their staff and equipment."   Indeed, in some cases, TransMedics would even "*hold its device hostage, withholding access to their lifesaving technology unless hospitals agree to utilize TransMedics aviation's costly planes*."

64.    The letter further explained that "TransMedics is not a collaborative partner in transplantation as administrators continue to push back against its coercive tactics," but that it seemed that "TransMedics is more dedicated to driving its profits at the unfortunate expense of the United States taxpayers and patients who need services the most."

65.    However, Defendants vehemently denied the allegations in the Gosar Letter. Specifically, on February 26, 2024, Defendant Hassanein published a letter (the "Response Letter").  The Response Letter denied the Gosar Letter's claims that the Company had pressured transplant centers into using their overpriced logistics services as a condition of access to their OCS products, claiming that this "*couldn't be further from the truth*" because transplant centers have the "*final say*" on using TransMedics' NOP services:

> Your letter accused TransMedics of pressuring hospitals to utilize our more expensive logistics. *This couldn't be further from the truth*. TransMedics presents the logistics quotation to transplant centers using our NOP service. *The transplant centers then have the final say on whether they want to use our services or not*.

66.    Indeed, Defendant Hassanein insisted that Transplant Centers' use of the NOP service was not only entirely voluntary and free of coercion, but was wholly due to the NOP's "*efficient cost profile*" and better outcomes, stating that "[o]ver the past 24 months, more and more centers elected to transition to NOP *due to its more efficient cost profile, better clinical outcomes, and the ability to increase their transplant volumes without surgical fatigue of their staff*." Hassanein claimed that this was because "[t]he NOP program was created to….[r]educe the fixed infrastructure and resources costs required of transplant centers to manage the OCS technology to access more donor organs and grow their overall transplant volume" and to "[p]rovide a better way to minimize fatigue and manage work-life balance of the surgical and clinical staff of the transplant centers."

67.    Defendant Hassanein again denied the Gosar Letter's allegations during the Company's 4Q and FY 2023 earnings call on February 26, 2024—the same day Hassanein published the Response Letter.  Specifically, Hassanein asserted, during the call that the Gosar Letter "*contains serious accusations, which are grossly inaccurate, unfounded and based on wrong information*.":

> *This letter contains serious accusations, which are grossly inaccurate, unfounded and based on wrong information. Let me repeat again. This letter contains serious accusations, which are grossly inaccurate, unfounded and based on wrong information*….This letter came out of left field. It was not supported by any facts. It was complete -- completely unfounded.....I don't know where this letter -- how this letter came about other than it appears that there's some misinformation being propagated but our response is pretty strong, and it was designed as such to make sure that if anybody wants to go down the same path that they need to know exactly the facts before they come and levy these accusations against TransMedics.

68.    Additionally, Hassanein attempted to quell concerns that TransMedics' growth was due to strongarming or unfair anticompetitive tactics, e.g. forcing hospitals to use TransMedics' NOP services in order to get access to the device.  Indeed, Hassanein asserted that the Company's

"growth and success" was "based solely" on the value of their product and services and "*not based on anything else*":

> We are confident that ***this sustained growth and success of NOP is based solely on the operational efficiency to grow transplant volumes, highest level of clinical care of donor organs and the overall cost efficiency experienced by transplant programs across the United States.....The success of OCS NOP program is based on better clinical, economic and operational outcomes experienced by the transplant centers and not based on anything else***.

69.     Defendants then continued to repeatedly make similar reassurances during the ensuing months, insisting that TransMedics' growth was solely due to the value of its OCS product and NOP services, and that TransMedics was not engaging in any coercive tactics or price gouging whatsoever.  For example, during a March 12, 2024 investor conference, Hassanein asserted that "***we are leaving the final decisions completely in the hands of the transplant program***. We offer quotes for the logistics for every mission that we get through the NOP, and ***it's up to the transplant program to say yay or nay whether or not they want to use TransMedics logistics***[.]"  Instead, Hassanein claimed, "[w]e want to make sure that our service, ***our world class service and our availability and our pricing is what brings you back to using TransMedics logistics***. ***So that's what have we been implementing to date. So it's up to them whether or not they use us or not***."  Hassanein further assured that the goal of their program was to "reduce cost" and that "***[w]e're in this not to gouge the system***."

70.     Similarly, in the Company's Q1 2024 earnings call on April 30, 2024, Hassanein touted the "rapid pace by which we went from 0 to 105 customers using our TransMedics logistical services[,]" attributing this to "***the more efficient cost structure and the availability that is afforded by TransMedics logistics***."  And during the Company's 2Q 2024 earnings call on July 31, 2024, Defendant Gordon similarly emphasized that "***we're not trying to gouge the system. We have a pricing model that works***."  And Hassanein reaffirmed that "***we don't look at***

*transplantation as an opportunity for pricing leverage*[,]" explaining that, instead "[w]hat we are focusing on is growing the overall national transplant volume. We're growing our market share in the existing transplant volume. We are comfortable with our current pricing model. We want to be a trusted partner to transplant programs. This is a very important aspect of our mission. ***We're not in this to just capitalize on leverage***."

**2.    A Surprise Decline In Revenue Raises Further Doubts, But Defendants Assure Investors That There Is "No Clear Reason" For The Decline Other Than "Summer Seasonality"**

71.    On October 28, 2024, after market hours, Defendants stunned the market with a steep drop in revenue and profit margin. Specifically, in reporting its 3Q 2024 earnings that day, TransMedics reported total quarterly revenue of $108.8 million, representing a ***5% sequential decline*** from the prior quarter. Moreover, the Company's gross profit margin declined by 5 points from the prior quarter.

72.    Particularly striking was that 100% of the revenue decline was due to a decline in *product revenue*, *i.e.* revenue from the Company's OCS devices and disposable cartridges. Service revenue—i.e. revenue from the NOP services—had actually risen very slightly. This implied that TransMedics devices were being used in fewer transplants (since the product cost per transplant had stayed the same), while TransMedics was gouging hospitals even more per transplant for its NOP logistics services on each of those transplants.

73.    During TransMedics' earnings call that day, Defendant Gordon acknowledged that the Company saw "a pause in our consistent sequential growth trajectory that we have maintained since our initial commercial launch[.]" Defendant Hassanein similarly confirmed that "we need to continue to grow our penetration and overall market[,]" to reach the Company's growth goals, but "[u]nfortunately, in Q3, that never -- that didn't happen."

25

74.     On the news of TransMedics' revenue decline, the price of TransMedics stock fell $37.74 per share, or nearly 30%, from $126.24 on October 28, 2024, to close at $88.50 on October 29, 2024, on unusually high volume.

75.     Nonetheless, Hassanein blamed the Company's sudden decline in revenue on "seasonality," and adamantly denied that it was related to problems in the Company's own business, insisting that "we did not see any degradation of our market share or center penetration on all three organs."  Specifically, as Hassanein asserted:

> [L]et me discuss the revenue and case volumes. In Q3, overall U.S. national liver and heart transplant volumes declined sequentially approximately 5%, while total lung volumes declined by approximately 3% in the U.S. ***There is no clear reason for these declines other than normal variability of donor availability and potential summer seasonality***. So the sequential decline in the U.S. case volume was directly in line with the decline in national transplant volumes. Importantly, ***we did not see any degradation of our market share or center penetration on all three organs***.
>
> ***I want to make it crystal clear. We have not seen any fundamental or competitive dynamics playing any role in the slight sequential decline in case volume for OCS in Q3. Let me repeat it again, there has not been or we have not seen any fundamental or competitive dynamics playing any role in the slight sequential decline in case volume for OCS in Q3***.

76.     Analysts noted that the poor results were "quite a shock" given Defendants' prior statements, and expressed that they were "struggling to understand" what had happened to TransMedics' growth.  Following the call, analysts continued to show surprise at TransMedics' sudden plunge in performance, and expressed skepticism about Defendants' "seasonality" excuse. Baird reported that "***TMDX's miss came as a surprise***[,]" and complained that management had been unable to explain the poor results, noting that it remained "***unclear why revenue diverged materially from our…estimates, especially following several quarters of mid-to-high-teens beats***[.]"  JPMorgan opined that the news raised "***[m]ore [q]uestions [t]han [a]nswers***[,]" and similarly doubted management's explanations of its poor performance.  For example, while management had been "adamant" that TransMedics wasn't losing ground in the transplant market,

JPMorgan noted that "*this raises more questions around why growth would slow to market levels so suddenly, especially for Liver*[,]" and called this phenomenon "*hard[] to explain, especially if competitive dynamics weren't a headwind to growth this quarter*."

77.    Strikingly, Oppenheimer analysts did their own "math" and estimated that, in contrast to Defendants' claims during the call, TransMedics most likely *had* lost market share in liver and heart.    As such, the Oppenheimer analyst observed that TransMedics' "*share gain trajectory of last 12 quarters is broken*," and that, as such, Defendants' "*commentary explaining [the] sequential downtick [in revenue] is a head scratcher*[.]"    And Piper Sandler similarly observed that while management "were emphatic that they are not losing share to competitive perfusion products or NRP[,]" it was "*just the fact mathematically*" that TransMedics likely experienced "*some share loss*."

78.    On December 2, 2024, TransMedics again surprised the market by announcing the sudden and unexpected removal of Defendant Gordon as CFO and his immediate replacement with a new CFO.    Indeed, in a move highly unusual for replacement of executive officers, Defendant Gordon was replaced as CFO *as of December 2, 2024—the date of the press release*.    Analysts noted their concern at the sudden and unexpected change of CFOs.    Piper Sandler analysts noted that "*we admit that CFO transitions are typically not good and, candidly, were surprised*..." William Blair similarly noted that "*[t]he CFO transition comes as a bit of a surprise to us*[.]" Morgan Stanley's December 12, 2024 report lamented that "*The last six weeks were turbulent for TMDX*, inherently lowering expectations for 2025 and beyond," and particularly noted the "*weaker 3Q earnings*" reported on October 28, 2024 "*and a last minute CFO change that came with a 2024 sales guide trim*

79.    On this news, the price of TransMedics stock fell $13.70 per share, or nearly 16%, from $85.14 on December 2, 2024, to close at $71.44 on December 3, 2024.

**F.    The Truth Emerges As Scorpion Capital Publishes Its Bombshell Report**

80.    On January 10, 2025, a short-seller and researcher known as Scorpion Capital[2] published a bombshell, 342-page report that exposed the truth about TransMedics' unsustainable business model.   The Scorpion Report was the product of a six-month investigation that featured over 30 interviews, including with ex-employees, surgeons, leading transplant centers, organ procurement organizations, competitors, and TransMedics' largest customers.

81.    As the Scorpion Report revealed, contrary to Defendants' public statements, TransMedics' growth had *not* been built on providing "the most cost-effective transportation in the history of organ transplant," but on a far-reaching scheme to overbill hospitals by bundling extravagant and often unnecessary logistics services from the NOP with its OCS technology.

82.    Indeed, in direct contrast with Defendants' insistence that the decision to use NOP services was always "completely in the hands of the transplant program," the Scorpion Report revealed that the exact opposite was true—it was TransMedics' "***policy***" that users of the OCS devices also had to agree to use the NOP, and had to agree, in advance, to pay "***mystery charges***" without any advance disclosure of what they would be, thus "***holding hostage***" the transplant centers unless they agreed, in advance, to a blank check for TransMedics' logistics services.

---

[2] Scorpion Capital is run by Kir Kahlon, the fund's founder and Chief Investment Officer.  Kahalon previously worked for Seligman Investments, which manages ~$15 billion and is based in Silicon Valley and New York.  Prior to Seligman, Kahalon worked with Tiger Global, a hedge fund focusing exclusively on deep-dive investigative shorts.  Kahalon began his career at the global management consulting firm Bain & Company, and entered the investment business in 2004 when he was hired by activist investor Carl Icahn.  Kahalon graduated from UC Berkeley (BA) with Highest Honors in 1992 and Harvard Business School (MBA) in 1998.

83.    Moreover, in direct contrast with Defendants' claims of high cost efficiency, the Scorpion Report unveiled the Company's "entirely unethical" practices of padding its bills with excessive flights, thereby *"utilizing their aircraft to bill for the aircraft"* and forcing clients to pay "*ridiculous transportation invoices*" for "*private jets to fly [TransMedics'] surgeons all over*." In many cases this meant sending a plane to retrieve "*an organ that's from a DCD donor that's only 150 miles away and you can drive there with your liver team*[.]"

84.    Moreover, contrary to Defendants' claims that TransMedics' high costs were not a problem for customers, because they were always "fully reimbursed," the Scorpion Report revealed that this was not at all the case, and that TransMedics' "unsustainable" services were dramatically eating into hospitals' profit margins on transplants, such that some were moving away from those services entirely. Indeed, as one prominent surgeon told Scorpion, "*I understand that TransMedics, they're going to tell you, this is going to be covered by Medicare and by private insurance and yadda, yadda*[,]" but "*[t]he reality is that right now ... you get paid about 50-60% of the cost*[,]" and "*the commercial insurance... They don't pay you anything.*" As such, other surgeons and hospital executives explained that TransMedics' bills ate up a "very, very substantial amount of the margin" and "erod[ed] a significant amount of [hospitals'] profit" on transplants, and were "*so darn expensive*" that they were "*not sustainable*" for hospitals, forcing some hospitals to seek other options.

        **1.    The Scorpion Report Revealed That, Contrary To Defendants' Statements, Transplant Centers That Used The OCS Device Were Forced To Also Use TransMedics' Expensive NOP Services**

85.    The Scorpion Report confirmed that, in direct contrast to Defendants' public statements that it "couldn't be further from the truth" that they were improperly pressuring hospitals to use their services, users of TransMedics' OCS device had no choice but to also use their NOP services bundled with the device, at great cost to the transplant centers. Indeed, while

Defendants repeatedly insisted that "***[t]he transplant centers then have the final say on whether they want to use our services or not***," in reality, the exact opposite was true: transplant centers "***d[idn]'t have another option***" but to use the NOP if they wanted access to the OCS device.

86.     For example, a former TransMedics reimbursement executive interviewed by Scorpion Capital[3] confirmed that the Gosar Letter had been entirely correct about the fact that TransMedics required anyone who used the OCS device to also use the NOP logistics program, because "***[c]enters that had bought OCS systems were not allowed to buy cartridges unless they used the [NOP services]***":

> Q: "What was correct and incorrect in that Gosar letter? ***Do you have to use their NOP to use OCS***?"
>
> A: "***Yes, you do. Centers that had bought OCS systems were not allowed to buy cartridges unless they used the national program***. .... [Redacted surgeon name] was one of the centers that had OCS on the shelf, and they wanted to use it and they were told that they were not going to be able to use it any longer and that it had to go through the national program."

The former TransMedics reimbursement executive described this as the "policy" of TransMedics.

87.     Another interviewee, described as a "[t]ransplant surgeon and surgical director at a high volume academic center in the western US" confirmed this policy:

> Q: "The organ procurement service. ***Do they mandate that as part of the deal - that you have to use their pump?***"
>
> A: "***Yeah, you don't have access to their pump.***
>
> Q: "***Unless you use their service?***"

---

[3] On information and belief, the former reimbursement executive is a former TransMedics VP of Market Access who, as described further below, was also interviewed by AlphaSense twice during 2024, which interviews were published by AlphaSense on September 26 and October 11, 2024. Plaintiffs' conclusion that this is the same individual is based on close similarities between the accounts in the Scorpion Report and AlphaSense interviews.  AlphaSense is a platform that provides access to proprietary research, earnings transcripts, and other documents, including interviews with industry professionals.

A: *"Yeah*."

88.    A transplant surgeon in a leadership role at Vanderbilt University also confirmed this policy, confirming that you were required to use both TransMedics transport and TransMedics personnel if you used their OCS machine, and that "*[y]ou don't have another option… you have to do it. You cannot send your own perfusionist to go and to pump the liver, no.  You cannot do it. They have to do it. That's for sure*."

89.    The Vanderbilt surgeon further explained that, based on his own experience in this regard, he believed the Gosar Letter to be accurate, explaining that: "[t]hat's the reason I'm telling you, *I believe that [the Gosar Letter] is completely honest*. It's a very honest letter."

90.    An interviewee described as a transplant cardiologist at one of the top centers in the U.S. confirmed these policies of requiring the use of TransMedics' services along with TransMedics' products, and explained that these practices had "driven [] away" his center from using TransMedics.  As the cardiologist explained, "[t]he other thing that's really driven us away is *they were essentially mandating, requiring you to use their surgeons and their procurement teams for these hearts*."   The cardiologist further described the NOP as "mandated," explaining that, "[i]n the last 7-8 months, for example, whenever we use the OCS system, it's always been the TransMedics procurement team."

91.    An interviewee described as a Vanderbilt transplant cardiologist similarly confirmed that TransMedics' high costs and bundling of services was driving his center away from the Company, explaining that "their rigidity and *needing to use their team and needing to spend so much more money procuring hearts compared to what we are comfortable with that's driven down our intent to utilize this company*."

92.    A "[t]ransplant cardiologist at a major Ivy League academic center" explained that TransMedics even required some hospitals to use the NOP as part of their contracts.  As the cardiologist explained, "*in some of their new contracts, they are mandating that if you are going to use our product, you have to use our planes and procurement…their price is so egregious that a lot of programs, including ours, can't or won't do it*."

### 2.    The Scorpion Report Revealed That TransMedics "Held [Transplant Centers] Hostage" To Pay For Their Excessive Services, And Engaged In Rampant Waste And Abuse Through Excessive Use Of Their Private Planes, Dramatically Increasing Costs For Hospitals

93.    The Scorpion Report further revealed that, in direct contradiction to Defendnats' claims of providing "*the most cost-effective transportation in the history of organ transplant, period, full stop*," the exact opposite was true.  Instead, TransMedics deliberately engaged in a pattern of highly non-cost-effective and excessive use of its fleet of private planes in order to pad its billing to transplant hospitals and increase its own revenue.  TransMedics would undertake these unnecessary flights both to transport personnel and to transport organs, often flying organs over distances that could have been driven, or flying personnel to locations where local personnel was available, and, in some cases, using two or even three different planes for the same transplant.  Making matters worse, as many hospital administrators and transplant professionals confirmed, TransMedics often gave hospitals no advance warning of the massive transportation costs they would be billed, with hospitals only finding out when they received the bill.  And further, even TransMedics' bills to hospitals would obscure the nature of the flight charges by failing to provide clear information about the distance or necessity of the flights billed.

94.    One executive at a leading West Coast organ procurement organization ("OPO") explained that TransMedics would effectively "*hold [the transplant center] hostage*" by forcing them to choose between either declining an otherwise usable organ or agreeing, in advance, to pay

all of TransMedics' exorbitant costs without even knowing in advance what they would be.  As such, he explained "organs are wasted" because some hospitals couldn't afford to blindly agree to a blank check for TransMedics' costs.  For example, he explained, in order to use an organ that TransMedics had available, the hospital would have to agree to use their OPO services without even knowing in advance how many flights would be involved, how long the flights would be, or how expensive the services would be.  As he explained:

> [T]here are organs that are wasted where we would happily pay for their service and their device or use the device, could rescue these organs that could be transplanted to save people's lives **and they will blanketly refuse to move—they won't move a finger unless somebody commits to paying, not just for the disposable but all the extra mystery fees that you might get because when you request them when you hire them or commission them to go and perfuse an organ, you don't know where their machine is coming from. You don't know whether the technician is coming from another city. You don't know if you're going to get the cost of their service plus one round-trip flight from the Bay Area or if you're going to be on a case that just happens to require three charters. There are these hidden—for the transplant centers**, it*'s all these mystery fees that you don't really know how many flights you're going to pay for until they tell you how many flights they've used*.

95.    The West Coast OPO executive described an example wherein a transplant center got **several hundred thousand dollars' worth of surprise invoices** from TransMedics after expecting a total cost of around $100,000 for the OCS machine plus NOP service.  Making matters worse, **Defendant Hassanein personally threatened the transplant center** to pay within 48 hours or else lose access to TransMedics' OCS machines.  As the executive recounted:

> I got a message from [redacted]. [Redacted] was a heavy user of TransMedics liver machine. They went into a contract, and then TransMedics started operating in this really inefficient way *….they show up with three planes, and so then [redacted] believed that they just ordered a $100,000 machine and service, but then a month later, they get $300,000, $400,000 worth of invoices because TransMedics is passing along all of these aircraft fees and the ground transportation fees to them*… it had been several months where they had not yet been able to reimburse TransMedics for the flight charges that they were trying to pass through to them. Well, *Waleed [Hassanein] reaches out to this transplant cente*r, which is the largest transplant center in [redacted], and essentially *gives them 48 hours to pay*

33

> *all of these flight charges that they never agreed to pay*. ….*And essentially tells*
> *them that they are going to shut off access to the machine to them*. They never
> even agreed to these expenses…

The executive added that he "found it very disturbing that they come in with these threats that their
patients will no longer have access to these lifesaving grafts because [TransMedics] now want[s]
to be reimbursed for these flights retrospectively that they acknowledged was never in the
agreement, but the incurred the charges and they want them to be paid anyway," and described the
practice as "*holding [the transplant center] hostage.*"

96.     A former TransMedics OCS Specialist who left the Company shortly before the
January 2025 Scorpion Report described inexplicable excesses in the Company's flights that he
called "entirely unethical." As he explained, *"[w]hy are you flying a team from Texas or from*
*California when we have a full team of 10 people up here waiting to do cases*? We're not given
a great reason. All we're told is that's where the planes are, in Texas and in California, and there's
a plane coming."  The TransMedics OCS Specialist explained that the practice of flying in
personnel from other locations became particularly rampant after TransMedics began acquiring
and using its own proprietary planes in August 2023.  But the OCS Specialist explained that this
made no sense from a cost efficiency perspective, because "*[i]t's cheaper to send a local team.*"
As such, the practice only led to one conclusion: "*they are utilizing their aircraft to bill for the*
*aircraft*."   The OCS Specialist described this as "a big reason why I decided to get out of the
company. It's just entirely unethical."

97.     A transplant administrator at University of California-San Francisco Hospital
complained bitterly about TransMedics' forcing of excessive flight bills onto hospitals,
exclaiming:

> *I hate flying their team all over the f\*\*\*ng country*. I hate it. *I hate paying for*
> *private jets to fly their surgeons all over. I don't know why we have to pay for all*

*these ridiculous transportation invoices*. And I hate when, *now that they've got their own transportation company, they just started flying their teams and sending us invoices*.

98.     The UCSF administrator further complained that "there's very little transparency" in TransMedics' bills for the flights, and that TransMedics neither gave advance notice of flight costs nor thoroughly explained the flight costs on their bills.  As the administrator explained:

> Contracting with them for the transportation felt ridiculous because *they couldn't tell us what the rates were. Basically, we just get a piece of paper, an invoice that says you owe us for this flight going from here to here. It doesn't say anything about what kind of aircraft it was, how long was it in the air—all this stuff. It's just a number. They could have just made it up. I find that to be very frustrating*.

99.     The UCSF administrator similarly averred that TransMedics would fly in technicians or surgeons from other parts of the country even though plenty were available near UCSF or elsewhere on the West Coast.  As he explained, "[t]here have been instances where *we are flying people, flying their staff from multiple locations to a case. I naively thought that they had a team here that would always just be doing the cases here on the West Coast but then I realized we are flying people from other locations*."  Asked whether he felt that TransMedics was "*jamming you with the cost of [] two planes*" in spite of having a local team available, the administrator responded "*Yeah.  It is really ridiculous*."

100.     A top liver transplant surgeon from a midwest academic center similarly affirmed that "*it's all about the money*" with TransMedics and expressed his hope that "with these other devices coming into market, it's going to drive the cost down, and TransMedics is going to have to come up with some other pricing."

**3.    The Scorpion Report Revealed That, Contrary To Defendants'
Claims, Transplant Centers Expressed Major Concerns About
TransMedics' Costs, And Some Either Reduced Or Eliminated Their
Use Of TransMedics' Services As A Result**

101.    The Scorpion Report further revealed that, in direct contrast to Defendants'
repeated claims that TransMedics' high costs were not an issue for transplant centers, in reality
those transplant centers had serious problems with TransMedics' costs.  Moreover, in contrast to
Defendants' repeated insistence that all of their exorbitant logistics costs were "***fully reimbursed***"
by both Medicare and commercial insurance to the point that this was "***not even a close call***," in
reality, transplant centers would often get back "***50-60% of the cost***" or even "***zero***" for
TransMedics logistics, which dramatically ate into hospitals' profit margin and was "***not
sustainable***." And tellingly, multiple transplant professionals described that they had directly
discussed their concerns about these cost issues with TransMedics' most senior management.

102.    As one transplant surgeon at a northeast academic transplant center explained, high
costs were a problem for his hospital, because the hospital would receive the same amount of
money per transplant whether he used inexpensive cold storage systems or high-priced
TransMedics services, meaning that TransMedics costs dramatically reduced the hospital's margin.
As he explained:

> [w]hether I use TransMedics or whether I put [the organ] in a cooler of ice, I still
> get $300,000 [in reimbursement].  But when I put it in the cooler of ice and bring
> the organ, my margin on the case is, let's say, $100,000-120,000 or something.
> When I do it, and I then use the OCS device, ***my margin on the case is $10,000***
> because I still have to pay for using the TransMedics device out of that global
> contract.

The transplant surgeon explained that "[t]he only way I get reimbursed is that I can put the
utilization of that on my Medicare Cost Report" but that "Medicare patients make up roughly about
30% of our liver transplant patients," meaning that only "30% of the [total] cost [of all of
TransMedics' services] will get reimbursed to us on the Medicare Cost Report[,]" while expenses

for commercially insured patients—the other 70% of liver patients—received only partial reimbursement at best.

103.    A transplant hepatologist and director of the liver transplant at a midwest academic transplant center corroborated this.  As he explained, "[a]ll of this is very true and it very much eats up your margin…*you are eating up a very, very substantial amount of the margin, no doubt about it*."

104.    A prominent surgeon in a leadership role at a major west coast academic transplant center elaborated on how TransMedics' services could dramatically increase costs for transplant centers.  As he explained, "*[t]he bills from TransMedics could be $110,000-120,000*, and that's in addition to the transplant center's organ acquisition fee that they're getting from the OPO… think of it like buying a car, and TransMedics is the transport company for that car, *the total cost out the door could be approaching $150,000- 200,000* and the profit margin for a lot of the payors that we deal with is only about $300,000."  Consequently, he explained, by using TransMedics, "*you could be eroding a significant amount of your profit at the transplant center if you were using their NOP program soup-to-nuts*."

105.    Significantly, the transplant professionals interviewed also emphasized that TransMedics' model was "*not sustainable*" for them, and emphasized that, contrary to TransMedics' claims, his hospital only received 50-60% reimbursement from Medicare for those costs.  For example, as a Vanderbilt Hospital transplant surgeon explained, "*it's not sustainable for a transplant center*."  The Vanderbilt surgeon pushed back on TransMedics' repeated claims that all costs were reimbursed.  The surgeon noted that "*I understand that TransMedics, they're going to tell you, this is going to be covered by Medicare and by private insurance and yadda, yadda*. …. *The reality is that right now*, Medicare, when you use the pump, you add this cost into

your acquisition cost for Medicare, but **you get paid about 50-60% of the cost**." As such, he explained, "**if that cost is 100,000, you get reimbursed 50,000. So, you have to absorb the other $50,000**."

106.    The Vanderbilt surgeon further explained that commercial insurance reimbursed far less than Medicare for TransMedics' services, explaining that "you prefer to have Medicare versus commercial insurance because **the commercial insurance, they don't care. They don't pay you anything. They pay you zero if you use TransMedics unless you renegotiate a contract**."

107.    A transplant surgeon and director at a major academic transplant center in Pennsylvania similarly averred that his hospital would "los[e] money" if it used TransMedics too much, explaining that that was not sustainable for hospitals. As the transplant director explained, "I know I can't use [TransMedics] too much, or I'm not going to be making any money, and then I'm not going to have a job…if a hospital thinks they're losing money by providing a service, are they really going to go out and provide a service?"

108.    Significantly, numerous transplant professionals also described how their hospitals were reducing or eliminating usage of TransMedics as a result of the high costs and anti-competitive business model. For example, an executive at a major OPO explained that University of Cincinnati's hospital was "getting away" from TransMedics because they're "so darn expensive[.]" As the OPO executive explained "**I know University of Cincinnati was using TransMedics, and they're getting away from it because it's just so darn expensive**, and they're moving towards a Paragonix[4]-type device… But I think Cincinnati is going that route and getting

---

[4] Paragonix is a competitor of TransMedics who makes the SherpaPak system, a temperature-controlled organ preservation system that is significantly cheaper than TransMedics' OCS.

away from the TransMedics device." The OPO executive said that University of Virginia was also going the same route and moving away from TransMedics.

109.    A former TransMedics OCS specialist explained that University of Washington was also moving away from TransMedics because they were "upset about the cost" and had gone "way over-budget." As the former TransMedics OCS specialist explained, "[o]ne of my contacts works here locally at UW and he was in one of the meetings about - on their transplant board … *in a meeting, they were going into how they were trying to block all TransMedics business because they're upset about the cost and everything, and they've gone way over-budget* and all this stuff, so they were *making an effort to not use it at all*[.]"

110.    A UCSF hospital administrator similarly expressed that the hospital was looking for ways to rely less on TransMedics due to the high cost. As he explained, "We, also on the liver side, are interested in doing more [normothermic regional perfusion][5] and using other devices as alternatives [to TransMedics] whenever possible…*we don't want to have to rely so heavily on TransMedics…I'm struggling from an administrative standpoint. These costs are really making it challenging for u*s."

111.    An organ procurement technician at a high-volume northwestern US academic transplant center put it bluntly: "*It's cost. It's just not sustainable*." The technician confirmed that he had heard personnel at hospitals across the US make the same complaint, i.e. that "*the talk of cost for TransMedics is, I mean, from Hawaii to Texas, I've heard people say that it's just not sustainable, that they have to find different ways because they just can't sustain the cost*."

---

[5] Normothermic regional perfusion ("NRP") is a technique used in organ donation after circulatory death to restore warm, oxygenated blood flow to the organs inside the donor's body to preserve them for transplantation. Blood flow to the brain is blocked to ensure death is not reversed. Unlike machine perfusion, which preserves organs outside the body in devices like TransMedics' OCS device, NRP maintains and evaluates organs *in situ* before removal.

112.    A transplant hepatologist and director of liver transplants at a midwest academic transplant center that is one of TransMedics' highest volume users concurred.  As he explained, "***It is a ridiculously expensive solution. I could argue predatory, perhaps*… *my biggest issue with it is that it is outrageously overpriced.***"  The transplant director further explained that TransMedics needed to have "more transparency in contracting" and emphasized "***I think the price is completely unreasonable, to be very, very clear***."

113.    A transplant hepatologist in a leadership role at Massachusetts General Hospital similarly confirmed that TransMedics' costs were so high that they severely eroded hospital margins on transplants, raising questions about whether TransMedics' services were viable for the hospital.  As the transplant hepatologist explained: "they're bordering on ***eating into all of the margin or most of the margin that would be gotten from doing another case of liver transplantation***. I think that when you start pushing up against that, at least as an institution, ***you have to start asking the question, is this viable?***"

114.    A veteran transplant administrator and executive who also worked for Massachusetts General Hospital similarly complained about the high and unnecessary costs created by TransMedics' services, and confirmed that TransMedics often imposed these exorbitant charges without giving hospitals a chance to decline them in advance:

> As the relationship evolved over the years, the tune has changed. It has become less about what can we do together and trying to figure out the best way, the best logistical setup, and the best-aligned incentives to achieve our mutual goals to become ***more about utilization at all costs***, meaning sometimes there would be situations where I get involved at 2:00AM on a Saturday because so-and-so had said we want to use the OCS device and then now the entire team takes a hold of the entire logistical setup and I find out down the line that something where it's a typical we fly out the teams, we take the procurement team with us with the modules, and ***now it's upwards of like $180,000 to almost a $200,000 all-in with the procurement team decision that was made without any one of us involved.***

115.    The Massachusetts General Hospital executive further compared the constant "added fees" to the practices of a "used car salesman."  As the executive explained,  "it's [TransMedics'] team that racks up the price because depending on the size of the jet, depending on if you're going to bring the surgeons on or not… *you have all these added fees like a used car salesman* saying, oh, by the way, you can this and get it financed at zero percent but then there are all these other things that can just be added on, *and it's not what we signed up for, nor is it what we need*."

116.    Significantly, the Massachusetts General Hospital executive stated that he had specifically raised concerns about these practices with TransMedics' most senior officers.  As the executive explained, "*I've had to have very candid conversations with their leadership*."  The executive explained that these conversations occurred due to TransMedics frequently making decisions to impose higher logistics costs without even consulting the hospital or its surgeons.  As he explained, "there will be a situation where someone had made a call independent of our surgeons, and it just would continue to occur at a higher frequency, almost once a month, sometimes even a couple of times a week where now *I have to get involved whenever there's a certain threshold that gets crossed as far as costs go where I would then have to bypass the entire team, go straight up to their leadership, and say, this is not what we discussed*, *and we either need to end this or address this*."  The executive further explained that the problem was ongoing, i.e. that "*these types of issues continue to sprout*[.]"

117.    The Scorpion Report further described how one major university hospital, Duke University, gave a presentation at a "TransMedics user meeting," and later at the June 2024 American Transplant Congress ("ATC") annual meeting, in which they described the massive costs

that TransMedics was adding to their transplants.[6]  Indeed, as a director of a leading transplant hospital explained, "Duke University did a beautiful analysis - they presented it at the meetings *where they showed how much of a hit they took with TransMedics liver use at their center*. They presented this at one TransMedics user meeting, and then they've also presented at a symposium at the ATC."

118.    The transplant hospital director—who personally saw the presentation slides and spoke to their creators about them—elaborated that, according to the Duke analysis, the combined OCS and NOP costs for a TransMedics transplant eroded hospitals' margins to just *40%* of what they would be with standard cold storage.  As the director explained:

> [T]he way that [Duke] analyzed this, what they looked at, what *their pre-OCS usage was of DCD organs, but then they looked at, especially when they started using the NOP program which also involved using the surgeon and the aviation part of it, and they* saw -because I've seen slides where they actually analyze what their contribution margins were for cases that used standardized storage, OCS at the simple level, with just the technician, and OCS through the NOP program. If I remember correctly, *say, the direct contribution margin for static cold storage was just rated at a dollar. The contribution margin was something in the 40-cent range for the cases you use TransMedics on*.

119.    The prominent hospital transplant director also complained about the high costs TransMedics persistently forced on hospitals.  As the director explained, "TransMedics *has been charging a lot of money for not only the device but also their NOP program, their aviation company - all the stuff that they've rolled in and they tried to force it down everybody's throat that to use their liver device, you had to do everything*."  The transplant director analogized it to "*a price-fixed dinner [where] you couldn't do a la carte*."  The transplant director also noted that

---

[6] The Scorpion Report, which is dated January 10, 2025, describes that Duke had "recently presented a paper stating the device is uneconomic."  The only recent ATC annual meeting as of the publication of the Scorpion Report was the June 1-4, 2024 meeting in Pennsylvania.  Thus, the date of the presentation is pleaded on information and belief.

there had been widespread pushback from the transplant surgeons and centers, explaining that "the *push from all of us in the surgical community saying this is ridiculous that you are forcing us to use your hired surgeon and aviation company when we would prefer to use our own surgeon*."

120.    Moreover, the transplant director complained that TransMedics would regularly impose unnecessary flight charges in situations where the organ was only a short distance away and it would have made far more sense to drive the organ.  As the director explained: "*if you're going to be getting an organ that's from a DCD donor that's only 150 miles away and you can drive there with your liver team, why would you need to use their aviation company and their surgeon when you could provide those services yourself*[.]"  And in striking contrast to Defendants' repeated assurances that cost was no issue for hospitals' use of services because everything was supposedly reimbursed, the director explained that TransMedics' services "*really whittle away at your bottom line for the hospital*."

121.    According to the transplant director, while TransMedics was experiencing an initial rush of new transplant center customers interested in the technology, centers that had experience with TransMedics were increasingly balking at the high costs.  For example, he explained that Duke University was already dramatically reducing its volume of TransMedics cases.  And, contrary to Defendants' public statements that all costs for the OCS and NOP were reimbursed, in reality, centers were struggling to get full reimbursement.  As the transplant director explained:

> *I know for a fact that the Duke guys were on target to do a huge percentage of their liver transplants using TransMedics in a given year but they dropped their volume by 20% because they were taking such a bath based on their Medicare reimbursement that they needed to make sure that they stayed profitable and not start actively losing money*, which, again, at a center like mine that has a worse payor mix than Duke, is even more at risk for. So, the centers that were really big enthusiastic users, like any new technology, there's this explosion in people using whatever the technology or the drug is, *and then the reality of the situation sets in, whether it's the finances or the fact that it's being overused* or beyond indication[.]

122.    On the news of the Scorpion Report, the price of TransMedics stock fell $3.74 per share, or 5.15%, to close at $68.81 on January 10, 2025. On January 13, 2025—the next trading day—TransMedics' stock fell a further $4.76 per share, or 6.9%, to close at $64.05.

### G.    Former Employees And Other Transplant Professionals Corroborate Key Allegations From The Scorpion Report

123.    Numerous former TransMedics employees and transplant professionals who have worked with TransMedics have further corroborated the facts set forth in the Scorpion Report in separate interviews.

124.    CW 1[7] a former TransMedics OCS Specialist, confirmed that he saw evidence that TransMedics' revenue losses in 3Q 2024 were due to hospitals reducing or ceasing their business with TransMedics due to the high cost of OCS and the NOP.  CW 1 recalled Defendant Hassanein's comments after the 3Q 2024 earnings report about revenue losses being due to seasonality. However, he said that this was not accurate.  Instead, he explained, the losses were due in large part to the loss of hospital customers in Texas, a major market for TransMedics.  As he explained, "[t]he Company does not disclose when a large hospital does not renew. That results in a huge loss in volume and revenue."  He also noted that the Texas non-renewals led to significant employee layoffs in Texas.

125.    CW 1 attributed the loss of business from these Texas hospitals to the high cost of TransMedics products and services, and noted that these hospitals did not see the benefits of the OCS pump compared to that high cost.  Instead, he explained, hospitals were signing up with one of TransMedics' main competitors, OrganOx, which had a cold storage system that was much

---

[7] CW 1 worked for TransMedics as an OCS Specialist in New York City from July 2023 through March 2025.  He reported to Regional Manager Brianne Mastaj and later to Regional Manager Matt Emeigh-McBride.  To preserve anonymity, all confidential witnesses herein are referred to with male gender pronouns.

cheaper than OCS. He explained that "[s]ome centers believed that they could achieve their volumes with ice, and they didn't need the [TransMedics OCS] pump." CW 1 said he had also heard of certain San Diego hospitals moving to OrganOx from TransMedics for the same reason. He stated that this phenomenon "*was all about the money and the cost. I heard people complain about the cost of TransMedics all the time*."

126.    CW 1 also confirmed that he received complaints from a major hospital in his area, NYU Langone, about the high costs of TransMedics' services, to the point that he wished he had written down the number of times surgeons told him that TransMedics was too expensive and not in their budget. He commented, "*NYU Langone was always complaining about TransMedics being so expensive*," and estimated that 75% of the surgeons that he worked with complained about the cost of the OCS devices. He noted that "cost was definitely a barrier".

127.    CW 2,[8] an organ transplant coordinator at a major hospital in the southern United States, similarly corroborated that it was highly dubious that TransMedics' 3Q 2024 earnings miss was due to "seasonality." When asked if this explanation made sense, he laughed and said that he had never heard of "normal variability of donor availability" or "summer seasonality" in organ transplant (contrary to Defendant Hassanein's claims). He explained, "[t]here is no seasonality in the organ business. Amira [Hassanein][9] and Waleed [Hassanein] like to make up their own things."

---

[8] CW 2 is, and was throughout the Class Period, an organ transplant coordinator at a major hospital in the southern United States. He asked that his specific hospital not be identified in this complaint. CW 2 dealt directly with TransMedics personnel on a regular basis, including in fielding organ offers from TransMedics. His hospital was a regular user of TransMedics' services during the Class Period.

[9] Amira Hassanein is Defendant Hassanein's sister and the Company's Product Director for OCS Lung. Several CWs and Scorpion Report interviewees described her as playing an active role in pressuring hospitals to take lungs that were on TransMedics' OCS machines and to use their attendant logistics services.

128.    CW 2, who dealt directly with TransMedics on a regular basis, referred to TransMedics as the "**TransMedics Mob**" due to their "**strongarming**" tactics in pressuring hospitals to use their services.  He explained that, like many hospitals that worked with TransMedics, his hospital had once had its own OCS machine, which TransMedics then removed, forcing his hospital to use TransMedics' services in order to get access to their machines.  CW 2 also explained that he was aware of six-figure research grants TransMedics had made to his hospital, as well as speaking fees and other inducements, and stated that he was "told that **we are beholden to TransMedics because of them donating money to us**."  Indeed, one surgeon at CW 2's hospital told him "**we kind of owe [TransMedics] so we play along**."

129.    Strikingly, CW 2 provided documents confirming that TransMedics' practices locked hospitals into accepting their logistics charges even before having the chance to determine whether a donor organ was viable.  For example, one "quote" sent by text message from TransMedics staff imposed steep cancellation charges even before TransMedics' team had been deployed to a site, and steeper charges if cancellation occurred later.  As the terms of those quotes provided:

- 25% aviation charge if case is canceled before any TransMedics team is deployed

- 50% aviation charge if the donor does not expire, or the organ is declined at donor location

- The full aviation charge is due once the TransMedics team departs from the donor location

- For ground transportation, the full amount is due if canceled less than 6 hours before the original donor OR time

CW 2 explained that these charges, which were standard on quotes throughout the Class Period, added further pressure on hospitals.

46

130.    CW 2 also provided several specific examples of exorbitant charges for flights (for which he retained documentary records), including one in which the total TransMedics charge for flights was roughly $42,000, one in which the charge for flights was nearly $57,000, and another in which the total flight cost was nearly $77,000, with an additional $2,950 charge for ground transportation added to each one. CW 2 said that TransMedics regularly charged substantially similar amounts for flights throughout the Class Period, and that flight charges averaged in the $50,000 range. CW 2 added that he found TransMedics' charges for aircraft "obscene," particularly when added on top of other logistics charges, such as a minimum $20,000 fee for using TransMedics' surgeons, even though his hospital had its own surgeons in house who were both higher quality and already on the hospital's payroll.  He added, "***[t]hey send us a bill for anything that they can bill us for. It's like flying on Spirit Airlines. There is a cost and then there is the real cost***."

131.    CW 2 added that he had reviewed the Scorpion Report and found it to be generally accurate and consistent with his experience.  He further noted that after the report was published, he noticed a marked decline in the aggressiveness of TransMedics' tactics toward his hospital.

132.    CW 3,[10] an expert in organ procurement and preservation who works in the industry, explained that, originally, during the trials of TransMedics' OCS devices, hospitals had been allowed to have their own OCS devices.  This enabled hospitals to send their own surgeon and technician along with their own OCS device to a donor site, at which point they'd be able to evaluate whether the donor organ needed to be put on the OCS machine (since not all organs required or would benefit from OCS).  Beginning in 2022 or 2023, however, TransMedics no

[10] CW 3 is an organ procurement and preservation expert who works for a company in the organ procurement industry.  He asked that more specific details of his position not be given.

longer allowed hospitals to keep their own OCS machines, forcing them to use TransMedics' machines. He explained that this practice dramatically increased the costs for hospitals in multiple ways. First, hospitals could no longer make their own decisions about whether OCS was needed – instead, they would often get calls that an available organ had already been placed on OCS by TransMedics teams. Second, hospitals now had to pay inflated charges for TransMedics surgeons and technicians instead of using their own personnel. And third, hospitals also had to pay for inflated transportation costs, including flying TransMedics' teams to the donor site as well as flying the organ to the city where the recipient hospital was located.

133.    As examples of TransMedics' cost inflation, CW 3 described how it would cost roughly $6,000 to send non-TransMedics transplant surgeons to remove and retrieve an organ, but TransMedics charged at least $15,000 for the same service, which hospitals were required to use. He said that TransMedics would often engage in this practice even when the donor hospital already had surgeons on site that could have performed the organ removal. He also described how TransMedics would charge $50,000 for air transportation on its own private planes in situations whereas third-party private planes could be chartered for $15,000.

134.    CW 3 said that he was aware of hospitals including Henry Ford Clinic in Michigan and Baylor St. Luke's Hospital in Houston specifically pushing back on these practices with TransMedics management. Moreover, contrary to Defendant Hassanein's claims of a "big moat" around TransMedics' technology and services, CW 3 explained that other solutions like normothermic regional perfusion and competitor devices were genuine competitive threats, providing comparable or better outcomes at lower costs.

135.    CW 4,[11] an organ procurement coordinator for a west coast hospital confirmed that hospitals "absolutely" had to use TransMedics' NOP services to maintain access to the OCS device. He explained that, in some cases, TransMedics would use three different planes from three different locations just to get its teams to the donor site, with the device flying in from one location, the surgical team from another, and the perfusionists from a third location, at average flight costs of $20,000 per flight. "Unfortunately," he explained, "that happened frequently."

136.    CW 5,[12] a thoracic and lung transplant surgeon at Mayo Clinic, corroborated that TransMedics required centers to use "the logistics part of TransMedics' business" in order to use their technology, and that this was something centers balked at.  As he explained, this "closed loop" system was "***not something that most centers are happy about that I know. They don't like that. They don't want to be locked in in that sense. They want to be able to choose freedom, to be able to arrange for some of the only logistics, some parts of things***."

137.    CW 6,[13] a director at Buckeye Transplant Services, also confirmed TransMedics' practice of forcing its high-cost logistics onto transplant centers, and reported that many

---

[11] CW 4 has been an Organ Procurement Coordinator with a west coast hospital since 2022, and previously worked in several other positions in the organ transplant industry. He has dealt with TransMedics frequently throughout his time with his hospital.

[12] CW 5 is a thoracic and lung transplant surgeon and has served as an Associate Professor of Surgery at Mayo Clinic School of Medicine since November 2020, and has been a thoracic and lung transplant surgeon with Mayo Clinic since 2012.  He performs roughly 300 surgeries annually, including thoracic, lung, and minimally invasive foregut surgeries.  His quotes are taken from an interview done by an AlphaSense analyst and published on the AlphaSense platform in July 2024.  As noted above, AlphaSense a platform that provides access to proprietary research, earnings transcripts, and other documents, including interviews with industry professionals.

[13] CW 6 has served in various roles with Buckeye Transplant Services since 2017, and has been a Director of Business Development since March 2023.  Buckeye Transplant Services is an Ohio-headquartered company that specializes in transplant offer screening, organ transport logistics, and data reporting.  The quotes herein from CW 6 are taken from an interview published on AlphaSense on August 26, 2024.

TransMedics customers have balked at TransMedics' high costs.  As CW 6 explained: "…*[y]ou cannot just have the device, you have to have their specialists. No matter what, you're going to have their specialist fly out to the organ recovery and either meet your team who's doing the recovery and fly back, or you're going to pay for their surgeon to go out and do that, and both are very expensive*."

138.    CW 6 added that TransMedics seemed to charge excessive prices for its aviation services, particularly given that those services were in-house at TransMedics.  As he stated, "I don't know what their margins are, but *I know that because I know air logistics, that their prices are high*."

139.    CW 7—a former VP of Market Access at TransMedics who was also interviewed by Scorpion Capital—gave substantially similar accounts to those described in the Scorpion Report in a separate interview.[14]  CW 7 corroborated that, when TransMedics first introduced OCS, it allowed hospitals to purchase their own OCS machines so that they could have full control over the logistics and costs associated with the transplants.   However, as he explained, once TransMedics got FDA approval, it stopped this practice and forced transplant centers to use the NOP.  As he explained:

> [T]here were some centers that were using OCS and had bought the console and were going out on runs when the NOP program started*. And I'll tell you that they were furious with TransMedics for stopping that*. **They were no longer allowed to use their own runs. TransMedics would literally say, I'm not selling you a cartridge within the console anymore. You can't have them on your shelf. You have to use the NOP. And the surgeons were furious … So there was a lot of bad blood to make a pun, around using the NOP at the beginning for sure**.

---

[14] CW 7 is a former VP of Market Access for TransMedics.  His quotes in this section are taken from interviews with AlphaSense published on September 26 and October 11, 2024.  As noted above, on information and belief, he is the same reimbursement executive described in the Scorpion Report, as his accounts in both sources are substantively similar.

140.    As CW 7 further explained, TransMedics would force centers to use TransMedics procurement surgeons and technicians even where the hospitals could easily have used their own personnel or those of another company at a lower cost.  Specifically, he explained, "***[t]hey require their own team of procurement surgeons, and their own team of technicians go on the run, and they charge somewhere around $20,000 for that service, even if the center doesn't want it.***"

141.    CW 8,[15] a Director of Operations at UPMC, also confirmed that, contrary to TransMedics' claims that all of their costs were "fully reimbursed," in reality, commercial insurance only paid a fixed amount per transplant, such that TransMedics' more expensive services would eat into their margins, causing the hospital to want to use TransMedics' services less. Specifically, in response to the question "[w]hat would cause you to use TransMedics more or less," CW 8 explained:

> [O]verall, not just us, but everyone else, part of it is the way we get reimbursed for it. Say you're spending $60,000 for a heart and then you're using the TransMedics device, that prices on top of it, on top of the $60,000. ***The problem is when you go to your commercial insurances, they don't care what your expenses to get the organ, they're still going to pay you the same case rate they agreed to. Our reimbursement number currently doesn't change*** … ***They actually pay per transplant***, it's not per procurement. It's an all-in price. You spend whatever you have to do to get the organ.  This is what we're going to pay you for that transplant … It's a case rate … ***historically commercial payers have not been overly willing to adjust their pricing to account for [high acquisition costs]***. This is me as a financial guy, … ***they're not paying us more for what we did to get the organ there to transplant their patient***.

142.    CW 8 further elaborated that, due to this limited commercial reimbursement, UPMC was reducing its use of TransMedics on account of the added expense of their logistics services.  For example, he explained that even in the case of a transplant where the organ donor

---

[15] CW 8 has been Director of Operations at UPMC since April 2010.  His quotes are taken from an interview published by AlphaSense on December 4, 2024.

was very close by, TransMedics would require his hospital to fly in their entire team from another state, such that "*[t]he costs are night and day*":

> Question: … would you say the numbers between NRP [normothermic regional perfusion] and TransMedics for a local job is pretty apparent, the difference?
>
> Answer: … **If I'm in Philadelphia, and I have an organ available at a hospital that's like five mi[les] away from me and I want to use TransMedics, I have to fly a TransMedics team in**. They have to go to the hospital, they have to recover the organ, they have to bring it to my hospital, and then I have to fly them back **where if I have a local team, I'm eliminating the flight and the cost of their machine and really the cost of their surgeon, too, and doing it for much less**. Does that make sense for you? **The costs are night and day**.

143.    As CW 8 elaborated, "if [an organ is] local, you're going to use your own team [to retrieve it]. **It is a heck of a lot cheaper for us to load people into a van and drive across the city … if I had to drive across a river, I'd rather send my own team than pay the TransMedics team to fly in**, **do their stuff, use their surgeon, and then drive the organ across from me**."

144.    CW 9,[16] a longtime transplant surgeon at Westchester Medical Center Health Network, explained that the high cost of TransMedics' force-bundled services often made competitors like OrganOx more attractive. As he explained, "**for me, the biggest difference is the cost because the TransMedics is all-inclusive**, **and then cost is going to be higher** compared to OrganOx."

145.    CW 10,[17] an executive at TransMedics' competitor XVIVO, corroborated that TransMedics was force-bundling its NOP logistics services with its OCS product. Specifically,

---

[16] CW 9 is a transplant surgeon at Westchester Medical Center Health Network, and has been a transplant surgeon for 15 years. His quotes are taken from an interview published by AlphaSense on February 7, 2025. At the time of his interview, he had reportedly been using TransMedics for over a year.

[17] CW 10 is currently a VP at TransMedics' competitor, XVIVO, and previously worked for XVIVO as a Director of Sales and before that as a Regional Business Manager. CW 10 has worked at XVIVO for a total of nearly 7 years. CW 10's quotes are taken from an interview published on AlphaSense on July 23, 2024.

CW 10 explained that, previously, centers had been allowed to maintain and operate their own OCS machines and coordinate their own transplant logistics, but that TransMedics had changed the policy to require use of TransMedics, NOP services, i.e. "*there were centers that were using [TransMedics' OCS] on their own, [but they] were no longer allowed to do that unless they use their service model in tandem with the machine*." CW 10 described this practice as "*something that a number of centers are upset about*." As he explained, this also limited TransMedics' market share because their services were not affordable to smaller transplant centers, as "*mostly large centers are the only ones who can afford that. The smaller transplant centers can't.*" CW 10 explained that TransMedics "would have to adjust their model" and "also have to probably adjust their pricing" to grow its market share.

146.    A former TransMedics pilot also confirmed that he was repeatedly asked to fly in ways that did not seem to make any logistical sense, unless the goal was to pad TransMedics' billing. Specifically, CW 11[18] recalled instances where he made extremely short flights in the Northeast for distances that would have made more sense to drive, such as Newark, NJ to White Plains, NY to Bedford, MA. He added, "[f]lying from Newark to White Plains and back to Bedford made no sense. They should have used ground transportation like an ambulance."

**H.    Independent Data Analysis Further Supports The Conclusion That TransMedics' NOP Services Dramatically Increased Hospitals' Costs**

147.    An independent data analysis performed by Plaintiffs' healthcare economics expert confirms that, as TransMedics began mandating the use of its NOP and aviation services to access use of the OCS device, high-volume transplant centers who were known to also be high-volume TransMedics customers—including many of those referenced in the Scorpion Report—saw a

---

[18] CW 11 worked for TransMedics as a flight captain from approximately October 2023 through March 2024.

dramatic increase in their organ acquisition costs. Plaintiffs' expert gathered and analyzed data from the RAND Center for Excellence on Health System Performance Healthcare Provider Cost Reporting Information System ("RAND HCRIS"), maintained by the Centers for Medicare & Medicaid Services, covering hospital's fiscal reporting from 2021 through 2023 (the most recent data available).[19] This dataset included organ procurement costs across more than 100 of the nation's largest hospitals and transplant centers, including cost-per-organ figures. The expert's findings show extraordinarily high increases in procurement costs in the reported data for 2022 and 2023, contradicting TransMedics' claim that its services represent "the most economical way of managing organ transplants."

148. For example, from fiscal years 2021 to 2023—ending on June 30, 2024—Duke University Hospital experienced a staggering ***147% increase*** in its average acquisition costs per liver. Indeed, in fiscal year 2021—before TransMedics forced customers to use its NOP and aviation—Duke's average procurement cost per liver was $47,031. By the summer of 2024, however, the average cost per liver had ballooned to $116,276. The same was true for the Mayo Clinic in Phoenix, Arizona, a known high-volume TransMedics user, where the average cost per liver ***more than doubled***—from $71,445 in calendar year 2021 to $154,329 in calendar year 2023—marking a ***116% increase***. Henry Ford Hospital, another high-volume TransMedics user, similarly saw a ***74% increase***, with costs rising from $59,949 to $104,142 in calendar years 2021

---

[19] The hospitals do not have unform fiscal years. While many track their fiscal year by calendar date, i.e. ending on December 31 of each year, others include 2024 information within the "2023" reported data. Specifically, many of the reporting hospitals ended their fiscal years on June 30 of each respective year and have already submitted full reports. In such instances, the reported data extends halfway through 2024 and therefore reflects TransMedics' rapid build out of its aviation services, which grew from two aircrafts on August 1, 2023 to fifteen planes by July 1, 2024. In some instances, however, the current reported data only extends through the fall of 2023, as those hospitals have not yet reported their 2024 results, which could include information relating to transplants occurring in the final four months of 2023.

to 2023, while Vanderbilt's average per-lung cost similarly ***shot up nearly 63%***, from $36,186 to $58,733 from July 2021 through June 2024. Additionally, UCSF, University of Washington, and Baylor University Medical Center in Dallas, Texas each reported liver acquisition cost increases of more than 30% during the same period of July 2021 through June 2024.

149. By contrast, many hospitals not known to be TransMedics Liver users saw their costs relatively flat or even declining in their reported data. For example, despite significantly increasing the number of liver transplants performed between July 2021 and June 2024, Oklahoma University Medical Center, who is not listed as an OCS Liver user on TransMedics' website, actually ***decreased its average cost per liver by 12%*** from a fiscal year 2021 average cost of $54,169 to just $47,760 by June 2024. Similarly, Indiana University Health and Presbyterian St. Luke's Medical Center,[20] neither of whom are listed on TransMedics' website as users of the OCS Liver device, only saw their acquisition costs increase by ***less than 20%*** in their reported data.

150. Increases in costs per heart were similarly dramatic. Hartford Hospital, listed on TransMedics' website as an OCS Heart center, reported ***a 152% increase*** in its average acquisition costs per heart in its data submitted through September 30, 2023. Indeed, Hartford Hospital reported an average of just $46,540 per-heart in acquisition costs for fiscal year 2021, but that number swelled to $117,455 in its most recently reported data. Emory University Hospital, who is similarly highlighted on the TransMedics website, experienced ***an 83% increase***, with average costs rising from $74,030 to $136,148 in its most recently reported data through August 31, 2023. At the University of Cincinnati, costs per heart rose by ***more than 50%*** from $48,984 to $73,349 from July 2021 through June 2024. Both Baylor and the University of Washington saw their heart procurement costs ***jump by 44%*** over the time period from July 2021 through June 2024. Baylor's

---

[20] Presbyterian St. Luke's Medical Center's reported data extends through August 31, 2023.

average cost per heart surged from $133,594 in fiscal 2021 to an astounding $191,807 by June 2024, while University of Washington's increased from $97,890 to $139,841.

151.    By contrast, many non-users of TransMedics' services did not see similar cost increases. For example, Allegheny Medical Center in Pittsburgh, Pennsylvania, which does not appear as an OCS Heart customer on TransMedics' website, was able to increase the number of heart transplants it performed between July 2021 and June 2024 while decreasing their cost per heart. In fiscal year 2021, Allegheny performed 28 heart transplants with an average acquisition cost of $181,344, but in its fiscal year 2023, ending in June 2024, the hospital performed 34 transplants at a cost of just $141,518, *a cost decrease of 22%*. Tampa General Hospital[21] and Saint Lukes Hospital of Kansas City, Missouri, neither of whom are listed by TransMedics as OCS Heart customers, each only saw a meager 3% increase in their reported average acquisition cost per heart.

### I.    Defendants Sold Over $45 Million Worth Of Stock In Highly Suspicious Sales During The Class Period

152.    During the Class Period, the Individual Defendants capitalized on their misrepresentations to investors by making massive and suspiciously timed sales of their personally held TransMedics stock. Indeed, with the Company's stock price artificially inflated as a result of their false and misleading statements, Defendants Hassanein and Gordon sold a total of over 400,000 shares for *proceeds of over $45,000,000*.

153.    Significantly, these sales were highly suspicious because they were far beyond the number of shares sold and the amount of proceeds received by the same Defendants in the equivalent time period prior to the Class Period (the "Control Period"). Indeed, Defendant Hassanein sold *more than three times the dollar value of stock during the Class Period* that he

---

[21] Tampa General Hospital's has reported its data through August 31, 2023.

did during the Control Period, and Defendant Gordon similarly sold **nearly three times the dollar value of stock** that he did during the Control Period.

154.    Specifically, Defendant Hassanein sold more than $34.4 million worth of stock during the Class Period, compared to just $10.3 million worth of stock during the Control Period. Similarly, Defendant Gordon sold more than $11 million worth of stock during the Class Period versus just $4.5 million worth during the Control Period.

| Defendant | Control Period | | Class Period | |
|---|---|---|---|---|
| | Shares Sold | Proceeds from Sale | Shares Sold | Proceeds from Sale |
| Waleed H. Hassanein | 174,929 | $10,360,189.71 | **286,194** | **$34,421,292.58** |
| Stephen Gordon | 100,000 | $4,551,626.35 | **113,963** | **$11,048,650.39** |
| **Total** | 274,929 | $14,911,816.06 | **400,157** | **$45,469,942.97** |

155.    Significantly, Defendant Hassanein sold a whopping **$9.3 million worth of stock outside of his 10b5-1 plan** in just three outsized transactions at highly suspicious times that took place between the publication of the Gosar Letter and the October 2024 corrective disclosure concerning the Company's surprise 3Q 2024 revenue miss.  And particularly suspicious is the $8 million worth of stock Hassanein suddenly dumped in just 24 hours in late August 2024—two thirds of the way through the third quarter—outside of his 10b5-1 plan.  Indeed, from August 21-22, 2024, Defendant Hassanein suddenly dumped 45,000 shares outside of his 10b5-1 plan at prices between $171-$175 per share—**as little as 1% below TransMedics' Class Period and all-time high stock price of $177.37 per share, which it reached the very next day**, on August 23, 2024.  In fact, mere days after Hassanein sold, TransMedics' stock price would begin to decline substantially, and a mere two months later, Defendants would reveal a shocking decline in revenue that would send TransMedics' stock price plummeting 30% in a single day.

156.    Significantly, Hassanein's August 2024 out-of-plan stock sales also took place a mere three weeks after he had made exceedingly positive statements about the sustainability of the

Company's business and pricing model during the Company's July 31, 2024 earnings call, in which he insisted that "we're not trying to gouge the system.  We have a pricing model that works[,]" and that the Company was "focusing on [] growing the overall national transplant volume[,]" and "growing our market share in the existing transplant volume[,]" rather than using it as an "opportunity for pricing leverage."   Moreover, Hassanein's sales came roughly two thirds into 3Q 2024, at which point he undoubtedly knew about the steep decline in the Company's revenue.  And further, Hassanein's out-of-plan sales in May and August 2024 represented his only out-of-plan sales at any time during either the Control Period or the Class Period.

157.     Moreover, Hassanein adopted a new 10b5-1 plan on September 6, 2023, and thus the majority of Hassanein's Class Period stock sales that were made pursuant to a 10b5-1 plan were pursuant to a plan adopted during the Class Period.

## V.     DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A.     TransMedics' 2023 Annual Report Filed On Form 10-K

158.     On February 27, 2023—the day before the first day of the Class Period—after market hours, TransMedics filed its 2023 Annual Report with the SEC on Form 10-K (the "2023 10-K").  The 2023 10-K, which was signed by Defendants Hassanein and Gordon, claimed that TransMedics developed the OCS program to "provide a more efficient process to procure donor organs with the OCS."  Specifically, the 2023 10-K stated: "*[o]ur National OCS Program was developed to provide a more efficient process to procure donor organs with the OCS*."

159.     The statement in paragraph 159 was materially false and misleading.  Specifically, the NOP was *not* "Developed to provide a more efficient process to procure donor organs." Instead, as later revealed, the NOP was developed to overbill hospitals for excessive transportation and other services in order to pad TransMedics' revenue.  As one transplant executive explained,

through the NOP, TransMedics would "hold[] [the transplant center] hostage" and "refuse to move" with an available organ unless the recipient hospital agreed, in advance, to pay "***mystery fees***" that could lead to hundreds of thousands of dollars in invoices for air transportation and other services. For example, a former TransMedics OCS Specialist described the Company's "entirely unethical" practices of padding its bills with excessive flights, rhetorically asking "***"[w]hy are you flying a team from Texas or from California when we have a full team of 10 people up here waiting to do cases***?" and averring that "***they are utilizing their aircraft to bill for the aircraft***." A UCSF hospital administrator described how he "***hate[d] paying for [TransMedics] private jets to fly their surgeons all over***," and paying their "***ridiculous transportation invoices***."

160.    A hospital transplant director similarly described his hospitals' issues with TransMedics imposing unnecessary flights even in situations were ground transport would have been more logical and economical, for example, "***getting an organ that's from a DCD donor that's only 150 miles away and you can drive there with your liver team***," prompting him to rhetorically ask "***why would you need to use their aviation company and their surgeon when you could provide those services yourself***." And a former TransMedics pilot similarly described the Company's practice of flying irrationally short distances, such as flights from Newark, NJ to White Plains, NY—a distance of only 60 miles by car.

### B.    TransMedics' Presentations At The March 6, 2023 Cowen Healthcare Conference And March 13, 2023 Oppenheimer Conference

161.    On March 6, 2023, TransMedics presented at the 2023 Cowen Healthcare Conference. During the conference, an analyst expressed concerns about the costs of TransMedics' NOP services, and specifically, whether commercial and government payors would fully reimburse transplant hospitals for those expenses. In response, Defendant Hassanein unequivocally assured investors that "***Every NOP service charge is fully reimbursed. It's not even a close call***[.]"

<u>Question – Joshua Jennings</u>: ... I want to talk about how OCS is driving overall transplant volume growth, but maybe one – another maybe one or two questions on NOP.  Just thinking about demand building and ***centers potentially being worried***, I mean ***everyone is worried about getting paid for expenses and on the NOP side, specifically the service fees***. And when you think, you're at a point now where there is enough experience through 2022 and 2021, but mostly 2022, where centers are getting paid for the NOP service expense and then the charge, that's an easier discussion as you're looking at new centers, what is that discussion?

<u>Answer – Waleed H. Hassanein</u>: ***Every NOP service charge is fully reimbursed. It's not even a close call, everything we do in the service model is exactly what the transplant programs have been doing for the last four decades. So, that's not a question at all.*** Yes, there is a significant more awareness now about the NOP, about the big centers that utilize NOP pretty aggressively, ***that they're getting reimbursed and that's creating its own momentum or catalyst for additional centers to come through***. …that's the beauty of the NOP and we expect that to continue to grow through 2023 and 2024.

162.    Defendants made similar statements at the March 13, 2023 during TransMedics' presentation at the Oppenheimer Healthcare Conference.  Specifically, during the conference, an analyst again raised concerns about the high costs of NOP services, and asked whether those costs could be a hinderance to growth.  But Defendant Hassanein again unequivocally asserted that these costs were "***all covered under the existing reimbursement mechanisms for organ transplant***":

<u>Question – Suraj Kalia [Oppenheimer Analyst]</u>: So, Waleed, thank you for that. Waleed, we have talked offline in terms of ***reimbursement for OCS and NOP. That is one of the questions that frequently comes up in client conversations***. I would love for you to dissect reimbursement, very simplistically speaking, make it palatable for clients' consumption. If there are challenges, how is it worked out? Just kind of walk us through the nuts and bolts.

<u>Answer – Waleed H. Hassanein</u>: Sure. So, Suraj, thank you for the question***. It's very important question of course***. So let me start by saying ***one important fact that every charge around the NOP, from technology to surgical procurement to clinical management to transportation costs are all covered under the existing reimbursement mechanisms for organ transplant. So that is a fact***.

Moreover, Hassanein insisted that not only Medicare, but also commercial payors all fully covered all costs related to TransMedics' NOP services, because "all commercial payers that cover organ

transplant follow the [Center for Medicare and Medicaid Services ("CMS")] model of reimbursement":

> So for CMS [Center for Medicare and Medicaid Services], CMS drives the reimbursement strategy for organ transplant and ***all commercial payers that cover organ transplant follow the CMS model***. CMS is reimbursing organ transplant from two dedicated budgets. The first budget is the traditional DRG, but that covers the transplant procedure and the posttransplant stay for first 15 days to 30 days depending on the center or the organ.

> But another budget is called Organ Acquisition Cost Center. ***It's literally a pass-through budget or a fee for service budget that covers all organ preservation, surgical procurement, transportation, any clinical services provided, any lab testing or diagnostics provided for organ procurement***. …

> ***The same happens with the commercial payers. The only difference between CMS and the commercial payer in some forms of contract with commercial private payers in the US, they lump sum these two budgets together and provide a global rate. So that's the only nuances between CMS, which is two separate budgets***.

163.    The statements in paragraphs 161-162 were materially false and misleading. Indeed, as later revealed, TransMedics' costs were *not* "fully reimbursed" to hospitals by both Medicare and commercial payors.  Indeed, a Vanderbilt surgeon confirmed—directly contradicting Defendants' statements--"***I understand that TransMedics, they're going to tell you, this is going to be covered by Medicare and by private insurance and yadda, yadda***. …. ***The reality is that right now*** … you add this cost into your acquisition cost for Medicare, but ***you get paid about 50-60% of the cost***."   Moreover, the surgeon explained "***the commercial insurance… They don't pay you anything. They pay you zero if you use TransMedics unless you renegotiate a contract***."

164.    Similarly, a UPMC Operations Director explained that commercial insurance reimbursement was fixed, not unlimited, such that "***when you go to your commercial insurances, they don't care what your expenses to get the organ, they're still going to pay you the same case rate they agreed to. Our reimbursement number currently doesn't change*** … ***They actually pay per transplant***."   As such, other surgeons and hospital executives explained that TransMedics'

bills ate up a "very, very substantial amount of the margin" and "erod[ed] a significant amount of [hospitals'] profit" on transplants, and were "**so darn expensive**" that they were "**not sustainable**" for hospitals, leading some hospitals to move to other options.

### C. The September 11, 2023 Morgan Stanley Annual Global Healthcare Conference

165.    On September 11, 2023, TransMedics presented at the Morgan Stanley 21st Annual Global Healthcare Conference.    During the conference, an analyst raised questions about the impact of "margin structure" and "price negotiations" on the business, as well as potential "barriers to entry" for competition.    In response, Defendant Hassanein asserted that the NOP gave the Company a "big moat" versus competitors, but also that TransMedics' would not "**use [its] unique position to g[o]uge the market**."    Specifically, Hassanein asserted: "**[t]he NOP is a big moat**. We always said that. But **with adding the logistics control over that, that gives us a bigger, wider, deeper moat around the business that nobody in the industry can access**."    However, he explained, "**[we] don't use that unique position to g[o]uge the market**."

166.    The statements in paragraph 165 were materially false and misleading.    As numerous surgeons, hospital administrators, and other transplant professionals confirmed, TransMedics' business was very much dependent on "us[ing] its…position to gouge the market."    Indeed, one transplant executive spoke of TransMedics' practice of "**holding [the transplant center] hostage**" by calling them with an available organ that was already on their OCS machine and requiring them to agree in advance to provide a blank check for TransMedics' services if they wanted the organ.    Indeed, the executive described an incident in which Hassanein personally called a transplant center and "**g[ave] them 48 hours to pay all of these flight charges that they never agreed to pay**. …**And essentially t[old] them that they [we]re going to shut off access to**

*the machine to them*."  A UCSF administrator described TransMedics' practice of "***flying their staff from multiple locations to a case***," just so they could "***jam[] you with the cost of two planes***."

167.    Moreover, these practices did not give TransMedics a "big moat"—instead, the opposite was true, as hospitals found TransMedics' costs "***not sustainable***" and were thus "getting away from [using TransMedics]" because "they're so darn expensive," and instead moving toward competitors like OrganOx and Paragonix, or toward alternative solutions like normothermic regional perfusion.

### D.    TransMedics' 3Q 2023 Earnings Call

168.    On November 6, 2023, TransMedics held its earnings call for 3Q 2023.  During the earnings call, an analyst asked Hassanein to explain what the "typical case revenue" was for TransMedics' NOP aviation services, in relation to reimbursement.  In response, Defendant Hassanein again asserted that there was no reason to be concerned whatsoever about reimbursement issues impacting TransMedics' business.  Indeed, Hassanein insisted that "this is not a question[,]" because "there is no limit" on reimbursement, and "it's fully reimbursed":

> William John Plovanic, Canaccord Genuity Corp.: And I mean, we don't have visibility into the metrics, but just a ballpark. On average, what's a typical case revenue that gets -- that you've seen kind of push through the hospitals to reimburse for an average case …the revenue for aviation specifically, how should we think about that?

> Hassanein: ***This is not a question***. This is a fact of organ transplant. Old aviation and logistics transport are fully reimbursed through the same mechanism of organ acquisition. ***There's no limit per se***. In fact, ***we are doing this because we believe we could be more efficient and pass some of the efficiencies back to the transplant program***. So I do not want anybody on this call to think that the aviation business is not reimbursed through normal mechanisms of organ transplant. ***There is no limit. There is no specifics***….***it's fully reimbursed. It's not a question of reimbursement***. It's a question of making sure that we have the fleet, the efficiencies, the support team to be able to cover the missions.

169.    The statements in paragraph 168 were materially false and misleading.  Indeed, as a Vanderbilt surgeon confirmed—directly contradicting Defendants' statements—"***I understand that TransMedics, they're going to tell you, this is going to be covered by Medicare and by private***

*insurance and yadda, yadda*," but "*[t]he reality is that right now* … you add this cost into your acquisition cost for Medicare, but *you get paid about 50-60% of the cost*."   Moreover, the surgeon explained "*the commercial insurance… [t]hey don't pay you anything. They pay you zero if you use TransMedics unless you renegotiate a contract*."

170.    Similarly, a UPMC Operations Director explained that commercial insurance reimbursement was fixed, not unlimited, such that "*when you go to your commercial insurances, they don't care what your expenses to get the organ, they're still going to pay you the same case rate they agreed to. Our reimbursement number currently doesn't change* … They actually pay per transplant."   And because of these reimbursement issues, other surgeons and hospital executives explained that TransMedics' bills ate up a "very, very substantial amount of the margin" and "erod[ed] a significant amount of [hospitals'] profit" on transplants, and were "*so darn expensive*" that they were "*not sustainable*," leading some hospitals to move to other options such as Normothermic Regional Perfusion or devices from competitors like OrganOx and Paragonix.

### E.    TransMedics' February 26, 2024 Response Letter And Q4 2023 Earnings Report

171.    On February 26, 2024, TransMedics published the Response Letter, in response to the Gosar Letter, on its website. The Response Letter was personally signed by Defendant Hassanein and appeared on TransMedics letterhead. The Response Letter emphatically denied the key claims made by the Gosar Letter.   For example, the Response Letter expressly denied the Gosar Letter's claims that the Company had pressured transplant centers into using their overpriced logistics services in order to use their OCS product, claiming that this "couldn't be further from the truth":

> Your letter accused TransMedics of pressuring hospitals to utilize our more expensive logistics. *This couldn't be further from the truth*. TransMedics presents the logistics quotation to transplant centers using our NOP service. *The transplant centers then have the final say on whether they want to use our services or not*.

172.    Indeed, Defendant Hassanein insisted that Transplant Centers' use of the NOP service was not only entirely voluntary and free of coercion, but was wholly due to the NOP's "**efficient cost profile**" and better outcomes, stating that "[o]ver the past 24 months, more and more centers elected to transition to NOP **due to its more efficient cost profile, better clinical outcomes, and the ability to increase their transplant volumes without surgical fatigue of their staff**." Hassanein claimed that this was because "**[t]he NOP program was created to....[r]educe the fixed infrastructure and resources costs required of transplant centers to manage the OCS technology** to access more donor organs and grow their overall transplant volume" and to "[p]rovide a better way to minimize fatigue and manage work-life balance of the surgical and clinical staff of the transplant centers."

173.    Also on February 26, 2024, TransMedics held its earnings call for Q4 2023.  During the call, Defendant Hassanein again denied the claims in the Gosar Letter, emphatically stating that the accusations were "grossly inaccurate, unfounded and based on wrong information.":

> This letter contains serious accusations, **which are grossly inaccurate, unfounded and based on wrong information**. **Let me repeat again. This letter contains serious accusations, which are grossly inaccurate, unfounded and based on wrong information**....This letter came out of left field. It **was not supported by any facts**. It was complete -- completely unfounded.....I don't know where this letter -- how this letter came about other than it appears that there's some **misinformation** being propagated but our response is pretty strong, and it was designed as such to make sure that if anybody wants to go down the same path that they need to know exactly the facts before they come and levy these accusations against TransMedics

174.    Meanwhile, Hassanein insisted that the "sole" reason for the NOP's growth was "operational efficiency" along with "highest level of clinical care" and "overall cost efficiency[,]" and, importantly, that the growth was "**not based on anything else**.":

> We are confident that this **sustained growth and success of NOP is based solely on the operational efficiency to grow transplant volumes, highest level of clinical care of donor organs and the overall cost efficiency experienced by transplant**

65

*programs* across the United States.....***The success of OCS NOP program is based on better clinical, economic and operational outcomes experienced by the transplant centers and not based on anything else***.

175.    The statements in paragraphs 171-174 were materially false and misleading. Indeed, transplant centers did not "have the final say" in whether they used TransMedics' overpriced NOP services, and were not using the NOP due to an "efficient cost profile," "better clinical outcomes," and "the ability to increase transplant volumes" but rather due to Defendants forcing them to use the NOP and "***holding [them] hostage***" if they wanted access to the OCS devices.  As one former TransMedics reimbursement executive confirmed, it was TransMedics' "***policy***" that "***[c]enters that had bought OCS systems were not allowed to buy [OCS] cartridges unless they used the [NOP services]***."  And numerous transplant surgeons and hospital executives confirmed this policy, explaining that "***you don't have access to [OCS]…unless you use their [NOP] service***," and that "***you don't have another option***," and that TransMedics was "***essentially mandating, requiring you to use their surgeons and their procurement teams***."  One transplant director similarly described how TransMedics was "***charging a lot of money for not only the device but also their NOP program, their aviation company - all the stuff that they've rolled in and they tried to force it down everybody's throat that to use their liver device***," and likened this to "***a price-fixed dinner [where] you couldn't do a la carte***."  Similarly, a director at Buckeye Transplant Services explained that "…***[y]ou cannot just have the device, you have to have their specialists.*** No matter what, you're going to have their specialist fly out to the organ recovery and either meet your team who's doing the recovery and fly back, or you're going to pay for their surgeon to go out and do that, and both are very expensive."

176.    Thus, for similar reasons, it was false and misleading to claim that transplant centers were using the NOP solely due to its purported benefits and "not based on anything else."  Indeed,

one Vanderbilt university surgeon expressly stated that the claims in the Gosar Letter were correct, affirming that "*[i]t's a very honest letter.*"

### F.   The March 4, 2024 Cowen Healthcare Conference And March 12, 2024 Oppenheimer Healthcare Conference

177.   On March 4, 2024, TransMedics presented at the 2024 Cowen Healthcare Conference.  During the conference call, an analyst raised concerns that he had heard of "feedback" from hospitals about difficulties getting reimbursed for TransMedics' OCS device and NOP services, including TransMedics' aviation services.

178.   In response, Defendants Hassanein insisted that this was "not accurate" and wholly based on "confusion" over reimbursement.  As Hassanein explained:

> I think this *confusion* comes when you ask a physician or a surgeon about Medicare cost support. They really are not that involved. They don't know the mechanisms. And there's a farce in transplant medicine. They tell you, oh, we're getting reimbursed $0.50 on $1, whatever. $0.60 on $1. *That's not accurate. It's just a reflection of the mechanism*.

Hassanein asserted that this "confusion" simply stemmed from the fact that the "cost report" hospitals send every year to CMS also includes a list of costs incurred by commercial patients, and that CMS will only reimburse the Medicare-covered portion of those expenses.  Meanwhile, Hassanein insisted, commercial insurance was covering all of the costs for commercial payors, leaving no costs unreimbursed.  As he explained, "commercial payers are highly incentivized and driving for more organ transplants to happen. *That's why commercial payers responded to centers that presented them case to increase their organ acquisition budget by a significant amount to cover the OCS NOP positively and favorably, and they all got the money requested*[.]"

179.   The analyst also asked whether transplant centers using the NOP were happy with the services and whether they were thus continuing to use those services, *i.e.* whether the NOP was "sticky" with customers.  In response, Hassanein asserted that not only was the program "*very*

67

*sticky*" with customers, but that "*we've never seen an NOP[-using] center that starts with NOP and walk[s] away from NOP.*"

180.    The statements in paragraphs 178-179 were materially false and misleading.  As a Vanderbilt surgeon explained, "*I understand that TransMedics, they're going to tell you, this is going to be covered by Medicare and by private insurance and yadda, yadda*. …. *The reality is that right now* … you add this cost into your acquisition cost for Medicare, but *you get paid about 50-60% of the cost.*"   Moreover, the surgeon explained "*the commercial insurance… They don't pay you anything. They pay you zero if you use TransMedics unless you renegotiate a contract.*"

181.    Similarly, a UPMC Operations Director explained that commercial insurance reimbursement was fixed, not unlimited, such that "*when you go to your commercial insurances, they don't care what your expenses to get the organ, they're still going to pay you the same case rate they agreed to. Our reimbursement number currently doesn't change* … *They actually pay per transplant.*"  As such, other surgeons and hospital executives explained that TransMedics' bills ate up a "very, very substantial amount of the margin" and "erod[ed] a significant amount of [hospitals'] profit" on transplants, and were "*so darn expensive*" that they were "*not sustainable*" for hospitals.

182.    Moreover, some hospitals were "walk[ing] away" from TransMedics due to those high costs.  For example, a former TransMedics OCS Specialist described how hospitals in Texas were cancelling contracts due to TransMedics' high costs.  A transplant executive similarly relayed how University of Cincinnati hospital was "*getting away from [using TransMedics] because it's just so darn expensive,*" and that University of Virginia was doing the same.  Another former TransMedics OCS Specialist explained that University of Washington was also moving away from TransMedics because they were "upset about the cost" and had gone "way over budget," and thus

"*making an effort to not use it at all*."  A UCSF hospital administrator similarly explained that "*we don't want to have to rely so heavily on TransMedics… These costs are really making it challenging for u*s."

183.    On March 12, 2024, TransMedics presented at the Oppenheimer Healthcare Conference.  During the conference, an Oppenheimer analyst asked whether customers for TransMedics OCS device were also required or pushed to use the Company's NOP services.  In response, Defendant Hassanein again insisted that there was no such requirement or pressure, and that it was entirely "*up to the transplant program to say yay or nay whether or not they want to use TransMedics logsistics*":

> Answer – Dr. Waleed Hassanein: … *we are leaving the final decisions completely in the hands of the transplant program*. We offer quotes for the logistics for every mission that we get through the NOP, and *it's up to the transplant program to say yay or nay whether or not they want to use TransMedics logistics, whether it's air or ground*.....And we've said numerous times to transplant programs, we don't operate based on a contract concept. We want to make sure that our service, our world class service and our availability and our pricing is what brings you back to using TransMedics logistics. So that's what have we been implementing to date. *So it's up to them whether or not they use us or not*.

184.    Later in the same conference, Hassanein further emphasized that TransMedics' goal with the NOP was to "reduce cost and share that with the transplant program" and insisted that "*[w]e're  in this not to gouge the system*":

> The reason why we're in the logistics aspect of this chain is because we see a huge opportunity to reduce cost and share that with the transplant program. We're in this for the long-term. We see a huge opportunity to efficiently run our own logistic network and pass that cost efficiency back through the transplant program. We want the transplant program to benefit from using our logistics. **We're in this not to gouge the system.**

185.    The statements in paragraphs 183-184 were materially false and misleading. Indeed, TransMedics was not "leaving the final decisions completely in the hands of the transplant program" and was not leaving it "up to the transplant program to say yay or nay whether or not

they want to use TransMedics logistics, whether it's air or ground." Instead, as numerous transplant professionals and executives confirmed, TransMedics was forcing them to use the NOP and "***holding [them] hostage***" if they wanted access to the OCS devices. As one former TransMedics reimbursement executive confirmed, it was TransMedics' "***policy***" that "***[c]enters that had bought OCS systems were not allowed to buy [OCS] cartridges unless they used the [NOP services]***." And numerous transplant surgeons and hospital executives confirmed this policy, explaining that "***you don't have access to [OCS]…unless you use their [NOP] service***," and that "***you don't have another option***," and that TransMedics was "***essentially mandating, requiring you to use their surgeons and their procurement teams***."

186.    Moreover, as one hospital transplant director explained, TransMedics was indeed "goug[ing] the system" by "***charging a lot of money for not only the device but also their NOP program, their aviation company - all the stuff that they've rolled in and they tried to force it down everybody's throat that to use their liver device***." The transplant director analogized this to "***a price-fixed dinner [where] you couldn't do a la carte***." A transplant hepatologist and director of liver transplants similarly explained, "***[i]t is a ridiculously expensive solution. I could argue predatory… my biggest issue with it is that it is outrageously overpriced.***"

**G.    TransMedics' Q1 2024 Earnings Call**

187.    On April 30, 2024, TransMedics held its Q1 2024 Earnings Call. During the call, an analyst asked about the types of "feedback" TransMedics was getting from customers that had used the NOP aviation services. In response, Hassanein touted the "***more efficient cost structure***" of TransMedics' aviation services as the reason for the "rapid pace" of customer growth for those service:

> Question: … Can you share any general feedback from customers that have used TransMedics aviation? And maybe if or how that feedback has changed since you began integrating the aviation segment?

70

<u>Hassanein</u>: … I think the only thing that I can share publicly … is I point out to the results. I point out to … the[] rapid pace by which we went from 0 to 105 customers using our TransMedics logistical services. ***And we expect to go deeper within these accounts. I'll leave it at that. I think centers are beginning -- or are actually witnessing the better structure, the more efficient cost structure and the availability that is afforded by TransMedics logistics. And again, I point to the results.***

188.    The statements in paragraph 187 were materially false and misleading.  In reality, TransMedics was not providing a "more efficient cost structure" with its logistics, but was forcing highly excessive and inefficient logistics charges onto its customers.  As a former TransMedics OCS Specialist explained the Company engaged in "entirely unethical" practices of padding its bills with excessive flights, averring that "***they are utilizing their aircraft to bill for the aircraft***."  A UCSF hospital administrator described how he "***hate[d] paying for [TransMedics] private jets to fly their surgeons all over***," and paying their "***ridiculous transportation invoices***."

189.    A hospital transplant director similarly described his hospitals' issues with TransMedics imposing unnecessary flights even in situations where ground transport would have been more logical and economical, for example, "***getting an organ that's from a DCD donor that's only 150 miles away and you can drive there with your liver team***," prompting him to rhetorically ask "***why would you need to use their aviation company and their surgeon when you could provide those services yourself***."  And a former TransMedics pilot similarly described the Company's practice of flying irrationally short distances, such as flights from Newark, NJ to White Plains, NY—a distance of only 60 miles by car.

### H.    TransMedics' 2Q 2024 Earnings Call And September 2024 Morgan Stanley Healthcare Conference Presentation

190.    On July 31, 2024, TransMedics held its earnings call for 2Q 2024. During the call, an analyst asked Defendants to discuss the Company's "pricing leverage" for its products and

services going forward.  In response, Defendant Gordon again insisted that TransMedics was "***not trying to gouge the system***":

> As far as pricing leverage, look, at the moment, we've got a pricing model that works. As we move out and grow, we need to determine what the right model is. Maybe service has some levers there. But for now, ***we're not trying to gouge the system. We have a pricing model that works. And we're going to continue with that***. We don't see any changes in the near future.

Similarly, Hassanein said that he wanted to "echo what Stephan just said" on pricing leverage, asserting that the Company was "***not in this to just capitalize on leverage***":

> I want to echo what Stephen just said, especially on the second part of the question, Suraj, which is an excellent question as always. Listen, ***we don't look at transplantation as an opportunity for pricing leverage. What we are focusing on is growing the overall national transplant volume.*** We're growing our market share in the existing transplant volume. We are comfortable with our current pricing model. We want to be a trusted partner to transplant programs. This is a very important aspect of our mission. ***We're not in this to just capitalize on leverage***.

191.    Hassanein also again touted the Company's purported focus solely on providing "cost-effective" logistics to transplant hospitals, insisting that "we provide the most economical way of managing organ transplants since the invention of organ transplants[,]" because  "***[t]he way our logistics network is operating is providing significant cost efficiency to every major transplant program that is working with us***[.]"  As such, Hassanein averred, "that is how we're going to get the lion's share of the market with these approaches, ***just focusing on the fundamentals and providing good clinical outcomes or the best clinical outcomes and the most cost-effective way of managing organ transplant for these programs.***"

192.    The statements in paragraphs 190-191 were materially false and misleading. Indeed, TransMedics was very much "trying to gouge the system" and "capitalize on [their] leverage," and was not "providing significant cost efficiency" or "focusing on…the most cost-effective way of managing organ transplant.  Instead, as one hospital transplant director explained, TransMedics was "***charging a lot of money for not only the device but also their NOP program,***

*their aviation company - all the stuff that they've rolled in and they tried to force it down everybody's throat that that to use their liver device.*"   The transplant director analogized this to "*a price-fixed dinner [where] you couldn't do a la carte.*"  A transplant hepatologist and director of liver transplants similarly explained, "*[i]t is a ridiculously expensive solution. I could argue predatory… my biggest issue with it is that it is outrageously overpriced.*"  Others described how TransMedics' services destroyed a "*very, very substantial amount of the margin*" and "*erod[ed] a significant amount of [hospitals'] profit*" on transplants, because they were "*so darn expensive*" that they were "*not sustainable*" for hospitals.

193.    Moreover, TransMedics was systematically engaging in highly *inefficient* and *non-cost-effective* practices to pad their bills, such as "*getting an organ that's from a DCD donor that's only 150 miles away and you can drive there with your liver team*" or flying from Newark, NJ to White Plains, NY—a distance of only 60 miles by car.

194.    On September 4, 2024, TransMedics presented at the 2024 Morgan Stanley Healthcare Conference.  During the conference, Hassanein again emphasized the supposed cost efficiencies of the NOP, which he claimed provide "*the most cost-effective transportation in the history of organ transplant, period, full stop.*"  Specifically, Hassanein explained that the "cherry on top is the us controlling the logistics allows us to share some of the cost efficiency of us managing our own fleet and logistics network with the transplant program. So *we're delivering the most cost-effective transportation in the history of organ transplant, period, full stop.*"

195.    The statements in paragraph 194 were materially false and misleading. TransMedics was not providing "the most cost-effective transportation in the history of organ transplant," but was forcing highly excessive and inefficient logistics charges onto its customers. As a former TransMedics OCS Specialist explained the Company engaged in "entirely unethical"

practices of padding its bills with excessive flights, averring that "***they are utilizing their aircraft to bill for the aircraft***."  A UCSF hospital administrator described how he "***hate[d] paying for [TransMedics] private jets to fly their surgeons all over***," and paying their "***ridiculous transportation invoices***."  The UCSF administrator further complained that "***we are flying people, flying their staff from multiple locations to a case***" and that TransMedics was often "***jamming [the hospital] with the cost of [] two planes***."

196.  A hospital transplant director similarly described his hospitals' issues with TransMedics imposing unnecessary flights even in situations were ground transport would have been more logical and economical, for example, "***getting an organ that's from a DCD donor that's only 150 miles away and you can drive there with your liver team***," prompting him to rhetorically ask **"*why would you need to use their aviation company and their surgeon when you could provide those services yourself*.**"  And a former TransMedics pilot similarly described the Company's practice of flying irrationally short distances, such as flights from Newark, NJ to White Plains, NY—a distance of only 60 miles by car.

### I.    TransMedics' 3Q 2024 Earnings Call

197.  On October 28, 2024, TransMedics held its earnings call for the third quarter of 2024.  Due to the sudden decline in TransMedics' revenue and profit margin, Defendant sought to reassure investors that the sole reason for the decline was "seasonality," that the decline was "directly in line with the decline in national transplant volumes[,]" and that there was no other reason whatsoever for the drop in TransMedics' business.  Indeed, Defendant Hassanein emphasized that he wanted to "make it crystal clear" that the Company had "not seen any fundamental or competitive dynamics play any role" in TransMedics' volume decline:

> So the sequential decline in the U.S. case volume was ***directly in line with the decline in national transplant volumes. Importantly, we did not see any degradation of our market share or center penetration on all three organs. I want***

*to make it crystal clear. We have not seen any fundamental or competitive dynamics playing any role* in the slight sequential decline in case volume for OCS in Q3. *Let me repeat it again, there has not been or we have not seen any fundamental or competitive dynamics playing any role* in the slight sequential decline in case volume for OCS in Q3

198.    Defendant Hassanein then continued to assert, throughout the earnings call, that there was no other reason for the decline whatsoever other than general seasonality in the transplant market.  For example, Hassanein insisted that "[t]here[] [was] absolutely categorically no impact of any technologies, methodologies or competitive dynamic on the decline in Q3, specifically in heart."  And removing any doubt about his intended message, Hassanein warned investors against "*trying to create something out of nothing*[,]" because "*pricing pressure has nothing to do with what happened in Q3*":

> *again, I caution the Street from trying to create something out of nothing. Price elasticity or pricing pressure has nothing to do with what happened in Q3* because we've seen major transplant programs lose significant portion of their annual volume in the United States. I'm talking major transplant programs being behind 40, 50 transplants in the month of August, for example, *has nothing to do with pricing sensitivity*. I can tell you that these transplant program[s] would have done anything to get access to transplants during that time.

199.    The statements in paragraphs 197-198 were materially false and misleading.  TransMedics' revenue decline was not due to "seasonality," and, in reality, TransMedics was experiencing "pricing pressure" and "pricing sensitivity."  Indeed, a former TransMedics OCS Specialist described how hospitals in Texas were cancelling contracts during 3Q 2024 due to TransMedics' high costs.  A transplant executive similarly relayed how University of Cincinnati hospital was "*getting away from [using TransMedics] because it's just so darn expensive*," and that University of Virginia was doing the same.  Another former TransMedics OCS Specialist explained that University of Washington was also moving away from TransMedics because they were "upset about the cost" and had gone "way over budget," and thus "*making an effort to not*

*use it at all*."  A UCSF hospital administrator similarly explained that "*we don't want to have to rely so heavily on TransMedics… These costs are really making it challenging for us*."

J.    **TransMedics' December 2024 Piper Sandler Conference Presentation And December 2024 Analyst Day**

200.    On December 3, 2024, TransMedics presented at the 2024 Piper Sandler Healthcare Conference.  During the conference, in response to an analyst question about whether TransMedics could maintain its pricing, Hassanein again assured investors that "*[w]e're not gouging the market in any way*."   Specifically, the analyst asked "Can you guys maintain this level of pricing? And why is that?"  In response, Hassanein averred:

> We are maintaining [our pricing] because many reasons. One, we are delivering significant value compared to anybody in the industry. We think our price actually is fairly priced. *We're not gouging the market in any way*. We actually think we're leaving some value on the table. But that's fine. We are long-term-focused. Number three, *we are sharing significant cost savings with the transplant program, especially with the network effect that we created around NOP and aviation that nobody else in the industry can match*. ... That's why, we are maintaining our price. And that's why, we think that we're providing significant value and sharing cost savings and the value of the network effect that we've created in the NOP with our transplant program.

201.    Similarly, on December 10, 2024, Defendants were again asked about their pricing structure.  In response, Hassanein again reaffirmed that the Company did not "gouge the market," explaining that "*we pride ourselves for not gouging the market. We let others do that*."

202.    The statements in paragraphs 200-201 were materially false and misleading.  As numerous surgeons, hospital executives, and transplant professionals confirmed, TransMedics was indeed "gouging the market" and was not providing "significant cost savings."  Instead, as one hospital transplant director explained TransMedics was "*charging a lot of money for not only the device but also their NOP program, their aviation company - all the stuff that they've rolled in and they tried to force it down everybody's throat that to use their liver device*."   The transplant director analogized this to "*a price-fixed dinner [where] you couldn't do a la carte*."  A transplant

hepatologist and director of liver transplants similarly explained, "*[i]t is a ridiculously expensive solution. I could argue predatory… my biggest issue with it is that it is outrageously overpriced.*" Others described how TransMedics' services destroyed a "*very, very substantial amount of the margin*" and "*erod[ed] a significant amount of [hospitals'] profit*" on transplants, because they were "*so darn expensive*" that they were "*not sustainable*" for hospitals.

## VI.    ADDITIONAL ALLEGATIONS OF SCIENTER

203.    As alleged herein, numerous facts give rise to a strong inference that Defendants knew or recklessly disregarded that their statements and omissions concerning TransMedics' cost-efficient NOP model and its customer's willingness to continue using TransMedics' services were materially false and misleading when made.  In addition to the allegations set forth above, these particularized facts include the following.

204.    *TransMedics' entire business was made up of its OCS device and NOP services, and the NOP was the largest driver of its Class Period growth.*  Throughout the Class Period, TransMedics' sole product was OCS, and its only other significant revenue stream was its NOP services that came along with OCS.  Moreover, TransMedics' revenue growth was largely fueled by the NOP.  As early as May 1, 2023, TransMedics reported that its 162% increase in quarterly revenue was "*due primarily* to NOP adoption in the U.S."  That theme—that revenue growth was "due primarily" to increased NOP adoption—was *repeated in every single earnings press release throughout the Class Period*.  For example, when reporting full year 2023 financial results on February 26, 2024, TransMedics explained that the 2023 revenue "increase was due primarily to the increase in utilization of the OCS *through the NOP*."  Hassanein himself underscored the pivotal role NOP played for the Company, explaining on March 12, 2024, that "the NOP was the major catalyst for rapid adoption for the growth that our business has been experiencing." On September 4, 2024—nearing the end of Q3 2024—Hassanein again confirmed that "we wouldn't

have been here … achieving this huge growth trajectory without the NOP and without the integration of NOP into our model." The fact that the Company's revenue growth and future viability were virtually entirely dependent on the success of the NOP supports a finding of Defendants' scienter.

205.    *Defendants' specific, regular public remarks to investors, including in response to direct analysts inquiries, about the pricing and reimbursement to transplant centers, and the viability of the NOP business model are demonstrative of their intimate knowledge about those subjects and Defendants' understanding of the critical importance thereof.* Defendants made numerous specific statements throughout the Class Period explaining that the Company implemented fair pricing because doing so was necessary to scale the business and keep repeat customers. Specifically, Defendants made highly specific claims that: (a) "[e]very NOP service charge is fully reimbursed," that "every charge around NOP, from technology to surgical procurement to clinical management to transportation costs are all covered…that is a fact," and "there's no limit per se" on organ acquisition costs; (b) despite the purported full reimbursements, TransMedics was committed to not using its "unique position to g[o]uge the market," was not "trying to gouge the system" and was not "gouging the market in any way"; (c) the fair pricing purportedly "worked" as it made the NOP "operationally scalable" and the "most efficient cost structure in transplant logistics in the United States"; and therefore (d) TransMedics' "pricing is what brings [customers] back to using TransMedics" and the NOP success was "solely" the result of "cost efficiency" and "better clinical, economic, and operational outcomes experienced by the transplant centers and not based on anything else." Furthermore, Defendants called TransMedics' NOP the "most cost-effective transportation in the history of organ transplant, period, full stop," that purportedly allowed TransMedics to "share" some of the procurement costs with its customers.

Defendants made these statements in direct response to specific inquiries from market analysts reflecting concern about those very topics, and Defendants' statements in fact reassured investors regarding the success and future viability of the Company's revenues. The specificity and constant repetition of Defendants' statements themselves are probative of scienter.

206. *The Gosar Letter, and Defendants' vehement denials of the concerns expressed in that letter, are probative of scienter.* The Gosar Letter, made public on February 22, 2024, called into question Defendants' business model of charging extreme prices for use of its OCS technology and holding the "lifesaving technology" "hostage" while "pressing hospitals to utilize [NOP's] expensive aircraft." It also claimed that TransMedics greatly increased the price it charged for OCS disposables and reprimanded the Company's "coercive tactics" which included mandated use of TransMedics professionals to operate the machine, thereby greatly increasing the cost to hospitals. The letter thus put Defendants on direct notice of concerns about these practices.

207. Moreover, in response, TransMedics published a letter authored by Hassanein which vehemently asserted that the Gosar Letter's accusations "couldn't be further from the truth." Hassanein specifically denied that the Company used any coercive tactics or overcharged for its services and instead claimed that the Company's success was solely due to its customer's "more efficient cost profile" under NOP. According to Hassanein, TransMedics "created a new, more scalable model" that provides "significant operational and cost efficiencies to the transplant centers." Similarly, during the February 26, 2024 earnings call, Hassanein confirmed that the Gosar Letter "was not supported by any facts" and was "completely unfounded." The fact that Defendants were unquestionably on notice of the issues raised in Gosar Letter and emphatically denied that such issues were prevalent at the Company in any way, supports a finding of scienter.

208.    *Hassanein was directly confronted about the Company's exorbitant pricing and the coercive business practices undermining the sustainability of the Company's business model*.  As reported in the Scorpion Report, on multiple occasions transplant centers and OPOs directly confronted Defendant Hassanein about the Company's coercive and unsustainable business model.  For example, an executive at Massachusetts General Hospital explained, "***I've had to have very candid conversations with [TransMedics'] leadership***," due to TransMedics' regular practice of imposing high logistics costs without even consulting the hospital or surgeon.  The executive explained that these issues would "occur at a high[] frequency, almost once a month, sometimes even a couple of times a week where now ***I have to get involved whenever there's a certain threshold that gets crossed as far as costs go where I would then have to bypass the entire team, go straight up to their leadership, and say, this is not what we discussed***, ***and we either need to end this or address this***."  The executive further explained that the problem was ongoing, i.e. that "***these types of issues continue to sprout***."

209.    Moreover, as one hospital transplant director recalled, a team from Duke University hospital made a presentation at a meeting attended by Defendant Hassanein himself during which they "***showed how much of a hit they took with TransMedics liver use at their center***," breaking down in detail the reduction in Duke's margin from using TransMedics' aviation and other services.  As the transplant director recalled: "***at that meeting - Waleed [Hassanein] and his people got so angry at the Duke guy for bringing it up.***"

210.    Similarly, an OPO executive relayed an incident where Hassanein personally called a transplant center and threatened to withhold use of the OCS machine unless the center came current on extraordinary "flight charges that [the center] never agreed to pay."  Furthermore, analysts specifically asked Hassanein whether TransMedics could "maintain this level of pricing"

and to comment on "the margin structure for the clinics and the programs themselves…when they're utilizing NOP." Hassanein's direct exposure to the challenges surrounding TransMedics' pricing and long-term sustainability substantiates a finding that he had direct knowledge of these issues.

211. *The sudden replacement of Defendant Gordon as TransMedics' CFO is indicative of scienter.* Just one month after disclosing a surprise decline in revenue in Q3 2024, and just one month before the Scorpion Report was published, Defendant Gordon was suddenly removed as the Company's CFO without any notice, effective immediately, without clear explanation, and with a replacement already in place. The highly suspicious timing and circumstances surrounding Defendant Gordon's removal as CFO further support scienter.

212. *Defendant Hassanein and Gordon's insider selling supports a finding of scienter.* As set forth above, Defendants Hassanein and Gordon sold a total of ***$45 million*** worth of TransMedics stock during the Class Period at prices inflated by their fraud. These sales were suspicious in both timing and amount. First, Hassanein's $34.4 million in Class Period sales involved him selling significantly more shares and receiving ***well over three times the proceeds*** he received from stock sales during the Control Period. Similarly, Gordon sold more shares during the Class Period than during the Control Period and reaped proceeds of nearly three times as much as he did before. Moreover, Hassanein made large and unusual sales outside his 10b5-1 plan (which he never did at any other time during the Control Period or Class Period), and these sales were even more suspicious because the sales were made during Q3 2024—more than two-thirds through the disastrous quarter—and at prices within 1% of TransMedics' all-time high stock price.

## VII.   LOSS CAUSATION

213. As further described above, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated and/or maintained the price of TransMedics

securities at an artificially high level, and operated as a fraud or deceit on Class Period purchasers of TransMedics securities by failing to disclose and misrepresenting the adverse facts detailed herein.

214.    As detailed below, the truth was revealed through a series of corrective disclosures, causing Lead Plaintiffs and the Class to suffer significant damages as a result.

215.    Lead Plaintiffs and members of the Class purchased TransMedics securities at artificially inflated prices during the Class Period. But for Defendants' fraudulent scheme and material misrepresentations and omissions, Lead Plaintiffs and members of the Class would not have purchased TransMedics securities at artificially inflated prices.

216.    As Defendants' fraudulent scheme and material misrepresentations and omissions were gradually revealed to the market through the corrective disclosures, the price of TransMedics securities declined significantly. The corrective impact of the initial partial disclosures alleged herein was tempered, however, by Defendants' continued material misrepresentations and omissions, as detailed above.

217.    Lead Plaintiffs and the Class suffered economic losses as the price of TransMedics securities fell in response to the corrective disclosures, as demonstrated below. The disclosures described below, however, do not necessarily represent an exhaustive list of all stock price declines attributable to Defendants' fraudulent conduct, given that fact and expert discovery in this case has not yet begun. Lead Plaintiffs expressly reserve the right to identify additional relevant disclosures and price declines following an opportunity to conduct full fact and expert discovery in this case.

A.    **February 22, 2024 Corrective Disclosure**

218.    On February 22, 2024, the Daily Caller reported on the Gosar Letter issued by Representative Gosar the prior day and included the letter's full text for public review.  The Gosar Letter disclosed serious improprieties with TransMedics' operations and practices, including

dramatically increased and unsustainable pricing for OCS disposables, mandated minimum volume requirements for transplant centers, forced utilization of TransMedics' NOP system, and implementation of "coercive tactics" to "utilize TransMedics aviation's costly planes" under the threat of "losing access to TransMedics' life saving device."

219.    In response to the disclosures in the Gosar Letter, TransMedics' stock price fell approximately 2.5% from a closing price of $86.99 per share on February 21, 2024, to a closing price of $84.81 on February 22, 2024.  As the market digested the serious charges in the Gosar Letter, TransMedics' stock price declined an additional 8.3% over the following two days, to close at $77.74 on February 26, 2024.

220.    Notwithstanding the price decline following these disclosures, TransMedics' stock price remained artificially inflated because Defendants continued to materially mislead the market regarding their true business practices, including by vehemently denying the charges in the Gosar Letter, and by concealing the full extent of the Company's predatory pricing, TransMedics' coercive business practices, and the extreme frustration expressed by TransMedics' customers.

**B.    October 28, 2024 Corrective Disclosure**

221.    After the markets closed on October 28, 2024, TransMedics issued a press release disclosing disappointing results for the third quarter of 2024.  Specifically, the company reported revenue of just $108.8 million, a decline of 5% as compared to the $114.3 million in revenue earned during Q2 2024. The Company also disclosed that its gross margins declined to just 56% as compared to the 61% gross margins experienced in both the prior quarter, i.e. Q2 2024, and the prior year's third quarter, i.e. Q3 2023.  Later on the accompanying earnings call, despite claiming the decline was due to "seasonality," CFO Gordon admitted that the Company saw "a pause in our consistent sequential growth trajectory that we have maintained since our initial commercial launch[.]" Hassanein similarly confirmed that for the Company to reach its growth goals, "we need

to continue to grow our penetration and overall market. Unfortunately, in Q3, that never -- that didn't happen."

222.    On the earnings call, analysts explained that the poor results were "quite a shock" given Defendants' prior statements, and were "struggling to understand" what happened to TransMedics' growing business.  In print, analysts at Piper Sandler explained that the "magnitude [of the loss] was greater than expected" and that TransMedics was losing market share to other perfusion therapies; Baird explained that "TMDX's miss came as a surprise"; J.P. Morgan complained that the poor results and the Company commentary "raises more questions around why growth would slow to market levels so suddenly"; and Oppenheimer noted the "sequential downtick is a head scratcher."

223.    In response to the news of poor revenue results and the lack of clear explanation as to its cause, TransMedics' share price plummeted 30% from a closing price of $126.24 on October 28, 2024, to closing price of $88.50 on October 29, 2024.

224.    Notwithstanding the price decline following the October 28, 2024 disclosures, TransMedics' stock price remained artificially inflated because Defendants continued to materially mislead the market by claiming the poor results were completely caused by "seasonality" and "normal variability of donor availability," and disclaimed the loss of any market share.

### C.    December 2, 2024 Corrective Disclosure

225.    On December 2, 2024, after market hours, TransMedics issued a press release on Form 8-K, revealing that TransMedics was demoting Defendant Gordon from his position as CFO and replacing him effective immediately, after which he would ultimately be transitioned out of his employment with the Company entirely.

226.     TransMedics' replacement of its CFO with no advance public notice partially disclosed to the market that TransMedics' unsustainable business practices were no longer able to

generate the financial results that TransMedics had achieved in prior reporting periods. This announcement also represented a partial materialization of the undisclosed risks occasioned by TransMedics' unsustainable business practices.

227.    In response to this news, TransMedics' stock price dropped nearly 16% from a closing price of $85.14 on December 2, 2024 to a closing price of $71.44 on December 3, 2024.

### D.    January 10, 2025 Corrective Disclosure

228.    On January 10, 2025, Scorpion Capital published the Scorpion Report, disclosing, amongst other things, that Defendnats' business practices were unsustainable. Specifically, TransMedics had been price-gouging transplant centers by forcing customers to use the NOP service to obtain organs and by excessively utilizing—and overbilling for—the use of TransMedics' private planes. The Scorpion Report also highlighted the long-standing customer complaints about the prohibitive cost of TransMedics' services, and how Duke University presented at a transplant conference on the financial burden and poor economics faced by hospitals that used TransMedics' services. The Scorpion Report therefore revealed the true causes of the revenue shortfall in Q3 2024: customer backlash against TransMedics' coercive practices, which caused customers to avoid using TransMedics whenever possible. Further, the Scorpion Report corroborated and confirmed the facts set forth in the Gosar Letter.

229.    On this news, the price of TransMedics stock dropped $3.74 per share, to close at $68.81 on January 10, 2025, down from the closing price of $72.55 on January 8, 2025, the prior trading day, a drop of 5.16%. The market price for TransMedics securities continued to drop as the market absorbed the information disclosed in the more than 300 pages of the Scorpion Report. Indeed, TransMedics' stock dropped an additional $4.76 per share on January 13, 2025—the next trading day—to close at $64.05, representing a two-day drop of nearly 12%.

## VIII.   PRESUMPTION OF RELIANCE

230.   At all relevant times, the market for the Company's common stock was an open, efficient and well-developed market for the following reasons, among others:

a)   TransMedics' common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b)   As a regulated issuer, TransMedics filed periodic reports with the SEC and the NASDAQ;

c)   TransMedics regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d)   TransMedics was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to those brokerage firms' sales force and certain customers. Each of these reports was publicly available and entered the public marketplace.

231.   As a result of the foregoing, the market for TransMedics' common stock reasonably and promptly digested current information regarding the Company from all publicly available sources and reflected such information in the price of the Company's common stock.  All investors who purchased the Company's common stock during the Class Period suffered similar injury through their purchase of TransMedics' common stock at artificially inflated prices, and a presumption of reliance applies.

232.    A Class-wide presumption of reliance is also appropriate in this action under the U.S. Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding TransMedics' business and operations—information that Defendants were obligated to disclose— positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the material misstatements and omissions set forth above, that requirement is satisfied here.

## IX.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND THE BESPEAKS CAUTION DOCTRINE

233.    The statutory safe harbor or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances does not apply to any of the false and misleading statements pleaded in this Complaint.  The statements alleged to be false or misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false or misleading may be characterized as forward-looking, they were not adequately identified as forward-looking statements when made, and there were no meaningful cautionary statements identifying important facts that could cause actual results to differ materially from those in the purportedly forward-looking statements.

234.    To the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, each of these Defendants had actual knowledge that the particular forward-looking statement was materially false or misleading. Defendants are liable for the statements pleaded because, at the time each of those

statements was made, Defendants knew the statement was false, and the statement was authorized and/or approved by an executive officer and/or director of TransMedics who knew that such statement was false when made.

## X.    CLASS ACTION ALLEGATIONS

235.    Lead Plaintiffs bring this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all persons or entities who purchased or otherwise acquired publicly traded TransMedics securities between February 28, 2023 and January 10, 2025, inclusive (the "Class"), and were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of TransMedics at all relevant times, members of their immediate families, and their legal representatives, heirs, agents, affiliates, successors or assigns, Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof, and any entity in which Defendants or their immediate families have or had a controlling interest.

236.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, TransMedics's shares were actively traded on the NASDAQ.  As of January 31, 2024, TransMedics had 32,715,316 shares outstanding.  While the exact number of Class members is unknown to Lead Plaintiffs at this time, and can only be ascertained through appropriate discovery, Lead Plaintiffs believe that there are at least thousands of members of the proposed Class.  Record owners and other members of the Class may be identified from records maintained by the Company, or its transfer agent(s), and may be notified of this class action using a form of notice similar to that customarily used in securities class actions.

237.    Lead Plaintiffs' claims are typical of the claims of the other members of the Class as all members of the Class were similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

238.    Lead Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Lead Plaintiffs have no interests that conflict with those of the Class.

239.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    a)    whether Defendants violated the Exchange Act by the acts and omissions as alleged herein;

    b)    whether Defendants knew or recklessly disregarded that their statements and/or omissions were false and misleading;

    c)    whether documents, press releases, and other statements disseminated to the investing public and the Company's shareholders misrepresented material facts about the business, operations, and prospects of TransMedics;

    d)    whether statements made by Defendants to the investing public misrepresented and/or omitted to disclose material facts about the business, operations, and prospects of TransMedics;

    e)    whether the market price of TransMedics shares during the Class Period was artificially inflated due to the material misrepresentations and failures to correct the material misrepresentations complained of herein; and

    f)    the extent to which the members of the Class have sustained damages and the proper measure of damages.

240.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this suit as a class action.

## XI.    CLAIMS FOR RELIEF

### COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5
Promulgated Thereunder Against Defendants**

241.    Lead Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

242.    Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Lead Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of TransMedics shares; and (iii) cause Lead Plaintiffs and other members of the Class to purchase TransMedics shares at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each of them, took the actions set forth herein.

243.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the purchasers of the Company's shares in an effort to maintain artificially high market prices for TransMedics shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

90

244.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about TransMedics's business, operations, and prospects, as specified herein. Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of TransMedics' business, operations, and prospects, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about TransMedics and its business, operations, and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of conduct of business that operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

245.    Each of the Individual Defendants' primary liability and controlling person liability, arises from the following facts: (i) each of the Individual Defendants was a high-level executive and/or director at the Company and a member of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's business, operations, and prospects; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Defendants and was advised of and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's financial condition and performance at all relevant times; and (iv) each of the Individual Defendants was aware of the

Company's dissemination of information to the investing public, which they knew and/or recklessly disregarded was materially false and misleading.

246.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing TransMedics' operating condition, business practices, and prospects from the investing public and supporting the artificially inflated and/or maintained price of its common stock. As demonstrated by Defendants' overstatements and misstatements of the Company's business, operations, and prospects, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

247.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of TransMedics shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants or upon the integrity of the market in which the stock trades, and/or in the absence of material adverse information that was known or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants, Lead Plaintiffs and the other members of the Class purchased TransMedics shares during the Class Period at artificially inflated prices and were damaged thereby.

248.    At the time of said misrepresentations and omissions, Lead Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true. Had Lead

Plaintiffs and the other members of the Class and the marketplace known of the truth regarding the problems that TransMedics was experiencing, which were not disclosed by Defendants, Lead Plaintiffs and other members of the Class would not have purchased their TransMedics shares, or, if they had purchased such shares during the Class Period, they would not have done so at the artificially inflated prices that they paid.

249.    By virtue of the foregoing, Defendants each violated § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

250.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiffs and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**COUNT II**

**For Violations of Section 20(a) of the Exchange Act
Against the Individual Defendants**

251.    Lead Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

252.    The Individual Defendants acted as controlling persons of TransMedics within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's operations, and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Lead Plaintiffs contend are false and misleading.  Each of the Individual Defendants was provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by

Lead Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

253.    In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

254.    As set forth above, Defendants each violated § 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, the Individual Defendants are liable pursuant to § 20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Lead Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's shares during the Class Period.

## XII.    PRAYER FOR RELIEF

255.    WHEREFORE, Lead Plaintiffs pray for relief and judgment as follows:

a)    Declaring this action to be a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of the Class defined herein;

b)    Awarding all damages and other remedies available under the Securities Exchange Act in favor of Lead Plaintiffs and all other members of the Class against Defendants in an amount to be proven at trial, including interest thereon;

c)    Awarding Lead Plaintiffs and the other members of the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

d)    Awarding such other and further relief as this Court deems appropriate.

## XIII.  JURY DEMAND

256.    Lead Plaintiffs demand a trial by jury.

Dated: August 8, 2025                    Respectfully submitted,

By: */s/ Joseph E. White, III*
Joseph E. White, III (BBO# 648498)
**SAXENA WHITE P.A.**
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
Fax: (561) 394-3382
jwhite@saxenawhite.com

Joshua H. Saltzman (*pro hac vice*
forthcoming)
Marco A. Dueñas (admitted *pro hac vice*)
**SAXENA WHITE P.A.**
10 Bank Street, Suite 882
White Plains, NY 10606
Tel.: (914) 437-8551
Fax: (888) 216-2220
jsaltzman@saxenawhite.com
mduenas@saxenawhite.com

Amanda F. Lawrence (BBO# 568737)
**SCOTT+SCOTT ATTORNEYS
AT LAW LLP**
156 South Main Street
Colchester, CT 06415
Tel.: (860) 537-5537
Fax: (860) 537-4432
alawrence@scott-scott.com

Thomas L. Laughlin, IV (admitted *pro hac
vice*)
Mandeep S. Minhas (admitted *pro hac vice*)
**SCOTT+SCOTT ATTORNEYS
AT LAW LLP**
The Hemsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Tel: (212) 223-6444
Fax: (212) 223-6334

tlaughlin@scott-scott.com
mminhas@scott-scott.com

*Lead Counsel*

Brian J. Schall (*pro hac vice* forthcoming)
**THE SCHALL LAW FIRM**
2049 Century Park East, Suite 2460
Los Angeles, CA 90067
Tel: (310) 301-3335
Fax: (310) 388-0192
brian@schallfirm.com

*Additional Counsel for Oguzhan Altun*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 8, 2025, I authorized the electronic filing of the foregoing

with the Clerk of the Court using the CM/ECF system which will send a Notice of Electronic

Filing to all counsel of record.

Respectfully submitted,

By: */s/ Joseph E. White, III*
Joseph E. White, III