## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| MERLY JEWIK, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiff, | Case No.: 1:25-cv-10385-LTS |
| v. | **ORAL ARGUMENT REQUESTED** |
| TRANSMEDICS GROUP, INC., WALEED HASSANEIN, and STEPHEN GORDON, | Leave to file granted on September 30, 2025 (Dkt. No. 54) |
| Defendants. | |
| PATRICK COLLINS, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiff, | |
| v. | Case No.: 1:25-cv-10778-LTS |
| TRANSMEDICS GROUP, INC., WALEED HASSANEIN, and STEPHEN GORDON, | |
| Defendants. | |

## DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE CONSOLIDATED CLASS ACTION COMPLAINT

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................................1

BACKGROUND ..................................................................................................................4

I.      Transmedics' Products and Services ........................................................4

II.     Congressman Gosar Writes to Transmedics and a Short Seller Attempts to Exploit Market Reaction ...................................................................................6

III.    Challenged Statements ..........................................................................7

LEGAL STANDARD ..........................................................................................................7

ARGUMENT ......................................................................................................................8

I.      Plaintiffs Fail to Plead Any Materially False or Misleading Statements ................8

        A.      Plaintiffs Do Not Plead Falsity Based on the AlphaSense Interviews, the Scorpion Report, or the Gosar Letter ...................................8

                1.      The Confidential Witnesses and Quotations from AlphaSense Interviews Are Unreliable ...........................................9

                2.      The Scorpion Report Is Unreliable ...............................10

                3.      The Gosar Letter Does Not Contain Any Reliable Factual Allegations ...................................................................13

        B.      Plaintiffs Fail to Allege Particularized Facts Demonstrating Defendants' Statements Regarding NOP Pricing Were False or Misleading ............14

        C.      Plaintiffs Fail to Allege Particularized Facts Demonstrating Defendants' Statements Regarding Lack of Coercion to Purchase NOP Were False and Misleading ...................................................................18

        D.      Plaintiffs Fail to Allege Particularized Facts Demonstrating Defendants' Statements Regarding Reimbursement Were False or Misleading ............20

        E.      Plaintiffs Fail to Allege TransMedics' Statements Regarding Seasonality Were Materially False or Misleading ...................................................22

        F.      Statements Regarding Efficiencies and Achievements Are Inactionable Puffery ...................................................................24

II.     Plaintiffs Fail to Plead Facts Giving Rise to a Strong Inference of Scienter ........26

        A.      The CW Allegations Do Not Plead the Scienter of Any Individual Defendant ...................................................................26

        B.      The Gosar Letter and the Scorpion Report Do Not Establish Scienter ...................................................................27

        C.      Individual Defendants' Stock Sales Do Not Support an Inference of Scienter ...................................................................28

i

|  |  | 1. | Dr. Hassanein's Trades ................................................................ | 29 |
|  |  | 2. | Mr. Gordon's Trades .................................................................. | 30 |
|  | D. |  | Plaintiffs' Remaining Scattershot Scienter Allegations Fail .................... | 30 |
| III. |  |  | Plaintiffs Fail to Allege a Scheme ......................................................... | 32 |
| IV. |  |  | Plaintiffs Fail to Plead Loss Causation ................................................. | 33 |
|  | A. |  | February 22, 2024 *Daily Caller* Article ............................................. | 33 |
|  | B. |  | October 28, 2024 Press Release ........................................................ | 34 |
|  | C. |  | December 2, 2024 Press Release ....................................................... | 34 |
|  | D. |  | January 10, 2025 Scorpion Report .................................................... | 34 |
| V. |  |  | Plaintiffs' Section 20(a) Claim Must Be Dismissed ................................ | 35 |
| CONCLUSION |  |  | .................................................................................................... | 35 |

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
    28 F.4th 343 (2d Cir. 2022) ...........................................................................18

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..................................................................................5, 7

*Auto. Indus. Pension Tr. Fund v. Textron Inc.*,
    682 F.3d 34 (1st Cir. 2012)..........................................................................28

*Bennett v. H&R Block Fin. Advisors, Inc.*,
    2005 WL 8178042 (N.D. Cal. June 1, 2005) ...................................................14

*Brennan v. Zafgen*,
    853 F.3d 606 (1st Cir. 2017)......................................................8, 28, 29, 30

*City of Brockton Ret. Sys. v. Avon Prods., Inc.*,
    2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014)................................................13

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*,
    632 F.3d 751 (1st Cir. 2011)........................................................................29

*City of Miami Fire Fighters' & Police Officers' Ret. Tr. v. CVS Health Corp.*,
    519 F. Supp. 3d 80 (D.R.I. 2021)................................................................25

*City of Miami Fire Fighters' & Police Officers' Ret. Tr. v. CVS Health Corp.*,
    46 F.4th 22 (1st Cir. 2022)...................................................................17, 25

*Coyne v. Metabolix, Inc.*,
    943 F. Supp. 2d 259 (D. Mass. 2013) ....................................................... *passim*

*Crowell v. Iconics, Inc.*,
    343 F. Supp. 2d 1 (D. Mass. 2004) .................................................................31

*Cullen v. RYVYL Inc.*,
    2024 WL 898206 (S.D. Cal. Mar. 1, 2024) ....................................................31

*DeFeo v. IonQ, Inc.*,
    134 F.4th 153 (4th Cir. 2025) ..................................................................9, 35

*Dura Pharms., Inc. v. Broudo*,
    544 U.S. 336 (2005)....................................................................................33

*Fitzer v. Sec. Dynamics Techs., Inc.*,
    119 F. Supp. 2d 12 (D. Mass. 2000) ...............................................................24, 25

*Garvey v. Arkoosh*,
    354 F. Supp. 2d 73 (D. Mass. 2005) .....................................................................14

*Glaser v. The9, Ltd.*,
    772 F. Supp. 2d 573 (S.D.N.Y. 2011)...................................................................31

*Harrington v. Tetraphase Pharms., Inc.*,
    2017 WL 1946305 (D. Mass. May 9, 2017) .........................................................29

*Harris v. AmTrust Fin. Servs., Inc.*,
    135 F. Supp. 3d 155 (S.D.N.Y. 2015)...................................................................13

*Hensley v. Imprivata, Inc.*,
    260 F. Supp. 3d 101 (D. Mass. 2017) ......................................................12, 19, 30

*Hershewe v. JOYY Inc.*,
    2021 WL 6536670 (C.D. Cal. Nov. 5, 2021).....................................................9, 18

*In re Ariad Pharms., Inc. Sec. Litig.*,
    842 F.3d 744 (1st Cir. 2016) .................................................................................29

*In re Biogen Inc. Sec. Litig.*,
    193 F. Supp. 3d 5 (D. Mass. 2016) ...........................................................24, 25, 27

*In re Biogen Inc. Sec. Litig.*,
    857 F.3d 34 (1st Cir. 2017).........................................................................7, 24, 25

*In re Block, Inc. Sec. Litig.*,
    2025 WL 2607890 (S.D.N.Y. Sept. 9, 2025).......................................................18

*In re BofI Sec. Litig.*,
    977 F.3d 781 (9th Cir. 2022) .................................................................................35

*In re Bos. Sci. Corp. Sec. Litig.*,
    646 F. Supp. 3d 249 (D. Mass. 2022) ...................................................................18

*In re Buca Inc. Sec. Litig.*,
    2006 WL 3030886 (D. Minn. Oct. 16, 2006) .......................................................34

*In re Cabletron Sys., Inc.*,
    311 F.3d 11 (1st Cir. 2002)......................................................................... *passim*

*In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig.*,
    934 F. Supp. 2d 1219 (C.D. Cal. 2013) ................................................................14

*In re CVS Health Corp. Sec. Act Litig.*,
    2025 WL 394329 (D.R.I. Feb. 5, 2025) .................................................................17

*In re Cytyc Corp.*,
    2005 WL 3801468 (D. Mass. Mar. 2, 2005) ......................................................25

*In re DraftKings Inc. Sec. Litig.*,
    650 F. Supp. 3d 120 (S.D.N.Y. 2023) ......................................................... *passim*

*In re First Marblehead Corp. Sec. Litig.*,
    639 F. Supp. 2d 145 (D. Mass. 2009) ..............................................................30

*In re Hertz Glob. Holdings Inc.*,
    905 F.3d 106 (3d Cir. 2018) .............................................................................31

*In re Int'l Rectifier Corp. Sec. Litig.*,
    2008 WL 4555794 (C.D. Cal. May 23, 2008) .................................................19

*In re iRobot Corp. Sec. Litig.*,
    527 F. Supp. 3d 124 (D. Mass. 2021) ......................................................... *passim*

*In re Karyopharm Therapeutics Inc., Sec. Litig.*,
    552 F. Supp. 3d 77 (D. Mass. 2021) ................................................................22

*In re Lehman Bros. Sec. & ERISA Litig.*,
    2013 WL 3989066 (S.D.N.Y. July 31, 2013) ...................................................9

*In re LexinFintech Holdings Ltd. Sec. Litig.*,
    2021 WL 5530949 (D. Or. Nov. 24, 2021) .....................................................10

*In re Mindbody, Inc. Sec. Litig.*,
    489 F. Supp. 3d 188 (S.D.N.Y. 2020) .............................................................33

*In re Nektar Therapeutics Sec. Litig.*,
    34 F.4th 828 (9th Cir. 2022) ...............................................................4, 18, 35

*In re NVIDIA Corp. Sec. Litig.*,
    768 F.3d 1046 (9th Cir. 2014) .........................................................................32

*In re Omnicom Group, Inc. Sec. Litig.*,
    597 F.3d 501 (2d Cir. 2010) .............................................................................34

*In re OSG Sec. Litig.*,
    2015 WL 3466094 (S.D.N.Y. May 29, 2015) .................................................33

*In re Peritus Software Servs., Inc. Sec. Litig.*,
    52 F. Supp. 2d 211 (D. Mass. 1999) ...............................................................30

*In re Stone & Webster, Inc., Sec. Litig.*,
    253 F. Supp. 2d 102 (D. Mass. 2003) .............................................................................26

*In re Textainer P'ship Sec. Litig.*,
    2007 WL 108320 (N.D. Cal. Jan. 10, 2007) .....................................................................17

*In re Wayfair, Inc. Sec. Litig.*,
    471 F. Supp. 3d 332 (D. Mass. 2020) ..................................................................28, 29, 30

*Iron Workers Local 580 Joint Funds v. NVIDIA Corp.*,
    2020 WL 1244936 (N.D. Cal. Mar. 16, 2020) ..................................................................17

*Isham v. Perini Corp.*,
    665 F. Supp. 2d 28 (D. Mass. 2009) ...............................................................................28

*Leacock v. IonQ, Inc.*,
    2023 WL 6308045 (D. Md. Sept. 28, 2023) ..................................................................9, 10

*Leavitt v. Alnylam Pharms., Inc.*,
    451 F. Supp. 3d 176 (D. Mass. 2020) .............................................................................29

*Leung v. Bluebird Bio, Inc.*,
    599 F. Supp. 3d 49 (D. Mass. 2022) ....................................................................... *passim*

*Levy v. Gutierrez*,
    2017 WL 2191592 (D.N.H. May 4, 2017) ...................................................................20, 21

*Long Miao v. Fanhua, Inc.*,
    442 F. Supp. 3d 774 (S.D.N.Y. 2020) ..................................................................... *passim*

*Loos v. Immersion Corp.*,
    762 F.3d 880 (9th Cir. 2014) ..........................................................................................33

*LSI Design & Integration Corp. v. Tesaro, Inc.*,
    2019 WL 5967994 (D. Mass. Nov. 13, 2019) .....................................................16, 23, 26

*Lydon v. Local 103, Int'l Bhd. of Elec. Workers*,
    770 F.3d 48 (1st Cir. 2014) ...............................................................................................1

*Mehta v. Ocular Therapeutix, Inc.*,
    955 F.3d 194 (1st Cir. 2020) ...........................................................................................28

*Metzler Asset Mgmt. GmbH v. Kingsley*,
    305 F. Supp. 3d 181 (D. Mass. 2018) ...........................................................26, 28, 32, 35

*Meyer v. Green*,
    710 F.3d 1189 (11th Cir. 2013) .......................................................................................33

*N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*,
    537 F.3d 35 (1st Cir. 2008) ................................................................................9

*Ng v. Berkeley Lights, Inc.*,
    2024 WL 695699 (N.D. Cal. Feb. 20, 2024) ....................................................12

*Plumber & Steamfitters Local 773 Pension Fund v. Danske Bank A/S*,
    11 F.4th 90 (2d Cir. 2021) .................................................................................7

*Pound v. Stereotaxis, Inc.*,
    8 F. Supp. 3d 1157 (E.D. Mo. 2014) ................................................................23

*Premca Extra Income Fund LP v. iRobot Corp.*,
    763 F. Supp. 3d 121 (D. Mass. 2025) ....................................................9, 10, 32

*Pyramid Holdings, Inc. v. Inverness Med. Innovations, Inc.*,
    638 F. Supp. 2d 120 (D. Mass. 2009) ..............................................................24

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) .........................................................................................26

*Thant v. Karyopharm Therapeutics Inc.*,
    43 F.4th 214 (1st Cir. 2022) ........................................................................22, 24

*Wang Yan v. ReWalk Robotics Ltd.*,
    330 F. Supp. 3d 555 (D. Mass. 2018) ....................................................2, 24, 25

*Wang Yan v. ReWalk Robotics Ltd.*,
    973 F.3d 22 (1st Cir. 2020) ..........................................................................2, 24

**State Cases**

*Berlik v. Baker*,
    No. 21-cv-11723-AK, Docket 47 (D. Mass. Sept. 30, 2022) ...........................32

**Statutes, Rules and Regulations**

15 U.S.C. § 78(u)-4(b)(1)(B) .........................................................................................7

17 C.F.R. § 240.10b-5 ...........................................................................4, 7, 29, 32, 35

Fed. R. Civ. P. 9(b) ...................................................................................................7, 8

**Other Authorities**

*TransMedics Group, Inc. Common Stock (TMDX) Charts*, NASDAQ,
    https://www.nasdaq.com/market-activity/stocks/tmdx/advanced-
    charting?timeframe=YTD ...................................................................................2

Defendants TransMedics Group, Inc. ("TransMedics" or the "Company"), Waleed Hassanein ("Dr. Hassanein"), and Stephen Gordon ("Mr. Gordon," with Dr. Hassanein, the "Individual Defendants," and together with TransMedics, "Defendants") submit this memorandum of law support of their motion to dismiss the Consolidated Class Action Complaint for Violations of the Federal Securities Laws, Dkt. No. 50 ("Complaint").

## INTRODUCTION

This case is a misguided attempt to manufacture a securities fraud claim from a self-serving, sensationalized short-seller report and other equally unreliable and unverified third-party sources. TransMedics is a global medical technology company that has revolutionized the transplant industry with its Organ Care System ("OCS") technology, the National OCS Program ("NOP") clinical service, and dedicated transplant logistics service offerings. OCS and NOP enable hospitals (and patients) to utilize more donor organs that, historically, were wasted due to limitations of the cold storage method for organ preservation, thus helping save more lives. As a result of its innovative products and services, TransMedics has enjoyed phenomenal success and created significant shareholder value. *E.g.*, Ex. 6 (Apr. 30, 2024 Earnings Call) at 2–3 (describing revenue growth for first quarter of 2024, as well as data showing "NOP resulted in excellent post-transplant clinical outcomes").[1] Importantly, the success of TransMedics' business disrupted decades-old inefficient processes.

In February 2024, the *Daily Caller* published a letter from Congressman Paul Gosar (9th

---

[1] All exhibits referenced herein ("Ex.") are attached to the Declaration of Tamar Kaplan-Marans, filed herewith. These exhibits are documents to which the Complaint or the Company's filings with the Securities and Exchange Commission ("SEC") cite or refer. In ruling on a motion to dismiss, a court may consider "documents incorporated by reference in [the complaint], matters of public record, and other matters susceptible to judicial notice." *Lydon v. Local 103, Int'l Bhd. of Elec. Workers*, 770 F.3d 48, 53 (1st Cir. 2014) (alteration in original). In addition, courts routinely take judicial notice of statements contained in a defendant's regulatory filings. *See, e.g.*, *Leung v. Bluebird Bio, Inc.*, 599 F. Supp. 3d 49, 57–58 (D. Mass. 2022) (considering at motion to dismiss stage excerpts from SEC filings).

Congressional District, Arizona) (the "Gosar Letter" or "Letter"), addressed to TransMedics' Chief Executive Officer Dr. Hassanein, raising "questions" about the Company's "lifesaving technology." Ex. 10 (Gosar Letter) at 1. The Letter was an individual effort and did not purport to commence any investigation. TransMedics published its response within one week, which refuted and denied the allegations raised in the Gosar Letter. Now, more than a year and a half later, the Congressman's office has not followed up nor taken any public action.

Then, in January 2025, Scorpion Capital ("Scorpion") published a short-seller report (the "Scorpion Report") targeting the Company, with the express motive of driving down TransMedics' stock price and profiting from its short position. The Scorpion Report purported to include quotations from interviews with a number of anonymous witnesses. Further, Scorpion disclosed on the second page of its 342-page report that it stood to benefit from a drop in the Company's stock price. Scorpion also admitted that it modified witnesses' quotations, omitted positive comments about TransMedics, and otherwise disclaimed the accuracy of its own report *repeatedly*. The Scorpion Report makes various allegations about TransMedics' business practices, including the Company's pricing and alleged coercion of customers to purchase NOP. Despite the dubious nature of the Scorpion Report, the Company commissioned an independent investigation, which resulted in no findings of misconduct. *See* Ex. 4 (Ex. 99.1 to Feb. 27, 2025 Form 8-K) at 1.

Nevertheless, in February 2025, a purported shareholder filed this suit. Since then, TransMedics' stock price has nearly doubled.[2] At its core, the Complaint strains to convert unreliable and baseless criticisms of the Company's business practices into securities fraud,

---

[2] *See TransMedics Group, Inc. Common Stock (TMDX) Charts*, NASDAQ, https://www.nasdaq.com/market-activity/stocks/tmdx/advanced-charting?timeframe=YTD. On a motion to dismiss, the Court may consider the Company's stock price. *E.g.*, *Wang Yan v. ReWalk Robotics Ltd.*, 330 F. Supp. 3d 555, 563 n.3 (D. Mass. 2018) ("Because [the company's] common stock is publicly traded on NASDAQ, its stock price 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" (citation omitted)), *aff'd*, 973 F.3d 22 (1st Cir. 2020).

alleging that, contrary to various public statements between February 28, 2023, and January 10, 2025 (the "Class Period"), TransMedics forced hospitals to use its NOP services to access its OCS devices, and engaged in price "gouging." Lead Plaintiffs ("Plaintiffs") also allege that TransMedics misrepresented that insurers "fully reimbursed" customers for TransMedics' services, and that its revenue declined in the third quarter of 2024 due to "seasonality." The Complaint fails to state a claim under the Private Securities Litigation Reform Act ("PSLRA") for multiple reasons:

*No falsity.* Despite hundreds of paragraphs, the Complaint does not allege with particularity any actionable or false and misleading statement, as it must under the PSLRA. As noted above, Plaintiffs rely primarily on a collection of quotations from anonymous sources, most of which they lifted directly from the Scorpion Report and from interviews found on AlphaSense, a subscription-based platform that is not publicly accessible. The Complaint fails to plead any basis to suggest that these witnesses are reliable, or even have knowledge—let alone expertise— on the subject matter, and the Scorpion Report concedes it is unreliable. Moreover, the witnesses' allegations themselves are conclusory and fail to identify any specific instances in which: TransMedics' prices were too high (or any comparison to what reasonable services should cost); TransMedics forced a customer to purchase NOP; or commercial insurance or Medicare denied reimbursement for the Company's products or services. Further, many of the challenged statements amount to inactionable puffery.

*No strong inference of scienter.* The Complaint also fails to plead with particularity a strong inference of scienter. Plaintiffs do not allege that any of their numbered confidential witnesses ("CWs"), or the other cited anonymous witnesses lifted from AlphaSense and the Scorpion Report, ever personally interacted with the Individual Defendants. Nor do Plaintiffs offer

concrete allegations about what either Individual Defendant knew that was contrary to any challenged statement, or how they were reckless. Instead, Plaintiffs resort to legally insufficient allegations based on the Individual Defendants' status at the Company, the importance of the subject matter of the challenged statements, and (strangely) the fact that the Company *denied* the assertions in the Gosar Letter and provided detailed explanations to the contrary. Further, Plaintiffs' theory of suspicious stock sales misreads the record, which shows that both Individual Defendants *increased* their stock holdings during the Class Period and sold only small percentages outside of trading plans.

**No loss causation.** None of the alleged corrective disclosures revealed the "truth" about any challenged statement. The Gosar Letter was an inquiry; it did not present any new "facts." Plaintiffs fail to connect the revenue decline in the third quarter of 2024 or Mr. Gordon's resignation to the challenged statements. And the Scorpion Report is wholly unreliable, so much so that the market would have viewed it with "a healthy grain of salt." *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 840 (9th Cir. 2022) (quotation marks and citation omitted).

**No scheme liability.** The Complaint fails separately to identify its scheme allegations (as it must) and, in any event, fails to allege deceptive conduct apart from the alleged misstatements.

**No liability under Section 20(a).** Because Plaintiffs fail to allege a claim under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), they also fail to state a claim under Section 20(a) of the Exchange Act.

## BACKGROUND

### I.    TransMedics' Products and Services

TransMedics is a global medical technology company that develops and markets a first-in-class Organ Care System technology. The OCS is a revolutionary portable, perfusion-based device that keeps donated organs living and functioning outside the human body (hearts beating, lungs

breathing, livers making bile, and kidneys making urine).  Compl. ¶ 1.[3]  The OCS protects organs from the historical risks of cold storage and enables assessment of the donor organ's viability for transplantation.  ¶ 36.  All these unique capabilities overcome the significant limitations of cold static storage on donor organs for transplantation.  ¶¶ 1, 36.  The OCS expands the pool of available donors for transplant patients compared to traditional cold storage.  ¶¶ 36, 40.  This is because OCS safely preserves organs for a longer time outside of the human body, enabling long-distance procurement.  ¶ 36.  Importantly, OCS enables the use of donor organs from donors after circulatory death, in addition to the traditional donation after brain death.  ¶ 40.

TransMedics also developed the National OCS Program, an end-to-end, all-inclusive surgical, clinical perfusion, and transplant logistics service model in addition to OCS technology. ¶¶ 43–44.  TransMedics established the NOP to assist hospitals to use OCS technology without the resource burden of training their own staff and associated learning curves.  ¶¶ 2, 46. Traditionally, hospitals used a brokered charter flight model for transplants that was "operationally inefficient and added significant costs," resulted in organ safety issues and loss, and limited the ability to grow transplant volumes.  *See* Ex. 5 (Feb. 26, 2024 Earnings Call) at 4.  The Company then "created a whole new paradigm" for organ transplants with its NOP.  ¶ 45.  Multiple transplant leaders from major U.S. academic transplant centers at the April 2024 International Society of Heart and Lung Transplant Conference recognized NOP as more efficient than alternatives, "as well as the exceptional clinical outcomes enabled by OCS and NOP."  *See* Ex. 6 at 3–4.  NOP "maximize[s] transplant volume," for its customers while "enhanc[ing] clinical outcome[s]" by

---

[3] All paragraph citations refer to the paragraphs in the Complaint.  Defendants accept the factual allegations of the Complaint as true solely for purposes of this motion, but do not accept any misleading or incomplete characterizations.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Complaint describes the statements that Plaintiffs challenge as purportedly "false and misleading" at Paragraphs 158 through 202.  The Complaint uses bold and italic text to highlight select portions of these challenged statements.  Defendants understand that Plaintiffs challenge only those portions of the statements that are so emphasized.

handling all logistics in-house: NOP coordinates surgeons, transplant specialists, and air and ground logistics in a full-service option that "take[s] care of the entire process."  ¶¶ 46–47 (first bracket added).  After receiving FDA approval for liver (2021) and heart (2022) transplant use, OCS significantly expanded the market for both types of transplants.  ¶¶ 40–41.

## II.    Congressman Gosar Writes to TransMedics and a Short Seller Attempts to Exploit Market Reaction

On February 22, 2024, the *Daily Caller* published the Gosar Letter, raising "questions about [TransMedics'] lifesaving technology," and alleging that TransMedics pressured hospitals to utilize its "expensive" NOP services in order to access its OCS technology.  Ex. 10 at 1–2.  On February 26, 2024, the Company published a response to the Gosar Letter on its website.  ¶ 65.  The Company refuted the "accusations," and corrected the "inaccurate . . . information" underlying the Congressman's questions.  ¶ 67.  The Company explained, in detail, that customers ultimately decide whether they want to use its services, and that customers choose TransMedics for its "efficient cost profile, better clinical outcomes," and ability to increase transplant volumes.  ¶ 66.  TransMedics also noted that it designed the OCS and NOP to improve organ donation access and minimize surgeon fatigue.  *Id.*

On January 10, 2025, Scorpion Capital published a short-seller report targeting TransMedics to drive down its stock price.  *See* Ex. 12 (Scorpion Report) at 2 (disclosing short position and that Scorpion "stands to realize significant gains" if TransMedics' stock "decline[s]").[4]  The Scorpion Report repeatedly disavowed its own accuracy, *see infra* Argument § I.A.2., and relied on anonymous witnesses' unsubstantiated statements claiming that TransMedics built its business on unsustainable and coercive business practices.  *See* ¶¶ 16, 80,

---

[4] As the Scorpion Report is hundreds of pages long and publicly available, Defendants, for the Court's convenience, only include pages specifically referenced herein.

228.  This lawsuit followed.

## III.    Challenged Statements

Plaintiffs challenge Defendants' statements during the Class Period regarding:
(1) corporate optimism about the Company's efficiencies and achievements; (2) pricing of NOP;
(3) hospitals' choice whether to purchase NOP in addition to OCS; (4) Medicare and commercial
reimbursement for TransMedics' charges; and (5) the reason for a revenue decline in the third
quarter of 2024.  *See* Appendix A (Challenged Statement Chart).

## LEGAL STANDARD

On a motion to dismiss, the Court must credit well-pleaded facts but need not accept "legal
conclusions" or "[t]hreadbare recitals of the elements of a cause of action."  *Ashcroft v. Iqbal*, 556
U.S. 662, 678–79 (2009).  To state a claim under Section 10(b) of the Exchange Act and Rule 10b-
5(b), a plaintiff must adequately plead: "(1) a material misrepresentation or omission; (2) scienter;
(3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6)
loss causation."  *In re Biogen Inc. Sec. Litig.*, 857 F.3d 34, 41 (1st Cir. 2017).

To state a claim for scheme liability under Section 10(b) and Rule 10b-5(a) and (c), a
plaintiff must plausibly allege "(1) that the defendant committed a deceptive or manipulative act,
(2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance."  *Plumber
& Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021).

A complaint asserting securities fraud must comply with both the heightened pleading
standard of Federal Rule of Civil Procedure 9(b) and the stringent requirements of the PSLRA.
*See Biogen*, 857 F.3d at 41.  Under the PSLRA, Plaintiffs must "specify each statement alleged to
have been misleading [and] the reason or reasons why the statement is misleading."  15 U.S.C.
§ 78(u)-4(b)(1)(B).  Plaintiffs must also allege "with particularity facts giving rise to a strong
inference that defendants acted with scienter," meaning "a conscious intent to defraud" or "a high

7

degree of recklessness." *Brennan v. Zafgen*, 853 F.3d 606, 613 (1st Cir. 2017) (citation modified).

## ARGUMENT

## I.    Plaintiffs Fail to Plead Any Materially False or Misleading Statements

Plaintiffs' allegations fail to meet the strict pleading requirements of the PSLRA.  First, their allegations rely almost entirely on anonymous sources that are mostly lifted from a third-party website and a short-seller report that disclaims its own accuracy.  These sources do not meet the stringent standards of the PSLRA as applied in this Circuit.  Moreover, the Complaint fails to identify a false statement with the particularity required by statute and Rule 9(b).  Plaintiffs fail to allege any specific instances in which TransMedics coerced a customer into purchasing NOP, or in which a customer did not receive reimbursement for TransMedics' products or services.  Finally, many of the challenged statements are classic cases of puffery, which the First Circuit has long held to be non-actionable as a matter of law.

### A.    Plaintiffs Do Not Plead Falsity Based on the AlphaSense Interviews, the Scorpion Report, or the Gosar Letter

To attempt to plead falsity, Plaintiffs rely on allegations based on eleven CWs, though Plaintiffs interviewed only five of them, while lifting quotations from the rest from the website AlphaSense.[5]  Plaintiffs also rely heavily on statements in the Gosar Letter and anonymous interviews in the Scorpion Report.  Plaintiffs' allegations from these three external sources, however, do not meet the PSLRA's heightened pleading requirements, which mandate that

---

[5] Plaintiffs describe the CWs' job titles as follows: a former TransMedics "OCS Specialist" (CW 1); an "organ transplant coordinator" (CW 2); an "organ procurement and preservation expert" (CW 3); an "organ procurement coordinator" (CW 4); "transplant surgeon[s]" (CWs 5 and 9); a transplant services "director" (CW 6); a former Market Access Vice President at TransMedics (CW 7); a hospital "director of operations" (CW 8); a Vice President at TransMedics' competitor (CW 10); and a former TransMedics pilot (CW 11).  ¶¶ 124, 127, 132, 135–37, 139, 141, 144–46.  These CWs allege that: (1) TransMedics charged exorbitant prices (and some CWs opine on whether that caused the Q3 2024 revenue drop), *e.g.*, ¶¶ 124, 130, 142–44; (2) TransMedics required customers to use its logistics services if they wanted access to its technology and machines, *e.g.*, ¶¶ 132, 136; and (3) customers did not receive full reimbursement for TransMedics' charges, *e.g.*, ¶ 141.

plaintiffs plead falsity with particularity, supported by reliable sources. *See N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc.*, 537 F.3d 35, 51 (1st Cir. 2008) (assessing confidential witnesses under PSLRA requires "evaluation, inter alia, of . . . the reliability of the sources" (quotation marks omitted)); *In re Cabletron Sys., Inc.*, 311 F.3d 11, 29–30 (1st Cir. 2002) (similar).

### 1.    The Confidential Witnesses and Quotations from AlphaSense Interviews Are Unreliable

In the First Circuit, courts assess the sufficiency of confidential sources under the PSLRA based on "the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia."[6]  *Biogen IDEC*, 537 F.3d at 51 (quoting *Cabletron*, 311 F.3d at 29–30).

For six CWs (CWs 5, 6, 7, 8, 9, and 10), Plaintiffs rely on interviews of anonymous sources published on the website AlphaSense.  *See* ¶¶ 136 n.12, 137 n.13, 139 n.14, 141 n.15, 144 n.16, 145 n.17.  AlphaSense published these interviews between six months to a year before Plaintiffs filed the Complaint.  Plaintiffs appear to have simply cross-referenced the six interviews with the Scorpion Report.  They do not claim to have independently investigated or corroborated the interviews.  *See Miao*, 442 F. Supp. 3d at 804 (discrediting confidential source allegations where plaintiff failed to corroborate or investigate allegations independently); *In re Lehman Bros. Sec. & ERISA Litig.*, 2013 WL 3989066, at *4 (S.D.N.Y. July 31, 2013) ("When citing alleged confidential witnesses in a complaint, the [Rule 11] certification means that counsel has spoken

---

[6] Although courts often evaluate witnesses' reliability in the context of scienter, the analysis applies with equal force when considering falsity.  *See, e.g.*, *Premca Extra Income Fund LP v. iRobot Corp.*, 763 F. Supp. 3d 121, 152 (D. Mass. 2025), *appeal argued*, No. 25-01192 (1st Cir. Sept. 8, 2025); *Leacock v. IonQ, Inc.*, 2023 WL 6308045, at *12 (D. Md. Sept. 28, 2023), *aff'd sub nom. DeFeo v. IonQ, Inc.*, 134 F.4th 153 (4th Cir. 2025); *In re DraftKings Inc. Sec. Litig.*, 650 F. Supp. 3d 120, 155 (S.D.N.Y. 2023); *Hershewe v. JOYY Inc.*, 2021 WL 6536670, at *6 (C.D. Cal. Nov. 5, 2021); *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 801 (S.D.N.Y. 2020).

with these confidential witnesses and knows who they are.  Allowing counsel to rely on confidential witness statements recounted in a separate complaint would provide the [c]ourt little assurance that the factual contentions have any evidentiary support.").  Thus, the AlphaSense interviews amount to no more than unreliable "vague hearsay."  *In re LexinFintech Holdings Ltd. Sec. Litig.*, 2021 WL 5530949, at *7 (D. Or. Nov. 24, 2021).

Further, Plaintiffs make it impossible for the Court to analyze whether these sources are reliable.  They do not attach the AlphaSense articles to the Complaint, and they are hidden behind a costly, subscription-based paywall.  The Complaint therefore lacks key details that the PSLRA requires to assess the sources before drawing any inferences from their allegations, such as who interviewed these anonymous sources, when the interviews occurred, or the sources' familiarity with TransMedics and the basis for their knowledge.  *See, e.g.*, *Premca*, 763 F. Supp. 3d at 151; *Leacock*, 2023 WL 6308045, at *11 (rejecting sources as unreliable because "[t]here is no description of the nature of their interactions with [the company] or its technologies, whom at [the company] they worked with, or when or how often they did business with [the company]").  Courts have repeatedly rejected plaintiffs' allegations based on anonymous sources that "are devoid of details lending themselves to corroboration."  *E.g.*, *DraftKings*, 650 F. Supp. 3d at 155; *Miao*, 442 F. Supp. 3d at 800–01.  The Court should therefore reject the allegations predicated on uninvestigated, uncorroborated AlphaSense interviews.

### 2.    The Scorpion Report Is Unreliable

Courts also routinely reject allegations that rest on short-seller reports or anonymous witnesses quoted in such reports.  *See, e.g.*, *Leacock*, 2023 WL 6308045, at *13 (finding Scorpion Capital report unreliable because plaintiffs did not offer sufficient corroboration or describe sources with sufficient particularity); *DraftKings*, 650 F. Supp. 3d at 155 (discrediting short-seller report that had "all the indicia of unreliability that have led courts often not to credit attributions

to unnamed sources in short-seller reports"). "[F]actual allegations" in a "report by a short seller—an entity with an economic interest in driving down the company's stock price[] . . . must be considered with caution." *DraftKings*, 650 F. Supp. 3d at 154; *see also Miao*, 442 F. Supp. 3d at 801 (collecting cases and noting that short sellers "have an obvious motive to exaggerate the infirmities of the securities in which they speculate"). These concerns are heightened where, as here, a short-seller report relies on confidential sources. *See DraftKings*, 650 F. Supp. 3d at 154 ("[W]here these two problematic features coincide—when a complaint's factual attributions to unidentified sources derive not from interviews by plaintiffs' counsel, but from a short-seller report's attributions to such sources—there is still greater need for care."); *Miao*, 442 F. Supp. 3d at 801 ("[C]ase law reflects a particular need for close scrutiny where a short-seller report relied upon by a securities plaintiff itself relies on 'confidential' or anonymous sources . . . .").

In this case, Scorpion disclosed that the witnesses' statements "may be paraphrased, truncated, and/or summarized solely at [Scorpion's] discretion," and quotations "do not reflect all information they have shared with [Scorpion], including, without limitation certain positive comments and experiences with [TransMedics]." *See* Ex. 12 at 2. Scorpion also stated that it "cannot and do[es] not provide any representations or warranties with respect to the accuracy" of materials reviewed and experts consulted. *Id.* The Scorpion Report acknowledged that Scorpion "stands to realize significant gains in the event that" TransMedics' stock price "decline[s]," and that its experts "typically received compensation for their conversations and may have conflicts of interest or other biases with respect to TransMedics, which may give them an incentive to provide [Scorpion] with inaccurate, incomplete or otherwise prejudiced information." *Id.* Further, Scorpion cautioned that "[t]he former employees of TransMedics that we spoke with are by definition separated from the company and thus the information they have provided may be

outdated." *Id.* Plaintiffs also fail to plead that they independently investigated the sources in the Scorpion Report. *See Miao*, 442 F. Supp. 3d at 804. Given all these express disclaimers, the obvious conflict, and Plaintiffs' lack of independent corroboration, it is difficult to imagine a court would rely on the Scorpion Report to satisfy Plaintiffs' pleading obligations here.

In addition to all these issues, the descriptions of the anonymous sources are insufficient to make them reliable. *E.g.*, *Cabletron*, 311 F.3d at 29–30; *DraftKings*, 650 F. Supp. 3d at 155. Only three ever allegedly worked at TransMedics, and the Scorpion Report describes several only as "executives," "administrators," "transplant professionals," or, even more vaguely, as "others," with no explanation of their job functions and no specific, direct connection to TransMedics. *See, e.g.*, ¶¶ 166, 167, 175, 182, 185, 192, 202; *In re iRobot Corp. Sec. Litig.*, 527 F. Supp. 3d 124, 137 (D. Mass. 2021) (discrediting hearsay confidential witness testimony from "a lower-level employee at a third-party marketing vendor"); *Miao*, 442 F. Supp. 3d at 803 (finding that anonymous witness statements "are not described at a sufficient level of particularity" where they lack "any description of these employees' roles or titles" and fail to specify the basis for witnesses' knowledge). And beyond that, because the Complaint does not specify when the Scorpion Report witnesses held their positions, the Court cannot conclude that they speak to the state of affairs during the Class Period or at the time of any challenged statement. ¶¶ 86–88, 90–92, 94, 96–97, 100, 102–14, 117; *Hensley v. Imprivata, Inc.*, 260 F. Supp. 3d 101, 122 (D. Mass. 2017) (Sorokin, J.) (confidential witness's allegations are "of minimal value" in part because they "concerned a time" "outside of the class period").

Courts have found that similar shortcomings preclude short-seller reports from supporting a plaintiff's allegations of falsity. *See, e.g.*, *Ng v. Berkeley Lights, Inc.*, 2024 WL 695699, at *10 (N.D. Cal. Feb. 20, 2024) ("Given Scorpion Capital's obvious self-interest in [defendant's] stock

price declining and the lack of sufficient indicia plausibly demonstrating the report's reliability, the [c]ourt finds that [p]laintiffs have not sufficiently alleged that the Scorpion Report supports their allegations of falsity."); *Harris v. AmTrust Fin. Servs., Inc.*, 135 F. Supp. 3d 155, 159 (S.D.N.Y. 2015) (dismissing complaint that "rel[ied] almost entirely on a negative report published by a short seller" and that, as a result, was "long on sound, fury and speculation, but . . . short on specifics"), *aff'd*, 649 F. App'x 7 (2d Cir. 2016).

### 3.     The Gosar Letter Does Not Contain Any Reliable Factual Allegations

The Gosar Letter similarly cannot support Plaintiffs' falsity allegations.  First, the Letter is merely an individual inquiry and does not purport to be based on any Congressional investigation. Indeed, the Letter's stated intent was simply to "assist [Congressman Gosar's] oversight efforts as a member of the United States House of Representatives" rather than to advance an investigation. Ex. 10 at 2.  Congressman Gosar himself described his Letter as nothing more than expressing his "questions about [TransMedics'] life-saving technology."  *Id.* at 1.  Second, the Letter does not cite any particular source for its assertions—it refers only to "allegations" the Congressman's office received, as well as generalized reports from "[s]ome [hospitals'] transplant centers."  *Id.* at 2–3.  Plaintiffs are unable therefore to show that the sources were in any position to have knowledge, or to offer any other indicia of reliability.[7]  *See City of Brockton Retirement Sys. v. Avon Prods., Inc.*, 2014 WL 4832321, at *23 (S.D.N.Y. Sept. 29, 2014) (information in article from "a person familiar with the matter" provided "no basis for the [c]ourt to evaluate its reliability").  Otherwise, Congressman Gosar's purported bases for the assertions in his letter are merely: (1) changes in the pricing for TransMedics' services and technology post-FDA approval and (2) TransMedics' decision to streamline its services by acquiring an aviation company to run

---

[7] For the same reasons, it is of no moment that Gosar claims to have been a "doctor."  Ex. 10 at 1.

transplant aviation in-house.  Ex. 10 at 1–2.  These assertions do not contradict any challenged statement.

In any event, the Letter cannot establish any facts because it contains no formal findings and—at best—makes allegations similar to those in a complaint without any independent investigation.  *Id.* at 2; *Bennett v. H&R Block Fin. Advisors, Inc.*, 2005 WL 8178042, at *4 (N.D. Cal. June 1, 2005) (refusing to consider allegations drawn solely from "unadjudicated" complaint); *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 934 F. Supp. 2d 1219, 1226 (C.D. Cal. 2013) (allegations "based on, or rely on, complaints in other actions that have . . . not [been] resolved, are, as a matter of law, immaterial").

### B.     Plaintiffs Fail to Allege Particularized Facts Demonstrating Defendants' Statements Regarding NOP Pricing Were False or Misleading

Plaintiffs challenge a series of statements denying that TransMedics was "gouging" the market or charging excessively expensive prices, explaining TransMedics' intent in developing NOP, and describing TransMedics' services as sustainable.  ¶¶ 158, 165, 171–74, 190–91, 200–01.  But Plaintiffs fail to provide specifics that plausibly could support a claim that TransMedics was "price gouging."  That would require knowing what TransMedics charged for particular services, as well as information showing another competitor would have charged less in that specific transplant case.  *See Coyne v. Metabolix, Inc.*, 943 F. Supp. 2d 259, 273 (D. Mass. 2013) (confidential witness allegations regarding sales projections were insufficient without context, including "what 'sustainable sales' means," "actual sales figures," or "why the existing sales figures would have made it impossible to meet the projected target dates").  Without any such basic detail, the allegations are just rhetoric.  *See Garvey v. Arkoosh*, 354 F. Supp. 2d 73, 82 (D. Mass. 2005) (dismissing complaint based on "generalities and hearsay-derived speculation").

Nor do Plaintiffs plead specifics by relying on the same unreliable anonymous witness

allegations from the Scorpion Report that TransMedics' NOP services were excessively expensive. *See* ¶¶ 91, 94–100, 104, 107–21; *supra* Argument § I.A.2.  Again, no witness offers specific facts showing that NOP service prices were inappropriate or excessive in a specific transplant case.  And Congressman Gosar's assertions that TransMedics increased prices post-FDA approval, without a point of comparison, do not support Plaintiffs' allegations that the prices were excessive.

Plaintiffs also allege that TransMedics developed NOP to "overbill hospitals for excessive transportation and other services to pad TransMedics' revenue," ¶ 159, contrary to TransMedics' statement in its FY 2022 Form 10-K that it "developed [NOP] to provide a more efficient process to procure donor organs" through OCS, ¶ 158.  Plaintiffs plead no job responsibilities or other basis that would support an inference that any of the anonymous witnesses they cite knew TransMedics' intent in developing NOP.  *See Cabletron*, 311 F.3d at 29–30; *supra* n.5.  Further, Plaintiffs disregard the full context of TransMedics' 10-K and instead cherry-pick a brief, out-of-context quote.  On the very same page in the 10-K from which Plaintiffs quote, TransMedics explained the development of NOP, and its benefits, in detail:

> We developed [NOP] to provide additional capabilities to [hospitals'] transplant centers for the complicated organ procurement process that often requires resources and logistics beyond a transplant center's existing capabilities and capacity, thereby limiting the number of organs the transplant center may be able to retrieve.  Our NOP provides trained organ procurement surgeons, clinical specialists and transplant coordinators that provide an end-to-end clinical solution using our OCS technology.  This enables transplant centers the ability to utilize the OCS to procure and transplant more organs for their patients than they would otherwise be able to do without increasing their own staff.

*See* Ex. 1 (Feb. 27, 2023 10-K) at 3.

Plaintiffs completely fail to engage with these efficiencies.  For example, flying in dedicated teams of transplant surgeons *could* be cost-efficient because it reduces "the learning curve" for a sophisticated technology by providing TransMedics' own staff to operate the device, frees up hospital surgeons for *other* surgeries, and may avoid fatigue of surgical staff.  ¶¶ 46, 66.

And allegations based on CW 11—the pilot who allegedly worked for TransMedics for six months during the Class Period—similarly fail to provide sufficient details to show that TransMedics' efficiency statements were false or misleading. CW 11 claims he made "extremely short flights," giving a single example of a flight from Newark, NJ, to White Plains, NY, to Bedford, MA, and that he believed that TransMedics "should have used ground transportation, like an ambulance." ¶ 146. But he provides no case-specific details to assess efficiency, such as whether that transport was emergent, or even a quotation for a ground transportation alternative. *See, e.g.*, *Coyne*, 943 F. Supp. 2d at 267. This says nothing about TransMedics' cost-efficiency.[8]

Plaintiffs also allege that TransMedics' customers found the Company's business practices to be "not sustainable," leading "some hospitals to move to other options," again relying on anonymous witnesses from the Scorpion Report. ¶¶ 20, 84, 101, 105, 107, 111, 164, 167, 170, 181, 192, 202. As an initial matter, this is a red herring. TransMedics did not claim that it would never lose a customer. To the contrary, it identified customer loss as a risk factor in its public disclosures.[9] *See, e.g.*, *LSI Design & Integration Corp. v. Tesaro, Inc.*, 2019 WL 5967994, at *4 (D. Mass. Nov. 13, 2019) (Sorokin, J.) (statement in 10-Q regarding source of company's funding not false or misleading where 10-Q "placed investors on notice" of specific funding sources). Moreover, these allegations lack particularity. Plaintiffs do not identify a single hospital that actually moved to other options due to TransMedics' allegedly "not sustainable" business practices. Nor do Plaintiffs specify the particular circumstances under which "some hospitals" decided to use other options, which could be for reasons completely unrelated to dissatisfaction

---

[8] Nor do Plaintiffs provide a basis for why CW 11, a *pilot*, would have the requisite knowledge to support the assertion that TransMedics "should have used ground transportation" for organ donation. ¶ 146; *see iRobot*, 527 F. Supp. 3d at 137.

[9] *See* Ex. 1 at 32 ("[O]ur . . . customers may not continue to utilize our products . . . at current levels, pricing, or at all, and our revenue could fluctuate . . . ."); Ex. 2 (Feb. 27, 2024 10-K) at 34 (similar).

with TransMedics' business practices, or the timing of any such decision.  *See City of Miami Fire Fighters' & Police Officers' Ret. Tr. v. CVS Health Corp.*, 46 F.4th 22, 30 (1st Cir. 2022) ("For allegedly false statements to support a claim of securities fraud, they must be 'false when made.'") (citation omitted); *In re CVS Health Corp. Sec. Act Litig.*, 2025 WL 394329, at *4 (D.R.I. Feb. 5, 2025) (plaintiffs have burden to "plead sufficient facts" to support "correlation between the time frame of the assertion and the 'true' state of affairs").

Plaintiffs' purported anonymous "healthcare economics expert['s]" analysis does not save these allegations.  ¶¶ 147–51.  The Complaint provides no basis supporting the individual's claimed expertise.  *See Iron Workers Local 580 Joint Funds v. NVIDIA Corp.*, 2020 WL 1244936, at *7 (N.D. Cal. Mar. 16, 2020) ("Plaintiffs must allege with sufficient particularity that the expert was in a position to know the relevant fact claimed.") (quotations and citation omitted).[10]  And the analysis simply concludes that aggregate data (from a third-party source) show costs of organ acquisition increased in 2022 and 2023 for hospitals "known" to be TransMedics customers versus hospitals that did not use TransMedics.  ¶ 148.  This observation does not purport to be a statistically significant analysis, nor does it remotely establish any fact contrary to any challenged statement.  Even assuming TransMedics' prices were higher than other options, that hardly translates to "price gouging" or "unsustainable business practices."  Nothing in the Complaint suggests that those prices were "excessive" under the circumstances.  Increased costs could simply reflect better services, or extenuating circumstances in particular cases.  Again, Plaintiffs do not allege details about any specific case, such as how far away the organ was located, or whether surgeons procured the organ after brain death (meaning it was only available using TransMedics' technology), or what a competitor would have charged.  *Cf. Ark. Pub. Emps. Ret. Sys. v. Bristol-*

---

[10] *See also In re Textainer P'ship Sec. Litig.*, 2007 WL 108320, at *5 (N.D. Cal. Jan. 10, 2007) (unnamed consultant's analysis inadequate where it did not "include any information about the consultant's qualifications").

*Myers Squibb Co.*, 28 F.4th 343, 354 (2d Cir. 2022) ("[Expert] opinion cannot rescue the Investors' claims, unless that opinion was based on particularized facts sufficient to state a claim for fraud."); *see In re Block, Inc. Sec. Litig.*, 2025 WL 2607890, at *8 (S.D.N.Y. Sept. 9, 2025) ("[W]ithout other factual allegations adequate to support Plaintiffs' contention, this expert opinion is insufficient.").[11]

### C. Plaintiffs Fail to Allege Particularized Facts Demonstrating Defendants' Statements Regarding Lack of Coercion to Purchase NOP Were False and Misleading

Plaintiffs challenge Defendants' denial that TransMedics required hospitals to purchase NOP in order to access OCS. *See* ¶¶ 173–74 (denying Gosar Letter and attributing growth of NOP and OCS to better clinical outcomes and efficiency), 183 (it is "up to the transplant program to say yay or nay" to TransMedics' services. Plaintiffs argue that these statements were false because TransMedics "forc[ed] [hospitals] to use [NOP]" "if they wanted access to the OCS devices." ¶¶ 175, 185. In support, Plaintiffs cite several CWs and witnesses lifted from the Scorpion Report. These allegations are unreliable and the Court should not credit them. *See supra* Argument § I.A.1–2.

As to the numbered CWs who spoke to this topic (CWs 2, 3, 4, 5, 6, 7, 9, and 10), the Complaint lacks allegations showing that they would have had knowledge. *See, e.g.*, *In re Bos. Sci. Corp. Sec. Litig.*, 646 F. Supp. 3d 249, 279 (D. Mass. 2022); *Miao*, 442 F. Supp. 3d at 799 ("[C]ourts generally have not credited the statements of CWs . . . whose descriptions do not suggest that they had been in position to know the facts attributed to them."). Only one witness, CW 7, is

---

[11] Moreover, the Court is not required to accept this analysis simply because it purports to be an expert opinion. *See Hershewe*, 2023 WL 3316328, at *2 (discounting conclusory expert opinions in pleadings); *Nektar*, 34 F.4th at 837 ("Plaintiffs cannot evade the PSLRA's exacting pleading standards by merely citing an expert who makes assertions about falsity based on questionable assumptions and unexplained reasoning.").

alleged to have worked for TransMedics.[12] ¶ 139. Nothing about CW 7's mere job title, VP of Market Access, suggests knowledge of sales practices. Indeed, Plaintiffs allege only that they believe CW 7 is the same *reimbursement* executive quoted in the Scorpion Report. The Complaint describes three CWs (CWs 3, 6, and 10) only as a purported "expert in organ procurement and preservation" (CW 3), a "Director of Business Development" at a company that offers transplant-related services (CW 6), and an executive at TransMedics' competitor, XVIVO (CW 10), respectively. ¶¶ 132, 137, 145. None of their titles suggests that they would have knowledge of TransMedics' sales policies and practices. Moreover, the Complaint does not specify when certain CWs (CWs 3, 7, and 10), and all the Scorpion Report witnesses, held their positions. Thus, the Court cannot infer that their allegations relate to the Class Period, much less reflect any facts at the time of any of the challenged statements. ¶¶ 132 n.10, 139 n.14, 145 n.17; *Hensley*, 260 F. Supp. 3d at 122 (Sorokin, J.) (confidential witness's allegations are "of minimal value" in part because they "concern[ed] a time well outside the class period"). Similarly, Plaintiffs allege that four CWs worked in hospitals (CWs 2, 4, 5, 9), but two (CWs 5 and 9) are surgeons with no allegation of direct involvement with TransMedics. ¶¶ 136, 144. These witnesses similarly lack the requisite details. *E.g.*, *Cabletron*, 311 F.3d at 29–30.

Beyond all these problems, the CWs' allegations do not plead with specificity that any coercion occurred. *Cf. In re Int'l Rectifier Corp. Sec. Litig.*, 2008 WL 4555794, at *18 (C.D. Cal. May 23, 2008) (finding that "the Complaint fails to identify overall volume, specific transactions, specific shipments, specific customers, specific times, or specific dollar amounts" as to induced sales in channel stuffing claim). CW 7, the TransMedics employee, does not name a single instance or specific TransMedics customer that the Company so coerced. ¶ 139 & n.14. The

---

[12] Indeed, the majority (eight out of eleven) of the CWs in the Complaint are not current or former TransMedics employees (CWs 2, 3, 4, 5, 6, 8, 9, 10).

allegations from two Scorpion Report witnesses alleged to have worked for TransMedics (a former TransMedics OCS specialist and a former TransMedics reimbursement executive) fail for the same reason. ¶¶ 175, 182, 185. Although CW 2, one of the transplant coordinators, allegedly "provided documents confirming that TransMedics' practices locked hospitals into accepting their logistics charges even before having the chance to determine whether a donor organ was viable," ¶ 129, those documents are not attached to the Complaint. Instead, the Complaint provides the "terms" of text messages from unidentified "TransMedics staff" providing pricing quotes for NOP that supposedly included cancellation fees. *Id*. Without more, this does not demonstrate that TransMedics forced hospitals to use NOP. *See Levy v. Gutierrez*, 2017 WL 2191592, at *24 (D.N.H. May 4, 2017) (rejecting allegations that defendant "forced" company "to conceal information from investors" because "allegations—lacking identification of time, place or manner—fall short" of particularity standard). And any complaints about cancellation fees have nothing to do with any challenged statement; indeed, there is no reason to believe cancellation fees were not standard industry practice.

### D.    Plaintiffs Fail to Allege Particularized Facts Demonstrating Defendants' Statements Regarding Reimbursement Were False or Misleading

Plaintiffs challenge four statements made by Dr. Hassanein regarding hospitals' ability to obtain reimbursement for costs associated with TransMedics' NOP through Medicare or commercial payers. *See* ¶¶ 161 ("Every NOP service charge is fully reimbursed."), 162 ("[E]very charge around [NOP] . . . [is] covered under the existing reimbursement mechanisms for organ transplant."), 168 (similar), 178 ("[C]ommercial payers" gave hospitals "the money [they] requested" to "increase their organ acquisition budget by a significant amount to cover the OCS

[and] NOP.").[13]

Plaintiffs again rely on statements from anonymous and unreliable sources to argue that these four statements were false or misleading.[14]  First, a *single* Vanderbilt surgeon quoted in the Scorpion Report claims that Medicare only reimbursed for 50–60% of the total organ acquisition costs and commercial insurance paid zero "unless you renegotiate a contract."  ¶¶ 163, 169, 180.  Second, Plaintiffs rely on CW 8, a UPMC Operations Director, who claims that TransMedics ate into hospital profits because commercial payers "pay [hospitals] the same rate they agreed to" regardless of whether the hospital's actual transplant cost differs from the agreed-upon rate.  ¶¶ 141, 164, 170, 181.  Third, Plaintiffs point to unnamed "other surgeons and hospital executives" who claim hospitals tried to move away from TransMedics due to its price point, and assume with no foundation that this indicates a lack of reimbursement.  ¶¶ 164, 170, 181.

None of these generalized assertions identifies a single instance where TransMedics charges were not reimbursed, and they certainly do not provide enough detail to render Defendants' statements regarding reimbursement false.  The allegations therefore fail for a lack of particularity.[15]  *E.g. Levy*, 2017 WL 2191592, at *24 (rejecting allegations "lacking identification of time, place or manner"); *Cabletron*, 311 F.3d at 29 (requiring courts in First Circuit to assess "level of detail provided by the confidential sources" under PSLRA).

Context shows why this pleading deficiency matters.  For example, as Plaintiffs concede,

---

[13] Under the Company's business model, TransMedics sells the OCS and NOP to hospitals.  After hospitals pay TransMedics for its services, they submit bills for reimbursement to insurance, either to Medicare or to commercial payers.  ¶ 42.  TransMedics is not directly involved in the reimbursement process.  *See id.*; *see also* Ex. 1 at 4 (referring to TransMedics' customers "billing for reimbursement" and "advice" TransMedics provides customers regarding reimbursement).

[14] These statements are not reliable, including because Plaintiffs lifted CW 8's interview from AlphaSense and the other two witnesses' interviews from the Scorpion Report.  *See supra* Argument § I.A.1–2.

[15] The Gosar Letter similarly does not support Plaintiffs' allegations regarding reimbursement.  Instead, it says only that hospitals are "uncomfortable asking Medicare for reimbursement due to the increased costs associated with use of the TransMedics NOP."  Ex. 10 at 2.  Alleging that hospitals did not *seek* reimbursement, however, does not plead with particularity that hospitals did not *receive* reimbursement when they requested it properly.

a hospital's bill includes far more than TransMedics' charges—it includes the hospital's other acquisition costs, overhead, and profit margin. *See, e.g.*, ¶¶ 101 (acknowledging that "hospitals' profit margin" is factor in reimbursement), 104 (bill for TransMedics is "in addition to the [hospitals'] organ acquisition fee that they're getting from the [organ procurement organization]"), 163 (surgeon conceding that "you add this [TransMedics cost] into your acquisition cost for Medicare"), 164 (recognizing hospital profit and margin for transplants). So, absent any details at all, there is no basis to infer that if there was less than full reimbursement, it was the TransMedics charges (as distinct from other charges) that insurance did not cover. As to commercial payers, CW 8's vague allegation that the "reimbursement number" did not change based on the acquisition costs incurred is not tantamount to identifying instances in which insurers denied TransMedics charges. More specifics are needed to connect the dots. Ultimately, "[b]ecause the [confidential witnesses'] statements are generalized assertions and not in conflict with disclosures made by [defendant], they cannot be alleged to be false or misleading." *iRobot*, 527 F. Supp. 3d at 135.

### E. Plaintiffs Fail to Allege TransMedics' Statements Regarding Seasonality Were Materially False or Misleading

Plaintiffs argue that Defendants' explanation for TransMedics' revenue decline in the third quarter of 2024—that "seasonality" and not "pricing pressure" caused the decline—was false and misleading.[16] ¶¶ 197–99. But Plaintiffs divorce the challenged statements from their context. *Id*. To assess whether a challenged statement is materially misleading, courts must examine the full context in which the statement was made. *In re Karyopharm Therapeutics Inc., Sec. Litig.*, 552 F. Supp. 3d 77, 87 (D. Mass. 2021), *aff'd sub nom. Thant v. Karyopharm Therapeutics Inc.*, 43 F.4th

---

[16] Notably, Plaintiffs only challenge two statements that Mr. Gordon made, neither of which relates to reimbursement or seasonality. *See* ¶¶ 159 (pricing), 190 (efficient process). Because the statements regarding pricing and efficiency are inactionable, *see supra* Argument § I.B., the Court should dismiss Mr. Gordon from this case.

214 (1st Cir. 2022).  That context includes the issuer's other disclosures.  *See id.*

Plaintiffs suggest that Dr. Hassanein attributed the decline in revenue solely to "seasonality."  This is false.  Dr. Hassanein used the word seasonality only once on the earnings call, saying that "[n]ational liver and heart transplant volumes declined sequentially" and that there was "no clear reason for these declines other than normal variability of donor availability and *potential* summer seasonality."  Ex. 7 (Oct. 28, 2024 Earnings Call) at 3 (emphasis added).  TransMedics' full disclosure makes clear that Dr. Hassanein attributed the decline in *transplant volumes* to the national organ transplant market experiencing the same dip in donor availability.

Plaintiffs also allege that the seasonality statements are false because three unidentified witnesses claim hospitals were moving away from TransMedics during Q3 2024 because of its high costs.  ¶ 199.  First, these witnesses—one who appears to be CW 1, and two lifted from the Scorpion Report—are unreliable for the reasons explained above.  *See supra* Argument § I.A.2.  Second, they offer only vague allegations that hospitals were trying to get away from TransMedics, ¶ 199, and do not identify a single specific customer that TransMedics actually lost.  *See, e.g.*, *Tesaro*, 2019 WL 5967994, at *4 (Sorokin, J.) (plaintiffs failed to plead falsity as to company's statements regarding anticipated cash to fund operations because confidential witnesses "did not allege that . . . demand was, in fact, declining" or that company "did not—or could not—reasonably expect" to generate cash as claimed).  Third, even if unnamed "hospitals in Texas were cancelling contracts" in Q3 2024, ¶ 199, Plaintiffs provide no detail on TransMedics' revenue from these hospitals or any other basis to infer they were a material factor in the revenue decline.  *See Coyne*, 943 F. Supp. 2d at 259 ("anaemic accusations" from confidential witness asserting "lack of 'sustainable sales'" and "absence of a 'robust backlog'" without "defin[ing] or quantify[ing] either phrase" are insufficient); *Pound v. Stereotaxis, Inc.*, 8 F. Supp. 3d 1157, 1166 (E.D. Mo. 2014)

23

(finding no falsity based on "anecdotal information regarding individual customer complaints").[17]

### F.    Statements Regarding Efficiencies and Achievements Are Inactionable Puffery

Finally, several challenged statements are expressions of corporate optimism or puffery. Courts routinely find such statements to be inactionable because they do not convey information specific enough that a reasonable investor would rely on them.[18]  *See Thant*, 43 F.4th at 223 (finding "vague optimism" about product "cannot constitute a material misstatement for purposes of the pleading requirements set by the PSLRA"); *Wang Yan v. ReWalk Robotics Ltd.*, 973 F.3d 22, 32 (1st Cir. 2020) (unlike "concrete statements of present fact," "puffed-up qualitative expression" is inactionable puffery); *Fitzer v. Sec. Dynamics Techs., Inc.*, 119 F. Supp. 2d 12, 23, 26 (D. Mass. 2000) (expressions of "loose optimism about both a company's current state of affairs and its future prospects" are not actionable as a matter of law).

First, TransMedics' generic representations concerning NOP's efficiencies, ¶¶ 158 (OCS provides a "more efficient process"), 172 (NOP's "efficient cost profile"), 174 (NOP's growth based on providing "[the] highest level of clinical care" and "operational efficiency"), 187 (TransMedics' "efficient cost structure"), 191 (similar), 194 (referring to NOP as "the most cost-effective transportation in the history of organ transplant, period, full stop"), are classic examples of inactionable puffery.  *See, e.g.*, *Pyramid Holdings, Inc. v. Inverness Med. Innovations, Inc.*, 638

---

[17] Allegations regarding Dr. Hassanein's statement that NOP was "very sticky" with customers, ¶ 179, fail because Plaintiffs do not plead that a single customer left TransMedics.  Plaintiffs' allegations regarding that statement also fail because it constitutes inactionable puffery, as explained herein.  *E.g.*, *Thant*, 43 F.4th at 223; *see infra* Argument § I.F.

[18] Some courts have found statements to be puffery because they were not objectively verifiable.  *See ReWalk*, 330 F. Supp. 3d at 571 (finding "unquestionably *subjective*, optimistic statements" that data were "compelling" and technology was a "breakthrough product" inactionable (emphasis added)); *In re Biogen Inc. Sec. Litig.*, 193 F. Supp. 3d 5, 41–42 (D. Mass. 2016) (finding statements that product was "do[ing] well," "a major business driver," "a compelling treatment option" and "a terrific product that is going to perform very well" were non-actionable subjective corporate optimism), *aff'd*, 857 F.3d 34 (1st Cir. 2017).  The challenged statements discussed in this Section constitute puffery under either formulation.

F. Supp. 2d 120, 122 (D. Mass. 2009) (finding "use of efficient high quality manufacturing operations" and "we can cost effectively integrate" to be inactionable puffery); *In re Cytyc Corp.*, 2005 WL 3801468, at *20 (D. Mass. Mar. 2, 2005) (citing "the company is on target toward achieving the most profitable year in its history" as example of "puffing").  In any event, to the extent any of these statements are not puffery, Plaintiffs fail to allege any contrary facts, *e.g.*, that TransMedics' prices were excessive by any objective measure.  *See supra* Argument § I.B.

Second, TransMedics' superlative characterizations of NOP, *e.g.*, ¶¶ 165 ("a bigger, wider, deeper moat around the business"), 183 ("world class service"), 200 ("nobody else in the industry can match"), are also expressions of optimism that are inactionable as a matter of law.  *See City of Miami Fire Fighters' & Police Officers' Ret. Tr. v. CVS Health Corp.*, 519 F. Supp. 3d 80, 87 (D.R.I. 2021) (statement that company became "leader" in industry constitutes inactionable puffery), *aff'd*, 46 F.4th 22; *In re Biogen Inc. Sec. Litig.*, 193 F. Supp. 3d 5, 41–42 (D. Mass. 2016) ("[S]ubjective, optimistic statements would not be considered material by a reasonable investor or by the market as a whole."), *aff'd*, 857 F.3d 34; *Fitzer*, 119 F. Supp. 2d at 30 (statement that product "would be a 'preferred' product and would 'position [the company] to be the first to offer such a solution'" is inactionable puffery).

Finally, TransMedics' statements describing NOP as providing the highest level of care, *e.g.*, ¶¶ 172–74 (denying claims in Gosar Letter and stating that NOP has "better clinical outcomes" and "highest level of clinical care"), constitute inactionable puffery as well.  *See ReWalk*, 330 F. Supp. 3d at 571 (statements referring to "compelling" clinical data and calling device a "breakthrough product" are "unquestionably subjective, optimistic statements" a reasonable investor would not find material).  And, in any event, Plaintiffs never allege with specific facts that TransMedics' NOP did not provide better clinical outcomes.

## II.    Plaintiffs Fail to Plead Facts Giving Rise to a Strong Inference of Scienter

As an initial matter, Plaintiffs fail to plead scienter because they have not identified with particularity a false or misleading statement in the first place. *See Tesaro*, 2019 WL 5967994, at *6 (Sorokin, J.) (noting that "failure to properly allege that the statements at issue were false or misleading is sufficient on its own for dismissal"); *In re Stone & Webster, Inc., Sec. Litig.*, 253 F. Supp. 2d 102, 127 (D. Mass. 2003) (declining to address scienter where "the Amended Complaint insufficiently alleges false or misleading statements on the part of the defendants"). To the extent Plaintiffs purport to rely on witness statements from a third-party website, the Scorpion Report, and the Gosar Letter, those are equally if not more unreliable in the scienter context. *See supra* Argument § I.A.1–3. Plaintiffs' remaining insufficient and misleading scattershot allegations regarding the Company's core operations, a small percentage of Defendants' stock sales when they increased their overall holdings, Mr. Gordon's resignation, and the mere fact that Defendants made statements and denied wrongdoing all fail. *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007); *Metzler Asset Mgmt. GmbH v. Kingsley*, 305 F. Supp. 3d 181, 212 (D. Mass. 2018), *aff'd*, 928 F.3d 151 (1st Cir. 2019).

### A.    The CW Allegations Do Not Plead the Scienter of Any Individual Defendant

No CW provides any details regarding any interactions with either Individual Defendant.[19] The purported former TransMedics employees do not claim to have reported to either Individual Defendant. Together with the host of other defects cited above, this renders the allegations insufficient to plead scienter. *E.g.*, *Metzler*, 305 F. Supp. 3d at 213 ("Compelling evidence of scienter most often includes clear allegations of admissions, internal records or witnessed

---

[19] To the extent Plaintiffs attempt to allege direct interaction between confidential witnesses and Dr. Hassanein, those allegations are based on hearsay. *E.g.*, ¶ 95 (recounting message witness quoted in Scorpion Report received from unnamed third-party regarding conversation with Dr. Hassanein). And not a single anonymous source alleges having direct contact with Mr. Gordon.

discussions that suggest that defendants were aware that they were withholding vital information or at least were warned by others that this was so when they made the misleading statements." (quotation omitted)); *iRobot*, 527 F. Supp. 3d at 142 (finding certain confidential witnesses "do not have a clear basis of knowledge" because they "are never alleged to have even spoken to any of the [i]ndividual [d]efendants" and "there is no reporting line alleged").

### B.    The Gosar Letter and the Scorpion Report Do Not Establish Scienter

None of the assertions that Plaintiffs cite from the Gosar Letter nor the Scorpion Report purports to relay any interactions with either Individual Defendant and therefore they cannot support scienter.   Nor does Defendants' denial of Congressman Gosar's allegations support scienter, *see* ¶ 207, or Defendants would be caught in an impossible Catch 22—liable whether they admit the allegations or deny them.   *See DraftKings*, 650 F. Supp. 3d at 163–64 (denial of allegations "says nothing about the state of mind of the company or its officers").

Plaintiffs claim that the Scorpion Report shows that sources "directly confronted" Dr. Hassanein about the Company's pricing and the sustainability of its business model.  ¶¶ 208–10. But the Scorpion Report does not support these characterizations.  An executive at Massachusetts General Hospital claims he had conversations with "[TransMedics'] senior executives" about TransMedics' pricing, but not with either Individual Defendant.  ¶¶ 21, 208–09.  And an unnamed "hospital transplant director" described a "presentation at a meeting attended by [Dr.] Hassanein" concerning TransMedics' pricing, but Plaintiffs fail to plead whether this director was even present at the meeting or what that presentation said about pricing, let alone how Dr. Hassanein's attendance at that presentation demonstrates scienter.  ¶¶ 21, 209; *Biogen*, 193 F. Supp. 3d at 48 (finding CW's allegation that individual defendant attended "town hall" meeting "vague" and insufficient to support inference of scienter).  At bottom, both witnesses complain TransMedics was "expensive" but that does not contradict TransMedics' denials of "price gouging."  *See supra*

Argument § I.B.; *Auto. Indus. Pension Tr. Fund v. Textron Inc.*, 682 F.3d 34, 40 (1st Cir. 2012) (no showing of scienter where "[defendant's] statement and the confidential witness[es]' description[s] . . . are not in conflict"); *Metzler*, 305 F. Supp. 3d at 216 (no scienter where witness's statements "do not contradict defendants' public statements").

Plaintiffs also claim an "[organ procurement organization] executive" alleged that Dr. Hassanein called a hospital, threatening to withhold an OCS machine unless the hospital "came current" on its outstanding TransMedics flight balance in "48 hours." ¶¶ 18, 95, 210. Plaintiffs claim this supports his scienter for their coercion allegations, but the far more cogent inference is that Dr. Hassanein wanted the hospital to settle its existing debt before incurring additional charges. *E.g.*, *Leung v. Bluebird Bio, Inc.*, 599 F. Supp. 3d 49, 67 (D. Mass. 2022) (no scienter where "[t]he competing, nonculpable inference from the facts alleged . . . is more compelling than Plaintiff's proposed inference").

### C.    Individual Defendants' Stock Sales Do Not Support an Inference of Scienter

Plaintiffs rely, in part, on allegations regarding the Individual Defendants' stock trades during the Class Period. *See* Ex. 8 (Dr. Hassanein's Forms 4) at 23–61; Ex. 9 (Mr. Gordon's Forms 4) at 24–38. But "[i]nsider trading cannot . . . establish scienter on its own." *Isham v. Perini Corp.*, 665 F. Supp. 2d 28, 37 (D. Mass. 2009). To support scienter, insider trading allegations must show "the timing [or] the amount of insider sales is particularly unusual or suspicious." *See Zafgen*, 853 F.3d at 616. Plaintiffs' allegations regarding the Individual Defendants' stock sales fall short of this exacting standard.

As an initial matter, both Individual Defendants *increased* their holdings in TransMedics' stock during the Class Period, which serves to negate an inference of scienter. *E.g.*, *Mehta v. Ocular Therapeutix, Inc.*, 955 F.3d 194, 210 n.18 (1st Cir. 2020); *In re Wayfair, Inc. Sec. Litig.*, 471 F. Supp. 3d 332, 348 (D. Mass. 2020). Including vested stock options, Dr. Hassanein increased

28

his holdings by 176,992 shares and Mr. Gordon increased his holdings by 2,510 shares during the Class Period. *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp.*, 632 F.3d 751, 760 (1st Cir. 2011) (consideration of holdings must include vested options) (collecting cases). Further, while Plaintiffs cherry-pick sales as "suspicious," they ignore that almost all of the Individual Defendants' sales during the Class Period were made pursuant to Rule 10b5-1 plans or to satisfy tax obligations.[20] This undermines any inference of scienter. *See* Ex. 8 at 23, 60; Ex. 9 at 24, 38; *Leavitt v. Alnylam Pharms., Inc.*, 451 F. Supp. 3d 176, 188 (D. Mass. 2020) ("[T]hat all trading was pre-scheduled pursuant to Rule 10b5-1 trading plans negates an inference of scienter."); *Harrington v. Tetraphase Pharmaceuticals, Inc.*, 2017 WL 1946305, at *7 (D. Mass. May 9, 2017) (Sorokin, J.) ("[T]he trading pursuant to the [Rule 10b5-1] plans fails to support an inference of scienter."); *Wayfair*, 471 F. Supp. 3d at 348–49 (no scienter where sale occurred for tax withholding obligations).

### 1.    Dr. Hassanein's Trades

Preliminarily, Plaintiffs fail to allege that Dr. Hassanein's trades pursuant to his Rule 10b5-1 plan were suspicious; they do not allege that Dr. Hassanein entered into any of these trades, or the plan itself, with knowledge of material non-public information. *E.g.*, *Leavitt*, 451 F. Supp. 3d at 188 ("Plaintiffs do not provide the necessary evidence or context surrounding the trades that would allow the Court to draw the strong inference required."). Instead, Plaintiffs fixate on a handful of Dr. Hassanein's trades in May and August 2024 outside of his Rule 10b5-1 trading plan. ¶ 155. But these sales amount to roughly 13% of his TransMedics holdings (including vested options) during the Class Period. *See* Ex. 8 at 44–45, 56–57; *Zafgen*, 853 F.3d at 615–16 (when

---

[20] Plaintiffs appear to attempt to allege that the Individual Defendants entered into the 10b5-1 trading plans during the Class Period, and that doing so undermines the protections afforded by such plans. ¶ 157. But trading under a 10b5-1 plan created during a class period is not suspicious if the timing of the plan's creation is not itself suspicious. *In re Ariad Pharms., Inc. Sec. Litig.*, 842 F.3d 744, 755 (1st Cir. 2016).

defendant keeps "vast majority" of their holdings, "strength of the insider trading allegations drifts toward the marginal end").

Plaintiffs also attempt to connect Dr. Hassanein's August 2024 off-plan trades to TransMedics' revenue decline in Q3 2024—which the Company announced on October 28, 2024—and argue Dr. Hassanein "undoubtedly knew" the decline was coming. ¶ 156. But considering the size of Dr. Hassanein's trades relative to his holdings, the timing of the trades fails to raise any suspicion. *See* Ex. 8 at 56–57. Indeed, a two-month gap hardly suggests a motive to trade ahead of a quarterly revenue decline. *See Hensley*, 260 F. Supp. 3d at 123 (Sorokin, J.) (no scienter from insider sales preceding announcement of missed Q3 2015 projections).

### 2. Mr. Gordon's Trades

Plaintiffs allege Mr. Gordon sold "more than $11 million worth of stock during the Class Period versus just $4.5 million worth during the Control Period." ¶¶ 154, 212. But his off-plan sales amount to approximately 21% of his holdings and he *increased* his holdings during the Class Period. *See* Ex. 9 at 24, 38; *Zafgen*, 199 F. Supp. 3d at 469 (no scienter where insider retained 85% of holdings); *In re Peritus Software Servs., Inc. Sec. Litig.*, 52 F. Supp. 2d 211, 225 (D. Mass. 1999) (keeping "94%, 62%, and 75%" of stock suggests sales not unusual); *In re First Marblehead Corp. Sec. Litig.*, 639 F. Supp. 2d 145, 163–64 (D. Mass. 2009) (sales of 25%, 14%, and 13% of stock not unusual). His sales also include a sale to satisfy Mr. Gordon's tax obligations. *See Wayfair*, 471 F. Supp. 3d at 348. None of these trades supports a strong inference of scienter.

### D. Plaintiffs' Remaining Scattershot Scienter Allegations Fail

To the extent Plaintiffs assert a "core operations" theory, *i.e.*, that OCS and NOP were central to TransMedics' business, ¶ 204, this misses the mark. The core operations theory assumes "facts critical to a business's core operations . . . are so apparent that their knowledge may be attributed to the company and its officers." *Leung*, 599 F. Supp. 3d at 66 (quotation marks omitted)

(quoting *Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 19 (D. Mass. 2004)).  But Plaintiffs fail to allege facts that contradicted any challenged statement.  *See supra* Argument §§ I.A.–E.  Nor do they allege any other "significant evidence of a defendant's intent or recklessness, or a plus factor," without which courts "have been hesitant to apply significant weight to 'core operations' allegations." *Leung*, 599 F. Supp. 3d at 66 (internal quotation omitted).

Defendants' "regular public remarks to investors," ¶ 205, do not raise an inference of scienter.  Were that so, scienter would exist in every case.  Plaintiffs also claim that an analyst confronted Dr. Hassanein with the falsity of his statements when he asked whether TransMedics could "maintain this level of pricing" and to comment on hospital "margin structure." ¶ 210.  But the analyst's question regarding customers' profit margins is just that: a business-related question, not a confrontation or notice of any facts alleged to be false.[21]

Further, Mr. Gordon's decision to step down as Chief Financial Officer, ¶ 211, is not "inherently suspicious" without "further particularized allegations." *iRobot*, 527 F. Supp. 3d at 140–41.  "[P]leading scienter requires more than pleading a link between bad news and an executive's resignation." *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 119 (3d Cir. 2018).  Here, Plaintiffs allege no such particularized facts beyond timing. ¶ 211; *see iRobot*, 527 F. Supp. 3d at 140–41 ("Absent any further particularized allegations, other than the timing of aligning with alleged corrective disclosures, the complaint fails to allege sufficient facts to show that [personnel]

---

[21] Plaintiffs also allege that "[s]everal CWs and Scorpion Report interviewees" described Amira Hassanein, Dr. Hassanein's sister and the Company's Product Director for OCS Lung, as "playing an active role in pressuring hospitals" using OCS to use NOP. ¶ 127 n.9.  But Plaintiffs fail to allege with any specificity any instance of this purported pressuring.  Plaintiffs also fail to allege any reason Dr. Hassanein would have been aware of such conduct, any more than he can be presumed to know everything that any other Company employee did. *Glaser v. The9, Ltd.*, 772 F. Supp. 573, 591 (S.D.N.Y. 2011) ("[C]onclusory statements that defendants 'were aware' of certain information, and mere allegations that defendants 'would have' or 'should have' had such knowledge is insufficient.").  That Amira Hassanein is Dr. Hassanein's sister does not presumptively mean he has knowledge of her actions. *See Cullen v. RYVYL Inc.*, 2024 WL 898206, at *15 (S.D. Cal. Mar. 1, 2024) (no scienter where confidential witness did not allege personal knowledge of individual defendants' scienter, but instead, pled only knowledge of alleged fraudulent acts of family friend of defendant).

departures were tied to their knowledge or even participation in the alleged fraud."); *Metzler*, 305 F. Supp. 3d at 219 (similar).

Moreover, TransMedics announced Mr. Gordon would remain a non-executive employee until March 1, 2025, and thereafter serve in an advisory capacity into early 2026, which analysts recognized was to "help the company during its next wave of growth." *See* Ex. 3 (Exhibit 99.1 to December 2, 2024 Form 8-K); Ex. 11 (Dec. 2, 2024 William Blair Analyst Report) at 1; *Premca*, 763 F. Supp. 3d at 160 (finding "nothing suspicious" about executive resigning while "staying on as a director until May 2024 and assisting [the company] with finding a replacement" because it is "not a situation where an officer or director was pushed out of the company"); *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014) (no scienter on basis of executive departures in part because "two of [] three individuals remained at [the company] in some type of advisory role").

## III.    Plaintiffs Fail to Allege a Scheme

Plaintiffs include passing references that "[TransMedics] was engaged in a scheme to juice its revenue" by forcing hospitals to purchase NOP if they wanted to use OCS, ¶ 11, in order "to overbill hospitals," ¶ 81, and lodge a few allegations regarding an unidentified "scheme," ¶¶ 213, 215–16, 242–44.  This fails because they otherwise make no effort to plead "scheme liability" by setting out a separate section or count detailing the basis for such a claim, or by identifying any deceptive acts apart from the alleged misrepresentations.  "[C]laims for disclosure fraud under Rule 10b-5(b) cannot be simply retitled or recharacterized into claims of scheme liability under Rule 10b-5(a) or (c)." *Berlik v. Baker*, No. 21-CV-11723-AK, Dkt. 47, at 10 (D. Mass. Sept. 30, 2022) (slip op.).  Plaintiffs do just this: they allege misrepresentations based on alleged contrary facts and then label those facts a scheme.  For example, Plaintiffs allege that, contrary to what Defendants claimed, the Company's growth was not a result of any cost efficiencies but from

pressuring hospitals to use its NOP services to access OCS devices.  ¶ 175.  They then rely on the same alleged facts to claim that there was a scheme to "overbill hospitals."  ¶ 81.  This is "indistinguishable from the misstatements and omissions alleged" and cannot support a separate scheme claim.  *In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 216–17 (S.D.N.Y. 2020).

## IV.    Plaintiffs Fail to Plead Loss Causation

To survive a motion to dismiss, Plaintiffs must plead a causal connection between the alleged fraud and their alleged losses.  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).  Plaintiffs typically identify a corrective disclosure followed by a stock price drop or a materialization of an undisclosed risk.[22]  *Coyne*, 943 F. Supp. 2d at 273; *Leung*, 599 F. Supp. 3d at 70.  Loss from "the disclosure of negative information other than a prior false or misleading statement" does not support a claim for securities fraud.  *Coyne*, 943 F. Supp. 2d at 273.

### A.    February 22, 2024 *Daily Caller* Article

Plaintiffs allege that TransMedics' stock price dropped on February 22, 2024, when the *Daily Caller* reported on the Gosar Letter, which purportedly "disclosed serious improprieties with TransMedics' operations and practices."  ¶ 218.  The Gosar Letter is, at best, an inquiry.  It did not disclose any "truth" to the market, let alone bring "charges" or make findings contrary to any challenged statement.  ¶¶ 62–63.  An investigation alone does not plead loss causation, so *a fortiori*, an inquiry letter does not.  *See Loos v. Immersion Corp.*, 762 F.3d 880, 890 (9th Cir. 2014) (even formal investigation "simply puts investors on notice of a *potential* future disclosure of fraudulent conduct" and any associated stock drop "can only be attributed to market speculation" not fraud (emphasis added)); *Meyer v. Green*, 710 F.3d 1189, 1201 (11th Cir. 2013) (similar).

---

[22] These theories are fundamentally the same here.  ¶ 226; *e.g.*, *In re OSG Sec. Litig.*, 2015 WL 3466094, at *3 (S.D.N.Y. May 29, 2015) (rejecting loss causation and noting that materialization of risk argument "merely rehashes the corrective disclosure claim").

### B.    October 28, 2024 Press Release

Plaintiffs next attempt to plead that TransMedics' October 28, 2024 press release announcing a slight decline in revenue and gross margins for Q3 2024 constituted a corrective disclosure.  ¶¶ 221–24.  But Plaintiffs fail to allege a connection between this financial dip and Defendants' allegedly false or misleading statements.  *See Coyne*, 943 F. Supp. 2d at 273 (no loss causation because "[i]t is not enough to allege that Defendants made false statements on the one hand and that some announcement caused a stock drop on the other").

### C.    December 2, 2024 Press Release

Plaintiffs allege that TransMedics' stock price dropped when the Company announced Mr. Gordon's resignation because it partially disclosed TransMedics' unsustainable business practices and was a "partial materialization of the undisclosed risks" of said practices.  ¶ 226.

But the announcement did not say anything about why Mr. Gordon resigned in order for the market to infer fraud, and Mr. Gordon remained a TransMedics employee.  Ex. 3 at 1; *see In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511, 514 (2d Cir. 2010) (executive's resignation was not corrective disclosure because it did not reveal any "then-undisclosed fact with regard to the specific misrepresentations," and negative publicity drawn from resignation was "too tenuously connected" to allegedly fraudulent transaction to establish loss causation under materialization of the risk theory).  Although a stock price decline followed this press release, "the press release did not disclose [any] alleged fraud."[23]  *See In re Buca Inc. Sec. Litig.*, 2006 WL 3030886, at *9 (D. Minn. Oct. 16, 2006).

### D.    January 10, 2025 Scorpion Report

Finally, Plaintiffs fail to allege loss causation based on the Scorpion Report.  Plaintiffs

---

[23] That Mr. Gordon will remain an employee and advisor to TransMedics further undermines Plaintiffs' attempt to use this press release as a corrective disclosure.  *See* Ex. 3 at 1.

assert that the Scorpion Report revealed the alleged fraud to the market, and that TransMedics' stock price dropped in response. ¶¶ 228–29. Not so. To begin, cases are legion finding that short-seller reports cannot support loss causation when they do not reveal anything new to the market, but simply repackage information in a negative light. *See, e.g.*, *Nektar*, 34 F.4th at 840; *DeFeo*, 134 F.4th at 163. Even when a short-seller report pulls together hard-to-find information in a way that arguably presents new information to the market, if the source is unreliable, it cannot function as a corrective disclosure. *Nektar*, 34 F.4th at 839–40 (finding short-seller report unreliable despite it "pull[ing] together disparate sources and connected data in ways that were not plainly obvious").

The Scorpion Report is inherently unreliable for the reasons explained above, and even assuming it presented new information to the market, it cannot function as a corrective disclosure. *See supra* Argument § I.A.2.; *see also DeFeo*, 134 F.4th at 163 (rejecting loss causation allegations because "the self-interested Report relies on anonymous sources for its nonpublic information and disclaims its accuracy"); *Nektar*, 34 F.4th at 840 ("[I]t is not plausible that the market would perceive the [short-seller] Report as revealing false statements . . . ." (quotation marks omitted) (quoting *In re BofI Sec. Litig.*, 977 F.3d 781, 797 (9th Cir. 2022)).

## V.    Plaintiffs' Section 20(a) Claim Must Be Dismissed

Because Plaintiffs do not adequately plead a primary violation of Section 10(b), the control person claim under Section 20(a) must be dismissed. *See Metzler*, 305 F. Supp. 3d at 223 (dismissing Section 20(a) claim because such claims "depend on an underlying violation of the Exchange Act").

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should dismiss the Complaint with prejudice.

Dated: October 7, 2025

Respectfully Submitted,

*/s/ Michael G. Bongiorno*
Michael G. Bongiorno (BBO # 558748)
Timothy J. Perla (BBO # 660447)
Sonia Sujanani (BBO # 691145)
Margaux Malasky (BBO # 705494)
**WILMER CUTLER PICKERING
    HALE AND DORR LLP**
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-5000
michael.bongiorno@wilmerhale.com
timothy.perla@wilmerhale.com
sonia.sujanani@wilmerhale.com
margaux.malasky@wilmerhale.com

Tamar Kaplan-Marans (*pro hac vice*)
**WILMER CUTLER PICKERING
    HALE AND DORR LLP**
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: (212) 230-8800
Fax: (212) 230-8888
tamar.kaplan-marans@wilmerhale.com

*Counsel for Defendants TransMedics Group,
Inc., Waleed Hassanein, and Stephen Gordon*

**Appendix A: Statements Alleged to be False or Misleading
in the Consolidated Class Action Complaint for Violations of the Federal Securities Laws**

| No. | Document Source | Citation(s) | Statement |
|---|---|---|---|
| 1. | Feb. 27, 2023 TransMedics Group, Inc.'s ("TransMedics") Form 10-K | ¶ 158 | "***Our National OCS Program was developed to provide a more efficient process to procure donor organs with the OCS***."[1] |
| 2. | Mar. 6, 2023 Cowen Healthcare Conference Transcript | ¶ 161 | Q: "I want to talk about how OCS is driving overall transplant volume growth, but maybe one – another maybe one or two questions on NOP.  Just thinking about demand building and ***centers potentially being worried, I mean everyone is worried about getting paid for expenses and on the NOP side, specifically the service fees.***  And when you think, you're at a point now where there is enough experience through 2022 and 2021, but mostly 2022, where centers are getting paid for the NOP service expense and then the charge, that's an easier discussion as you're looking at new centers, what is that discussion?"<br><br>A: "***Every NOP service charge is fully reimbursed.  It's not even a close call, everything we do in the service model is exactly what the transplant programs have been doing for the last four decades.  So, that's not a question at all.***  Yes, there is a significant more awareness now about the NOP, about the big centers that utilize NOP pretty aggressively, ***that they're getting reimbursed and that's creating its own momentum or catalyst for additional centers to come through. . . .***  that's the beauty of the NOP and we expect that to continue to grow through 2023 and 2024." |

[1] The bolding and italics contained herein are copied from the Consolidated Class Action Complaint for Violations of the Federal Securities Laws, Dkt. No. 50 ("Complaint").  The Complaint describes the statements that Lead Plaintiffs challenge as purportedly "false and misleading" at Paragraphs 158 through 202.  The Complaint uses bold and italic text to highlight select portions of these challenged statements.  Defendants TransMedics, Waleed Hassanein, and Stephen Gordon understand that Lead Plaintiffs challenge only those portions of the statements that are so emphasized.

| No. | Document Source | Citation(s) | Statement |
|-----|----------------|-------------|-----------|
| 3. | Mar. 13, 2023 Oppenheimer Healthcare Conference Transcript | ¶ 162 | Q: "So, Waleed, thank you for that.  Waleed, we have talked offline in terms of **reimbursement for OCS and NOP.  That is one of the questions that frequently comes up in client conversations.**  I would love for you to dissect reimbursement, very simplistically speaking, make it palatable for clients' consumption.  If there are challenges, how is it worked out?  Just kind of walk us through the nuts and bolts."<br><br>A: "Sure.  So, Suraj, thank you for the question.  **It's very important question of course.**  So let me start by saying **one important fact that every charge around the NOP, from technology to surgical procurement to clinical management to transportation costs are all covered under the existing reimbursement mechanisms for organ transplant.  So that is a fact.**" |
| 4. | Mar. 13, 2023 Oppenheimer Healthcare Conference Transcript | ¶ 162 | "So for CMS [Center for Medicare and Medicaid Services], CMS drives the reimbursement strategy for organ transplant and **all commercial payers that cover organ transplant follow the CMS model.**  CMS is reimbursing organ transplant from two dedicated budgets.  The first budget is the traditional DRG, but that covers the transplant procedure and the posttransplant stay for first 15 days to 30 days depending on the center or the organ."<br><br>"But another budget is called Organ Acquisition Cost Center.  **It's literally a pass-through budget or a fee for service budget that covers all organ preservation, surgical procurement, transportation, any clinical services provided, any lab testing or diagnostics provided for organ procurement. . . ."**<br><br>"**The same happens with the commercial payers.  The only difference between CMS and the commercial payer in some forms of contract with commercial private payers in the US, they lump sum these two budgets together and provide a global rate.  So that's the only nuances between CMS, which is two separate budgets.**" |
| 5. | Sept. 11, 2023 Morgan Stanley 21st Annual | ¶ 165 | "**The NOP is a big moat.**  We always said that.  But **with adding the logistics control over that, that gives us a bigger, wider, deeper moat around the business** |

| No. | Document Source | Citation(s) | Statement |
|---|---|---|---|
| | Global Healthcare Conference Transcript | | *that nobody in the industry can access. . . . [We] don't use that unique position to g[o]uge the market.*" |
| 6. | Nov. 6, 2023 TransMedics' Earnings Call Transcript | ¶ 168 | Q: "And I mean, we don't have visibility into the metrics, but just a ballpark. On average, what's a typical case revenue that gets -- that you've seen kind of push through the hospitals to reimburse for an average case . . . the revenue for aviation specifically, how should we think about that?" |
| | | | A: "***This is not a question.*** This is a fact of organ transplant. Old aviation and logistics transport are fully reimbursed through the same mechanism of organ acquisition. ***There's no limit per se.*** In fact, ***we are doing this because we believe we could be more efficient and pass some of the efficiencies back to the transplant program.*** So I do not want anybody on this call to think that the aviation business is not reimbursed through normal mechanisms of organ transplant. ***There is no limit. There is no specifics. . . . [I]t's fully reimbursed. It's not a question of reimbursement.*** It's a question of making sure that we have the fleet, the efficiencies, the support team to be able to cover the missions." |
| 7. | Feb. 26, 2024 TransMedics' Letter to Congressman Paul Gosar | ¶ 171 | "Your letter accused TransMedics of pressuring hospitals to utilize our more expensive logistics. ***This couldn't be further from the truth.*** TransMedics presents the logistics quotation to transplant centers using our NOP service. ***The transplant centers then have the final say on whether they want to use our services or not.***" |
| 8. | Feb. 26, 2024 TransMedics' Letter to Congressman Paul Gosar | ¶ 172 | "Over the past 24 months, more and more centers elected to transition to NOP ***due to its more efficient cost profile, better clinical outcomes, and the ability to increase their transplant volumes without surgical fatigue of their staff.***" |
| | | | "***The NOP program was created to . . . [r]educe the fixed infrastructure and resources costs required of transplant centers to manage the OCS technology*** to access more donor organs and grow their overall transplant volume" and to "[p]rovide a better way to minimize fatigue and manage work-life balance of the surgical and clinical staff of the transplant centers." |

3

| No. | Document Source | Citation(s) | Statement |
|---|---|---|---|
| 9. | Feb. 26, 2024 TransMedics' Earnings Call Transcript | ¶ 173 | "This letter contains serious accusations, ***which are grossly inaccurate, unfounded and based on wrong information.  Let me repeat again.  This letter contains serious accusations, which are grossly inaccurate, unfounded and based on wrong information. . . .***  This letter came out of left field.  It ***was not supported by any facts.*** It was complete -- completely unfounded. . . .  I don't know where this letter -- how this letter came about other than it appears that there's some ***misinformation*** being propagated but our response is pretty strong, and it was designed as such to make sure that if anybody wants to go down the same path that they need to know exactly the facts before they come and levy these accusations against TransMedics." |
| 10. | Feb. 26, 2024 TransMedics' Earnings Call Transcript | ¶ 174 | "We are confident that this ***sustained growth and success of NOP is based solely on the operational efficiency to grow transplant volumes, highest level of clinical care of donor organs and the overall cost efficiency experienced by transplant programs*** across the United States. . . .  ***The success of OCS NOP program is based on better clinical, economic and operational outcomes experienced by the transplant centers and not based on anything else.***" |
| 11. | Mar. 4, 2024 Cowen Healthcare Conference Transcript | ¶¶ 177–78 | "I think this ***confusion*** comes when you ask a physician or a surgeon about Medicare cost support.  They really are not that involved.  They don't know the mechanisms.  And there's a farce in transplant medicine.  They tell you, oh, we're getting reimbursed $0.50 on $1, whatever. $0.60 on $1.  ***That's not accurate. It's just a reflection of the mechanism.***"<br><br>Dr. Hassanein asserted that this "confusion" simply stemmed from the fact that the "cost report" hospitals send every year to CMS also includes a list of costs incurred by commercial patients, and that CMS will only reimburse the Medicare-covered portion of those expenses.<br><br>"[C]ommercial payers are highly incentivized and driving for more organ transplants to happen.  ***That's why commercial payers responded to centers that presented them case to increase their organ acquisition budget by a significant*** |

| No. | Document Source | Citation(s) | Statement |
|---|---|---|---|
| | | | *amount to cover the OCS NOP positively and favorably, and they all got the money requested . . . .*" |
| 12. | Mar. 4, 2024 Cowen Healthcare Conference Transcript | ¶ 179 | Dr. Hassanein asserted that not only was the program "***very sticky***" with customers, but that "***we've never seen an NOP[-using] center that starts with NOP and walk[s] away from NOP.***" |
| 13. | Mar. 12, 2024 Oppenheimer Healthcare Conference Transcript | ¶ 183 | "***[W]e are leaving the final decisions completely in the hands of the transplant program.*** We offer quotes for the logistics for every mission that we get through the NOP, and ***it's up to the transplant program to say yay or nay whether or not they want to use TransMedics logistics, whether it's air or ground. . . .*** And we've said numerous times to transplant programs, we don't operate based on a contract concept. We want to make sure that our service, our world class service and our availability and our pricing is what brings you back to using TransMedics logistics. So that's what have we been implementing to date. ***So it's up to them whether or not they use us or not.***" |
| 14. | Mar. 12, 2024 Oppenheimer Healthcare Conference Transcript | ¶ 184 | "The reason why we're in the logistics aspect of this chain is because we see a huge opportunity to reduce cost and share that with the transplant program. We're in this for the long-term. We see a huge opportunity to efficiently run our own logistic network and pass that cost efficiency back through the transplant program. We want the transplant program to benefit from using our logistics. **We're in this not to gouge the system.**" |
| 15. | Apr. 30, 2024 TransMedics' Earnings Call Transcript | ¶ 187 | Q: "Can you share any general feedback from customers that have used TransMedics aviation? And maybe if or how that feedback has changed since you began integrating the aviation segment?"<br><br>A: "I think the only thing that I can share publicly . . . is I point out to the results. I point out to . . . the[] rapid pace by which we went from 0 to 105 customers using our TransMedics logistical services. ***And we expect to go deeper within these accounts. I'll leave it at that. I think centers are beginning -- or are actually witnessing the better structure, the more efficient cost structure and the*** |

| No. | Document Source | Citation(s) | Statement |
|---|---|---|---|
| | | | *availability that is afforded by TransMedics logistics. And again, I point to the results.*" |
| 16. | July 31, 2024 TransMedics' Earnings Call Transcript | ¶ 190 | "As far as pricing leverage, look, at the moment, we've got a pricing model that works. As we move out and grow, we need to determine what the right model is. Maybe service has some levers there. But for now, ***we're not trying to gouge the system. We have a pricing model that works. And we're going to continue with that.*** We don't see any changes in the near future."<br><br>"I want to echo what Stephen just said, especially on the second part of the question, Suraj, which is an excellent question as always. Listen, ***we don't look at transplantation as an opportunity for pricing leverage. What we are focusing on is growing the overall national transplant volume.*** We're growing our market share in the existing transplant volume. We are comfortable with our current pricing model. We want to be a trusted partner to transplant programs. This is a very important aspect of our mission. ***We're not in this to just capitalize on leverage.***" |
| 17. | July 31, 2024 TransMedics' Earnings Call Transcript | ¶ 191 | "[W]e provide the most economical way of managing organ transplants since the invention of organ transplants[,]" because ***"[t]he way our logistics network is operating is providing significant cost efficiency to every major transplant program that is working with us[.]"***<br><br>"[T]hat is how we're going to get the lion's share of the market with these approaches, ***just focusing on the fundamentals and providing good clinical outcomes or the best clinical outcomes and the most cost-effective way of managing organ transplant for these programs.***" |
| 18. | Sept. 4, 2024 Morgan Stanley Healthcare Conference Transcript | ¶ 194 | "[The] cherry on top is the us controlling the logistics allows us to share some of the cost efficiency of us managing our own fleet and logistics network with the transplant program. So ***we're delivering the most cost-effective transportation in the history of organ transplant, period, full stop.***" |

| No. | Document Source | Citation(s) | Statement |
|---|---|---|---|
| 19. | Oct. 28, 2024 TransMedics' Earnings Call Transcript | ¶ 197 | "So the sequential decline in the U.S. case volume was ***directly in line with the decline in national transplant volumes. Importantly, we did not see any degradation of our market share or center penetration on all three organs. I want to make it crystal clear. We have not seen any fundamental or competitive dynamics playing any role*** in the slight sequential decline in case volume for OCS in Q3. ***Let me repeat it again, there has not been or we have not seen any fundamental or competitive dynamics playing any role*** in the slight sequential decline in case volume for OCS in Q3." |
| 20. | Oct. 28, 2024 TransMedics' Earnings Call Transcript | ¶ 198 | "There[] [was] absolutely categorically no impact of any technologies, methodologies or competitive dynamic on the decline in Q3, specifically in heart." <br><br> "***[A]gain, I caution the Street from trying to create something out of nothing. Price elasticity or pricing pressure has nothing to do with what happened in Q3*** because we've seen major transplant programs lose significant portion of their annual volume in the United States. I'm talking major transplant programs being behind 40, 50 transplants in the month of August, for example, ***has nothing to do with pricing sensitivity.*** I can tell you that these transplant program[s] would have done anything to get access to transplants during that time." |
| 21. | Dec. 3, 2024 Piper Sandler Healthcare Conference Transcript | ¶ 200 | Q: "Can you guys maintain this level of pricing? And why is that?" <br><br> A: "We are maintaining [our pricing] because many reasons. One, we are delivering significant value compared to anybody in the industry. We think our price actually is fairly priced. ***We're not gouging the market in any way.*** We actually think we're leaving some value on the table. But that's fine. We are long-term-focused. Number three, ***we are sharing significant cost savings with the transplant program, especially with the network effect that we created around NOP and aviation that nobody else in the industry can match. . . .*** That's why, we are maintaining our price. And that's why, we think that we're providing significant value and sharing cost savings and the value of the network effect that we've created in the NOP with our transplant program." |

| No. | Document Source | Citation(s) | Statement |
|-----|-----------------|-------------|-----------|
| 22. | Dec. 10, 2024 TransMedics' Investor and Analyst Day Transcript | ¶ 201 | "[*W*]*e pride ourselves for not gouging the market. We let others do that.*" |