**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |
|---|---|
| In re TRANSMEDICS GROUP, INC. SECURITIES LITIGATION | Master Case No. 1:25-cv-10385-LTS<br><br>CLASS ACTION |
| This Document Relates To:<br><br>ALL ACTIONS | |

**LEAD PLAINTIFFS' OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS THE CONSOLIDATED COMPLAINT**

**TABLE OF CONTENTS**

TABLE OF CONTENTS..................................................................................................................... i

TABLE OF AUTHORITIES ...........................................................................................................iii

INTRODUCTION ......................................................................................................................... 1

BRIEF SUMMARY OF THE ALLEGATIONS .......................................................................... 4

    I.    TransMedics' Business ................................................................................ 5

    II.    TransMedics' Launches The "Amazon Prime of Organ Transplant".................... 5

    III.    Throughout the Class Period, Defendants Falsely Assured Investors that NOP Was Delivering Highly "Cost-Effective" Transplant Services that Were Always "Fully Reimbursed" by Insurance, and that They Did Not Engage in Force Bundling of Their Services and Devices ................................................................. 5

    IV.    Defendants Sell Massive Amounts Of Stock.......................................................... 7

    V.    The Truth Is Revealed............................................................................................. 7

LEGAL STANDARD.................................................................................................................... 10

ARGUMENT ................................................................................................................................ 10

    I.    The Complaint Adequately Pleads Defendants' Materially False And Misleading Statements And Omissions ........................................................................ 10

        A.    The Scorpion Report, AlphaSense Interviews, and the Gosar Letter Are Reliable Sources That Demonstrate Falsity............................................. 11

        B.    Defendants' NOP Pricing and Efficiency Statements Were False and Misleading......................................................................................... 16

            1.    The Complaint Provides Details of TransMedics' Price Gouging 17

            2.    The Counterfactual Narrative Is Directly Contradicted by Detailed Allegations in the Complaint ......................................................... 18

            3.    The Complaint Lists Numerous Specific Clinics or Hospitals ..... 19

            4.    The Economic Expert Demonstrates the Falsity of Pricing Statements ................................................................................... 19

        C.    Defendants' Statements Denying That They Force-Bundled NOP With the OCS Device Were False and Misleading.................................................. 20

        D.    The Insurance Reimbursement Statements Were False and Misleading .. 22

        E.    The 3Q 2025 Earnings Call Statements Were False and Misleading ....... 23

        F.    Defendants' Statements Do Not Amount to Puffery .............................. 24

    II.    The Complaint's Allegations Give Rise To A Strong Inference Of Scienter ....... 25

        A.    The CWs, the Scorpion Report, and the Gosar Letter Demonstrate Defendants' Actual Knowledge................................................................. 26

  B. Plaintiffs Allege Numerous Other Indicia of Scienter.............................. 27

  C. The Complaint's Motive Allegations Further Support a Strong Inference of Scienter .................................................................................................. 29

III. The Complaint Pleads Loss Causation ................................................... 32

  A. February 22, 2024 Report on the Gosar Letter ....................................... 33

  B. October 28, 2024 Press Release................................................................ 33

  C. December 2, 2024 Press Release ............................................................... 34

  D. January 10, 2025 Scorpion Report............................................................ 34

IV. Control Person Liability Is Adequately Pled ........................................ 35

CONCLUSION....................................................................................................... 35

## TABLE OF AUTHORITIES

PAGE(S)

CASES

*Aldridge v. A.T. Cross Corp.*,
284 F.3d 72 (1st Cir. 2002)........................................................................................10, 18, 26

*Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*,
28 F.4th 343 (2d Cir. 2022) ....................................................................................12, 19, 20, 21

*Bennett v. H&R Block Fin. Advisors, Inc.*,
2005 WL 8178042 (N.D. Cal. June 1, 2005)...........................................................................15

*Bernstein v. Ginkgo Bioworks Holdings, Inc.*,
2023 WL 11996105 (N.D. Cal. Mar. 10, 2023)................................................................11, 35

*Bond v. Clover Health Inv., Corp.*,
587 F. Supp. 3d 641 (M.D. Tenn. 2022).............................................................................11, 13

*Bos. Ret. Sys. v. Alexion Pharms., Inc.*,
556 F. Supp. 3d 100 (D. Conn. 2021)......................................................................................34

*Brumbaugh v. Wave Sys. Corp.*,
416 F. Supp. 2d 239 (D. Mass. 2006).......................................................................................25

*City of Brockton Ret. Sys. v. Avon Prods., Inc.*,
2014 WL 4832321 (S.D.N.Y. Sept. 29, 2014).........................................................................15

*City of Miami Fire Fighters' & Police Officers' Ret. Tr. v. CVS Health Corp.*,
46 F.4th 22 (1st Cir. 2022)........................................................................................................19

*Collier v. ModusLink Glob. Sols., Inc.*,
9 F. Supp. 3d 61 (D. Mass. 2014)............................................................................................29

*Const. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*,
22 F.4th 1 (1st Circ. 2021)..................................................................................................22, 27

*Coyne v. Metabolix, Inc.*,
943 F. Supp. 2d 259 (D. Mass. 2013) (Defs.' Br. )............................................................18, 33

*Crowell v. Ionics, Inc.*,
343 F. Supp. 2d 1 (D. Mass. 2004) ..........................................................................................27

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005)..................................................................................................................32

*Fantini v. Salem State Coll.*,
    557 F.3d 22 (1st Cir. 2009) .............................................................................................. 10

*Friedberg v. Discreet Logic*,
    959 F. Supp. 42 (D. Mass. 1997) ..................................................................................... 29

*Gerneth v. Chiasma, Inc.*,
    2018 WL 935418 (D. Mass. Feb. 15, 2018) ..................................................................... 24

*Harrington v. Tetraphase Pharmaceuticals, Inc.*,
    2017 WL 1946305 (D. Mass. May 9, 2017) ..................................................................... 31

*Hill v. State St. Corp.*,
    2011 WL 3420439 (D. Mass. Aug. 3, 2011) ............................................................... 15, 20

*Ho v. Duoyuan Glob. Water, Inc.*,
    887 F. Supp. 2d 547 (S.D.N.Y. 2012) ............................................................................... 11

*Hoff v. Popular, Inc.*,
    727 F. Supp. 2d 77 (D.P.R. 2010) ..................................................................................... 35

*Homeward Residential, Inc. v. Sand Canyon Corp.*,
    298 F.R.D. 116 (S.D.N.Y. 2014) ...................................................................................... 14

*In re Allaire Corp. Sec. Litig.*,
    224 F. Supp. 2d 391 (D. Mass. 2002) ........................................................................ 25, 27

*In re Cabletron Sys., Inc.*,
    311 F.3d 11 (1st Cir. 2002) .......................................................................................... *passim*

*In re China Mobile Games & Ent. Grp., Ltd. Sec. Litig.*,
    2016 WL 922711 (S.D.N.Y. Mar. 7, 2016) ...................................................................... 13

*In re DraftKings Inc. Secs. Litig.*,
    650 F. Supp. 3d 120 (S.D.N.Y.) ....................................................................................... 13

*In re Equifax Inc. Sec. Litig.*,
    357 F. Supp. 3d 1189 (N.D. Ga. 2019) ............................................................................ 13

*In re EVCI Colls. Holding Corp. Sec. Litig.*,
    469 F. Supp. 2d 88 (S.D.N.Y. 2006) ................................................................................ 31

*In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*,
    705 F. Supp. 2d 86 (D. Mass. 2010) ................................................................................ 33

*In re iRobot Corp. Sec. Litig.*,
    2021 WL 950675 (D. Mass. Mar. 12, 2021) ..................................................................... 27

iv

*In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*,
   2014 WL 285103 (S.D.N.Y. Jan. 27, 2014) ....................................................................12, 13

*In re MicroStrategy, Inc. Sec. Litig.*,
   115 F. Supp. 2d 620 (E. D. Va. 2000) ................................................................................30

*In re Nektar Therapeutics Sec. Litig.*,
   34 F.4th 828 (9th Cir. 2022) ...............................................................................................35

*In re Petrobras Sec. Litig.*,
   116 F. Supp. 3d 368 (S.D.N.Y. 2015).................................................................................25

*In re Philip Servs. Corp. Sec. Litig.*,
   383 F. Supp. 2d 463 (S.D.N.Y. 2004).................................................................................15

*In re QuantumScape Sec. Class Action Litig.*,
   580 F. Supp. 3d 714 (N.D. Cal. Jan. 14, 2022)..........................................................11, 12, 35

*In re Resonant Inc. Sec. Litig.*,
   2016 WL 6571267 (C.D. Cal. July 11, 2016).......................................................................19

*In re Sanofi-Aventis Sec. Litig.*,
   774 F. Supp. 2d 549 (S.D.N.Y. 2011)..................................................................................28

*In re Scot. Re Grp. Sec. Litig.*,
   524 F. Supp. 2d 370 (S.D.N.Y. 2007)..................................................................................28

*In re Silicon Storage Tech., Inc. Sec. Litig.*,
   2007 WL 760535 (N.D. Cal. 2007) ......................................................................................19

*In re Silvercorp Metals, Inc. Sec. Litig.*,
   26 F. Supp. 3d 266 (S.D.N.Y. 2014)....................................................................................26

*In re Stillwater Cap. Partners Inc. Litig.*,
   858 F. Supp. 2d 277 (S.D.N.Y. 2012)..................................................................................34

*In re Thornburg Mortg., Inc. Sec. Litig.*,
   695 F. Supp. 2d 1165 (D.N.M. 2010) ..................................................................................30

*In re Verifone Holdings, Inc. Sec. Litig.*,
   704 F.3d 694 (9th Cir. 2012) ...............................................................................................26

*In re Winstar Commc'ns*,
   2006 WL 473885 (S.D.N.Y. Feb. 27, 2006).........................................................................33

*Institutional Invs. Grp. v. Avaya, Inc.*,
   564 F.3d 242 (3rd Cir. 2009) ...............................................................................................28

*Iron Workers Local 580 Joint Fund v. NVIDIA Corp.*,
2020 WL 1244936 (N.D. Cal. March 16, 2020) ...................................................................19, 20

*Kiken v. Lumber Liquidators Holdings, Inc.*,
155 F. Supp. 3d 593 (E.D. Va. 2015) ...................................................................................11

*Lako v. Loandepot, Inc.*,
2023 WL 444151 (C.D. Cal. Jan. 24, 2023) ...........................................................................13

*Leventhal v. Chegg, Inc.*,
721 F. Supp.3d 1003 (N.D. Cal. 2024) ...................................................................................18

*Levy v. Gutierrez*,
2017 WL 2191592 (D.N.H. May 4, 2017) ...............................................................................21

*Lewy v. SkyPeople Fruit Juice, Inc.*,
2012 WL 3957916 (S.D.N.Y. Sept. 10, 2012) ........................................................................13

*Lloyd, v. CVB Fin. Corp.*,
811 F.3d 1200 (9th Cir. 2016) ...............................................................................................33

*Loc. No. 8 IBEW Ret. Plan v. Vertex Pharms., Inc.*,
140 F. Supp. 3d 120 (D. Mass. 2015) ...................................................................................31

*Long Miao v. Fanhua, Inc.*,
442 F. Supp. 3d 774 (S.D.N.Y. 2020) ...................................................................................13

*Lormand v. U.S. Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) .................................................................................................32

*LSI Design & Integration Corp. v. Tesaro, Inc.*,
2019 WL 5967994 (D. Mass. Nov. 13, 2019) ........................................................................24

*Mass. Ret. Sys. v. CVS Caremark Corp.*,
716 F.3d 229 (1st Cir. 2013) .................................................................................................32

*McIntire v. China MediaExpress Holdings, Inc.*,
927 F. Supp. 2d 105 (S.D.N.Y. 2013) ...................................................................................11

*Morales-Tanon v. P.R. Elec. Power Auth.*,
524 F.3d 15 (1st Cir. 2008) ...................................................................................................10

*N. Collier Fire Control & Rescue Dist. Firefighters' Pension Plan v. Mercury
Sys., Inc.*,
768 F. Supp. 3d 133 (D. Mass. 2025) ...................................................................................26

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
380 F.3d 1226 (9th Cir. 2004) ...............................................................................................29

*Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*,
    432 F. Supp. 3d 131 (D. Conn. 2019)..................................................................34

*Pension System v. Boff Holding, Inc.*,
    977 F.3d 781 (9th Cir. 2020) ...........................................................................35

*Peters v. Twist Bioscience Corp.*,
    2025 WL 2532671 (N.D. Cal. Sept. 3, 2025) ...............................................11, 35

*PR Diamonds, Inc. v. Chandler*,
    364 F.3d 671 (6th Cir. 2004) ...........................................................................30

*Pub. Emps. Ret. Sys. of Miss., P. R. Tchrs. Ret. Sys. v. Amedisys, Inc.*,
    769 F.3d 313 (5th Cir. 2014) .......................................................................32, 33

*Resolution Trust Corp. v. Gold*,
    30 F.3d 251 (1st Cir. 1994)..............................................................................35

*Ret. Sys. of Gov't of the Virgin Is. v. Blanford*,
    794 F.3d 297 (2d Cir. 2015)....................................................................12, 21, 31

*Ret. Sys. v. Boston Scientific Corp.*,
    523 F.3d 75 (1st Cir. 2008).......................................................................10, 30, 31

*Ret. Sys. v. Talbots, Inc.*,
    2013 WL 5348569 (D. Mass. Sept. 23, 2013) ........................................................25

*Shaw v. Digital Equip. Corp.*,
    82 F.3d 1194 (1st Cir. 1996)..............................................................................15

*Snellink v. Gulf Res., Inc.*,
    870 F. Supp. 2d 930 (C.D. Cal. 2012) ..................................................................11

*Special Situations Fund III, L.P. v. Am. Dental Partners, Inc.*,
    775 F. Supp. 2d 227 (D. Mass. 2011) ..................................................................32

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)......................................................................................25

*Washtenaw County Emps. Ret. Sys. v. Avid Tech., Inc.*,
    28 F. Supp. 3d 93 (D. Mass. 2014)......................................................................27

*Wortley v. Camplin*,
    333 F.3d 284 (1st Cir. 2003)..............................................................................32

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C. §78u–4(b)(2) .......................................................................................15

Fed. R. Civ. P. 12(b)(6) .................................................................................................................10

Fed. R. Civ. P. 15(a) .....................................................................................................................35

PSLRA .....................................................................................................................................10, 11

Rule 9(b) ........................................................................................................................................10

Rule 10b5-1 ...........................................................................................................................7, 8, 31

**INTRODUCTION**

Lead Plaintiffs the Peace Officers' Annuity and Benefit Fund of Georgia and Oguzhan Altun ("Plaintiffs"), on behalf of a class of investors who purchased stock in Defendant TransMedics Group, Inc. ("TransMedics" or the "Company"), oppose the motion to dismiss filed by TransMedics, Waleed Hassanein, M.D. ("Hassanein") (the Company's founder and Chief Executive Officer ("CEO")), and Stephen Gordon ("Gordon") (the Company's Chief Financial Officer ("CFO")) (collectively, "Defendants") ("Defs.' Br.").

This is a securities class action in which Defendants made a series of materially false and misleading statements to investors about TransMedics' organ transplant and logistics business. Specifically, leading up to the Class Period and to fuel growth, TransMedics developed organ transportation and logistics services called the National OCS Program ("NOP"), which included private flights for organ transport overseen by teams of TransMedics' own surgeons and other professionals. NOP was critical to the future growth of TransMedics' business, and by 2023, the service accounted for more than a third of the Company's total revenue.

Throughout the Class Period (February 28, 2023 through January 10, 2025), Defendants repeatedly assured investors that NOP was a major success with its customers, providing them with massive cost-savings and efficiencies and even that NOP was "*the most cost-effective transportation in the history of organ transplant, period, full stop*." When the high price of NOP led the market to question whether the Company was engaging in price gouging, Defendants assured investors that they were not doing so "in any way." Moreover, in response to analyst concerns about whether customers would pay NOP's high costs, Defendants repeatedly insisted that this was not a problem because all of NOP's costs were "fully reimbursed."

1

On February 21, 2024, U.S. Congressman Paul Gosar sent TransMedics an open letter raising concerns that the Company was improperly holding its lifesaving devices "hostage" by requiring transplant hospitals to use overpriced NOP services in order to access its devices. The letter cited exorbitant bills for items such as the forced-use of the Company's fleet of private aircraft which inflated hospital costs by tens or hundreds of thousands of dollars per transplant. In response to the letter, TransMedics' CEO, Defendant Hassanein, emphatically denied those claims and assured the market that TransMedics' NOP service was a resounding success, emphasizing that "[t]he success of OCS NOP program is based on better clinical, economic and operational outcomes experienced by the transplant centers and not based on anything else."

Fueled by Defendants' representations, TransMedics' stock price reached a Class Period high of $177.37 on August 23, 2024. In turn, Defendants took full advantage of their misrepresentations, selling $45 million worth of TransMedics' common stock—including through several suspiciously timed sales at prices near Class Period and all-time highs.

In reality, Defendants' statements were entirely false. As was confirmed by dozens of former TransMedics employees, major transplant surgeons, senior hospital administrators, and other industry experts and professionals, TransMedics' NOP growth was not built on "cost-effective" services, but on rampant price gouging and the forced bundling of NOP with the Company's critical device which left transplant centers with no choice but to pay exorbitant fees for unnecessary NOP services. Indeed, TransMedics was not only mandating customers use its services, but it was forcing them "down everybody's throat." Furthermore, the Company included "mystery fees" that were concealed until after the customer committed to using NOP services to obtain the organ. And, far from being "fully-reimbursed," commercial insurance and Medicare

2

often refused to cover anything close to the full bill for TransMedics' overpriced services, which was causing hospitals to avoid using TransMedics' services.

The truth began to emerge on October 28, 2024, when, rather than reporting growth, TransMedics stunned the market by announcing an unexpected 5% *decline* in revenue. In response, the Company's stock price plummeted *30% in one day*, and analysts deemed the reversal "hard[] to explain" given that "competitive dynamics weren't a headwind to growth this quarter." Then, just six weeks later, on December 2, 2024, TransMedics again stunned the market by announcing the *immediate* resignation of its CFO, sending its stock price falling another 16%.

Finally, on January 10, 2025, the full truth emerged when a short-seller research firm, Scorpion Capital, published its bombshell report (the "Scorpion Report"). The highly detailed, 340-page report fully confirmed that Defendants' statements were false and misleading. Specifically, it revealed material new information regarding Defendants' misrepresentations to the market, including that a bevy of hospitals and surgeons confirmed TransMedics' improper and "unethical" practices such as "ridiculous" transportation charges with grossly unnecessary flights and forcing hospitals to "spend so much more money procuring" organs than necessary. Consequently, major hospitals were already moving away from TransMedics. In response, TransMedics' stock price again plummeted, falling another 12% over the next two days and continuing to decline in the days thereafter. By the end of the Class Period, TransMedics' stock price had fallen to just one third of its Class Period high, or to just $64 per share.

In the wake of these detailed allegations, Defendants principally argue that the Court should ignore them entirely because they are supposedly not reliable. This is nonsense. The Complaint's detailed allegations come not only from Plaintiffs' own interviews with former employees and industry professionals, but a U.S. Congressman's letter and the detailed

investigation of Scorpion Capital—a short-seller research firm whose reports have been relied on by federal courts. Moreover, each of these sources fully cross-corroborate each other, rendering their reliability indisputable at the pleading stage.

Next, Defendants argue that even if the Court accepts these allegations, their statements were not false. But the facts show otherwise—indeed, dozens of former employees and industry professionals *directly contradicted* Defendants' public claims that the Company did not price gouge, did not force customers to use NOP, and that its services were fully reimbursed. As for scienter, the Complaint's detailed allegations directly link the Individual Defendants to the fraud— including, among other compelling facts, direct communications from surgeons and hospital administrators who specifically complained to Defendant Hassanein himself about TransMedics' exorbitant costs and improper practices. Combined with Defendants' outsized and suspiciously-timed stock sales, such facts readily establish scienter.

Finally, as for loss causation, Defendants cannot dispute that TransMedics' stock price dropped significantly after each of the alleged disclosures, and that Plaintiffs have alleged the requisite causal connection. As such, Defendants' motion should be denied in its entirety.

## BRIEF SUMMARY OF THE ALLEGATIONS

Plaintiffs, by their Consolidated Class Action Complaint (ECF No. 50) (the "Complaint"), allege that, throughout the Class Period (February 28, 2023 through January 10, 2025), Defendants made a series of misstatements concerning their products' pricing and efficiencies, whether Defendants were pressuring customers to use all of the Company's products, reimbursement from insurance, and then the reasons behind a revenue decline. As explained herein, each of these were false and misleading.

## I.    TRANSMEDICS' BUSINESS

TransMedics is a medical technology company business built around its Organ Care System ("OCS") which is a portable, perfusion-based device designed to keep donated organs alive and functioning outside the human body until they reach their recipients. ¶36.[1] TransMedics' costs are paid by the transplant hospital serving the patient that receives the organ transplant. The costs are then indirectly reimbursed by either Medicare or commercial insurance. Medicare reimburses for "reasonable costs" related to organ acquisition and transport, but commercial insurance providers typically only pay a capped amount per transplant, regardless of costs. ¶42.

## II.    TRANSMEDICS' LAUNCHES THE "AMAZON PRIME OF ORGAN TRANSPLANT"

Leading up to the Class Period, TransMedics launched a major second revenue stream—a bundle of organ retrieval, transport, and logistics services called the "National OCS Program" ("NOP"). ¶2. Through NOP, TransMedics provided (and billed hospitals for) its own: (i) organ retrieval surgeons, (ii) transportation of organs, and (iii) personnel to assist with the OCS devices. *Id.* Defendants boasted that NOP created a "whole new paradigm," thus transforming TransMedics into "the Amazon Prime of organ transplant" because it would provide everything needed for the transplant process from beginning to end. ¶47. NOP became a critical source of revenue growth for TransMedics, growing dramatically faster than revenue from the Company's OCS devices. By the end of 2023, NOP comprised 36% of the Company's total revenue. ¶54. On August 1, 2023, TransMedics announced that it had further supercharged its NOP by agreeing to acquire Summit Aviation, a charter flight operator.

## III.    THROUGHOUT THE CLASS PERIOD, DEFENDANTS FALSELY ASSURED INVESTORS THAT NOP WAS DELIVERING HIGHLY "COST-EFFECTIVE" TRANSPLANT SERVICES THAT WERE ALWAYS "FULLY REIMBURSED" BY

---

[1]    All "¶__" and "¶¶__" citations refer to paragraphs in the Complaint.

**INSURANCE, AND THAT THEY DID NOT ENGAGE IN FORCE BUNDLING OF THEIR SERVICES AND DEVICES**

Throughout the Class Period, Defendants assured investors that its "Amazon Prime of organ transplant" would provide a path to meteoric and sustained revenue growth. In support of this promise, Defendants repeatedly misrepresented the true nature of NOP while concealing improper business practices in numerous ways. First, Defendants assured investors that NOP would continue to be widely adopted by hospitals because of the cost-savings it supposedly provided them. For example, Defendants repeatedly stated that they had created "*the most cost-effective transportation in the history of organ transplant, period, full stop.*" ¶194-95. Second, Defendants assured investors that the hospitals would have no issue with covering the costs of NOP because those services were "fully reimbursed" by both Medicare and private insurance (¶200), unequivocally asserting that "*every NOP service charge is fully reimbursed*" and that this was "*not even a close call.*" When analysts raised concerns as to whether hospitals might balk at NOP costs, Defendant Hassanein only doubled down, insisting that "*[t]here is no limit . . . it's fully reimbursed. It's not a question of reimbursement.*" ¶¶161, 168 (emphasis in original).

Third, in response to investor concerns, Defendants emphatically rejected any suggestion that they were forcing hospitals to use NOP in order to get access to the OCS device, claiming "[t]he transplant centers then have the final say on whether they want to use our services or not." ¶171. Indeed, Defendant Hassanein insisted that any suggestion that transplant centers were forced to use NOP "couldn't be further from the truth." And, finally, Defendants insisted that the seeming success of NOP was entirely based on its purported cost-efficiency and superior outcomes, rather than on any attempt to price gouge customers or force-bundle their services with their devices.

6

## IV.    DEFENDANTS SELL MASSIVE AMOUNTS OF STOCK

At the same time, they were misleading investors about TransMedics' business practices, Hassanein and Gordon sold immense and unusual amounts of stock that were suspiciously timed to personally benefit from their false statements.  Specifically, during the Class Period, these two Defendants sold a total of *over 400,000 shares for proceeds of over $45 million*.  ¶152.  Moreover, the sales were suspicious and unusual both in amount and timing.  Hassanein in particular sold three times his pre-Class Period sales in dollar value during the Class Period.  On one day alone, he sold *$8 million in stock* at all-time high share prices, doing so mere days before the end of 3Q 2024 (during which TransMedics experienced a stunning decline in revenue).  Moreover, this highly suspicious $8 million stock sale occurred outside of any Rule 10b5-1 trading plan.

## V.    THE TRUTH IS REVEALED

On February 21, 2024, U.S. Representative Paul A. Gosar sent a letter to Defendants which he also published on a news website (the "Gosar Letter").  The Gosar Letter alleged that: (1) TransMedics was requiring transplant centers that used OCS to use it a certain minimum number of times; (2) TransMedics hiked the prices of its disposable perfusion cassettes; (3) TransMedics was requiring transplant centers to use its NOP services which added substantially to the costs; and (4) TransMedics was "pressuring" centers to use its own aircraft, and thereby holding the "device hostage."  ¶63.  The Gosar Letter concluded by stating that "*TransMedics is more dedicated to driving its profits at the unfortunate expense of the United States taxpayers and patients who need services the most*."  ¶64 (emphasis added).  However, the Company publicly denied the claims in the Gosar Letter and published a "Response Letter" stating that the Gosar Letter's claims "couldn't be further from the truth," that hospitals had the "final say" on whether to use NOP services, and that NOP had a "more efficient cost profile."  ¶¶65-66.

Then, on October 28, 2024, the Company announced its 3Q 2024 earnings with total quarterly revenue of $108.8 million—a 5% sequential decline from the prior quarter.  ¶71    On news of the revenue decline, the price of TransMedics stock fell by $37.74 per share, or nearly 30% on unusually high volume.  However, Hassanein blamed the Company's sudden performance decline on "seasonality," and insisted that the poor results were a mere temporary blip, and not the result of, e.g., the high costs of NOP or transplant centers fleeing to competitors as a result.  ¶75.  For example, Defendant Hassanein insisted:

> I want to make it crystal clear.  We have not seen any fundamental or competitive dynamics playing any role in the slight sequential decline in case volume for OCS in Q3.  Let me repeat it again, there has not been or we have not seen any fundamental or competitive dynamics playing any role in the slight sequential decline in case volume for OCS in Q3.

*Id.*  Indeed, to dispel any concerns, Hassanein "caution[ed] the Street from trying to create something out of nothing."    Then, just six weeks later, on December 2, 2024, the Company announced the  unexpected removal of Defendant Gordon as CFO, effective that very same day.  ¶78.  TransMedics' stock price fell another 16%, and multiple analysts reported their "surprise" at the sudden removal, noting that "CFO transitions are typically not good."

Finally, on January 10, 2025, the full truth emerged when Scorpion Capital published a 342-page report that followed a six-month investigation, including interviews with more than 30 surgeons, hospital executives, organ procurement professionals and former TransMedics employees (the "Scorpion Report").  The Scorpion Report revealed, in exacting detail, that, in direct contradiction of Defendants' Class Period claims that the success of NOP "is based on better clinical, economic and operational outcomes experienced by the transplant centers and not based on anything else[,]" the exact opposite was true:  TransMedics' business was dependent on forcing

8

OCS customers to use its NOP services, providing highly *inefficient* services to inflate billing, and gouging transplant centers on the price when they were already captive.

In particular, the Scorpion Report revealed that, contrary to Defendants' repeated claims that it was "up to the transplant program to say yay or nay whether they want to use" NOP, in reality, TransMedics required customers to use TransMedics entire overpriced suite of transport and logistics services to access the OCS device. A former TransMedics reimbursement executive described this forced bundling as TransMedics' "policy"; a hospital transplant director lamented that TransMedics would "force [the NOP] down everybody's throat"; and a transplant cardiologist described how TransMedics mandated use of their teams, causing his hospital to move away from TransMedics. ¶¶86, 90, 119. The Scorpion Report further detailed the tactics TransMedics used, such as "extra mystery fees." ¶94. Indeed, a U.C.S.F. Hospital administrator complained that he "hate[d] paying for private jets to fly [TransMedics'] surgeons all over." And a former TransMedics OCS specialist complained of TransMedics' practice of "flying a team from Texas or from California when we have a full team of 10 people up here waiting to do cases" thus "utilizing their aircraft to bill for the aircraft" which was "entirely unethical." ¶96.

Then, the Scorpion Report revealed that, contrary to TransMedics' claims that its services were always "fully reimbursed," the truth was far different. For example, a Vanderbilt University transplant surgeon explained: "I understand that TransMedics, they're going to tell you, this is going to be covered by Medicare and by private insurance and yadda, yadda[,]" but that "[t]he reality is that right now . . . you get paid about 50-60% of the cost." Other surgeons and administrators confirmed that they would "lose money" if they used TransMedics too much." As such, hospitals were reported to be "getting away from [TransMedics] because it's just so darn expensive," and even "making an effort to not use it at all." ¶108.

Finally, the Scorpion Report revealed that Defendants knew about these issues as hospitals directly raised them with executives. For example, a Duke University Hospital presentation attended by Hassanein detailed the massive "hit" the hospital was taking from TransMedics services, and a Massachusetts General Hospital executive described his numerous "very candid conversations" with TransMedics senior executives about the Company's overcharging and improper bundling, explaining that he would "go straight up to their leadership and say, this is not what we discussed, and we either need to end this or address this[.]" ¶116. On news of the Scorpion Report, TransMedics' stock price fell 12% over two days. ¶122.

## LEGAL STANDARD

In deciding a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must "accept[] all well-pleaded facts as . . . true and draw[] all reasonable inferences in favor of [the plaintiff]." *Fantini v. Salem State Coll.*, 557 F.3d 22, 26 (1st Cir. 2009). A complaint need only "contain factual allegations sufficient to 'raise a right to relief above the speculative level.'" *Morales-Tanon v. P.R. Elec. Power Auth.*, 524 F.3d 15, 18 (1st Cir. 2008) (quoting *Bell Atl. Corp. v. Twombley*, 550 U.S. 544, 555 (2007)). The Private Securities Litigation Reform Act (the "PSLRA") "do[es] not require a plaintiff to plead evidence." *In re Cabletron Sys., Inc.*, 311 F.3d 11, 33 (1st Cir. 2002); *Mississippi Pub. Emps.' Ret. Sys. v. Boston Scientific Corp.*, 523 F.3d 75, 90 (1st Cir. 2008).

## ARGUMENT

## I.    THE COMPLAINT ADEQUATELY PLEADS DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

To plead falsity under the PSLRA and Rule 9(b), a complaint need only "specify each allegedly misleading statement or omission including its time, place, and content" and provide facts showing "why the statements or omissions were misleading." *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 78 (1st Cir. 2002). The Complaint does exactly that.

10

A.    The Scorpion Report, AlphaSense Interviews, and the Gosar Letter Are Reliable Sources That Demonstrate Falsity

Recognizing that the detailed allegations from the Scorpion Report, AlphaSense, and the Gosar Letter establish the falsity of their statements, Defendants attempt to have them effectively "thrown out." The law simply does not support this.

**The Scorpion Report.** Courts routinely allow plaintiffs in securities fraud actions to rely on research reports at the pleading stage. *See Bond v. Clover Health Inv., Corp.*, 587 F. Supp. 3d 641, 668 (M.D. Tenn. 2022) ("so-called 'short seller reports' . . . if pleaded with sufficient context attesting to their credibility, can appropriately be relied upon in a complaint").[2] Indeed, reports by the same short-seller relied upon here—Scorpion Capital—have been used by federal courts as the bases to sustain at least three other PSLRA complaints in the last four years. *See Peters v. Twist Bioscience Corp.*, 2025 WL 2532671, at *16 (N.D. Cal. Sept. 3, 2025); *Bernstein v. Ginkgo Bioworks Holdings, Inc.*, 2023 WL 11996105, at *8 (N.D. Cal. Mar. 10, 2023); *In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714 (N.D. Cal. Jan. 14, 2022).

The decision in *In re QuantumScape* is particularly instructive. There, the court held that a Scorpion Capital report was "sufficient to survive a challenge at the pleadings stage." *Id.* at 731-32. It found that the report—interviewing nine witnesses—had the "minimum indicia of reliability" necessary for plaintiff's claim to survive a motion to dismiss. *Id.* at 732. The quoted

---

[2]    *See also Kiken v. Lumber Liquidators Holdings, Inc.*, 155 F. Supp. 3d 593, 608-09 (E.D. Va. 2015) (accepting allegations from short-report on SeekingAlpha.com and presentation given by hedge fund manager); *McIntire v. China MediaExpress Holdings, Inc.*, 927 F. Supp. 2d 105, 123-24 (S.D.N.Y. 2013) (short seller reports "do[] not implicate the same skepticism as a traditional anonymous source") (citation modified); *Snellink v. Gulf Res., Inc.*, 870 F. Supp. 2d 930, 939 (C.D. Cal. 2012) ("It is permissible for Plaintiffs to rely on a short seller report . . . to allege falsity at the pleading stage."); *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 564 (S.D.N.Y. 2012) ("Even though Defendants claim that [the short-seller] is a biased party, and that it openly admits the possible inaccuracy of the Report, the reliability of the report is a question of fact.") (citation modified).

11

anonymous witnesses provided "overlapping and corroborative information," and their allegations were further validated by public information and interviews with four experts. *Id.*

The report issued by Scorpion Capital here was even more detailed than the one accepted in *QuantumScape*. It was over 340 pages and was based on a six-month investigation comprising over 30 research interviews, including former employees, transplant surgeons, major hospital executives, and organ procurement professionals. *See* ¶83. The Scorpion Report also relies on TransMedics' public documents to discuss the Company's opaque disclosures, including excerpts from SEC filings, presentations, and websites. Thus, the Scorpion Report possesses the "indicia of reliability to make [it] past the pleadings stage." *QuantumScape*, 580 F. Supp. 3d at 732.

Furthermore, counsel independently investigated the Scorpion Report and verified its contents through independent witness interviews. This adds to its reliability. *See, e.g.*, *In re Longwei Petroleum Inv. Holding Ltd. Sec. Litig.*, 2014 WL 285103, at *4 (S.D.N.Y. Jan. 27, 2014) (crediting report where plaintiffs corroborated findings); *Emps.' Ret. Sys. of Gov't of the Virgin Is. v. Blanford*, 794 F.3d 297, 303 (2d Cir. 2015) (crediting CW allegations corroborated by other witnesses' accounts and a short-seller report). Defendants simply overlook the fact that the Scorpion Report was mutually corroborative and corroborated by the firsthand witness accounts from Plaintiffs' counsel's own investigation and by the AlphaSense interviews. CW 7, a former reimbursement executive interviewed by Scorpion Capital, is also the former TransMedics VP of Market Access interviewed by AlphaSense twice during 2024. ¶86. Furthermore, CW 2 explained that they had reviewed the Scorpion Report and found it to be generally accurate and consistent with their experience. ¶131. Thus, Plaintiffs' allegations "are supported by former employees in

12

positions to know, who present overlapping and corroborative information." *Lako v. Loandepot, Inc.*, 2023 WL 444151, at *6 (C.D. Cal. Jan. 24, 2023).[3]

While Defendants make several individual arguments against the Scorpion Report, none change the outcome on this issue. First, it makes no difference that Scorpion Capital does not name the former employees it quotes because courts routinely credit unnamed sources in research reports like the one written by Scorpion Capital. *See, e.g.*, *In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1235-36 (N.D. Ga. 2019) (crediting allegations from unnamed sources where the "article cites two independent sources, with direct knowledge, who corroborate each other's assertions").[4] Second, Scorpion Capital does not disclaim the accuracy of the opinions in its report, as Defendants suggest. Defs.' Br. at 11. To the contrary, it affirms that "[its] opinions are held in good faith" and has "based them on the public information, sources, the interviewed individuals, and any social media posts cited in [the] report." Scorpion Capital also affirms that "the experts [it] spoke with are reliable sources of information." Scorpion Report (attached to Defs.' Br. as Ex. 12) at 2. Thus, Defendants misquote Scorpion Capital's "disclosures" when implying that the report intentionally contains inaccurate information. Contrary to Defendants' argument, these "disclosures" do not support rejecting the Scorpion Report at this stage of the litigation. *See Lewy v. SkyPeople Fruit Juice, Inc.*, 2012 WL 3957916, at *13 (S.D.N.Y. Sept. 10, 2012) (report credible despite disclaimers); *In re China Mobile Games & Ent. Grp., Ltd. Sec. Litig.*, 2016 WL 922711,

---

[3]     The in-depth nature of the Scorpion Report combined with Plaintiffs' verification of its contents make this case inapposite to the ones relied upon by Defendants, such as *Long Miao v. Fanhua, Inc.*, 442 F. Supp. 3d 774, 803-04 (S.D.N.Y. 2020) ("plaintiff's counsel in this case appear to have done nothing whatsoever to confirm the identities or statements of the confidential sources cited in the JCap Report"), and *In re DraftKings Inc. Secs. Litig.*, 650 F. Supp. 3d 120, 156 (S.D.N.Y.) ("And plaintiffs' counsel, by its own account, has not confirmed *any* of the attributions to unnamed sources in the Hindenburg Report.") (emphasis in original).

[4]     *See also Bond*, 587 F. Supp. 3d at 668 (refusing to "dismiss [allegations] as lacking credibility" because report relied "on confidential sources"); *Longwei*, 2014 WL 285103, at *3 (same).

at *4 (S.D.N.Y. Mar. 7, 2016) ("[d]efendants do not explain why the report's boilerplate disclaimers would apply to a simple fact").

**AlphaSense**: Next, Defendants attempt to wholly discredit the Complaint's allegations that are drawn from interviews published on the AlphaSense platform. Defs.' Br. at 9-10. AlphaSense is a subscription-based platform that, among other things, publishes transcripts of its analysts' interviews with industry and company professionals and experts. Although the interviews are published anonymously, AlphaSense both creates an audio recording of and transcribes the interviews and verifies their accuracy.[5] Defendants nonetheless argue that Plaintiffs' use of CWs from AlphaSense is improper because Plaintiffs did not "independently investigate" or "corroborate[]" those allegations. Defendants ignore, however, that Plaintiffs did investigate these allegations. The Complaint includes testimony from five additional confidential witnesses— identified as CWs 1, 2, 3, 4, and 11—who were independently interviewed by Plaintiffs' counsel and corroborate the allegations taken from AlphaSense. Moreover, the allegations from the AlphaSense CWs are corroborated by the Scorpion Report.[6]

Defendants' second attack on the AlphaSense allegations—that they somehow do not provide enough information on the CWs—is likewise not true. Defs.' Br. at 18. Plaintiffs have alleged these witnesses were interviewed by AlphaSense, the dates on which the interviews were published, and each witnesses' relationship to TransMedics—which is what the law requires.[7]

---

[5]    Specifically, –5, –6, –7, 8–, 9, and 10– were interviewed by AlphaSense. ¶¶136 n.12, 137 n.13, 139 n.14, 141 n.15, 144 n.16, 145 n.17.

[6]    Defendants' cases are inapposite, as they concern lifting anonymous CW allegations from complaints filed in other cases, which is entirely distinct from quoting verified and published interview transcripts. *See* Defs.' Br. at 9 (citing *In re Lehman Bros. Sec. & ERISA Litig.*, 2013 WL 3989066, at *4 (S.D.N.Y. July 31, 2013). Nonetheless, even allegations from other complaints may be properly relied on where they are combined with material plaintiff has investigated personally. *See, e.g.*, *Homeward Residential, Inc. v. Sand Canyon Corp.*, 298 F.R.D. 116, 126 (S.D.N.Y. 2014).

[7]    Defendants are also patently incorrect that Plaintiffs are required to attach the AlphaSense articles to the Complaint. Defs.' Br. at 10. As the First Circuit has repeatedly declared, the rigorous pleading standards for securities

14

And, once again, despite Defendants' attempts, the AlphaSense allegations cannot be looked at in a vacuum. *See, e.g.*, *In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 479 (S.D.N.Y. 2004) (court must consider the totality of the allegations, including the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged, the number of sources, etc.). Indeed, as another court in this district has observed:

> Such tunnel vision blocks the full picture. [Plaintiff's] evidentiary sources strengthen one another and collectively paint a plausible picture [of fraud]. Multiple types of evidence from multiple sources reinforce the same narrative. Without discovery, it is next to impossible for [Plaintiff] to produce any more.

*Hill v. State St. Corp.*, 2011 WL 3420439, at *13 (D. Mass. Aug. 3, 2011). In *Hill*, the Court rejected defendants' attempts to view evidentiary sources (such as CW accounts) in isolation. The Court should do the same here.

**Gosar Letter**: Defendants attempt to downplay the Gosar Letter arguing that it should be disregarded because it never amounted to formal charges. Defs.' Br. at 14. But Defendants' sole support for this claim comes from situations where another complaint or investigation was the only source of allegations. *See, e.g.*, *Bennett v. H&R Block Fin. Advisors, Inc.*, 2005 WL 8178042, at *4 (N.D. Cal. June 1, 2005); *City of Brockton Retirement Sys. v. Avon Prods., Inc.*, 2014 WL 4832321, at *23 (S.D.N.Y. Sept. 29, 2014). Here, the Gosar Letter is corroborated by Plaintiffs' own investigation, the Scorpion Report, and the AlphaSense interviews.

In conclusion, none of these three sources are offered solely to support falsity (or scienter as discussed below). Instead, they all overlap and reinforce each other—without any

---

fraud claims "do not require a plaintiff to plead evidence." *Cabletron*, 311 F.3d at 33 (citing *Cooperman v. Individual Inc.*, 171 F.3d 43, 48–49 (1st Cir.1999)); *see Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1225, (1st Cir. 1996), abrogated on other grounds by 15 U.S.C. §78u–4(b)(2) ("[W]e cannot hold plaintiffs to a standard that would effectively require them, pre-discovery, to plead evidence").

inconsistencies.    Especially when they are considered together, the falsity of Defendants' statements is apparent, as further discussed below for each category of misstatement.

**B.      Defendants' NOP Pricing and Efficiency Statements Were False and Misleading**

Defendants group a number of statements together related to NOP pricing.  Defs.' Br. at 14-18.  These fall under two categories: (1) efficiencies; and (2) price gouging.  As to the first, Defendants repeatedly stressed and even boasted to the market how efficient NOP was and that, due to these efficiencies, customers were choosing TransMedics over other options.  Those statements include that NOP provided "the most cost-effective transportation in the history of organ transplant, period, full stop"; (¶194) and that the "success" of NOP was "based solely on the *operational efficiency . . .*" ¶174 (emphasis added).[8]  Then, Defendants repeatedly made statements to the market about how they were in no way gouging the prices.  Those include:

- that they were "not trying to gouge the system"; (¶190);

- "[w]e're not in this to just capitalize on leverage" *id*.;

- "[w]e're in this not to gouge the system" (¶184); and

- "We're not gouging the market in any way"; and "we are sharing significant cost savings with the transplant program."  ¶200.

But, in reality, Defendants were padding their billing and engaging in excessive spending and non-cost-effective measures, all to the detriment of transplant centers and hospitals and solely to line their pockets.  In the face of these outrageous and utterly untrue statements about NOP pricing, Defendants make a number of spurious arguments.  All fail.

---

[8]       Other similar statements are: "we could be more efficient and pass some of the efficiencies back to the transplant program" (¶168); centers were choosing NOP "due to its more *efficient cost profile . . .*" (¶172); "the more efficient cost structure . . . that is afforded by TransMedics logistics"; (¶187); and "providing *significant cost efficiency* to every major transplant program that is working with us" and that Defendants were focusing on providing the "*most cost effective way of managing organ transplants . . .*" (¶191) (emphasis added).

16

### 1.    The Complaint Provides Details of TransMedics' Price Gouging

First, Defendants curiously claim that none of the allegations from dozens of sources explain exactly what TransMedics was charging or that it was excessive versus competitors. Defs.' Br. at 14-15. But this is simply untrue as the Complaint is replete with examples of specific instances of overpricing. Those include:

- the Gosar Letter's statement that NOP added a precise $20,000 to transplant centers' costs. ¶63.

- the Scorpion Report's description of a June 2024 Duke University presentation showing that TransMedics eroded hospitals' margins to 40% of what they would be using other processes. ¶118.

- an executive at a procurement organization explaining that a particular transplant center was charged $300,000-$400,000 in "surprise invoices." ¶95.

- transplant surgeon citing $110,000 to $200,000 bills from the Company. ¶104.

- CW 3 explaining that—as between TransMedics and its competitors—the costs were $15k versus $6k for surgeons and $50k versus $15k for planes. ¶133.

These are precise numbers provided by numerous sources, which are also then corroborated by a litany of broader statements about TransMedics' pricing.[9] To the extent Defendants demand more details, they are overstepping the bounds of a motion to dismiss where a plaintiff is not required to plead evidence. *Cabletron*, 311 F.3d at 33 (plaintiffs not required to plead transaction

---

[9]    *See, e.g.*: A prominent surgeon stating that TransMedics was "eroding a significant amount of . . . profit" (¶104); a Vanderbilt Hospital surgeon saying it was "not sustainable" (¶105); a transplant surgeon detailing they were losing money and it was not sustainable (¶107); an organ procurement technician saying "It's cost. It's just not sustainable" (¶111); a hepatologist stating it was "outrageously overpriced," even suggesting "predatory" (¶112); a hepatologist at Massachusetts General Hospital extolling that TransMedics' costs were eating into all of the margin (¶113); and an administrator at Massachusetts General Hospital similarly complaining about exorbitant charges that they did not "sign[] up for" "like a used car salesman." ¶115.

17

dates, customer names, identities of personnel involved, specific products, or dollar amounts); *Aldridge*, 284 F.3d at 79-82 (plaintiffs not required to allege specific amounts of every revenue overstatement); *Leventhal v. Chegg, Inc.*, 721 F. Supp.3d 1003, 1012 (N.D. Cal. 2024) (detailed quantification unnecessary at the pleading stage).[10]

### 2.    The Counterfactual Narrative Is Directly Contradicted by Detailed Allegations in the Complaint

Second, Defendants suggest that some of these extreme costs could somehow have been more cost effective for clients. Defs.' Br. at 15. But again, the laundry list of allegations cited above show that the costs were not, in fact, more effective. While Defendants take pains to demand more details from CW 11 (regarding unnecessary flights)—details that are not required—they ignore that other allegations in the Complaint directly corroborate CW 11's claims. Indeed, CW2 produced receipts of specific examples of "obscene" flights that totaled up to $77,000 for a single flight. ¶130. CW 4 also explained how TransMedics used three different planes from three different locations with an average price of $20,000/flight (¶135), while CW 6 discussed the exorbitant flight practices, concluding "I know that because I know air logistics, that their prices are high." ¶138. *See also* ¶142 (CW 8 explained that if there is an organ available locally, you still have to fly in a TransMedics team and "the costs are night and day"). Then, in the Scorpion Report, a transplant administrator at U.C.S.F. Hospital talked about the "ridiculous" practice of flying people across the country. ¶97-99. *See also* ¶96 (former TransMedics OCS specialist stating "they are utilizing their aircraft to bill for the aircraft'); ¶95 (executive outlining Company showing up with three planes). Defendants once again overlook these corroborating allegations.

---

[10]    The case at hand is thus at odds with *Coyne v. Metabolix, Inc.*, 943 F. Supp. 2d 259, 268 (D. Mass. 2013) (Defs.' Br. at 14) where the complaint was devoid of any specific numbers at all but instead provided merely generalized statements by confidential witnesses about the absence of a "robust backlog." Also worth noting is that, even with these generalized statements, the court did uphold some of the false statements in *Coyne*.

### 3.    The Complaint Lists Numerous Specific Clinics or Hospitals

Third, Defendants bafflingly say Plaintiffs do not identify a hospital that moved away from TransMedics. Defs.' Br. at 16. But the Complaint is replete with specific examples: University of Cincinnati ("getting away from" TransMedics because "it's just so darn expensive") (¶108), UVA (*id*.), University of Washington ("upset about the cost[s]") (¶109), U.C.S.F. Hospital (¶182), Duke (¶121), Texas customers going to OrganOx (¶125), San Diego hospitals due to cost (id.), NYU Langone (¶126), Henry Ford Clinic in Michigan and Baylor St. Luke's Hospital in Houston were "pushing back" due to costs (¶134), and UPMC. ¶142.[11]

### 4.    The Economic Expert Demonstrates the Falsity of Pricing Statements

Fourth, Defendants assert that the healthcare economics expert analysis contained in the Complaint cannot be credited because it is not a "statistically significant analysis," poking various holes in it that are barely appropriate for pre-trial Daubert motions. Defs.' Br. at 17. *See In re Resonant Inc. Sec. Litig.*, 2016 WL 6571267, at *5 (C.D. Cal. July 11, 2016) (accepting as true expert allegations at the pleading stage, noting that proper juncture for challenging admissibility was at Daubert motion). In short, the expert analyzed data from a publicly recognized center and found that the costs of hospitals using TransMedics more than doubled and were glaring when compared to hospitals that did not use TransMedics. The expert lists specific hospitals for each analysis. Such expert analyses are accepted as part of the falsity equation at the motion to dismiss stage. *See, e.g.*, *In re Silicon Storage Tech., Inc. Sec. Litig.*, 2007 WL 760535 at *30 (N.D. Cal. 2007) (citing *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1233–34 (9th Cir. 2004)). And the expert's analysis is directly distinguishable from those *in Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 354 (2d Cir. 2022) and in *Iron Workers*

---

[11]    This specific list of examples is a far cry from the nebulous paragraphs of generalized terms in *City of Miami Fire Fighters' & Police Officers' Ret. Tr. v. CVS Health Corp.*, 46 F.4th 22 (1st Cir. 2022).

19

*Local 580 Joint Fund v. NVIDIA Corp.*, 2020 WL 1244936, at * 6 (N.D. Cal. March 16, 2020). Defs.' Br. at 17-18.  In *Bristol-Myers*, the expert based his analysis on his opinions and not on particularized facts, as opposed to the reams of data here.  Then, in *NVIDIA*, the experts failed to identify the sources of their data and, unlike here, other analyses in that complaint did not corroborate, but differed from, the experts' work.

In sum, Defendants' varied arguments regarding the falsity of their pricing statements all fail as they all demand too much detail at the motion to dismiss stage (while also overlooking the details that are provided) and ignore the sheer quantity of corroborating allegations.

### C.      Defendants' Statements Denying That They Force-Bundled NOP With the OCS Device Were False and Misleading

Throughout the Class Period, Defendants sought to dispel the notion that they were requiring or pressuring customers to use NOP.  In doing so, they reassured investors that TransMedics' growth was solely due to the value of its products and services and not due to coercive tactics.[12]  Defendants' attacks on the falsity of these statements relate largely to the CW allegations and, again, they demand more evidence than the law requires.  Defs.' Br. at 18-20.

As to the CWs, the First Circuit standard for weighing the evidence provided by them is set out in *Cabletron*, which stated that a court must evaluate "the level of detail provided by confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the allegations, the number of sources, the reliability of the sources, and similar indicia."  *Cabletron*, 311 F.3d at 29-30.  Further, where here, CW statements corroborate each other and "collectively paint a plausible picture of a company defrauding its clients," a complaint does not need more details at this stage.  *See Hill*, 2011 WL

---

[12]      Those statements include that "[t]he transplant centers then have the final say on whether they want to use our services or not" (¶171); and that it was entirely "up to the transplant program to say yay or nay whether or not they want to use TransMedics logistics."  ¶183.

3420439, at *13 ("[w]ithout discovery, it is next to impossible for Plaintiffs to produce any more"); *Emps.' Ret Sys of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 303 (2d. Cir. 2015) (crediting CW allegations corroborated by other witnesses' accounts and a short-seller report).

As in *Cabletron*, multiple CWs here describe the mandatory bundling occurring at TransMedics. Indeed, Defendants acknowledge that eight separate CWs discuss this. Those CWs include a former TransMedics executive explaining that you were not allowed to buy certain parts unless you used NOP (¶86), a Mayo Clinic professional calling it a "closed loop" (¶136), and a CW providing documents evidencing the mandatory bundling requirement and "strongarming" by the "TransMedics Mob." ¶¶128-29. Moreover, again, those eight CWs' claims are corroborated by both the Gosar Letter (the Company "held its devices hostage") (¶63) and numerous individuals quoted in the Scorpion Report. The individuals in the Scorpion Report are described by their positions such as a transplant surgeon at Vanderbilt that said, "you have to do it," with respect to NOP, and provided time frames for TransMedics' bundling practices. *See, e.g.*, ¶90 (describing forced bunding during the months immediately preceding his interview). And despite Defendants' claims to the contrary, specific examples of clinics being forced to use NOP services are provided. *See, e.g.*, ¶128 (CW giving example of an OCS device being removed unless and until the clinic used NOP services). These are not mere inferences or suggestions, but direct examples and claims, making Defendants' cited cases easy to distinguish. *See, e.g.*, *Levy v. Gutierrez*, 2017 WL 2191592, at *24 (D.N.H. May 4, 2017) (CW allegations lacked identification and amounted to "reasonable to infer" allegations); *Hensley*, 260 F. Supp. 3d at 122 (dismissing vague and "threadbare" CW allegations when CW spoke to a time period "well outside the class period").

In response, Defendants' offer little more than scatter-shot attempts to discredit the CWs. All of them fail: First, as to Defendants' claims that the CWs would not have been in positions to

21

know what they stated, CW 3 was an expert in organ procurement (¶132), gave precise dollar amounts and listed two specific hospitals (¶¶133-134) thus evincing knowledge. CW 7 likewise gave dollar amounts (¶140). CW 6 himself stated he "knew air logistics" (¶138) and for CW 10, a current executive at a competitor who was previously director of sales, it is absurd to suggest he would not be in a position to know about what was happening at "major centers" (i.e., his same clients) or with market share. ¶145. These facts all must be accepted as true at this stage. *See Const. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc.*, 22 F.4th 1, 6 (1st Circ. 2021) ("we accept well-pleaded factual allegations in the complaint as true").

Second, Defendants complain about a supposed lack of dates for the CWs. But there are less than two years at play here as NOP services were introduced in early 2023, the aviation company was acquired in August 2023, and the Class Period ends in January 2025. And the CWs do explicitly give time frames. In fact, CW3 notes that "[b]eginning in 2022 or 2023, however, TransMedics no longer allowed hospitals to keep their own OCS machines, forcing them to use TransMedics' machines." ¶¶132-33. CW 7 likewise explains that the practice of forcing hospitals to use the NOP began "once TransMedics got FDA approval." ¶139. For all these reasons, Defendants' misstatements denying their forced bundling practices are actionable.

### D.    The Insurance Reimbursement Statements Were False and Misleading

Because of the high cost of organ transplants, insurance reimbursement is essential to hospitals and transplant centers and to TransMedics' revenue. Defendants sought to assuage the market and claim that insurance companies reimbursed fully for NOP services, assuring the public that hospitals had no problem getting reimbursement (i.e., it was a "non-issue") so there was no risk to revenue. In fact, Defendant Hassanein went so far as to state "[e]very NOP service charge is fully reimbursed. It's not even a close call . . . ." ¶161. *See also*, ¶162 ("all covered under the existing reimbursement mechanisms for organ transplant"); ¶168 ("it's fully reimbursed. It's not

22

a question of reimbursement"); ¶48 ("All the costs associated with the NOP technology and services are all reimbursed 100%.")[13];  These were all blatantly false.

Indeed, the Complaint's detailed allegations show that many transplant centers were not being fully reimbursed or even close to it.  These include two surgeons—a transplant surgeon who explained that insurance reimbursed the same amount no matter what the cost (¶102) and the Vanderbilt surgeon who averred that, at best, Medicare reimbursed 50-60% for TransMedics and sometimes zero from private insurance companies.  ¶105-106.  CW8 corroborated these claims, explaining that reimbursement was a fixed amount and the excess charges of TransMedics were not covered.  ¶141.  Once again, Defendants resort to demanding more, which as discussed above is not required at this stage.

### E.    The 3Q 2025 Earnings Call Statements Were False and Misleading

Additionally, on the 3Q 2025 earnings call when Defendants disclosed a sudden decline in TransMedics' revenue and profit margin, Defendant Hassanein specifically stated that "pricing pressure" and "pricing sensitivity" had "nothing to do" with the decline.  ¶198.  Instead, he insisted that "normal variability of donor availability and potential summer seasonality" were responsible for the decline.  ¶75.  The Complaint sets forth why these statements were false and misleading.

First, the "seasonality" excuse was blatantly false as it had never previously been an issue for the Company's business.  ¶12.  In fact, CW 2, an organ transplant coordinator who worked extensively with TransMedics, even confirmed that "[t]here is no seasonality in the organ business.  Amira [Hassanein] and Waleed [Hassanein] like to make up their own things." ¶127.  Defendants'

---

[13]    *See also* ¶178 ("commercial payers are highly incentivized and driving for more organ transplants to happen. That's why commercial payers responded to centers that presented them case to increase their organ acquisition budget by a significant amount to cover the OCS NOP positively and favorably, and they all go the money requested . . . ."); ¶179 ("we've never seen an NOP-[using] center that starts with NOP and walk[s] away from NOP").

"seasonality" excuse even shocked analysts because "seasonality" means the Company had experienced a decline at the same time in a previous year, which was not true. ¶12.

Then, Hassanein's denial that TransMedics was experiencing "pricing pressure" and "pricing sensitivity" was also false and misleading. ¶199. Once again, Defendants resort to claiming the witness accounts are unreliable and lacking in detail, but they are wrong on the law and the facts. Again, the law does not require evidence at this stage. But the Complaint pleads more than even is required. For example, Defendants ignore that CW 1 confirmed that TransMedics lost hospital customers in Texas, a major market, leading to revenue losses in 3Q 2024. ¶124. They also ignore the long list of clinics that were leaving or lessening their use of TransMedics due to pricing discussed above. And, to claim that Plaintiffs must somehow allege that these hospitals were a material factor in the revenue decline is a misstatement of the law. Indeed, "[m]ateriality is a mixed question of law and fact, and thus 'will rarely be dispositive in a motion to dismiss.'" *Gerneth v. Chiasma, Inc.*, 2018 WL 935418, at *3 (D. Mass. Feb. 15, 2018).[14]

### F.    Defendants' Statements Do Not Amount to Puffery

Defendants' last attempt to evade falsity is to claim some misstatements are simply "puffery." Defs.' Br. at 24. In particular, they say that statements describing NOP as "efficient" (¶¶158, 172, 174, 187, 191), that hospitals were using TransMedics due to its high level of care (¶¶172-74), and that NOP was a "big moat" that nobody else in the industry can match" (¶¶165, 183, 200) constitute inactionable puffery. They are wrong on all three.

---

[14]    Defendants' cases on the 3Q 2025 earnings call misstatements are inapt. For example, in *LSI Design & Integration Corp. v. Tesaro, Inc.*, 2019 WL 5967994, at *4 (D. Mass. Nov. 13, 2019), this Court found no falsity where the witness did not actually state that demand for a product was declining. Here, a long list of witnesses expressly state that clients were leaving TransMedics due to pricing. Nor is this case like *Stereotaxis*, where the confidential sources were not involved in "preparing projections, analyzing trends, or financial reporting." Here, CW 1 was an OCS Specialist who had evidence that TransMedics' revenue losses were due to hospitals in Texas ceasing their business with the Company "due to the high cost of OCS and the NOP." ¶124.

For puffery, a court must first consider "whether the statement is so vague, so general, or so loosely optimistic that a reasonable investor would find it unimportant to the total mix of information" and "dismissals on this ground are increasingly rare[]" in this District. *Brumbaugh v. Wave Sys. Corp.*, 416 F. Supp. 2d 239, 250, n.11 (D. Mass. 2006). Here, the alleged statements are not puffery when viewed in their full context. All three (as to efficiency, lack of competition, and customer use) presented investors with present facts that were false. NOP was the opposite of cost effective, and a long list of centers and hospitals were leaving TransMedics for lesser priced competitors and/or complaining about how Defendants held them hostage. Courts have found similar statements actionable. For example, in *In re Allaire Corp. Sec. Litig.*, 224 F. Supp. 2d 391, 332, 336 (D. Mass. 2002), the court found the statement that customers had brought their business "to the web faster and more cost effectively than ever before" actionable because it was an implied comparison when using "more cost effectively." *See also In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015) (statements "made repeatedly in an effort to reassure the investing public" are not puffery); *Washtenaw Cnty. Emps.' Ret. Sys. v. Talbots, Inc.*, 2013 WL 5348569, at *30 (D. Mass. Sept. 23, 2013) (statements not "mere puffery" where plaintiff alleged that Talbots "was in fact experiencing at that time widespread inventory management difficulties").

Therefore, for the reasons stated herein, Defendants made actionable false and misleading statements.

## II.    THE COMPLAINT'S ALLEGATIONS GIVE RISE TO A STRONG INFERENCE OF SCIENTER

In evaluating scienter, a complaint must be viewed in its entirety. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007). Plaintiffs are not required to plead direct evidence of intent, and, although the inference of scienter must be "strong," it "need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551

25

U.S. at 324. Because scienter is viewed holistically, plaintiffs may "combine various facts and circumstances indicating fraudulent intent." *Aldridge*, 284 F.3d at 82; *see also Cabletron*, 311 F.3d at 40 (noting that while "[e]ach individual fact about scienter may provide only a "brushstroke," the "resulting portrait" can meet the "strong inference" requirement). While Defendants here attempt to parse the scienter allegations, when considering scienter, "the sum is greater than the parts." *In re Verifone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 698 (9th Cir. 2012). "When there are equally strong inferences for and against scienter, the draw is awarded to the plaintiff." *N. Collier Fire Control & Rescue Dist. Firefighters' Pension Plan v. Mercury Sys., Inc.*, 768 F. Supp. 3d 133, 156 (D. Mass. 2025) (citation modified). Here, considered holistically, the facts set forth by Plaintiffs unquestionably create a strong inference of scienter.

### A. The CWs, the Scorpion Report, and the Gosar Letter Demonstrate Defendants' Actual Knowledge

Defendants begin by arguing that the Court must disregard allegations from dozens of CWs because their accounts are not sufficiently detailed. Defs.' Br. at 26. But such accounts are routinely accepted, and courts accord them great weight when, as here, they are detailed, corroborated, plausible, and numerous. *Cabletron*, 311 F.3d at 29. The Complaint's litany of detailed CW allegations demonstrate Defendants' knowledge of the falsity of their statements.

Indeed, a transplant director specifically recalled Hassanein being in the room for the Duke University presentation showing the specific costs of TransMedics (¶209), while an OPO executive recounted calls from Hassanein demanding payment on several hundred thousand dollars' worth of surprise invoices. ¶95. *See also*, ¶116 (Massachusetts General transplant administrator having "very candid conversations" with the Company's "leadership" about TransMedics' forced imposition of excessive logistics costs."). These accounts strongly contribute to an inference of scienter. *See, e.g.*, *In re Silvercorp Metals, Inc. Sec. Litig.*, 26 F. Supp. 3d 266, 276 (S.D.N.Y.

26

2014) ("Courts routinely credit analyst and investor reports like those at issue here, even those of short-sellers, as sufficiently reliable for allegations of scienter against a company.").[15]

Finally, the fact that a United States Congressman was looking into how TransMedics forced hospitals to use NOP also supports an inference of scienter. *See, e.g.*, *Washtenaw County Emps. Ret. Sys. v. Avid Tech., Inc.*, 28 F. Supp. 3d 93, 114 (D. Mass. 2014) ("[G]overnment investigation can be seen as one more piece of the puzzle, a series of circumstances that add up to a strong inference of scienter."). Moreover, Defendant Hassanein was on notice of the issues raised in the Gosar Letter as he personally responded to it. ¶207. Again, these three sources, along with the other allegations, taken holistically, more than establish Defendants' scienter.

## B.    Plaintiffs Allege Numerous Other Indicia of Scienter

First, where the misrepresentations relate to a company's key product or transaction—like NOP here—a strong inference of scienter arises that the company and its executives knew of factors directly affecting its success. *See Carbonite*, 22 F.4th at 9 ("the importance of a particular item to a defendant can support an inference that the defendant is paying close attention to that item, if that close attention would have revealed an incongruity so glaring as to make the need for further inquiry obvious.").[16] That is precisely what occurred here. While Plaintiffs do not suggest that the importance of NOP to the Company or Defendants' positions alone indicate scienter, such allegations certainly add to the already strong showing. NOP was a critical source of revenue

---

[15]    Defendants nonetheless argue that the Scorpion Report does not establish scienter because the Complaint supposedly lacks allegations of "direct" interaction with Defendants. Defs.' Br. at 27. But while the law requires no such direct reporting, Defendants ignore or minimize the Complaint's allegations (such as those described here) that do, in fact, detail direct interactions with Individual Defendants.

[16]    *See also Crowell v. Ionics, Inc.*, 343 F. Supp. 2d 1, 19 (D. Mass. 2004) (quoting another source) ( "facts critical to a businesses' core operations or an important transaction generally are so apparent that their knowledge may be attributed to the company and its officers."); *In re Allaire Corp. Sec. Litig.*, 224 F. Supp. 2d 319, 329 (D. Mass. 2002) (It is "inconceivable that management could not have known" that a new product, considered to be "the future of the company," "did not work satisfactorily"); *In re iRobot Corp. Sec. Litig.*, 2021 WL 950675, at *9 (D. Mass. Mar. 12, 2021) ("the Roomba's position as the core product tips towards a finding for a strong inference of scienter").

27

growth, growing faster than product revenue and making up the majority of the Company's revenue growth during the Class Period. ¶54. Hassanein himself called NOP "the major catalyst for our growth in 2022" (¶49) and a "multibillion-dollar market opportunity." ¶50.

Second, scienter is supported by the fact that Defendants, in response to repeated and pointed analyst and investor questions, kept falsely claiming that the Company was not "price gouging," or pressuring bundled sales, but was cost effective and fully reimbursed by insurance. *See Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 270 (3rd Cir. 2009) (scienter where executives were "specifically asked, directly and repeatedly" about topic"); *In re Sanofi-Aventis Sec. Litig.*,774 F. Supp. 2d 549, 571 n.28 (S.D.N.Y. 2011). While Defendants claim that there is only one response to an analyst (Defs.' Br. at 31), that is wrong. The Complaint contains numerous examples of Defendants pushing back on analysts who asked directly about pricing, bundling and reimbursement. *See, e.g.*, March 6, 2023 Cowen Healthcare Conference (analyst asking about reimbursement and Hassanein responding) (¶53); March 13, 2023 Oppenheimer Healthcare Conference (same) (¶53); November 6, 2023 Q3 2023 earning call (analyst asking about passing through revenue and Hassanein reassuring him) (¶60); December 3, 2024 Piper Sandler Healthcare Conference (analyst question about maintaining pricing and Hassanein claiming they were not gouging). ¶200. Additionally, in the same vein, Defendant Hassanein authored the response to the Gosar Letter, claiming it "couldn't be further from the truth." ¶207. Third, contrary to Defendants' suggestion, Gordon's sudden resignation (without a replacement) supports the inference of scienter. Such suspiciously timed resignations—just after receipt of the Gosar Letter and announcement of poor revenue growth results—can add "to the overall pleading of circumstantial evidence of fraud." *In re Scot. Re Grp. Sec. Litig.*, 524 F. Supp. 2d 370, 394 n.176

28

(S.D.N.Y. 2007); *Collier v. ModusLink Glob. Sols., Inc.*, 9 F. Supp. 3d 61, 76 (D. Mass. 2014) (resignations of senior officers contributed to overall inference of scienter).

### C.     The Complaint's Motive Allegations Further Support a Strong Inference of Scienter

The Complaint also alleges strong motive on behalf of Defendants which contributes to the compelling inference of scienter.  The First Circuit has stated that "[s]tock sales by insiders can supply evidence of scienter."  *Cabletron*, 311 F.3d at 39-40 (citing *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 197-98 (1st Cir. 1999)).  Here, Defendants' $45 million of trades were highly unusual, dramatically out of line with prior trading practices, and calculated to maximize personal benefits from false statements.  The Complaint's chart shows how the sale of 400,000 shares by Hassanein and Gordon was far beyond the amount and value of shares sold in the control period.  ¶153.  In fact, Hassanein sold $34.4 million in stock during the Class Period versus $10.3 million in the control period.  ¶154.  Defendants' anemic attacks do not hold water.

Retention of Shares.   Defendants insist that their retention of some of their shares eliminates the culpability of their trades.  First, selling 13% of one's shares in one summer (as Hassanein did) is suspicious.  For example, in *Friedberg v. Discreet Logic*, 959 F. Supp. 42, 51-52 (D. Mass. 1997), motive was established *even though defendants collectively sold only 12% of their total holdings*, and the court noted that "both the amount and the timing of the sale which, with the other evidence discussed, provide strong circumstantial evidence of conscious misbehavior."  Furthermore, even where courts are confronted with smaller amounts of insider sales, many still find those sales support the inference of scienter based on the seniority and involvement of the individuals who sold their shares.  And there is no requirement that insider stock sales exceed a certain percentage of a defendant's holdings to support scienter.  *See Nursing Home Pension Fund Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1232 (9th Cir. 2004) (selling 2.1%

29

and 7% of holdings supported scienter); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 646 (E. D. Va. 2000) (sales of 2.3% of holdings indicative of scienter).

Increase in Holdings.  That Defendants might have increased their total holdings during the Class Period is also not a valid reason to dismiss the stock sales allegations from the scienter inquiry.  Defs.' Br. at 28.  The SEC Form-4's submitted by Defendants show that the shares acquired by Defendants during the Class Period were acquired under various circumstances, including as restricted stock units that could not be sold off until vested, while quite a few were through a trust.  This means that Defendants received their shares as part of their compensation from the Company, rather than through purchasing shares on the open market.  And courts have held that the Defendants' acquisition argument is inappropriate particularly when there may be alternative reasons for any share increase.  *See, e.g.*, *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 691 (6th Cir. 2004) ("We also reject the Individual Defendants' contention that their purchase of shares during the class period refutes any inference that they knowingly or recklessly misled the market to increase the stock's price."); *In re Thornburg Mortg., Inc. Sec. Litig.*, 695 F. Supp. 2d 1165 (D.N.M. 2010) (defendant's argument surrounding purchases of more than $25 million in stock during the class period did not serve to defeat scienter).

Timing of Sales.  Defendants fixate on a "two-month gap" between when Hassanein engaged in his August 2024 selling spree and TransMedics' October 2024 disclosures.  Defs.' Br. at 30.  But the proper inquiry turns on the temporal proximity between when a defendant obtained material non-public information and his suspicious sales, not the proximity between stock sales and a misrepresentation.  *Bos. Sci.*, 523 F.3d at 92-93.  Here, Hassanein dumped 45,000 shares in August 2024 when the stock was close to its all-time high but when TransMedics' results for

30

virtually all of Q3 (with quarterly revenue and gross profits declining) would already have been known to executives, even if only announced in October 2024.

10b5-1 Trading Plans. Defendants try to exonerate their suspicious sales by pointing to trading plans. Defs.' Br. at 29. But this argument is severely flawed. To begin with, Defendants are wrong that "almost all" of their sales were made pursuant to the plans. Indeed, a large number of them were made outside of the trading plans- including $9.3 million for Hassanein. ¶155.[17] They are thus distinguishable from the trades in Defendants' cited case, *Harrington v. Tetraphase Pharmaceuticals, Inc.*, 2017 WL 1946305, at *6 (D. Mass. May 9, 2017) where *all* trades were made under a Rule 10b5-1 trading plan entered into before the class period. Defs.' Br. at 29. Furthermore, the trading plans here were entered into during the Class Period, which undermines any notion that such sales are not suspicious. *See Ariad Pharms.,* 842 F.3d at 754 n. 6; *Emp's Ret. Sys. of Gov't of the V.I. v. Blanford,* 794 F.3d 297, 309 (2d Cir. 2015). And moreover, it could be that the plans afford Defendants some discretion as to sell dates, making these plans irrelevant. *See, e.g.*, *Boston Scientific*, 523 F.3d at 92 ("there is no evidence of when the trading plans went into effect, that such trading plans removed entirely from defendants' discretion the question of when sales would occur, or that they were unable to amend these trading plans"); *Loc. No. 8 IBEW Ret. Plan v. Vertex Pharms., Inc.*, 140 F. Supp. 3d 120, 136 n. 15 (D. Mass. 2015). For these reasons, Defendants cannot use the existence of 10b5-1 trading plans as a shield to liability.

---

[17] Defendants try to state that some of Gordon's off-plan trades were to "satisfy a tax obligation." Defs.' Br. at 30. But, "[t]he fact that there might be an innocent explanation for the timing of [defendant's] sale is not enough to defeat the inference of scienter that arises from plaintiffs' well pleaded allegations – which, as defendants keep forgetting, I must accept as true for purposes of this motion to dismiss." *In re EVCI Colls. Holding Corp. Sec. Litig.*, 469 F. Supp. 2d 88, 100 (S.D.N.Y. 2006).

In sum, the Complaint's allegations, including those from CWs, the Gosar Letter, the Scorpion Report, suspicious insider sales, core operations, evasiveness to analyst questions, and a sudden CFO resignation, taken together, create a strong and compelling inference of scienter.

## III.    THE COMPLAINT PLEADS LOSS CAUSATION

To plead loss causation, Plaintiffs must "allege[] a causal connection between the [D]efendants' material misrepresentations and the drop in [TransMedics] share price." *Mass. Ret. Sys. v. CVS Caremark Corp.*, 716 F.3d 229, 237 (1st Cir. 2013).  Loss causation allegations are evaluated under "ordinary"—not heightened—pleading requirements." *Special Situations Fund III, L.P. v. Am. Dental Partners, Inc.*, 775 F. Supp. 2d 227, 244 (D. Mass. 2011).  Pleading loss causation "should not prove burdensome," as a plaintiff need only allege "some indication of the loss and the causal connection that the plaintiff has in mind." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 347 (2005).  Further, "loss causation may be pleaded on the theory that the truth gradually emerged through a series of partial disclosures and that an entire series of partial disclosures caused the stock price deflation." *Lormand v. U.S. Unwired, Inc.*, 565 F.3d 228, 261 (5th Cir. 2009) (citing Dura, 544 U.S. at 342).  Moreover, loss causation is generally a question of fact, left to the jury to resolve.  *Wortley v. Camplin*, 333 F.3d 284, 295 (1st Cir. 2003).

Plaintiffs easily meet this standard here.  The Complaint alleges that Defendants' fraud was partially revealed through a series of incremental disclosures on February 22, 2024 (10% decrease, ¶219), October 28, 2024 (30% decrease, ¶223), December 2, 2024 (16% decrease, ¶227), and January 10, 2025 (12% decrease, ¶229).  Moreover, where, as here, a complaint alleges a series of partial disclosures, "the whole is greater than the sum of its parts." *Pub. Emps. Ret. Sys. of Miss., P. R. Tchrs. Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 324 (5th Cir. 2014) (finding loss causation from a short-seller report, earnings report, and government investigations).

32

### A.    February 22, 2024 Report on the Gosar Letter

Defendants wrongly contend that Plaintiffs fail to plead loss causation because the Gosar Letter was merely an "investigation." Defs.' Br. at 33. But the letter clearly disclosed wrongdoing by TransMedics such as dramatically increasing pricing, mandating minimum volumes, forcing use of TransMedics' NOP system, and implementing "coercive tactics" to use the Company's costly planes under the threat of losing access to the devices. ¶218. And, even if the letter was simply an "announcement of an investigation," it can still "form the basis for a viable loss causation theory." *Lloyd, v. CVB Fin. Corp.*, 811 F.3d 1200, 1210 (9th Cir. 2016) (disclosure of investigation with subsequent confirming event establishes loss causation); *see also Amedisys*, 769 F.3d at 324 (investigation announcements were corrective together with other disclosures). Loss causation is thus adequately pled as to the Gosar Letter disclosures.

### B.    October 28, 2024 Press Release

Next, Defendants reported a surprise decline in TransMedics revenue and profit margin on October 28, 2024, and insisted the decline was due to "seasonality." ¶221. As seasonality had never previously been an issue for TransMedics' business, analysts concluded the Company was "losing market share to other perfusion therapies." ¶222. Defendants contend there is no loss causation because there is no connection between the drop and Defendants' false or misleading statements. Defs.' Br. at 34. That is wrong because at the very least, this was a materialization of the risk. *In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*, 705 F. Supp. 2d 86, 95 (D. Mass. 2010) (loss causation where a concealed risk "materialized and played some part in diminishing the market value of the security."). Once again, *Coyne* is distinguishable as the court there found no loss causation because the alleged corrective disclosure did not mention of the alleged undisclosed risk. *See Coyne*, 943 F. Supp. 2d at 273. Moreover, analysts' questioning Defendants' seasonality excuse support Plaintiff's loss causation allegations. *In re Winstar*

*Commc'ns*, 2006 WL 473885, at \*14 (S.D.N.Y. Feb. 27, 2006) (market may learn of fraud through "analysts questioning financial results").

### C.    December 2, 2024 Press Release

Defendants also assert that Defendant Gordon's resignation as CFO does not support loss causation because TransMedics did not outright tell the market that he was resigning due to fraud. Defs.' Br. at 34.  Again, Defendants misstate the law.  Executive resignations are sufficient to allege loss causation when taken in context.  *In re Stillwater Cap. Partners Inc. Litig.*, 858 F. Supp. 2d 277, 289 (S.D.N.Y. 2012) (resignation following report of company misconduct); *Ontario Tchrs.' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, 432 F. Supp. 3d 131, 174 (D. Conn. 2019) (departure part of a sequence of events that constructively disclosed fraud).  Defendant Gordon was abruptly demoted after the weak 3Q earnings reported on October 28, 2024.  ¶225.  The resignation was a "surprise" to analysts, who warned that "CFO transitions are typically not good." ¶78.  Defendants cannot absolve themselves of liability for securities fraud simply by obscuring the true reason for Defendant Gordon's departure.  *Bos. Ret. Sys. v. Alexion Pharms., Inc.*, 556 F. Supp. 3d 100, 140-41 (D. Conn. 2021)  (loss causation based on executive departure even though the "'departures were in fact attributed to non-fraudulent motivations'").

### D.    January 10, 2025 Scorpion Report

Finally, Defendants contend that the Scorpion Report does not constitute a corrective disclosure because it somehow did not reveal anything new to the market.  Defs.' Br. at 35.  But, as detailed *supra*, the Scorpion Capital interviewed numerous experts and witnesses that provided information about TransMedics that was not previously public.  Then, Defendants assert the Scorpion Report cannot function as a corrective disclosure because it is somehow "unreliable." But as established *supra*, the Scorpion Report is not some unreliable, purely anonymous product of "self-interested" reporting.  To the contrary, it corroborates its confidential sources with

34

independent investigation directed by Kir Kahlon, the firm's founder and chief investment officer.[18]  Indeed, other federal courts have recently accepted reports by the same short-seller as corrective disclosures for loss causation purposes—even where (unlike here) they constituted the sole corrective disclosure rather than part of a series of partial correctives.  *See Peters v. Twist Bioscience Corp.*, 2025 WL 2532671, at *16 (Scorpion Capital report as sole corrective disclosure sufficient to plead loss causation); *Bernstein v. Ginkgo Bioworks Holdings, Inc.*, 2023 WL 11996105, at *8 (N.D. Cal. Mar. 10, 2023) (same); *Quantumscape*, 580 F. Supp. 3d at 742 (Scorpion Capital report along with web article pleaded loss causation).

## IV.    CONTROL PERSON LIABILITY IS ADEQUATELY PLED

Defendants here merely argue that Plaintiff has not pled a primary violation under Section 10(b).  As stated above, however, Plaintiff has, in fact, alleged a viable claim under Section 10(b).  When a plaintiff has pleaded a Section 10(b) claim sufficiently, a motion to dismiss based on a control person should be denied.  *Hoff v. Popular, Inc.*, 727 F. Supp. 2d 77, 96 (D.P.R. 2010).  As such, the motion to dismiss the control person claim here should likewise be denied.

### CONCLUSION

For the reasons stated herein, Defendants' motion to dismiss should be denied.[19]

---

[18]    In Defendants' primary case, *In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 840 (9th Cir. 2022) by contrast, the short-seller was fully anonymous, the allegations were vague, and the report did not reveal new information to the market, but merely compiled and analyzed information that was already widely publicly available, such as defendants' statements at different conferences.  The court thus held that, based upon the anonymity of the report author and the vague allegations, investors would have taken its "contents with a health grain of salt."  However, *Nektar* relied upon *Houston Mun. Emps.' Pension System v. Boff Holding, Inc.*, 977 F.3d 781, 797 (9th Cir. 2020) wherein the Ninth Circuit specifically held that if the report "required extensive and tedious research," then "the time and effort it took to compile this information make it plausible that the posts provided new information to the market . . ."  Here, the Scorpion Report was the result of six months of exhaustive research and included numerous revelations of non-public information from interviews with surgeons, hospital administrators, former TransMedics employees, and others.

[19]    Should the Court find that Plaintiffs have failed to meet any particular pleading standard to state a claim for relief for any reason, Plaintiffs respectfully request that leave to amend be granted pursuant to Fed. R. Civ. P. 15(a) to remedy perceived deficiencies.  *See Resolution Trust Corp. v. Gold*, 30 F.3d 251, 253 (1st Cir. 1994) (leave to amend shall be freely granted when justice so requires).

Dated: November 21, 2025

Respectfully submitted,

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

By: /s/ Amanda F. Lawrence
Amanda F. Lawrence (BBO# 568737)
156 South Main Street
Colchester, CT 06415
Tel.: (860) 537-5537
Fax: (860) 537-4432
alawrence@scott-scott.com

Mandeep S. Minhas
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Hemsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Tel: (212) 223-6444
Fax: (212) 223-6334
mminhas@scott-scott.com

Joshua H. Saltzman
Steven B. Singer
**SAXENA WHITE P.A.**
10 Bank Street, Suite 882
White Plains, NY 10606
Tel:  (914) 437-8551
Fax: (888) 216-2220
jsaltzman@saxenawhite.com
ssinger@saxenawhite.com

Lester R. Hooker
**SAXENA WHITE P.A.**
7777 Glades Road, Suite 300
Boca Raton, FL 33434
Tel.: (561) 394-3399
Fax: (561) 394-3382
lhooker@saxenawhite.com

*Counsel for Lead Plaintiffs*

36

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the CM/ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on November 21, 2025.

/s/ Amanda F. Lawrence
Amanda F. Lawrence