UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| IN RE TRANSMEDICS GROUP, INC. | ) | |
| SECURITIES LITIGATION | ) | Civil No. 25-10385-LTS |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

MEMORANDUM AND ORDER ON MOTION TO DISMISS (DOC. NO. 55)

July 21, 2026

SOROKIN, J.

This is a putative class action alleging violations of the Securities Exchange Act of 1934

and Rule 10b-5 against TransMedics and two of its executives.  Plaintiffs, who bring this suit on

behalf of a class of similarly situated investors, allege that class members were harmed when

they purchased TransMedics' common stock at prices inflated by the company's false and

misleading statements during the Class Period of February 28, 2023, through January 10, 2025.

Defendants moved to dismiss the amended complaint pursuant to Fed. R. Civ. P. 12(b)(6).  Doc.

No. 55.[1]  For the reasons that follow, Defendants' motion to dismiss is DENIED IN PART and

ALLOWED IN PART as described in this Memorandum and Order.

I.   BACKGROUND

The following facts are drawn from the amended complaint, Doc. No. 50, and any

documents incorporated therein.  TransMedics is a medical technology company in the organ

---

[1] Citations to "Doc. No. __ at __" reference items filed on the electronic docket ("ECF") in the
action that is the subject of this Order; pincites are to page numbers in the ECF header or, where
applicable, to the paragraph numbering within the document.

transplant industry. Doc. No. 50 ¶ 1. Its sole product is the Organ Care System ("OCS"), a portable, perfusion-based device designed to keep donated organs viable outside the human body until they reach their recipients. Id. ¶¶ 1, 36. The OCS uses a process called normothermic perfusion to replicate aspects of the organ's natural functioning while outside of the human body. Id. ¶ 36. According to TransMedics, the OCS keeps organs viable for longer than traditional cold storage, improving outcomes for organ transplants. Id. ¶ 1. The OCS device includes a portable electromechanical console, which houses and controls the perfusion process, and a single-use perfusion set (also called a "cassette") that contains and circulates blood through the organ. Id. ¶ 37. TransMedics' product revenue is primarily driven by the sale of these cassettes, which are priced at $60,000 each. Id.

TransMedics' OCS devices received FDA approval for livers in 2021 and hearts in 2022. Id. ¶ 41. The liver and heart transplant markets are particularly important for TransMedics' business, because the technology behind the OCS expands the scope of viable livers and hearts for transplants. Id. ¶ 39. Until recent years, all heart and liver transplants were performed using organs donated after brain death. Id. at 39. This meant that the available donor pool for hearts and livers was significantly limited, because most hospital deaths are circulatory deaths (i.e., cardiac arrests) rather than brain deaths. Id. ¶ 40. TransMedics' OCS device paved the way for preserving organs donated after circulatory death—organs that would have otherwise been deemed unsuitable for transplants. Id. After receiving FDA approval for its liver and heart devices, TransMedics' revenue skyrocketed, increasing by nearly 170% from 2021 to 2022, and growing another 120% in 2023. Id. ¶ 41.

TransMedics' business model did not stop at the sale of the OCS devices. Id. ¶ 43. By 2023, TransMedics developed another major stream of revenue alongside its OCS product—a

2

bundle of organ retrieval, transport, and logistics services dubbed the National OCS Program ("NOP"). Id. ¶¶ 2, 43.  With the NOP, TransMedics not only offered its OCS devices to preserve donated organs for transplants, it also offered to provide end-to-end logistics and transport of those organs.  More specifically, TransMedics began sending its own surgeons and technicians to remove the organ from the donor, providing transport of the organ, and offering on-site assistance with the OCS machine at the recipient site.  Id. ¶¶ 2, 44.  On January 12, 2023, Defendant Waleed Hassanein, the CEO of TransMedics, proclaimed at an investor conference that the NOP represented "the Amazon Prime model for organ transplant."  Id. ¶ 45.

Plaintiffs' securities-fraud claim arises from various statements made by TransMedics and its officers lauding the success and cost-effectiveness of the NOP.  On February 27, 2023, the day before the start of the Class Period, TransMedics filed its 2022 Form-10K with the SEC, which announced that the NOP "was developed to provide a more efficient process to procure donor organs with the OCS."  Id. ¶ 52.  TransMedics also assured the public that the costs of the NOP were reimbursable by insurance.  At the Cowen Healthcare Conference on March 6, 2023, an analyst asked Hassanein about the price of NOP services, noting that "everyone is worried about getting paid for expenses and on the NOP side, specifically the service fees."  Id. ¶ 53.  Hassanein responded that "[e]very NOP service charge is fully reimbursed.  It's not even a close call."  Id.  Similarly, a week later at the March 13 Oppenheimer Healthcare Conference, Hassanein insisted that "one important fact [is] that every charge around the NOP, from technology to surgical procurement to clinical management to transportation costs are all covered under the existing reimbursement mechanisms for organ transplant.  So that is a fact."  Id.

TransMedics subsequently expanded its NOP offerings.  On August 1, 2023, the company announced its acquisition of Summit Aviation, a charter flight operator.  Id. ¶ 55.  At

the same time, TransMedics purchased its own fleet of private airplanes.  Id.  These moves allowed TransMedics to begin providing aviation services for transporting organs as well as TransMedics' own team of technicians and surgeons to donor sites.  Id.  As TransMedics scaled up its services, it continued to publicize the success of the NOP.  On September 11, 2023, at the Morgan Stanley Healthcare Conference, Hassanein asserted that the NOP gave TransMedics a "big moat" against competitors, noting that "adding the logistics control" over organ transplant "gives us a bigger, wider, deeper moat around the business that nobody in the industry can access."  Id. ¶ 165.  At the same time, he assured investors that TransMedics would not "use that unique position to g[o]uge the market."  Id.

Hassanein also continued to inform the public that the costs of the NOP, including the aviation services, were fully reimbursable by insurance.  During an earnings call on November 6, 2023, an analyst asked Hassanein about reimbursement for the NOP's aviation services. Hassanein averred:

> Old aviation and logistics transport are fully reimbursed through the same mechanism of organ acquisition.  There's no limit per se.  In fact, we are doing this because we believe we could be more efficient and pass some of the efficiencies back to the transplant program.  So I do not want anybody on this call to think that the aviation business is not reimbursed through normal mechanisms of organ transplant.  There is no limit. There is no specifics . . . it's fully reimbursed. It's not a question of reimbursement.  It's a question of making sure that we have the fleet, the efficiencies, the support team to be able to cover the missions.

Id. ¶ 168.

Meanwhile, the NOP grew into a critical source of revenue for TransMedics.  Id. ¶ 54. The percentage of TransMedics' revenue attributable to the NOP rose steadily throughout 2023. Id.  By the end of the year, growth in revenue from the NOP made up the majority of the company's revenue growth.  Id.

Then, things took a turn.  On February 21, 2024, U.S. Representative Paul A. Gosar of Arizona sent and published a letter to Hassanein ("Gosar Letter") raising various concerns about TransMedics' business practices.  Id. ¶ 61.  The Gosar Letter raised four main allegations.  First, the letter alleged that transplant centers that had participated in trials of the OCS "were then mandated by TransMedics to utilize the OCS no less than three to five times per month" or else be disqualified from purchasing more cassettes.  Id. ¶ 62.  Second, the letter stated that TransMedics hiked the price of cassettes from $7,000 to $60,000 after gaining FDA approval.  Id.  Third, the letter accused TransMedics of forcing transplant centers to pay for TransMedics' NOP services in order to access the OCS device.  Id. ¶ 63.  Fourth, the letter alleged that TransMedics was "pressuring hospitals to utilize their more expensive aircraft, not only for transportation of organs, but also for the convenient movement of their staff and equipment."  Id. The letter bemoaned that "TransMedics is more dedicated to driving its profits at the unfortunate expense of the United States taxpayers and patients who need services the most."  Id. ¶ 64.  On February 22, 2024, the Daily Caller published the full text of the Gosar Letter.  Id. ¶ 61.  By the end of the day, TransMedics' stock price had fallen by approximately 2.5%, and it declined an additional 8.3% over the next two days.  Id. ¶ 219.

On February 26, 2024, Hassanein published a response to the Gosar Letter ("Response Letter"), which denied the claims advanced by Gosar.  Id. ¶ 65.  Specifically, Hassanein asserted that Gosar's allegation that TransMedics forced customers to use the NOP "couldn't be further from the truth," because the transplant centers "have the final say on whether they want to use our services or not."  Id.  Furthermore, Hassanein noted that, "[o]ver the past 24 months, more and more centers elected to transition to NOP due to its more efficient cost profile, better clinical outcomes, and the ability to increase their transplant volumes without surgical fatigue of their

staff." Id. ¶ 66. During an earnings call on the same day, Hassanein emphasized that the Gosar Letter "contains serious accusations, which are grossly inaccurate, unfounded and based on wrong information." Id. ¶ 67. He proceeded to state:

> [The] sustained growth and success of NOP is based solely on the operational efficiency to grow transplant volumes, highest level of clinical care of donor organs and the overall cost efficiency experienced by transplant programs across the United States. . . . The success of OCS NOP program is based on better clinical, economic and operational outcomes experienced by the transplant centers and not based on anything else.

Id. ¶ 68.

In the following months, Hassanein continued to defend the merits of the NOP to investors. During the Cowen Healthcare Conference on March 4, 2024, an analyst noted that hospitals were reporting difficulties getting reimbursed for TransMedics' OCS devices and NOP services. Id. ¶ 177. Hassanein replied:

> I think this confusion comes when you ask a physician or a surgeon about Medicare cost support. They really are not that involved. They don't know the mechanisms. And there's a farce in transplant medicine. They tell you, oh, we're getting reimbursed $0.50 on $1, whatever. $0.60 on $1. That's not accurate. It's just a reflection of the mechanism.

Id. ¶ 178. He explained that "commercial payers are highly incentivized and driving for more organ transplants to happen," which is "why commercial payers responded to centers that presented them [with a] case to increase their organ acquisition budget by a significant amount to cover the OCS NOP positively and favorably, and they all got the money requested." Id.

The analyst also asked whether transplant centers were happy with the NOP and whether they were continuing to use NOP services. Id. ¶ 179. Hassanein responded that the NOP was "very sticky" with customers, noting that "we've never seen an NOP[-using] center that starts with NOP and walk[s] away from NOP." Id.

On March 12, 2024, TransMedics presented at the Oppenheimer Healthcare Conference. Id. ¶ 183.  There, an analyst asked whether customers of the OCS were required or pushed to use TransMedics' NOP services.  Hassanein responded, "We offer quotes for the logistics for every mission that we get through the NOP, and it's up to the transplant program to say yay or nay whether or not they want to use TransMedics logistics, whether it's air or ground." Id.  Later during the conference, Hassanein emphasized that TransMedics' goal behind the NOP was to "reduce cost and share that with the transplant program." Id. ¶ 184.  He insisted, "We're in this not to gouge the system." Id.

During an earnings call on April 30, 2024, Hassanein emphasized the popularity of TransMedics' aviation services.  Upon being asked what general feedback TransMedics received from customers about the aviation services, Hassanein answered:

> I point out to . . . the[] rapid pace by which we went from 0 to 105 customers using our TransMedics logistical services. And we expect to go deeper within these accounts. I'll leave it at that. I think centers are beginning—or are actually witnessing the better structure, the more efficient cost structure and the availability that is afforded by TransMedics logistics. And again, I point to the results.

Id. ¶ 187.

On July 31, 2024, TransMedics held an earnings call for the second quarter of 2024.  Id. ¶ 190.  During the call, an analyst asked about the company's pricing leverage for its products and services.  Defendant Stephen Gordon, TransMedics' Chief Financial Officer, responded, "As far as pricing leverage, look, at the moment, we've got a pricing model that works. . . . But for now, we're not trying to gouge the system. We have a pricing model that works." Id.  Hassanein chimed in, "Listen, we don't look at transplantation as an opportunity for pricing leverage. What we are focusing on is growing the overall national transplant volume. . . . We're not in this to just capitalize on leverage." Id.  Hassanein elaborated that TransMedics' logistics were "providing significant cost efficiency to every major transplant program that is working with us" and noted,

"that is how we're going to get the lion's share of the market with these approaches, just focusing on the fundamentals and providing good clinical outcomes or the best clinical outcomes and the most cost-effective way of managing organ transplant for these programs." Id. ¶ 191. Similarly, on September 4, 2024, Hassanein explained at the Morgan Stanley Healthcare Conference that the NOP "allows us to share some of the cost efficiency of us managing our own fleet and logistics network with the transplant program. So we're delivering the most cost-effective transportation in the history of the organ transplant, period, full stop." Id. ¶ 194.

But during this time, TransMedics' business was declining. Indeed, TransMedics experienced a sudden drop in revenue and profit margin during the third quarter of 2024. During an earnings call on October 28, 2024, Hassanein acknowledged the "pause in [TransMedics'] consistent sequential growth trajectory" and explained the setback in the following manner:

> In Q3 overall US. National liver and heart transplant volumes declined sequentially, approximately 5% while total lung volumes declined by approximately 3% in the US. There is no clear reason for these declines other than normal variability of donor availability and potential summer seasonality. So, the sequential decline in the US case volume was directly in line with the decline in national transplant volumes. Importantly, we did not see any degradation of our market share or center penetration on all three orders. I want to make it crystal clear we have not seen any fundamental or competitive dynamics playing any role in the slight sequential decline in case volume for OCS in Q3.

Doc. No. 57-7 at 4. Later in the call, Hassanein assured investors that the price of TransMedics' products and services was not the cause of the business decline, noting that "[p]rice elasticity or pricing pressure has nothing to do with what happened in Q3." Doc. No. 50 ¶ 198. Following the call, market analysts expressed surprise at TransMedics' sudden plunge in performance. Oppenheimer analysts noted that the "math" indicated that TransMedics likely lost market share in liver and heart. Id. ¶ 77. Piper Sandler analysts similarly observed that TransMedics likely experienced some loss of their market share. Id. Between October 28 and October 29, 2024, TransMedics' stock price dropped by nearly 30%. Id. ¶ 223.

Around a month later, on December 2, 2024, TransMedics announced the sudden removal of Gordon as Chief Financial Officer.  Id. ¶ 78.  Market analysts expressed shock by the removal and warned that "CFO transitions are typically not good."  Id.  On this news, the price of TransMedics stock fell by 16% between December 2 and December 3, 2024.  Id. ¶ 79.

Meanwhile, Hassanein continued to defend TransMedics' business practices.  On December 3, 2024, Hassanein responded to an analyst's question about TransMedics' pricing with the following:

> We are maintaining [our pricing] because many reasons. One, we are delivering significant value compared to anybody in the industry. We think our price actually is fairly priced. We're not gouging the market in any way. We actually think we're leaving some value on the table. But that's fine. We are long-term-focused. Number three, we are sharing significant cost savings with the transplant program, especially with the network effect that we created around NOP and aviation that nobody else in the industry can match. . . . . That's why, we are maintaining our price. And that's why, we think that we're providing significant value and sharing cost savings and the value of the network effect that we've created in the NOP with our transplant program.

Id. ¶ 200.  Similarly, on December 10, 2024, Hassanein publicly affirmed that TransMedics did not "gouge the market."  Id. ¶ 201.

Plaintiffs allege that all of these statements promoting the benefits of the NOP and denying allegations of exploitative business practices throughout the Class Period were false and misleading.  They contend that, behind the scenes, TransMedics was forcing customers to purchase its NOP services in order to use the OCS devices and inflating costs of the NOP with excessive flights and service fees, even though these costs were not fully reimbursable by insurance.  Id. ¶ 11.  Plaintiffs also allege that TransMedics' revenue decline during the third quarter of 2024 was attributable to customers moving to competitors due to TransMedics' coercive business tactics and high prices.  Id. ¶ 199.

To support their theory of fraud, Plaintiffs primarily rely on a short-seller report released by Scorpion Capital on January 10, 2025, criticizing the "Mafia-Style" business practices of TransMedics.[2] Id. ¶ 80; Scorpion Capital, Walk Like An Egyptian: A "Mafia-Style" Extortion, Racketeering, And Organ Trafficking Scheme Masquerading As A Medical Device Company 1 (2025) [hereinafter Scorpion Report], https://scorpionreports.s3.us-east-2.amazonaws.com/TMDX.pdf [https://perma.cc/N2VD-ZY6M].[3] By its own account, the report compiled information from Scorpion Capital's six-month investigation into TransMedics, during which it conducted "over 30 interviews, including [with] ex-employees, surgeons, leading transplant centers, organ procurement organizations, competitors, and its largest customers." Scorpion Report at 8. Relying on anonymized quotes from these interviews, the report asserted that TransMedics maintained a policy of forcing customers to purchase its procurement services and aircraft in order to use the OCS device. Id. at 50-70; Doc. No. 50 ¶¶ 86-92. The report also stated that TransMedics overcharged customers for its services, in particular by billing customers for excessive and unnecessary flights. Scorpion Report at 71-97; Doc. No. 50 ¶¶ 93-100. Furthermore, the report proclaimed that these high charges were turning transplant centers and hospitals away from TransMedics, especially because insurance companies declined to reimburse the bulk of these costs. Scorpion Report at 269-80; Doc. No. 50 ¶¶ 101-122.

---

[2] Plaintiffs dedicate 42 paragraphs of the amended complaint to summarizing information from the Scorpion Report, which itself is 342 pages long. The Court provides a concise summary of the major points raised by the report and includes more details of the report as needed throughout this Memorandum and Order.

[3] While Plaintiffs do not provide a link to the Scorpion Report in their complaint or attach it as an exhibit, the Report is plainly incorporated by reference because Plaintiffs quote from and rely upon the Report to shape their allegations. See Clorox Co. P.R. v. Proctor & Gamble Com. Co., 228 F.3d 24, 32 (1st Cir. 2000) ("[I]t is well-established that in reviewing the complaint, we may properly consider the relevant entirety of a document integral to or explicitly relied upon in the complaint, even though not attached to the complaint, without converting the motion into one for summary judgment." (citation modified)).

Elsewhere in the report, Scorpion Capital included a disclaimer acknowledging, among other things, that it "stands to realize significant gains in the event that the price of [TransMedics'] stock . . . decline[s] or change[s]."  Scorpion Report at 2.

Plaintiffs contend that the Scorpion Report "exposed the truth about TransMedics' unsustainable business model."  Doc. No. 50 ¶ 80.  To bolster this point, Plaintiffs point to information from eleven confidential witnesses ("CWs"), which they claim corroborates the findings of the Scorpion Report.  Id. ¶¶ 123-146.  Plaintiffs' counsel interviewed five of these CWs (CWs 1, 2, 3, 4, and 11) during their investigation.  For the remaining six CWs (CWs 5, 6, 7, 8, 9, and 10), Plaintiffs rely on anonymized interviews published on AlphaSense, an online platform that publishes proprietary research, earnings transcripts, and interviews with industry professionals.  Id. ¶ 136 n.12.  The Court provides a summary of each interview.

**CW 1** is a former OCS Specialist in New York City for TransMedics who was interviewed by Plaintiffs' counsel.  Id. ¶ 124.  He stated that he saw evidence that TransMedics' revenue loss in the third quarter of 2024 was due to hospitals reducing or ceasing their business with TransMedics based on the high cost of the OCS and the NOP.  Id.  In particular, he noted that the revenue losses were due in large part to the loss of hospital customers in Texas, a major market for TransMedics.  Id.  He explained that these hospitals were replacing TransMedics with a competitor, OrganOx, which offered a cold storage system at a much cheaper cost.  Id. ¶ 125.  CW 1 also said that he had heard of hospitals in San Diego moving to OrganOx from TransMedics.  Id.  He further disclosed that major hospitals in his area (New York City) complained to him about the high costs of TransMedics' services.  Id. ¶ 126.

**CW 2** is an organ transplant coordinator at a major hospital in the South who was interviewed by Plaintiffs' counsel.  Id. ¶ 127.  His hospital was a regular user of TransMedics'

services during the Class Period, and he dealt directly with TransMedics personnel on a regular basis. CW 2 expressed skepticism of Hassanein's claims regarding seasonal losses during the third quarter of 2024 and asserted that there is no seasonality in the organ business. Id. In addition, CW 2 noted that TransMedics used "strongarming" tactics to pressure hospitals to use its services. Id. ¶ 128. He explained that his hospital once had its own OCS machine, which TransMedics removed. Id. TransMedics subsequently required the hospital to purchase its services in order to access the OCS machine. Id. CW 2 also provided Plaintiffs' counsel with text messages from TransMedics staff apprising him about steep cancellation charges for the NOP services. Id. ¶ 129. CW 2 explained that these charges added further pressure on hospitals to use TransMedics' services. Id. Furthermore, CW 2 disclosed that TransMedics' flight charges averaged around $50,000, which the hospital had to pay on top of other logistics charges, such as a $20,000 minimum fee for using TransMedics' surgeons. Id. ¶ 130. Finally, CW 2 confirmed that he had reviewed the Scorpion Report and found it to be generally accurate and consistent with his experience. Id. ¶ 131.

CW 3 is an organ procurement and preservation expert who works for a company in the organ procurement industry. Id. ¶ 132. During his interview with Plaintiffs' counsel, he noted that, beginning in 2022 or 2023, TransMedics ceased allowing hospitals to keep their own OCS machines and forced them to use TransMedics' services to access the machines. Id. ¶ 132. This meant that hospitals were required to pay for TransMedics' surgeons and technicians on top of the transportation costs. Id. CW 3 also described that TransMedics charged more for their services than other companies. In particular, he noted that it would cost roughly $6,000 to send non-TransMedics transplant surgeons to remove and retrieve an organ, but TransMedics charged at least $15,000 for the same service. Id. ¶ 133. He also stated that TransMedics charged

$50,000 for air transportation on its planes, whereas third-party private planes could be chartered for $15,000.  Id.  CW 3 disclosed that he was aware of several hospitals, including Henry Ford Clinic in Michigan and Baylor St. Luke's Hospital in Houston, pushing back on TransMedics' practices with the company's management.  Id. ¶ 134.  He further stated that competitor devices to the OCS provided comparable or better outcomes at lower costs.  Id.

CW 4 is an organ procurement coordinator for a West Coast hospital who has dealt with TransMedics frequently in his position.  Id. ¶ 135.  During his interview with Plaintiffs' counsel, he confirmed that hospitals had to use TransMedics' NOP services to maintain access to the OCS device.  Id.  He also noted that, in some cases, TransMedics would charge for three different planes from three different locations to get its teams to the donor site—using one plane to transport the OCS device, another for the surgical team, and a third for the perfusionists.  Id.

CW 5 is a thoracic and lung transplant surgeon at the Mayo Clinic who was interviewed by AlphaSense.  Id. ¶ 136.  CW 5 confirmed that TransMedics required transplant centers to use the company's logistics services in order to use the OCS technology.  Id.  He noted that transplant centers were unhappy about being locked into using TransMedics' services.  Id.

CW 6 is a director of Buckeye Transplant Services, an Ohio company specializing in transplant screening, organ transport logistics, and data reporting.  Id. ¶ 137.  During his interview with AlphaSense, he stated that many TransMedics customers balked at the company's high costs.  Id.  He explained that TransMedics required customers to use the company's specialists and surgeons in order to access the OCS device.  Id.  CW 6 also mentioned that TransMedics charged high prices for air logistics.  Id. ¶ 138.

CW 7 is a former VP of Market Access for TransMedics who was interviewed by AlphaSense.[4] Id. ¶ 139. He noted that when TransMedics first introduced the OCS, it allowed hospitals to purchase their own OCS machines so that they could have full control over the logistics and costs associated with each transplant. Id. However, once TransMedics received FDA approval, it stopped this practice and forced transplant centers to purchase its NOP services to access the OCS machine. Id. CW 7 further explained that TransMedics forced customers to use its surgeons and technicians even if the hospitals could have used their own personnel or those of another company at a lower cost. Id. ¶ 140.

CW 8 is the Director of Operations at the University of Pittsburgh Medical Center ("UPMC") who was interviewed by AlphaSense. Id. ¶ 141. He noted that TransMedics would require his hospital to fly in TransMedics' team from another state, even in situations where the organ donor was located close by. Id. ¶ 142. He also disclosed that TransMedics' services were not fully reimbursed by commercial insurance companies. Id. ¶ 141. He explained that commercial payers typically pay the same rate for every organ transplant without adjusting for high acquisition costs. Id. Because of the limited commercial reimbursement of TransMedics' services, CW 8 disclosed that his center was reducing its business with TransMedics. Id. ¶ 142.

CW 9 is a transplant surgeon at Westchester Medical Center Health Network who was interviewed by AlphaSense. Id. ¶ 144. He reported that he had been using TransMedics for over a year. Id. He noted that the high costs of TransMedics' forced-bundled services made competitors like OrganOx more appealing. Id.

---

[4] Plaintiffs note that CW 7 appears to be the same individual described in the Scorpion Report as a "reimbursement executive" based on the similarity of the accounts of both sources. Doc. No. 50 ¶ 139 n.14.

14

**CW 10** is an executive at TransMedics' competitor XVIVO who was interviewed by AlphaSense.  Id. ¶ 145.  He stated that TransMedics initially allowed transplant centers to maintain and operate their own OCS machines but later changed its policy to require the use of TransMedics' NOP services to access the machines.  Id.  He said that "a number of centers" were growing upset about this forced bundling.  Id.  He further explained that TransMedics' bundling policy made its offerings out of reach for smaller transplant centers.  Id.

**CW 11** is a former TransMedics pilot who was interviewed by Plaintiffs' counsel.  Id. ¶ 146.  He recalled instances when the company directed him to make extremely short flights in the Northeast region (such as from Newark, NJ, to White Plains, NY, to Bedford, MA), even though ground transportation would have made more sense in his view.  Id.

In addition to these CW interviews, Plaintiffs cite an independent data analysis performed by their healthcare economics expert.  Id. ¶ 147.  Using data from the RAND Center, the expert analyzed organ procurement costs across more than one hundred of the nation's largest hospitals and transplant centers.  Id.  The expert found that certain hospitals using TransMedics experienced significant increases in their average acquisition costs per organ from 2021 to 2024.  Id. ¶¶ 148, 150.  By contrast, several hospitals that did not use TransMedics experienced relatively low increases or decreases in their average acquisition costs per organ during similar time frames.  Id. ¶¶ 149, 151.  Based on the expert's findings, Plaintiffs contend that the relatively high jumps in organ procurement costs experienced by TransMedics customers "contradict[] TransMedics' claim that its services represent 'the most economical way of managing organ transplants.'"  Id. ¶ 147.

Finally, Plaintiffs point to alleged insider trading by Hassanein and Gordon during the Class Period as evidence of their scienter of TransMedics' fraud.  According to the amended

complaint, Hassanein sold $34 million worth of shares during the Class Period. Id. ¶ 154. Plaintiffs argue that these stock sales were unusual because they amounted to nearly three times the total stock sales Hassanein made in the equivalent period prior to the Class Period ("Control Period"). Id. ¶ 153. Furthermore, they allege that Hassanein made $9.3 million of these stock sales outside of his 10b5-1 plan in "three outsized transactions at highly suspicious times that took place between the publication of the Gosar Letter and the October 2024 corrective disclosure concerning the Company's surprise 3Q 2024 revenue miss." Id. ¶ 155. One of these suspicious sales occurred in late August, when Hassanein suddenly sold 45,000 shares at a high price between $171 and $175 per share—just a few days before TransMedics' stock price began to decline substantially. Id. Plaintiffs allege that Hassanein made this sale "roughly two thirds into 3Q 2024, at which point he undoubtedly knew about the steep decline in the Company's revenue." Id. ¶ 156. As for Gordon, Plaintiffs note that he sold $11 million worth of shares during the Class Period—an increase from the $4.5 million worth of shares he sold during the Control Period. Id. ¶ 154.[5]

Two groups of plaintiffs filed suit against TransMedics in this Court. On May 22, 2025, the Court consolidated the cases and appointed the Peace Officers' Annuity and Benefit Fund of Georgia as Lead Plaintiff. Doc. No. 43. Pursuant to a jointly proposed briefing schedule, Plaintiffs filed their amended complaint on August 8, 2025. Doc. No. 50. Defendants moved to dismiss on October 7, 2025. Doc. No. 55. Plaintiffs opposed, Doc. No. 58, and Defendants replied, Doc. No. 61. The Court held a hearing on the motion on July 9, 2026.

---

[5] Plaintiffs make no other allegations about the timing of Gordon's sales or whether his sales were made pursuant to his 10b5-1 plan. However, Defendants acknowledge in their brief that Gordon's off-plan sales during the Class Period amounted to approximately 21% of his holdings. Doc. No. 56 at 38.

## II.    LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  The court must "take all factual allegations [in the complaint] as true and . . . draw all reasonable inferences in favor of the plaintiff."  Rodriguez-Ortiz v. Margo Caribe, Inc., 490 F.3d 92, 96 (1st Cir. 2007).  But "[t]he court need not accept a plaintiff's assertion that a factual allegation satisfies an element of a claim, . . . nor must a court infer from the assertion of a legal conclusion that factual allegations could be made that would justify drawing such a conclusion."  Cordero-Hernandez v. Hernandez-Ballesteros, 449 F.3d 240, 244 n.3 (1st Cir. 2006).

"For a complaint to state a claim for securities fraud under section 10(b) and Rule 10b–5, it must plead six elements: (1) a material misrepresentation or omission; (2) scienter, or a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation."  ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 58 (1st Cir. 2008).  Because Rule 9(b) applies to claims of securities fraud, Plaintiffs are "required to plead the circumstances of the securities fraud with particularity."  Zhou v. Desktop Metal, Inc., 120 F.4th 278, 287 (1st Cir. 2024).

## III.    DISCUSSION

Defendants contend that the amended complaint should be dismissed because it fails to plead materially false or misleading statements, scienter, and loss causation.  The Court addresses these arguments in turn.

### A.    Materially False and Misleading Statements

The Private Securities Litigation Reform Act ("PSLRA") requires Plaintiffs to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is

misleading." 15 U.S.C. § 78u-4(b)(1). "To establish a material misrepresentation or omission, [plaintiffs] must show that defendants made a material false or misleading statement or omitted to state a material fact necessary to make a statement not misleading." Ganem v. InVivo Therapeutics Holdings Corp., 845 F.3d 447, 454 (1st Cir. 2017) (citation modified). A misrepresentation or omission is material and thereby actionable only if a reasonable investor would have viewed it as "having significantly altered the total mix of information made available." Basic, Inc. v. Levinson, 485 U.S. 224, 232 (1988) (citation modified).

Plaintiffs rely on several different sources—namely, the Gosar Letter, the Scorpion Report, the AlphaSense interviews, interviews conducted by their own counsel, and an expert report—to support their allegations of falsity. As an initial matter, Defendants contend that the Gosar Letter, the Scorpion Report, and the anonymous interviews from AlphaSense are unreliable and asks the Court to reject allegations arising from these sources. Doc. No. 56 at 16-22. However, Defendants point to no cases adopting a bright-line rule of exclusion for any of these types of sources. As for the confidential witnesses from the AlphaSense interviews, the First Circuit has previously "decline[d] to adopt a rule which would exclude confidential source allegations which have every indication both that the source had access to information and that the information has the earmarks of credibility, simply because the identity of the source is not initially revealed." N.J. Carpenters Pension & Annuity Funds v. Biogen IDEC Inc., 537 F.3d 35, 52 (1st Cir. 2008). Accordingly, the First Circuit employs a totality-of-the-circumstances approach for evaluating confidential source material under the PSLRA and considers factors such as "the level of detail provided by the confidential sources, the corroborative nature of the other facts alleged (including from other sources), the coherence and plausibility of the

18

allegations, the number of sources, the reliability of the sources, and similar indicia." In re Cabletron Sys., Inc., 311 F.3d 11, 29-30 (1st Cir. 2002).

Courts employ a similar case-by-case approach to assessing the reliability of short-seller reports at the motion-to-dismiss phase. See Long Miao v. Fanhua, Inc., 442 F. Supp. 3d 774, 801 (S.D.N.Y. 2020) (rejecting bright-line rule and noting that the "developing body of case law involving factual attributions to short-seller reports to satisfy pleading requirements in a securities fraud complaint instead reflects the need for similar caution and care as with respect to attributions to CWs"); In re QuantumScape Sec. Class Action Litig., 580 F. Supp. 3d 714, 731-32 (N.D. Cal. 2022) (considering report by Scorpion Capital and rejecting "bright-line rule of exclusion").

Here, the confidential sources from the AlphaSense interviews and the Scorpion Report include customers of TransMedics' products and services, former TransMedics employees, and executives from competitor medical technology companies—all of whom plausibly have some degree of knowledge regarding TransMedics' practices and offerings. Crucially, the pertinent factual allegations from these sources and from the Gosar Letter are reinforced and echoed by one another as well as by the five CWs interviewed by Plaintiffs' counsel. Where "[m]ultiple types of evidence from multiple sources reinforce the same narrative," the sources can "strengthen one another and collectively paint a plausible picture of a company defrauding its clients." Hill v. State St. Corp., No. 09-cv-12146-NG, 2011 WL 3420439, at *13 (D. Mass. Aug. 3, 2011). While Defendants urge the Court to scrutinize the credibility of each source, their argument overlooks the fact that the reliability of these sources must be assessed within the totality of Plaintiffs' allegations, rather than in isolation.

With these considerations in mind, the Court declines to exclude these external sources on a wholesale basis and instead evaluates them in the context of Plaintiffs' allegations concerning the falsity of Defendants' challenged statements. The Court now turns to those allegations. The statements challenged by Plaintiffs can be grouped into five categories: (1) statements regarding the pricing of the NOP, (2) statements denying allegations of forced bundling, (3) statements regarding insurance reimbursement, (4) statements regarding customer retention, and (5) statements regarding the cause of TransMedics' decline during the third quarter of 2024. The Court discusses each category in turn.

### 1. *Statements Regarding NOP Pricing*

The first category of statements that Plaintiffs challenge concerns the cost-effectiveness, efficiency, and pricing of TransMedics' NOP offerings. This category includes ten statements:

- **February 27, 2023:** TransMedics submitted its 2022 Form 10-K, which explained that the NOP "was developed to provide a more efficient process to procure donor organs with the OCS." Doc. No. 50 ¶ 158.

- **September 11, 2023:** At the Morgan Stanley Healthcare Conference, Hassanein said that the NOP gave the company a "big moat" against competitors, adding that TransMedics would not "use that unique position to g[o]uge the market." Id. ¶ 165.

- **February 26, 2024**: In the Response Letter, Hassanein wrote that "more and more centers elected to transition to NOP due to its more efficient cost profile, better clinical outcomes, and the ability to increase their transplant volumes without surgical fatigue of their staff." Id. ¶ 172. He elaborated that the NOP "was created to . . . [r]educe the fixed infrastructure and resource costs required of transplant centers to manage the OCS technology to access more donor organs and grow their overall transplant volume." Id.

- **February 26, 2024**: During an earnings call, Hassanein said: "We are confident that this sustained growth and success of NOP is based solely on the operational efficiency to grow transplant volumes, highest level of clinical care of donor organs and the overall cost efficiency experienced by transplant programs across the United States." Id. ¶ 174. He also told investors that the NOP's success was "not based on anything else." Id.

- **March 12, 2024:** At the Oppenheimer Healthcare Conference, Hassanein said that TransMedics implemented the NOP because the company saw "a huge opportunity to reduce cost and share that with the transplant program." Id. ¶ 184. He added that TransMedics was not trying to "gouge the system." Id.

- **April 30, 2024:** During the earnings call for the first quarter of 2024, Hassanein attributed an increase in customers using TransMedics' logistical services to "the better structure, the more efficient cost structure and the availability that is afforded by TransMedics logistics." Id. ¶ 187.

- **July 31, 2024:** During the earnings call for the second quarter of 2024, Gordon said that TransMedics was "not trying to gouge the system" and that the company had "a pricing model that works." Id. ¶ 190.  Hassanein similarly noted, "We're not in this to just capitalize on leverage." Id.  He proceeded, "[W]e provide the most economical way of managing organ transplants since the invention of organ transplants," because "[t]he way our logistics network is operating is providing significant cost efficiency to every major transplant program that is working with us." Id. ¶ 191.

- **September 4, 2024:** At the Morgan Stanley Healthcare Conference, Hassanein said that the NOP provided "the most cost-effective transportation in the history of organ transplant, full stop." Id. ¶ 194.

- **December 3, 2024:** At the Piper Sandler Healthcare Conference, Hassanein stated that TransMedics was "not gouging the market in any way." Id. ¶ 200.  He continued, "we are sharing significant cost savings with the transplant program, especially with the network effect that we created around NOP and aviation that nobody else in the industry can match." Id.

- **December 10, 2024:** On TransMedics' Investor and Analyst Day, Hassanein stated, "we pride ourselves for not gouging the market." Id. ¶ 201.

Plaintiffs argue that these statements touting the cost advantages of the NOP and denying price gouging were false and misleading because, "in reality, Defendants were padding their billing and engaging in excessive spending and non-cost-effective measures, all to the detriment of transplant centers and hospitals and solely to line their pockets." Doc. No. 58 at 25.  The Court disagrees.

To begin, all the challenged statements broadly praising the "efficiency" and "cost savings" of the NOP offerings are inactionable puffery.  These statements amount to generalized assertions of corporate optimism that are not tethered to any objective standard.  See In re XM Satellite Radio Holdings Sec. Litig., 479 F. Supp. 2d 165, 180 (D.D.C. 2007) ("Because such generalized positive statements about 'cost effective,' 'smart,' 'sound' and 'efficient' growth are vague and incapable of objective verification, they are not the type of statement upon which a

21

reasonable investor would rely in considering the 'total mix' of facts available." (citation modified)); Guangyi Xu v. ChinaCache Int'l Holdings Ltd., No. 15-cv-07952-CAS, 2017 WL 114401, at *9 (C.D. Cal. Jan. 9, 2017) ("[C]laims to 'enhanced service' or being 'more efficient' are too vague to be more than non-actionable puffery."); In re Datatec Sys., Inc. Sec. Litig., No. 04-cv-525-GEB, 2006 WL 3095951, at *17 (D.N.J. Oct. 30, 2006) (statement touting that company's product allowed company "to rapidly and efficiently deliver high quality and cost effective large-scale technology deployment solutions to its clients" is inactionable "vague and general statement[] of optimism").  Because the statements generally promoting the NOP's "cost savings," "efficient cost profile," and "cost efficiency" do not contain any factual representation of quantifiable cost reductions or efficiency standards, they are the type of "vague proclamations . . . to which a reasonable investor would assign little weight."  In re Bos. Sci. Corp. Sec. Litig., 646 F. Supp. 3d 249, 275 (D. Mass. 2022).

Similarly, Hassanein's rosy statement describing the NOP as a "big moat" reflects a broad, exaggerative statement that a reasonable investor would not rely upon in making investment decisions.  See In re iRobot Corp. Sec. Litig., 527 F. Supp. 3d 124, 135-36 (D. Mass. 2021) (statements touting strong market share and downplaying impact of competition are inactionable puffery); Bos. Sci. Corp., 646 F. Supp. 3d at 278 ("A reasonable investor would not rely on Defendants' vague praise of their own product's potential market-advantages."); Lloyd v. CVB Fin. Corp., 811 F.3d 1200, 1206-07 (9th Cir. 2016) (statements describing company's credit metrics as "superior" to those of peers are "vague, optimistic statements" that "are not actionable").

On the other hand, the challenged statements describing the NOP as "the most cost-effective transportation in the history of organ transplant" and "the most economical way of

22

managing organ transplants" include an implied comparison and thus may tread beyond mere puffery. Doc. No. 50 ¶¶ 191, 194 (emphasis added); see also In re Allaire Corp. Sec. Litig., 224 F. Supp. 2d 319, 335 (D. Mass. 2002) (holding that comparative statement that company's platform allowed customers to "bring their businesses online faster and more cost effectively than ever before" is actionable). But even assuming these statements (or any other statements touting the NOP's pricing model and efficiency) are actionable, Plaintiffs have not alleged sufficient facts to demonstrate the falsity of these statements. Plaintiffs principally rely on allegations from the Scorpion Report and CW interviews noting customer dissatisfaction with TransMedics' high costs. See, e.g., Doc. No. 50 ¶ 170 (statement from Scorpion Report noting that TransMedics' bill ate up a "very, very substantial amount of the margin" on hospitals' organ transplant profits); id. (statement from Scorpion Report proclaiming that TransMedics' costs were "not sustainable" for hospitals); id. ¶ 125 (CW 1 noting that customers complained about TransMedics' costs "all the time"). Plaintiffs also point to their economic expert's data analysis, which shows that certain TransMedics customers experienced higher increases in costs per organ than hospitals that did not use TransMedics around the same time. Id. ¶¶ 147-151.

To the extent that these allegations indicate that TransMedics charged higher prices than their competitors during the Class Period, they do not render Defendants' statements false. The complaint itself acknowledges that TransMedics' OCS technology "engendered greater use of organs donated after circulatory death . . . because it allows clinicians to preserve, assess, and in some cases resuscitate . . . organs that would otherwise have been deemed unsuitable for transplant" under the traditional organ storage system. Id. ¶¶ 39-40. This suggests that TransMedics' products and services could provide certain benefits that other competitors could not. Understood in this light, the allegations that TransMedics charged higher prices than its

23

competitors or that TransMedics' prices were "unsustainable" for some customers do not support Plaintiffs' conclusion that TransMedics' NOP was less cost-effective.

The same goes for Plaintiffs' allegations about TransMedics' deployment of aviation services.  Relying on information from the Scorpion Report and CW interviews, Plaintiffs allege that TransMedics billed customers for substantial flight costs and utilized a practice of flying personnel and organs from multiple different locations for a single transplant.  See Doc. No. 50 ¶¶ 93, 96, 97, 99, 130, 135, 142.  But these allegations do not contradict Defendants' statements about the NOP's cost-effectiveness or efficiency.  While it may be costly for a hospital to pay for multiple planes to fly in TransMedics' team of surgeons and technicians, this service may save the hospital time and money by freeing up its personnel for other surgeries, increasing the hospital's transplant volumes, and allowing the hospital to access TransMedics' OCS device without having to train its employees.  Plaintiffs also rely on their counsel's interview with CW 11, a former pilot for TransMedics who recalled instances when he was directed to fly distances that could have been covered by ground transportation.  Id. ¶ 146.  But this, too, fails to demonstrate the inefficiency of TransMedics' aviation service.  While air transportation is presumably more expensive than ground transportation, using aviation, even for short distances, may be the more "cost-effective" or "efficient" option for urgent, time-sensitive organ transplants.  Put simply, Plaintiffs' allegations do not provide sufficient detail to evaluate the "cost-effectiveness" of TransMedics' services and offerings.  Allegations that TransMedics charged high prices for aviation and other services, without more, do not allege the falsity of these challenged statements with plausibility or particularity.

Similarly, Plaintiffs have not alleged sufficient facts to show that any of Defendants' statements denying price gouging were false and misleading.  The PSLRA requires a plaintiff to

explain "the reason or reasons why" an allegedly false statement "is misleading."  15 U.S.C.
§ 78u-4(b)(1).  Here, Plaintiffs fail to explain why TransMedics' pricing practices constituted
"price gouging," such that Defendants' statements denying price gouging were misleading or
false.  Plaintiffs do not define price gouging, offer any standards for assessing what constitutes
price gouging, or explain how a reasonable investor would have understood Defendants'
statements about price gouging.  All they do is point to various allegations concerning
TransMedics' "overpricing" practices.  Doc. No. 58 at 26.  But not every business that charges
high prices is guilty of price gouging—even when a business's prices greatly exceed those
charged by its competitors.  Without providing any objective mechanism for evaluating the
falsity of Defendants' statements denying price gouging, Plaintiffs cannot advance a claim of
securities fraud based on these statements.

2.    <em>Statements Regarding Forced Bundling</em>

Plaintiffs also challenge three statements by Hassanein denying accusations of forced-
bundling practices:

- **February 26, 2024:** In the Response Letter, Hassanein wrote that Gosar's allegation that TransMedics pressured hospitals to use its expensive logistics "couldn't be further from the truth."  Doc. No. 50 ¶ 171.  He explained that TransMedics "presents the logistics quotation to transplant centers using our NOP service," leaving transplant centers with "the final say on whether they want to use our services or not."  Id.

- **February 26, 2024:** During an earnings call, Hassanein again responded to the Gosar Letter, calling the letter's accusations "grossly inaccurate, unfounded, and based on wrong information."  Id. ¶ 173.  He said that the success of the "OCS NOP program is based on better clinical, economic and operational outcomes experienced by the transplant centers and not based on anything else."  Id. ¶ 174.

- **March 12, 2024:** At the Oppenheimer Healthcare Conference, Hassanein told investors that "it's up to the transplant program to say yay or nay whether or not they want to use TransMedics logistics, whether it's air or ground."  Id. ¶ 183.  He further noted that TransMedics doesn't operate on a "contract concept" and leaves it "up to [the transplant centers] whether or not they use us or not."  Id.

25

Plaintiffs contend that these statements were false and misleading because TransMedics engaged in a policy requiring customers to purchase the NOP in order to access the company's OCS technology. As described in the amended complaint, multiple anonymous sources from the Scorpion Report explained that TransMedics required customers seeking to use the OCS device to also use the NOP. See id. ¶ 86 (former TransMedics reimbursement executive noting that transplant centers that bought OCS systems "were not allowed to buy cartridges unless they used the [NOP]"); id. ¶¶ 87-92 (multiple transplant surgeons agreeing that TransMedics would not provide access to OCS unless customer bought NOP services). Plaintiffs also point to the interviews of eight CWs (CWs 2, 3, 4, 5, 6, 7, 9, and 10), who all similarly noted that TransMedics required customers to use its NOP services in order to gain access to the OCS machines. Id. ¶¶ 128, 132, 135, 136, 137, 139, 144, 145.

Taken together, these allegations suffice to plead the falsity of this category of statements. Plaintiffs' allegations include multiple sources who uniformly asserted that TransMedics engaged in a policy that forced customers to bundle the NOP with the OCS. Many of these sources worked at hospitals that used TransMedics and held positions that involved directly working with TransMedics personnel. See, e.g., id. ¶ 127 (organ transplant coordinator at major hospital who regularly dealt with TransMedics' personnel); id. ¶ 135 (organ procurement coordinator at West Coast hospital who worked frequently with TransMedics); id. ¶ 144 (transplant surgeon at Westchester Medical Center Health network who used TransMedics). Furthermore, one of the CWs who described TransMedics' forced-bundling practice served as the former VP of Market Access for TransMedics. Id. ¶ 139. These sources' positions and relationships with TransMedics support their knowledge of the company's sales practices and policies. Additionally, Plaintiffs do not rely solely on anonymous sources

26

interviewed by third parties but also include corroborating information from three CWs (CWs 2, 3, and 4) who were interviewed by Plaintiffs' counsel.  All of these considerations, coupled with the coherence of the information provided by each confidential source, support Plaintiffs' theory of fraud as to Defendants' forced-bundling practice.

Defendants aver that the "Court cannot infer that [Plaintiffs'] allegations relate to the Class Period, much less reflect any facts at the time of the challenged statements."  Doc. No. 56 at 27.  This argument is unavailing.  CW 7, the former VP of Market Access for TransMedics, described that TransMedics began its practice of forcing transplant centers to use the NOP once the company received FDA approval.  Doc. No. 50 ¶ 139.  Given that TransMedics received FDA approval for its liver OCS device in 2021 and for its heart OCS device in 2022, id. ¶ 41, these facts support the reasonable inference that TransMedics adopted its forced-bundling policy before Hassanein made the challenged statements in 2024.  Other allegations support this timeline.  The Gosar Letter, which was published before any of the challenged statements, accused TransMedics of changing its business structure "[o]nce FDA approval was achieved," by, among other things, creating "its own team of individuals as the sole source for any initiation of the OCS device" and requiring hospitals to "request the necessary TransMedics personnel" to use the OCS.  Doc. No. 57-10 at 2.  Furthermore, CW 3, an expert in organ procurement and preservation who works for a company in the organ procurement industry, estimated that TransMedics implemented its forced-bundling policy beginning "in 2022 or 2023."  Doc. No. 50 ¶ 132.  These allegations collectively bolster Plaintiffs' theory that Hassanein's statements refuting the forced-bundling accusations were false and misleading at the time they were made in 2024.

Furthermore, Plaintiffs have adequately pled that these misrepresentations were material. In response to the Gosar Letter, Hassanein repeatedly assured the public that TransMedics did not force or pressure customers into using the NOP.  These assurances created a factual representation about the sales practices of TransMedics and provided a counterweight to the criticisms and accusations advanced by the Gosar Letter.  Under these circumstances, a reasonable investor would have plausibly viewed Hassanein's factual representation as "significantly altering the total mix of information made available" to the market.  Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Waters Corp., 632 F.3d 751, 756 (1st Cir. 2011) (citation modified).  Accordingly, the Court finds that Plaintiffs have sufficiently pled that Hassanein's statements about the forced-bundling practice were materially false and misleading.

### 3.    Statements Regarding Insurance Reimbursement

Next, Plaintiffs allege that the following statements about reimbursement for the NOP were false and misleading:

- **March 6, 2023:** At the Cowen Healthcare Conference, Hassanein told analysts that "[e]very NOP service charge is fully reimbursed."  Id. ¶ 161.

- **March 13, 2023:** At the Oppenheimer Healthcare Conference, Hassanein stated that "every charge around the NOP, from technology to surgical procurement to clinical management to transportation costs are all covered under the existing reimbursement mechanisms for organ transplant."  Id. ¶ 162.  He said this was true for both public and commercial insurance payers, noting that "all commercial payers that cover organ transplant follow the CMS model."  Id.  He further noted that the "only difference between CMS and the commercial payer" was that some commercial payers provided reimbursement from one "global rate," whereas CMS covered organ transplants through "two separate budgets."  Id.

- **November 6, 2023:** During an earnings call, Hassanein said that TransMedics' aviation services were "fully reimbursed" and that "[t]here's no limit per se" on reimbursement. Id. ¶ 168.

- **March 4, 2024:** At the Cowen Healthcare Conference, an analyst told Hassanein that he had heard that hospitals faced challenges getting reimbursed for TransMedics' OCS and NOP.  Id. ¶ 177.  Hassanein responded that these concerns were "not accurate" and said that this "confusion" stemmed from the fact that the "cost report" hospitals send every

year to CMS includes a list of costs incurred by commercial patients, and that CMS will only reimburse the Medicare-covered portion of those expenses. Id. ¶ 178. He stated that commercial payers responded "positively and favorably" to transplant centers who asked to increase their budgets to cover the OCS and the NOP, and that the transplant centers "all got the money requested." Id. ¶ 178.

Plaintiffs contend that these four statements were false because insurance payers did not fully reimburse the costs of TransMedics' OCS and NOP. They point to the Scorpion Report, which includes quotes from two hospital personnel asserting that TransMedics' costs were not fully reimbursed by insurance companies or Medicare, leading the hospitals to absorb the costs. Id. ¶¶ 102, 105, 106. Furthermore, Plaintiffs rely on the AlphaSense interview with CW 8, the Director of Operations at UPMC, who noted that commercial payers would reimburse a fixed amount per transplant without adjusting their pricing to cover all of TransMedics' costs. Id. ¶ 141.

These allegations—sourced from hospital professionals who directly used TransMedics' transplant services and products—sufficiently plead falsity. Throughout the Class Period, Hassanein repeatedly asserted that all of TransMedics' costs were reimbursable by existing insurance programs and mechanisms. His statements did not include any qualifying language or exceptions. Instead, he unequivocally represented to investors that "every charge" from the NOP was covered by insurance, id. ¶ 162, and that "[t]here is no limit" on reimbursements, id. ¶ 168. Plaintiffs' allegations tell a different story, wherein some TransMedics customers were unable to receive full reimbursements for the NOP charges and only received fixed, not unlimited, amounts of reimbursement from insurance companies.

Defendants contend that Plaintiffs' theory of falsity as to this category of statements fails because "[n]one of [their] generalized assertions identifies a single instance where TransMedics charges were not reimbursed." Doc. No. 56 at 29. However, Plaintiffs allege that multiple hospital personnel struggled to get the costs of TransMedics services fully reimbursed by

29

insurance. They also provide the names of two hospitals that faced such reimbursement difficulties. Doc. No. 50 ¶¶ 141, 180 (UPMC and Vanderbilt). The fact that the amended complaint does not describe a specific transplant surgery that was not fully reimbursed by insurance is not fatal to Plaintiffs' claims. See also Cabletron, 311 F.3d at 33 ("[T]he rigorous standards for pleading securities fraud do not require a plaintiff to plead evidence."). Plaintiffs' allegations are sufficiently detailed to plead falsity.

In a last-ditch effort, Defendants argue that any allegation that a TransMedics customer did not receive full reimbursement for an organ transplant does not conflict with Hassanein's statements because it could have been the hospital's other costs (such as acquisition or overhead costs), rather than the charges from TransMedics, that were not fully reimbursed. Doc. No. 56 at 29-30. This argument misunderstands the nature of Plaintiffs' allegations. In his public statements, Hassanein insisted that TransMedics customers would face "no limits" in receiving reimbursements for TransMedics' costs. Doc. No. 50 ¶ 168. Contrary to these assurances, CW 8 explained that commercial payers did not "adjust their pricing" based on the expenses hospitals incurred from using TransMedics because commercial payers paid "the same case rate" for each transplant. Id. ¶ 141. CW 8 was not alone in facing these insurance limits. A transplant surgeon quoted in the Scorpion Report explained that his hospital would receive the same amount of reimbursement per transplant whether he used TransMedics' offerings or a cheaper cold storage system. Id. ¶ 102. These accounts plainly contradict Hassanein's representations that commercial payers "increase [transplant centers'] organ acquisition budget by a significant amount to cover the OCS NOP positively and favorably." Id. ¶ 178.

Thus, Plaintiffs have sufficiently pled that Hassanein's guarantees about reimbursement were false and misleading. They have also adequately alleged the materiality of these

statements.  Whether customers could pass on the costs of using TransMedics to insurance payers (or else, bear the costs themselves) is a fact that a reasonable investor would have taken into account when deciding to invest in TransMedics.  At this stage, the Court finds that Plaintiffs have plausibly pled that Hassanein's statements about reimbursement were materially false and misleading.

### 4.    *Statements Regarding Customer Retention*

The Court turns to the next challenged statement, which involves Hassanein's comments during the Cowen Healthcare Conference on March 4, 2024.  There, an analyst asked whether customers using the NOP were happy with the services.  Hassanein responded that the NOP was "very sticky" with customers and said that "we've never seen an NOP[-using] center that starts with NOP and walk[s] away from NOP."  Id. ¶ 179.

Plaintiffs argue that Hassanein's statement was false because many customers left TransMedics for more affordable competitors.  They rely on sources in the Scorpion Report noting that several hospitals were either reducing or planning to reduce their use of TransMedics due to its high prices.  Id. ¶¶ 108-111, 121.  Three CWs also noted similar trends.  Id. ¶ 125 (CW 1 describing loss of Texas hospital customers); id. ¶ 134 (CW 3 explaining that hospitals including Henry Ford Clinic in Michigan and Baylor St. Luke's Hospital in Houston were "pushing back" on TransMedics' business practices); id. ¶ 142 (CW 8 stating that UPMC was reducing use of TransMedics due to cost of services).

However, these allegations do not plausibly support the falsity of Hassanein's March 2024 statement.  On a preliminary note, Hassanein's comment describing the NOP as "very sticky" is a generalized statement of customer satisfaction and amounts to inactionable puffery.  See Orton v. Parametric Tech. Corp., 344 F. Supp. 2d 290, 301 (D. Mass. 2004) ("That [the defendant company] was 'pleased with . . . the confirmation [they] receiv[ed] from the market

31

and [their] customers' is a subjective opinion that the Purchasers could not specifically prove or disprove."); Wozniak v. Align Tech., Inc., 850 F. Supp. 2d 1029, 1036 (N.D. Cal. 2012) (holding that "so far we're getting really great feedback" is puffery).

As for Hassanein's assertion that no center has "walk[ed] away from NOP," Doc. No. 50 ¶ 179, none of Plaintiffs' allegations indicate that hospitals had begun dwindling their use of the NOP by the time Hassanein made this statement on March 4, 2024.  The vast majority of Plaintiffs' allegations describing hospital customers leaving TransMedics do not specify or even hint at when those actions occurred.[6]  The only source that provides any information about the timing of customer losses is CW 1, who told Plaintiffs' counsel that he saw "evidence that TransMedics' revenue losses in 3Q 2024 were due to hospitals reducing or ceasing their business." Id. ¶ 124.  CW 1's description of hospitals moving away from TransMedics concerns activities that presumably occurred during the third quarter of 2024—months after Hassanein made his challenged statement in March.  "For allegedly false statements to support a claim of securities fraud, they must be false when made." Miami Fire Fighters' & Police Officers' Ret. Tr. v. CVS Health Corp., 46 F.4th 22, 30 (1st Cir. 2022).  Without any factual allegation as to timing, Plaintiffs have not pled sufficient facts to support an inference that customers had begun to eliminate or reduce their use of the NOP by the time Hassanein made his statement.

---

[6] Furthermore, for many of the hospitals mentioned in the complaint, Plaintiffs simply allege that they were planning to move away from TransMedics. See, e.g., Doc. No. 50 ¶ 109 (University of Washington was "trying to block all TransMedics business"); id. ¶ 110 (UCSF was "looking for ways to rely less on TransMedics"); id. ¶ 134 (Henry Ford and Baylor St. Luke's Hospital were "pushing back" on TransMedics).  None of these allegations indicate that these hospitals took action on their plans to move away from TransMedics—let alone that they did so before the time of the challenged statement.

5.      *Statements Regarding 2024 Q3 Loss*

The final challenged statement concerns TransMedics' losses during the third quarter of 2024.  During an earnings call on October 28, 2024, Hassanein acknowledged TransMedics' sudden decline in revenue during the quarter.  Doc. No. 50 ¶ 197.  Explaining this decline to investors, he stated:

> There is no clear reason for these declines other than normal variability of donor availability and potential summer seasonality. So, the sequential decline in the US case volume was directly in line with the decline in national transplant volumes. Importantly, we did not see any degradation of our market share or center penetration on all three orders. I want to make it crystal clear we have not seen any fundamental or competitive dynamics playing any role in the slight sequential decline in case volume for OCS in Q3. Let me repeat it again. We have not seen any fundamental or competitive dynamics playing any role in the slight sequential decline in case volume for OCS in Q3.

Id.; Doc. No. 57-7 at 4.  When later prodded about the demand for TransMedics' offerings, Hassanein responded:

> Price elasticity or pricing pressure has nothing to do with what happened in Q3 because we've seen major transplant programs lose significant portion of their annual volume in the United States. I'm talking major transplant programs being behind 40 transplants to 50 transplants in the month of August, for example, has nothing to do with pricing sensitivity I can tell you that these transplant program[s] would have done anything to get access to transplants during . . . that time.

Doc. No. 50 ¶ 198; Doc. No. 57-7 at 12.  Plaintiffs allege that these statements were materially false and misleading because TransMedics' revenue decline was due to customers moving away from TransMedics based on its high pricing, rather than "seasonality."  Doc. No. 50 ¶ 199.

The Court finds that Plaintiffs have sufficiently pled the falsity of portions of Hassanein's earning call statements—namely, his assertions that "we have not seen any fundamental or competitive dynamics playing any role in the slight sequential decline in case volume for OCS in Q3" and that "pricing pressure has nothing to do with what happened in Q3."  Id. ¶¶ 197-198. According to CW 1, a former OCS Specialist who worked for TransMedics during this period,

33

TransMedics' revenue losses in the third quarter were due in large part to the loss of hospital customers in Texas, a major market for TransMedics.  Id. ¶ 124.  He noted that these Texas hospitals chose to leave TransMedics due to its high costs and replaced TransMedics with a competitor, OrganOX, which sold a cold storage system for a much lower price.  Id. ¶ 125.  CW 1 further recalled that the cancellation of contracts in Texas led to significant employee layoffs in Texas.  Id. ¶ 124.

These allegations from CW 1 plausibly allege the falsity of Hassanein's October 2024 statement with particularity.  During the earnings call, Hassanein made resolute, unhedged assurances that pricing pressure had "nothing to do" with the revenue decline and that TransMedics had not experienced "any" competitive dynamics "playing any role in the . . . decline."  Id. ¶¶ 197-198.  These statements created the impression that pricing and competition had zero impact on TransMedics' loss of revenue during the quarter.  However, the allegations from CW 1 about the reduction of customers in Texas indicate that the loss of customers to more affordable competitors played at least some role in TransMedics' declining performance.[7]

Defendants contend that allegations sourced from CW 1 are unreliable because Plaintiffs "fail to establish how CW 1, an alleged OCS Specialist (whose responsibilities are not pled) in *New York* had a basis to know what happened in *Texas*."  Doc. No. 61 at 18.  However, when drawing all reasonable inferences in favor of Plaintiffs, the Court finds plausible that a

---

[7] Defendants argue that CW 1's information about hospitals in Texas "provide[s] no detail on TransMedics' revenue from these hospitals or any other basis to infer they were a material factor in the revenue decline."  Doc. No. 56 at 31.  However, it is reasonable to infer that the loss of multiple customers in a major market would have negatively impacted TransMedics' revenue in some manner.  And, Plaintiffs do not need to allege that the loss of Texas customers was the primary or even a significant factor in TransMedics' revenue loss during the third quarter of 2024.  The critical issue in Hassanein's statement is his insistence that pricing pressure and competitive dynamics played no role in the company's revenue decline.  A different analysis may have unfolded here had Hassanein couched his statement in less absolute terms.

TransMedics employee in one region would credibly know about the company's losses in "a major market," especially where those losses were substantial enough to lead to "significant employee layoffs," as the complaint alleges. Id. ¶ 124. Not to mention, the reliability of the allegations from CW 1 are further strengthened by other factual allegations in Plaintiffs' complaint indicating that many other customers sought to reduce the use of TransMedics due to its steep pricing.

Based on these considerations, the Court finds that Plaintiffs have alleged the falsity of Hassanein's October 28 statements with plausibility and particularity. Furthermore, because a reasonable investor would take stock of the factors driving a company's sudden declining performance, Plaintiffs have adequately pled that Hassanein's misrepresentation about the causes of the third quarter losses were material.

B.    Scienter

The Courts turns to whether Plaintiffs have sufficiently pled scienter. The PSLRA "imposes a rigorous pleading standard on allegations of scienter." ACA, 512 F.3d at 58. "In this circuit, a plaintiff may satisfy the scienter requirement with a showing of either conscious intent to defraud or 'a high degree of recklessness.'" Id. (quoting Aldridge v. A.T. Cross Corp., 284 F.3d 72, 82 (1st Cir. 2002)). Plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind" for each false statement. 15 U.S.C. § 78u-4(b)(2)(A). "A complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Tellabs, Inc. v. Makor Issues & Rts., Ltd., 551 U.S. 308, 324 (2007).

1.    *Statements Regarding NOP Pricing and Customer Retention*

As explained above, Plaintiffs have not sufficiently pled the falsity of two categories of statements and thus cannot advance a claim of security fraud based on these statements.  But even assuming that these statements were actionable, they would fail on scienter grounds.  First, Plaintiffs have not adequately alleged Defendants' scienter as to their statements about the NOP's pricing.  Even assuming Defendants were aware that some customers were dissatisfied with the high costs of the NOP program, this does not contradict Defendants' public statements touting the cost-effectiveness of the NOP and denying price gouging.  Second, the complaint does not adequately plead scienter for Hassanein's March 4 statement proclaiming that no NOP-using center had "walk[ed] away from NOP" for many of the same reasons it fails to plead that the statement was false or misleading.  There are no allegations suggesting that at the time Hassanein made this statement, customers had already begun to move away from using the NOP—let alone that Hassanein was then aware of or recklessly disregarded the company's issues with customer attrition.

Based on these deficiencies, Plaintiffs have not stated a claim for securities fraud based on Defendants' statements regarding the NOP's pricing and customer retention.  With those claims dispensed, the Court turns to analyzing scienter for the other categories of challenged statements.

2.    *Statements Regarding Forced Bundling*

The Court begins with the statements denying the accusations of forced bundling. Plaintiffs allege that TransMedics forced customers of the OCS devices to pay for and use the NOP.  Relying on multiple CWs and sources from the Scorpion Report, Plaintiffs contend that the forced bundling was a "policy" implemented by TransMedics, rather than a one-off practice. Doc. No. 50 ¶¶ 17, 85-92, 128, 132, 135-136, 139-140, 144-145.  That the forced bundling was a

36

company-wide policy involving a vital component of TransMedics' business (i.e., the NOP) supports an inference of scienter. See Cabletron, 311 F.3d at 39 (finding that complaint pled scienter where "complaint makes adequate particularized allegations of large-scale fraudulent practices over time").

Of course, as Defendants accurately note, courts are reluctant to find scienter based solely on a "core operations" theory—that is, the theory that "facts critical to a business's core operations . . . are so apparent that their knowledge may be attributed to the company and its officers." Leung v. bluebird bio, Inc., 599 F. Supp. 3d 49, 66 (D. Mass. 2022) (citation modified). However, a "core operations" theory can be used to plead scienter when accompanied by "other significant evidence of a defendant's intent or recklessness, or a plus factor." Id.

Plaintiffs have alleged several plus factors that tip the scales toward scienter. While "it is not enough to say that senior management would have paid some attention to the product that they were" speaking publicly about, a complaint may successfully allege scienter by alleging "particular facts strongly suggesting that that attention exposed them to information that either rendered their public statements false or necessarily invited further investigation." Constr. Indus. & Laborers Joint Pension Tr. v. Carbonite, Inc., 22 F.4th 1, 9-10 (1st Cir. 2021). Here, the Gosar Letter put Defendants on notice about accusations of forced bundling. Doc. No. 50 ¶ 63. Public, condemnatory allegations from a congressman would have invited further inquiry into TransMedics' bundling practices, especially when within several days of the Gosar Letter's publication in the Daily Caller, TransMedics' stock dropped over 10%. Id. ¶ 219. Notably, neither the company nor Hassanein ignored the accusations. Three days after the publication of the Gosar Letter, Hassanein authored a letter vehemently repudiating Gosar's accusation that

37

TransMedics forced its customer to purchase its NOP services.  Id. ¶ 65.  Hassanein continued to reiterate these denials in subsequent statements to the public.  Id. ¶¶ 67, 69.

In light of the complaint's allegations that TransMedics engaged in a widespread forced-bundling policy, Hassanein's repeated statements denying the existence of such a policy on multiple occasions are not only plausibly false but strongly imply a conscious intent to defraud or a high degree of recklessness.  See Hall v. Johnson & Johnson, No. 18-cv-1833-FLW, 2019 WL 7207491, at *25 (D.N.J. Dec. 27, 2019) (finding scienter where defendants made "repeated, unqualified assurances, in the face of inquiries from the public, and regulatory authorities"); Karimi v. Deutsche Bank Aktiengesellschaft, 607 F. Supp. 3d 381, 398 (S.D.N.Y. 2022) ("Public denials . . . are also recognized to support an inference of scienter."); Brockton Ret. Sys. v. CVS Caremark Corp., No. 09-cv-554-JL, 2013 WL 6841927, at *4-5 (D.R.I. Dec. 30, 2013) (finding scienter where CEO, when "asked point-black" about particular concern, "unequivocally denied" issue and "proffered an alternative explanation") .

There are other facts that support a strong inference of scienter.  The Scorpion Report includes the account of a West Coast organ procurement expert, who reported hearing from a transplant center that Hassanein called the center directly and threatened to withhold the center's access to the OCS machine unless it paid TransMedics' transportation charges.  Doc. No. 50 ¶ 95.[8]  If true, this account, in the context of the complaint's other allegations, points to

---

[8] The Court agrees with Defendants that this allegation is based on hearsay, Doc. No. 56 at 34 n.19, and acknowledges that some courts "have looked askance upon confidential sources that . . . report only [multi-layer] hearsay."  iRobot, 527 F. Supp. 3d at 141 (citation modified); see also Quinones v. Frequency Therapeutics, Inc., 665 F. Supp. 3d 156, 178 (D. Mass. 2023) (noting that confidential witness's allegation based on "multi-layer hearsay" "undercuts the inference of scienter").  Nonetheless, the Court finds that the level of detail provided by this witness's testimony buttresses its own reliability, at least at the motion to dismiss stage.  Here, the witness named the specific transplant center at issue (which the Scorpion Report redacted) and recalled particular facts about that transplant center's conversation with Hassanein, including the amount

Hassanein's knowledge and enforcement of TransMedics' forced-bundling policy.[9]  It also suggests that Hassanein directly communicated and coordinated with customers in his role, placing him in a position to know about TransMedics' bundling practice.

Finally, Plaintiffs' claims of insider trading add color to their scienter allegations.  The complaint alleges that both Hassanein and Gordon sold higher amounts of stock during the Class Period than during a comparable "Control Period."  Id. ¶¶ 152-157.  In response, Defendants note that both Hassanein and Gordon increased their total holdings of TransMedics' stock during the Class Period and that sales made outside of their Rule 10b-5 plans represented a small percentage of their holdings (13% for Hassanein and 21% for Gordon).  Doc. No. 56 at 36-38. While Defendants identify weaknesses in Plaintiffs' insider-trading claims, even "insider trading claims . . . on the weaker end of the spectrum" can "provide some support against the defendants' motion to dismiss."  Miss. Pub. Emps.' Ret. Sys. v. Bos. Sci. Corp., 523 F.3d 75, 92 (1st Cir. 2008).  In any event, the Supreme Court has made clear that the relevant inquiry for securities-fraud cases "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard."  Tellabs, 551 U.S. at 310.  When considering the alleged facts in their totality, the

---

charged to the center by TransMedics and the length of time Hassanein gave the transplant to pay the charges.  Doc. No. 50 ¶ 95.  This level of specificity goes beyond the type of "vague hearsay" that courts hesitate to rely upon when analyzing scienter.  Zucco Partners, LLC v. Digimarc Corp., 552 F.3d 981, 997 (9th Cir. 2009), as amended (Feb. 10, 2009).

[9] Defendants contend that "the far more cogent inference" arising from this allegation "is that Dr. Hassanein wanted the hospital to settle its existing debt before incurring additional charges." Doc. No. 56 at 36.  While Defendants certainly present a possible inference, the Court finds that this allegation from the Scorpion Report, understood within the totality of Plaintiffs' other allegations about TransMedics' forced-bundling policy, creates an inference of Hassanein's scienter that is at least as compelling as any opposing inference.

Court finds that the allegations suffice to give rise to an inference of scienter that is at least as compelling as any non-culpable inference.

### 3. *Statements Regarding Insurance Reimbursement*

The next set of challenged statements involve Hassanein's statements regarding hospitals' ability to obtain reimbursement for TransMedics' NOP costs. For this category of statements, Plaintiffs have not alleged sufficient facts to create a strong inference of scienter.

Plaintiffs rely on the allegations of three TransMedics customers who noted challenges getting the costs of TransMedics fully reimbursed by insurance. See Doc. No. 50 ¶ 102 (transplant surgeon "at a northeast academic transplant center" noting that his center would receive same amount of reimbursement whether he used inexpensive cold storage systems or high-priced TransMedics services); id. ¶¶ 105-106 (Vanderbilt surgeon noting that Medicare and commercial payers did not fully cover TransMedics' services); id. ¶ 141 (CW 8 noting that "historically commercial payers have not been overly willing to adjust their pricing to account for [high acquisition costs]"). While these accounts suffice to plead the falsity of Hassanein's claims that insurance would reimburse all the costs associated with the NOP, they do not plead that Hassanein acted with scienter. None of these customers state that they informed Hassanein about their reimbursement difficulties. See Wasson v. LogMeIn, Inc., No. 18-cv-12330-ADB, 2021 WL 1080201, at *9 (D. Mass. Mar. 18, 2021) (finding no scienter where complaint failed to "identify a specific meeting . . . or a specific conversation" that informed individual defendant about customer complaints). Furthermore, the allegations about the experiences of three customers fail to raise a strong inference that the reimbursement challenges were so widespread and blatant that Hassanein knew or should have known about them.

Nor are there other allegations in the complaint that give rise to a strong inference of scienter insofar as these statements are concerned. While the complaint alleges that analysts

40

directly questioned Hassanein about reimbursement on multiple occasions, the complaint does not provide additional facts going toward Hassanein's state of mind. The complaint alleges no facts about Hassanein's participation in the reimbursement process. Nor does the complaint allege that Hassanein was ever confronted about particular reimbursement issues. The closest the complaint comes to forming this allegation is found in the Scorpion Report, which states that Hassanein attended a presentation by Duke University Hospital wherein the hospital noted that they took a "hit" on its margins from paying for TransMedics' services. Doc. No. 50 ¶¶ 117-118. This detail raises the possibility that Hassanein knew that Duke was absorbing the costs of the NOP instead of being able to pass on the costs to insurance. However, neither the complaint nor the Scorpion Report states when this presentation occurred. See Quinones v. Frequency Therapeutics, Inc., 106 F.4th 177, 184 (1st Cir. 2024) (declining to find scienter where allegations by CW were not "specific as to whether defendants learned of [relevant issue] before they made the statements at issue"). Without additional detail as to timing, the allegations about the Duke presentation do not suggest that Hassanein acted with scienter at the time he made the challenged statements.

With few facts pointing to Hassanein's culpable state of mind, the collateral allegations about suspicious stock sales are not enough to build a strong inference of scienter. See Miss. Pub. Emps.', 523 F.3d at 92 ("Insider trading cannot establish scienter on its own, but it can be used to do so in combination with other evidence."). Accordingly, the Court finds that Plaintiffs have not pled scienter as to Hassanein's statements about reimbursement.

### 4. Statements Regarding 2024 Q3 Loss

Plaintiffs also fail to allege that Hassanein acted with scienter when he told investors that "we have not seen any fundamental or competitive dynamics playing any role in the slight sequential decline in case volume for OCS in Q3" and that "pricing pressure has nothing to do

41

with what happened in Q3." Doc. No. 50 ¶¶ 197-198. Plaintiffs point to the allegations of CW 1, who reported that TransMedics' third quarter decline was "due in large part to the loss of hospital customers in Texas," who left TransMedics for cheaper competitors. Id. ¶¶ 124-125. However, nothing in CW 1's account indicates that Hassanein knew or was informed of this market loss in Texas. The mere fact that Texas was a "major market for TransMedics," id. ¶ 124, does not raise a strong inference that Hassanein knew or should have known about the status of customers in Texas.[10] Moreover, a lower-level employee's knowledge cannot be imputed to Hassanein without additional facts going toward his scienter. See Gonzalez v. Intellia Therapeutics Inc., No. 25-cv-10353-DJC, 2026 WL 1758286, at *13 (D. Mass. June 18, 2026) (declining to find scienter where lower-level employee did not "speak to the mindset of any of the Defendants" nor "allege that Defendants had knowledge of any of the alleged information at the time they made any given statement").

Additionally, Plaintiffs allege that Hassanein made unusually large, off-plan stock sales in late August 2024, at a time when "he undoubtedly knew about the steep decline in the Company's revenue." Doc. No. 50 ¶ 156. While the timing of the sales may raise an inference that Hassanein was aware of TransMedics' poor performance during the third quarter, they do not suggest he specifically knew that pricing pressure or competitive dynamics played a role in the declining revenue. Plaintiffs do not even allege that the customer losses in Texas occurred before Hassanein made the August stock sales. Without more factual details, Plaintiffs fail to plead Hassanein's scienter as to his statements explaining the third quarter decline.

---

[10] In analyzing falsity, the Court previously found it plausible that CW 1, an OCS Specialist based in New York City, would have known about TransMedics' market losses in Texas. However, under the PSLRA's heightened pleading standard for scienter, Plaintiffs' allegations do not suffice to raise a strong inference of Hassanein's scienter.

C.    Loss Causation

Based on the foregoing analysis, there remains one set of challenged statements that survive the falsity and scienter requirements for pleading securities fraud: Hassanein's statements denying forced bundling. But that does not conclude the Court's analysis. Defendants further contend that Plaintiffs fail to state a claim of securities fraud because the amended complaint does not plead loss causation. Doc. No. 56 at 41. The Court turns to that issue.

To survive a Rule 12(b)(6) motion as to loss causation, a plaintiff must "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." Dura Pharms., Inc. v. Broudo, 544 U.S. 336, 347 (2005). Plaintiffs commonly establish loss causation by:

> (1) identifying a "corrective disclosure" (a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud);
>
> (2) showing that the stock price dropped soon after the corrective disclosure; and
>
> (3) eliminating other possible explanations for this price drop, so that the factfinder can infer that it is more probable than not that it was the corrective disclosure—as opposed to other possible depressive factors—that caused at least a "substantial" amount of the price drop.

Mass. Ret. Sys. v. CVS Caremark Corp., 716 F.3d 229, 237-38 (1st Cir. 2013) (quoting FindWhat Inv. Grp. v. FindWhat.com, 658 F.3d 1282, 1311-12 (11th Cir. 2011)). "Said allegations must be plausible, meaning supported by factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Shash v. Biogen, Inc., 84 F.4th 1, 20 (1st Cir. 2023) (citation modified).

The amended complaint alleges that the truth of TransMedics' fraud "was revealed through a series of corrective disclosures," namely, (1) the Daily Caller's publication of the

43

Gosar Letter on February 22, 2024, (2) TransMedics' press release and earnings call disclosing its decline in revenue for the third quarter of 2024, (3) TransMedics' press release announcing Gordon's demotion on December 2, 2024, and (4) Scorpion Capital's publication of the Scorpion Report on January 10, 2025. Doc. No. 50 ¶¶ 214, 218-229. For the purposes of resolving the motion to dismiss, the Court finds that the Scorpion Report suffices for pleading loss causation as to the surviving category of challenged statements. The Scorpion Report unveiled information from multiple confidential witnesses, who reported that TransMedics forced customers to bundle the NOP services with use of its OCS device. Id. ¶¶ 85-92. These confidential witnesses included several transplant surgeons who used TransMedics' services as well as a former TransMedics reimbursement executive. Id. The complaint further alleges that the market quickly absorbed and responded to this news. Within two days of the Scorpion Report's publication, the stock price for TransMedics dropped around 12%. Id. ¶ 229.

While Defendants do not dispute the drop in stock price or raise another possible source of the drop, they object to Plaintiffs' reliance on the Scorpion Report as a corrective disclosure on several grounds. First, they assert that "cases are legion finding that short-seller reports cannot support loss causation when they do not reveal anything new to the market, but simply repackage information in a negative light." Doc. No. 56 at 43 (citing In re Nektar Therapeutics Sec. Litig., 34 F.4th 828, 840 (9th Cir. 2022)). Next, they contend that the Scorpion Report is unreliable because it relies on confidential sources and includes a disclaimer disavowing its own accuracy. Id. at 18-21, 43.

As for Defendants' first objection, the Court finds that the Scorpion Report plausibly revealed new information to the market rather than merely recycling publicly available information. The Scorpion Report provided previously unknown information, such as the

44

findings of "over 30 interviews, including [with] ex-employees, surgeons, leading transplant centers, organ procurement organizations, competitors, and [TransMedics'] largest customers." Scorpion Report at 8.  Defendants do not contend that these interviews, or the information provided by these interviews were available to the market before the release of the Scorpion Report.  And, these allegations plausibly revealed a new truth to the market—namely, that TransMedics forced customers to purchase the NOP to access the OCS, despite Hassanein's repeated assurances to the contrary.[11]

Second, the Scorpion Report is sufficiently reliable for the purposes of alleging loss causation.  As an initial matter, there is no categorical rule establishing that short-seller reports cannot constitute a corrective disclosure.  Indeed, one of the cases cited by Defendants makes clear that there is no such rule.  See Defeo v. IonQ, Inc., 134 F.4th 153, 163 (4th Cir. 2025) ("[W]e, like the Ninth Circuit, do not impose a categorical ban on using short-seller reports to plead loss causation.").[12]  And, as the Court already discussed in its falsity analysis, the mere fact

---

[11] To the extent that the earlier release of the Gosar Letter put the market on notice about accusations of forced bundling, the Gosar Letter did not reveal the pertinent truth to the market before the Scorpion Report.  The Gosar Letter contained broad accusations about TransMedics' practices; however, it was not until the Scorpion Report that the market learned the testimony of multiple customers and other confidential witnesses who disclosed new details about TransMedics' forced-bundling policy.  See Wu v. GSX Techedu Inc., 738 F. Supp. 3d 527, 567 (D.N.J. 2024) (holding that short-seller report amounted to corrective disclosure even though earlier report addressed similar issue because earlier report contained "threadbare" content that was "less a disclosure of information than an accusation").

[12] This case is also distinguishable from Nektar, a non-binding case relied upon by Defendants.  There, the Ninth Circuit declined to find that a report released by anonymous short-sellers established loss causation because the nature of the report meant that investors would have taken its contents "with a healthy grain of salt."  In re Nektar, 34 F.4th at 840 (quoting In re BofI Holding, Inc. Sec. Litig., 977 F.3d 781, 797 (9th Cir. 2020)).  Here, the short-seller report at issue was authored by Scorpion Capital—a known short-seller firm—not a mix of anonymous short-sellers.  See Espy v. J2 Glob., Inc., 99 F.4th 527, 541 (9th Cir. 2024) (acknowledging that reports authored by "well-known short-seller firms" presented a different situation than the anonymous report in Nektar).

45

that the Scorpion Report relies on confidential witnesses does not annihilate its reliability. The Report provides details of the witnesses' positions and connections to TransMedics. Furthermore, that numerous sources provided similar testimony about TransMedics' forced-bundling policy reaffirms the reliability of these accounts.

Nor does the Scorpion Report's disclaimer disqualify it from plausibly revealing a new truth to the market. In relevant part, the Report's disclaimer acknowledges Scorpion Capital's financial interest in shorting TransMedics:

> Scorpion Capital LLC is short TransMedics Group Inc. ("TMDX") . . . and therefore stands to realize significant gains in the event that the price of its stock, bonds, options, and/or other securities decline or change.

Scorpion Report at 2. It goes on to explain:

> Our opinions are held in good faith, and Scorpion Capital LLC has based them on the public information, sources, the interviewed individuals, and any social media posts cited in this report, but Scorpion Capital LLC cannot and does not provide any representations or warranties with respect to the accuracy of those materials.

Id. Regarding individuals interviewed for the Report, the disclaimer proceeds to state:

> We believe the experts we spoke with are reliable sources of information with respect to TMDX. However, we cannot and do not provide any representations or warranties with respect to the accuracy of the information they have provided to us. The quotations of experts used in this article do not reflect all information they have shared with us, including, without limitation, certain positive comments and experiences with respect to TMDX. In addition, the experts have typically received compensation for their conversations with us and may have conflicts of interest or other biases with respect to TMDX, which may give them an incentive to provide us with inaccurate, incomplete or otherwise prejudiced information. The former employees of TMDX that we spoke with are by definition separated from the company and thus the information they have provided may be outdated. . . . The quotations of experts used in this article are based on Scorpion Capital LLC conversations with such experts and may be paraphrased, truncated, and/or summarized solely at our discretion, and do not always represent a precise transcript of those conversations.

Id.

46

Evaluating a similar disclaimer published in another report by Scorpion Capital, the Fourth Circuit recently found "it implausible" that the report "accompanied by those kinds of disclosures, published by an activist short seller, would reveal some new truth to the market." Defeo, 134 F.4th at 164.  The First Circuit has not yet provided guidance on this issue.  In the absence of binding precedent, this Court declines to apply the Fourth Circuit's determination to the particular contours of this case.  In Defeo, the Fourth Circuit honed in on the disclosure that some quotations "may be paraphrased, truncated, and/or summarized solely at our discretion"— noting that this provision "is particularly troubling because it gives Scorpion Capital the kind of editorial license that could allow it to say just about anything and cloak it in the imprimatur of truth in order to make a buck."  Id. at 163.  While this Court agrees that the disclaimer generates some pause about the Report's accuracy, it declines to interpret the disclaimer as granting Scorpion Capital free "license" to fabricate narratives out of thin air.  Moreover, the disclaimer indicates that Scorpion Capital's opinions "are held in good faith" and drawn from experts whom it believes to be "reliable sources of information."  Scorpion Report at 2.

In any event, the "relevant question for loss causation purposes is whether the market reasonably *perceived*" the allegations in the Scorpion Report "as true and acted upon them accordingly."  In re BofI Holding, Inc. Sec. Litig., 977 F.3d 781, 792 (9th Cir. 2020).  Here, the prompt 12% drop in TransMedics' stock prices following the release of the Scorpion Report supports Plaintiffs' allegations of loss causation.  See Bernstein v. Ginkgo Bioworks Holdings, Inc., No. 4:21-cv-08943-KAW, 2023 WL 11996105, at *8 (N.D. Cal. Mar. 10, 2023) (finding loss causation based on another report by Scorpion Capital with similar disclaimer where stock price fell "approximately 12%").  Based on these considerations, the Court finds it plausible that the Scorpion Report acted as a corrective disclosure revealing the falsity of Hassanein's

47

statements denying forced bundling.  In light of this conclusion, the Court declines to resolve whether the other materials identified by Plaintiffs as corrective disclosures are adequate for pleading loss causation.  For all the foregoing reasons, Defendants' motion to dismiss Count I is DENIED as to the category of challenged statements regarding forced bundling and OTHERWISE ALLOWED.

      D.    <u>Section 20(a) Claim</u>

Count II of the amended complaint advances a Section 20(a) claim against Hassanein and Gordon.  Section 20(a) provides that once a company has been found to have violated the Exchange Act's substantive provisions, "[e]very person who, directly or indirectly, controls" the company "shall also be liable jointly and severally with and to the same extent as [the company] . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action."  15 U.S.C. § 78t(a).  Because Section 20(a) claims are derivative of an underlying violation of the Exchange Act, "it is an essential element of the § 20(a) controlling person claims in question that plaintiffs show a Rule 10b–5 violation by the controlled entity."  <u>In re Stone & Webster, Inc., Sec. Litig.</u>, 424 F.3d 24, 27 (1st Cir. 2005).

Plaintiffs allege that Hassanein and Gordon are controlling persons of TransMedics within the meaning of Section 20(a) on the basis that

> [b]y virtue of their high-level positions with the Company, participation in, and/or awareness of the Company's operations, and intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Lead Plaintiffs contend are false and misleading. . . . In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

Doc. No. 50 ¶¶ 252-253.  In their motion papers, Defendants do not raise any challenge as to whether Hassanein and Gordon qualify as controlling persons under Section 20(a); they simply contend that the Section 20(a) claim must be dismissed because "Plaintiffs do not adequately plead a primary violation of Section 10(b)."  Doc. No. 56 at 43.

Given its finding that the amended complaint states an underlying claim of securities fraud, the Court also finds that Plaintiffs have sufficiently pled Section 20(a) claims against Hassanein and Gordon.  Hassanein plainly cannot escape control-person liability where he made the allegedly false or misleading statements.  Chalverus v. Pegasystems, Inc., 59 F. Supp. 2d 226, 236-37 (D. Mass. 1999) ("[A] court should deny a motion to dismiss a section 20(a) claim when the defendants themselves made the allegedly false and misleading statements.").

Gordon presents a different question.  He did not make or sign off on any of the surviving false statements.[13]  Cf. PS Lit Recovery, LLC v. Pegasystems Inc., 814 F. Supp. 3d 190, 211 (D. Mass. 2026) (allowing Section 20(a) claim against company's COO and CFO, even though he did not make any statements giving rise to 10b-5 claim, because he signed SEC filings containing false and misleading statements).  Nor is Gordon's status as a director of TransMedics sufficient to establish control-person liability.  In re Lernout & Hauspie Sec. Litig., 286 B.R. 33, 43 (D. Mass. 2002) ("[S]tatus as a director is not enough to meet the threshold pleading requirements for a § 20(a) claim.").  The amended complaint also does not allege that Gordon exercised influence and control over Hassanein, the person responsible for making the false and misleading statements.  Nonetheless, Defendants advance no separate ground for the dismissal of

---

[13] The only challenged statements in the amended complaint that involve Gordon are (1) the 2023 10-K signed by Gordon, which claimed that the NOP "was developed to provide a more efficient process to procure donor organs with the OCS" (Doc. No. 50 ¶ 158); and (2) his statement denying price gouging on July 31, 2024 (id. ¶ 190).  As the Court has explained, Plaintiffs have not adequately pled that these statements were false or misleading.  See supra.

Gordon.  In the absence of any substantive arguments from Defendants regarding the Section 20(a) claim, the Court declines to grant dismissal.  Thus, Defendants' motion to dismiss Count II is DENIED.  Nonetheless, the parties ought to confer about whether Gordon remains a proper defendant moving forward in light of the Court's ruling.

IV.    CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss, Doc. No. 55, is DENIED IN PART and ALLOWED IN PART as described in this Memorandum and Order.  The Clerk shall schedule a Rule 16 conference in this matter.

SO ORDERED.

 /s/ Leo T. Sorokin
United States District Judge