**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| In re TRANSMEDICS GROUP, INC. SECURITIES LITIGATION | Master Case No. 1:25-cv-10385-LTS |
| This Document Relates to:<br><br>ALL ACTIONS | |

**JOINT STIPULATED AND ORDER FOR**
**DISCOVERY OF DOCUMENTS AND ELECTRONICALLY STORED INFORMATION**

This Order for Discovery of Documents and Electronically Stored Information (the "ESI Protocol" or "Protocol") shall govern the Parties in the above-captioned case, whether they currently are involved or become so in the future, and all parties in any related actions that may later be consolidated with this case (collectively, the "Action").

This Order is designed to implement and promote an efficient and effective discovery process so that Hard Copy Documents, Electronic Documents or Data, and Electronically Stored Information ("ESI") are identified, collected, reviewed, and produced in a timely fashion by the Lead Plaintiffs and Defendant(s), avoiding unnecessary, costly, or time-consuming discovery disputes, protecting applicable privileges, and positioning the Parties and the Court to move this matter to resolution by motion, trial, or settlement.

Nothing in this Order is intended to alter or affect the applicability of the Federal Rules of Civil Procedure, the Local Rules of the U.S. District Court for the District of Massachusetts, or the Court's Standing Orders for Civil Cases, and this Order does not affect the right of any Party to object to a discovery request or operate as a waiver of any Party's right to promulgate, object to, or seek relief from a discovery request. Nor does anything in this Protocol create or impose

additional obligations or burdens beyond those required by the above-referenced rules. The Parties expressly reserve all objections under the Federal Rules of Civil Procedure and applicable decisional authority relating to the production of Hard Copy Documents, Electronic Documents or Data, or ESI. Nothing in this Protocol alters, limits, or supersedes the privilege, non-waiver, or clawback protections provided by the Joint Stipulation and Protective Order entered in this Action (the "Protective Order").

The Parties acknowledge their duty to work together cooperatively throughout the discovery process. The Parties shall cooperate in good faith and be reasonably transparent in all aspects of the discovery process, including the preservation, identification, collection, review, and production of potentially relevant Hard Copy Documents, Electronic Documents or Data, or ESI. This includes cooperating to resolve discovery disputes in a timely and efficient manner.

## I. DEFINITIONS

1. "And" and "or" shall be construed conjunctively or disjunctively as necessary to make their use inclusive rather than exclusive, e.g., "and" shall be construed to mean "and/or."

2. "Cloud" shall be broadly interpreted to mean any web-based software, storage, hosting, messaging, or collaboration service used by a Party or its employees, agents, consultants, or vendors.

3. "Custodian" means any individual identified by a Party as likely having relevant Hard Copy Documents, Electronic Documents or Data, or ESI in their possession, custody, or control.

4. "Document(s)" is defined to be synonymous in meaning and equal in scope to the usage of this term in Local Rule 26.5 and Rules 26 and 34 of the Federal Rules of Civil Procedure. The term "Document" shall include Hard Copy Documents, Electronic Documents or Data, and ESI as defined herein.

5. "Electronic Document(s) or Data" means Documents or files existing in electronic form at the time of creation or collection, including but not limited to e-mail, text messages, chats, posts, or any other forms or means of electronic communications, word processing files (e.g., Microsoft Word), computer presentations (e.g., PowerPoint slides), spreadsheets (e.g., Excel), image files (e.g., .jpg and .pdf), and video and audio files.

6. "Electronically Stored Information" or "ESI," as used herein has the same meaning as defined in Federal Rules of Civil Procedure 26 and 34, and includes Electronic Documents or Data, and computer-generated information or data, created or stored in or on any storage media located on computers, servers, mobile or handheld devices, tablets, Cloud repositories or depositories, disks, USB or thumb drives, external hard drives, tapes, or other real or virtualized devices or digital media.

7. "Hard Copy Document(s)" means Documents existing in physical tangible form at the time of creation or collection, including but not limited to paper Documents.

8. "Hash Value(s)" is a unique numerical identifier that can be determined from a file, a group of files, or a portion of a file, based on a standard mathematical algorithm that calculates a value for a given set of data, serving as a digital fingerprint, and representing the binary content of the data to assist in subsequently ensuring that data has not been modified and to facilitate duplicate identification. Unless otherwise specified, Hash Values shall be calculated using the MD5 hash algorithm.

9. "Load File(s)" means electronic files provided with a production set of Electronic Documents or Data or ESI and images and used to load that production set into the Document review platform of the Requesting Party and for the correlation of such data within that platform by conveying information identifying a set of Document images, processed ESI, or Native Format

files, as well as the corresponding extracted full text or OCR text files, and containing agreed-upon extracted or user-created metadata as well as information indicating physical and logical unitization (i.e., Document breaks and Document relationships such as those between an e-mail and its attachments). A Load File is used to import all image, native, and text files and their corresponding production information into a review database. The Producing Party shall produce a Load File for all produced ESI and Documents with each particular production in accordance with specifications provided herein.

10. “Metadata” means: (i) information embedded in a Native File that is not ordinarily viewable or printable from the application that generated, edited, or modified such Native File; (ii) information generated automatically by the operation of a computer or other information technology system when a Native File is created, modified, transmitted, deleted, or otherwise manipulated by a user of such system, and for purposes of this Protocol; and (iii) information, such as Bates numbers and Hash Values, redaction status, privilege status, or confidentiality status created during the course of processing Documents or ESI for production.

11. “Native Format” or “Native File” means the file format associated with the application by which it was originally created as collected from Custodians or non-custodial sources. For example, the Native Format of an Excel workbook is an .xls or .xlsx file.

12. “Optical Character Recognition” or “OCR” means a technology process that captures text from an image for the purpose of creating an ancillary text file that can be associated with the image and searched in a database. OCR software evaluates scanned data for shapes it recognizes as letters or numerals.

13. “Party” or “Parties” means the Lead Plaintiffs in the above-captioned action and/or Defendants TransMedics Group, Inc. (“TransMedics”), Waleed Hassanein, and Stephen Gordon.

14. "Producing Party" means the Party producing Hard Copy Documents, Electronic Documents or Data, or ESI in response to any request for production of Documents pursuant to Federal Rule of Civil Procedure 34(a) or any other discovery request.

15. "Requesting Party" means the Party requesting Hard Copy Documents, Electronic Documents or Data, or ESI pursuant to Federal Rule of Civil Procedure 34(a), or for any other discovery request.

16. "Searchable Text" means the native text extracted from Electronic Documents or Data or ESI or, when extraction is infeasible, by OCR generated from a Hard Copy Document or electronic image.

17. "Unitization" means the assembly of a set of scanned Hard Copy Documents and indicates where individual pages or files belong together as Documents for functional, archival and retrieval purposes. Unitization includes both (i) Logical Unitization, being the determination of pages that belong together as Documents and which capture family relationships such as a parent Document or message and its attachments; and (ii) Physical Unitization, which captures the assembly of individually scanned pages into Documents and where each Document begins and ends. Physical Unitization normally uses objects such as staples, paper clips, and folders to determine pages that belong together as Documents for functional, archival, and retrieval purposes.

## II. PRESERVATION

1. Consistent with the Parties' obligations under Federal Rule of Civil Procedure 26(f)(2), the Parties have confirmed that they have taken reasonable measures to preserve potentially discoverable data from alteration or destruction in the ordinary course of business or otherwise.

2. The Parties will, upon becoming aware of them, promptly disclose categories or sources of potentially relevant Documents that they have reason to believe have not been preserved

or should not be preserved, and will explain the reasons supporting that belief. In the event that a Requesting Party identifies a good faith basis to believe that potentially relevant Documents may have been lost, deleted, or rendered inaccessible as a result of a Party's Document retention policies or practices, the Parties will meet and confer in good faith to discuss the sources of such Documents.

3. The Parties agree that the circumstances of this litigation do not warrant the preservation, collection, review, production, or identification on a privilege log of ESI that is not reasonably accessible. For purposes of this paragraph, the Parties agree that the following sources of ESI are not reasonably accessible:

i. ESI stored in disaster recovery backup tapes, continuity of operations systems, and data or system mirrors or shadow copies, so long as the same data is available in a more accessible form;

ii. Data remaining from systems no longer in use and that are unintelligible to and inaccessible by systems currently in use, and that cannot be restored to an accessible form following a reasonable effort, provided that, upon a Requesting Party's reasonable request, the Producing Party will identify any such legacy system it reasonably believes contains relevant, non-duplicative ESI, and the Parties will meet and confer;

iii. Slack space, file fragments, unallocated space, and other data recoverable only through forensic imaging or comparable specialized recovery techniques; and ESI deleted before the date a Party's preservation obligation attached, where such ESI is not available to that Party from any archive, journal, backup, snapshot, version history, retention or compliance repository,

or other system accessible through ordinary administrative means;

iv. Random Access Memory ("RAM") and temporary or cache files (including but not limited to internet history, web browser cache, and cookie files), wherever located;

v. ESI stored as server, operating system, or network logs;

vi. Temporary internet files, history, cache, cookies, and the like;

vii. Encrypted ESI/password-protected files, where the key or password cannot be ascertained through reasonable efforts in the ordinary course of processing; provided, however, that if the Requesting Party identifies a reasonable number of specific password-protected files it believes are relevant, the Producing Party will make reasonable, good faith efforts to ascertain the key or password for those files—including, at minimum, inquiry into the file's custodian and the Party's information technology personnel;

viii. ESI affected by ransomware or malware or that otherwise has been corrupted or is otherwise unable to be processed without extraordinary efforts;

ix. ESI stored on photocopiers, printers, scanners, and fax machines; and

x. Other file types as agreed to by the Parties.

4. Unless expressly stated otherwise, nothing in this Protocol shall be construed to modify, narrow, reduce, or eliminate any Party's obligations under the Federal Rules of Civil Procedure, the Private Securities Litigation Reform Act, or other applicable law, including any obligation to preserve Documents or ESI. The identification of sources of ESI not reasonably accessible in Section II.3 of this Protocol reflects the Parties' agreement that those sources need not be searched, collected, reviewed, produced, or logged.

5. The Parties' agreement in Section II.3 is without prejudice to (i) any Party's right to seek the search, collection, review, or production of ESI from any source identified therein upon a showing of good cause under Federal Rules of Civil Procedure 26(b)(2)(B); (ii) any Party's right to oppose such a request, including on grounds of undue burden or cost; and (iii) any Party's obligation under Rule 26(b)(2)(B) to identify by category or type any source of ESI it declines to search or produce on the ground that it is not reasonably accessible. If a Party learns that a source identified in Section II.3 contains non-duplicative, relevant information, the Parties will meet and confer in good faith concerning its collection and production.

## III. E-DISCOVERY LIAISONS

1. The Parties agree to designate one or more competent persons to serve as an attorney liaison, and one or more competent persons to serve as a technical liaison for purposes of meeting, conferring, and attending court hearings regarding discovery of ESI, when required.

## IV. IDENTIFICATION AND COLLECTION OF HARD COPY DOCUMENTS, ELECTRONIC DOCUMENTS AND DATA, AND ESI

1. Absent agreement of the Parties, the Parties shall meet and confer within a reasonable time, but no later than thirty (30) days after serving responses and objections or fourteen (14) days after entry of this Protocol, whichever is later, in an effort to reach agreement on a reasonable list of custodial and non-custodial sources for purposes of collection, review, and production of Hard Copy Documents, Electronic Documents or Data, and ESI. As soon as is practicable in advance of the meet and confer, each Party shall disclose:

i. Custodians. The custodians ("Custodian(s)") likely to have potentially relevant information in their possession, custody, or control. Each Custodian shall be identified by providing their name, title(s) (if any), and connection to this matter.

ii. Non-custodial Data Sources. A list of non-custodial data sources (e.g., shared drives, servers), if any, likely to contain potentially relevant Hard Copy Documents, Electronic Documents or Data, or ESI.

iii. Third-Party Data Sources. A list of third-party data sources likely to contain potentially relevant Hard Copy Documents, Electronic Documents or Data, or ESI (e.g., third-party e-mail providers, mobile device or messaging providers, Cloud hosting storage, collaboration tools or platforms) and, for each such source, the extent to which a Party is (or is not) able to preserve information hosted or stored with any third-party.

iv. Inaccessible Data. A list of data sources, if any, likely to contain potentially relevant information (by type, date, Custodian, electronic system, or other criteria sufficient to specifically identify the data source) that a Party contends or asserts is not reasonably accessible under Federal Rule of Civil Procedure 26(b)(2)(B). In addition to this list, the Parties may agree that certain data sources and ESI do not require preservation by the Parties.

2. Absent agreement of the Parties, within a reasonable time, but no later than thirty (30) days after serving their respective responses and objections to requests for the production of Documents or fourteen (14) days after entry of this Protocol, whichever is later, the Parties shall meet and confer regarding the identification of discrete Documents or categories of responsive Documents that are maintained in a readily identifiable location or format. Such Documents identified through this process shall be collected without the use of search terms or other agreed-upon search methodology and produced within a reasonable time thereafter.

3. The Parties recognize their continuing duty under the Federal Rules of Civil Procedure to disclose custodial and non-custodial sources in good faith and to supplement their lists of custodial and non-custodial sources as this matter progresses within thirty (30) days after the Party becomes aware of additional sources. The Parties shall meet and confer should the adequacy of the supplementation be disputed.

## V. SEARCH METHODOLOGY

1. If the Producing Party elects to use search terms to produce Electronic Documents or Data or ESI, the Parties agree to collaborate in identifying, negotiating, refining, and modifying search terms during the course of discovery.

2. If the Producing Party is identifying or culling potentially relevant materials, which are not already known to be responsive, using search terms, the Parties shall meet and confer within a reasonable time absent agreement of the Parties, but no later than thirty (30) days after serving their respective responses and objections to requests for the production of documents or fourteen (14) days after entry of this Protocol, whichever is later, to attempt to reach agreement on appropriate search terms and queries, file type and date restrictions, data sources (including Custodians), and other appropriate computer- or technology-aided methodologies, including but not limited to technology-assisted review ("TAR"), including TAR 1.0 and TAR 2.0, and any generative artificial intelligence ("Generative AI") or AI-assisted document review tools or platforms before any such effort is undertaken. During the meet and confer process, the Producing Party will disclose relevant English and foreign language company terminology (or equivalent) and all relevant project and code names, code words, acronyms, abbreviations, and nicknames, if any. The Parties shall continue to cooperate in testing, evaluating, and revising the appropriateness of any search terms or search term methodology.

3. As soon as practicable in advance of the meet and confer required under Paragraph 2, the Producing Party shall disclose the data sources (including Custodians), search terms and queries, any file type and date restrictions, and any other methodology that it proposes to use to locate any relevant Electronic Documents or Data or ESI. The Requesting Party shall respond promptly, if at all, to any such proposal, including any objections, comments, or requested revisions, and shall include in such response any request for hit count reports. Upon such request, as soon as practicable in advance of the meet and confer required under Paragraph 4, the Producing Party will provide hit count reports that contain at least the following information: file hit count (the number of files that contain each search term); family count (the number of files when family members are included in the search results); and uniqueness (the number of unique files that contain hits for only that search term).

4. After the Requesting Party responds pursuant to Paragraph 3, including any objections and, upon request, a hit count report, the Parties shall meet and confer regarding additional or revised custodians, sources, search terms, or other search criteria proposed by the Requesting Party.

5. Absent a showing of good cause or technical impossibility, search terms or queries proposed by the Requesting Party shall comply with the following guidelines. Focused terms and queries should be employed; broad terms or queries, such as product and company names, generally should be avoided. A conjunctive combination of multiple words or phrases (e.g., "computer" and "system"), or a proximity operator (e.g., "computer" w/5 "system"), narrows the search and shall count as a single search term. A disjunctive combination of multiple words or phrases (e.g., "computer" or "system") broadens the search.

6. To the extent that a Producing Party believes that any of the search terms proposed by a Requesting Party are unreasonably overbroad and will result in the identification of disproportionate numbers of irrelevant Documents or undue burden (the "Disputed Search Terms"), the Producing Party will promptly produce a Disputed Search Terms hit report that contains the following information: the aggregate hits for each of the Disputed Search Terms (i.e., the number of Documents returned by a search term); the number of hits for each term including family members; the number of unique hits for each of the disputed search terms (the number of Documents which contain the particular search term, but no other); and, to the extent practicable based on a reasonable sample review, the nature and type of irrelevant Documents that the search term is returning. After production of this Disputed Search Terms hit report, the Parties shall, within a reasonable time, meet and confer to discuss whether the Disputed Search Terms should be revised or eliminated from the review. For avoidance of doubt, the Producing Party's obligation under this Paragraph is limited to describing the general nature and type of irrelevant Documents returned by a Disputed Search Term, and nothing in this Paragraph shall require the Producing Party to produce, log, or otherwise disclose the contents of any Document that is not responsive.

7. Nothing in this Protocol will limit a Producing Party's ability to review Documents for relevance or privilege prior to production.

## VI. SECURITY OF PRODUCED MATERIALS

1. As used in this Section, "Produced Materials" means all Documents, Metadata, Native Files, and other materials produced in this Action, whether by a Party or a non-party, and designated confidential pursuant to the terms of the Parties' Protective Order, including designated deposition testimony and transcripts and any copies, excerpts, summaries, or analyses that reveal the substance of such materials. A Requesting Party shall maintain all Produced Materials using administrative, technical, and physical safeguards reasonably designed to protect against

unauthorized access, disclosure, alteration, loss, or destruction. Such safeguards shall be no less rigorous than those the Requesting Party uses to protect its own confidential information of a similar nature and shall be consistent with industry-standard information security practices. Any Produced Materials that the Producing Party identifies, at the time of production, as containing PHI or PII (as defined in the Protective Order) shall include a clear identifier indicating whether the information is PII, PHI, or both. Upon reasonable written request by the Requesting Party identifying the specific Documents (by Bates number or other reasonably identifying information) at issue, the Producing Party shall, within fourteen (14) days of such request, identify the particular federal, state, and/or foreign law it contends governs the PHI or PII in such Produced Materials. The Requesting Party shall maintain such identified Produced Materials consistent with the safeguards set forth above in this Section and the Protective Order. Nothing in this Section imposes on the Requesting Party an obligation to comply with any statute or regulation to which it is not otherwise subject as a matter of law. The Requesting Party shall require any vendor, expert, consultant, or other person to whom it provides Produced Materials to maintain confidentiality and security safeguards consistent with this Section.

2. Produced Materials shall be stored only on systems, repositories, networks, and devices that are subject to (a) appropriate security controls, including access controls, authentication requirements, and encryption of data, where reasonably available; (b) appropriate safeguards for the transmission of Produced Materials and their storage on portable media; and (c) procedures for promptly terminating access when no longer required. Access to Produced Materials shall be limited to persons authorized under the Protective Order and only to the extent reasonably necessary for purposes of this litigation.

3. In the event the Requesting Party becomes aware of any actual or reasonably suspected unauthorized access to, acquisition of, disclosure of, or loss of Produced Materials (a "Security Incident"), the Requesting Party shall notify the Producing Party in writing as soon as reasonably practicable and, absent good cause, no later than seven (7) calendar days after becoming aware of the Security Incident. The notification shall include, to the extent known at the time: (a) the nature of the Security Incident; (b) the categories of Produced Materials affected; (c) the date or estimated date of the Security Incident; (d) the remedial measures taken or planned in response; and (e) the identity of any unauthorized recipients, if known.

4. After notifying the Producing Party, the Requesting Party shall take reasonable steps to investigate, contain, remediate, and mitigate the effects of the Security Incident and shall provide additional information reasonably requested by the Producing Party concerning the scope of the Security Incident and the remedial measures undertaken. Nothing in this Paragraph shall be construed as an admission regarding the applicability of any legal obligation, liability, privilege, or waiver.

## VII. USE OF TAR AND GENERATIVE ARTIFICIAL INTELLIGENCE

1. If a Producing Party plans to use any TAR, also known as "predictive coding," or any Generative AI tool, to identify or cull Documents to be reviewed or produced, the Producing Party shall notify all Parties sufficiently in advance to permit the discussion and negotiation of an appropriate protocol governing that use. Neither Party shall object to the use of such technologies without showing good cause. Nothing herein shall preclude a Party from utilizing TAR or any Generative AI tool.

2. If a Producing Party intends to apply search terms or other culling criteria before applying TAR, it will disclose that intention and any search terms, date ranges, custodians, and

file types used to cull Documents when it provides the notice required by Paragraph 1 of this Section, and the Parties will meet and confer in good faith regarding any objection.

3. Validation metrics, recall estimates, and any other quality control measures reported by the Producing Party shall be calculated with reference to the population of Documents submitted to TAR or a Generative AI tool, and the Producing Party shall identify that population when reporting such results. If, after reviewing the Producing Party's validation results, the Requesting Party has a good faith, articulable basis to believe that the culling excluded a material volume of responsive Documents, the Parties will meet and confer in good faith regarding whether any additional, proportionate validation of the excluded population is warranted.

4. The Parties shall meet and confer regarding reasonable and proportional procedures for validating the results of TAR or any Generative AI tool, consistent with Federal Rule of Civil Procedure 26(b)(1). The meet and confer may address, among other things, whether a statistically reasonable sampling of Documents identified as non-responsive is warranted.

5. Absent written consent of the Producing Party or further order of the Court, no Produced Materials may be provided to any Generative AI system operated by a third party unless: (a) the system is operated within a secure environment subject to contractual confidentiality obligations; (b) the materials are not used for training, retraining, fine-tuning, testing, or improving any artificial intelligence model or service; (c) the third-party provider does not retain the materials while providing services, except as reasonably necessary to provide the service; and (d) the third-party provider is prohibited from disclosing the Produced Materials to any other person or entity. For avoidance of doubt, the Parties shall not submit Produced Materials to publicly accessible consumer artificial intelligence platforms or services for summarization, analysis, drafting, searching, embedding, training, or any other purpose.

6. Upon completion of the services for which Produced Materials were provided to a third-party provider, the Requesting Party shall ensure that the third-party provider deletes or returns all Produced Materials in its possession, custody, or control, and shall provide written certification of such deletion or return upon reasonable request.

7. Nothing in this Section prohibits a Party, counsel, or their vendors from using TAR, analytics tools, privilege-screening tools, Document-review platforms, or Generative AI tools in connection with this litigation, provided that such tools satisfy the requirements set forth above and are used in a manner consistent with the Protective Order and applicable obligations of confidentiality.

## VIII. VALIDATION

1. Where a Party uses TAR or any Generative AI tool, the Parties shall meet and confer regarding validation procedures as set forth in Section VII.

2. Where a Party uses search terms or other agreed-upon search methodology, rather than TAR, to cull a Document population, the Parties shall meet and confer regarding reasonable and proportional procedures for validating the results, consistent with Federal Rule of Civil Procedure 26(b)(1). Such procedures may include reviewing hit count reports, testing search terms against Documents known to be responsive, and supplementing or modifying search terms.

3. Where a Party uses search terms or other agreed-upon search methodology, rather than TAR, to cull a Document population and the Requesting Party has a good faith, articulable basis to believe that the search methodology has excluded a material volume of responsive Documents, the Parties will meet and confer in good faith regarding whether additional, proportionate validation is warranted.

## IX. DATABASES AND STRUCTURED DATA

1. Prior to collection, the Parties will meet and confer to address the production and production format of any relevant structured data or data contained in a database, including Cloud-based databases or platforms. Prior to meeting and conferring, the Producing Party will provide the following information about the database or structured data to the Requesting Party: database name; type of database; a list of the fields and field definitions contained within the database; software supporting the database; software version; business purpose; number of users and administrators; size of the database in terms of records; overall size of database in gigabytes ("GB"); a list of standard reports generated by the data; identity of the database owner or administrator; and, whether the database generates or supports any ephemeral data displayed on business analytic dashboards. The Producing Party shall provide the foregoing information only to the extent it is available and reasonably practicable to compile, and the Parties shall meet and confer regarding any category of information that is not.

2. If ESI in a commercial or proprietary database can be generated, provided, or produced in an existing and reasonably usable delimited report format (e.g., Excel, CSV), the Producing Party will produce the relevant ESI in such format. If an existing report format is not reasonably available or usable, the Parties will attempt to identify a mutually agreeable format of production based on the specific needs and the content and format of ESI within such structured data source.

## X. ENTERPRISE MESSAGING

1. The Producing Party shall identify enterprise messaging tools or other communication tools likely to contain responsive information and meet and confer regarding collection and production.

2. The Producing Party shall identify enterprise messaging tools or other communication tools used by relevant Custodians such as Slack, Skype, Google Chats, or Microsoft Teams. The Parties shall meet and confer regarding the extent and terms of collection and production.

## XI. DEVICES AND MESSAGING

1. The Producing Party shall take reasonable steps to determine whether and will disclose whether any relevant Custodian used personal or Company-issued devices (such as mobile phones, smartphones, laptops, home desktop computers, or tablets) for work-related communications.

2. The Producing Party shall take reasonable steps to determine whether and will disclose whether any relevant Custodian used messaging applications (such as SMS, iMessage, WhatsApp, or Signal) for work-related communications.

3. The Producing Party shall take reasonable steps to preserve, collect, and produce responsive Documents or communications collected from any such device or messaging application in a reasonably usable format that maintains full conversation context, participants, timestamps, and available Metadata. The Parties shall meet and confer regarding collection methods and export format. The foregoing obligations extend only to work-related communications on devices and messaging applications within the Producing Party's possession, custody, and control.

4. For the avoidance of doubt, nothing in this Protocol shall be construed to narrow, reduce, or eliminate any Party's obligations under the Federal Rules of Civil Procedure, the Private Securities Litigation Reform Act, or other applicable law, unless expressly stated otherwise.

## XII. KNOWN RESPONSIVE MATERIALS MUST BE PRODUCED

5. Hard Copy Documents, Electronic Documents or Data or ESI known to be responsive to a pending request within the permissible scope of discovery to the matter shall be produced without regard to whether the files are responsive to any search term, of high "relevance" predicted by a TAR text classification algorithm or otherwise flagged as potentially relevant by another search or review methodology. Relevant privileged files need not be produced but must be included in an appropriate privilege log, subject to Section XXVI.

## XIII. FORMS OF PRODUCTION: HARD COPY DOCUMENTS

1. Hard Copy Documents shall be scanned to single page Group IV TIFF format, 300 dpi quality or better with corresponding searchable OCR text as indicated in this Protocol. The Document's original orientation should be maintained (i.e., portrait-to-portrait and landscape-to-landscape), and Hard Copy Documents containing color used to convey information shall be produced as set forth in the Color section below. Image file names will be identical to the corresponding Bates numbered images, with a ".tiff" file extension. The file name of each text file should correspond to the file name of the first image file of the Document with which it is associated.

## XIV. UNITIZING DOCUMENTS

1. In scanning Hard Copy Documents, distinct Documents should not be merged into a single record, and single Documents should not be split into multiple records (i.e., paper Documents should be logically unitized). For example, Hard Copy Documents stored in a binder, folder, or similar container should be produced in the same order as they appear in their original container. A scanned version of the front cover of the container should be produced immediately before the first Document in the container. Similarly, the back cover of the container should be produced immediately after the last Document in the container. The Parties and their vendors will

undertake reasonable efforts to logically and correctly unitize Documents and commit to promptly and reasonably address situations of improperly unitized Documents.

## XV. HARD COPY DOCUMENT METADATA

1. The following Metadata fields should be provided for Hard Copy Documents when reasonably available:

i. Beginning Bates number,

ii. Ending Bates number,

iii. First attachment Bates number,

iv. Last attachment Bates number,

v. Source location/Custodian,

vi. Confidentiality designation,

vii. Redacted (Y/N), and

viii. Extracted/OCR text file path.

## XVI. FORMS OF PRODUCTION: ELECTRONIC DOCUMENTS, DATA, AND ESI

1. The Parties will produce the following forms of Electronic Documents, Data, and ESI in Native Formats:

i. Excel and other spreadsheet files (e.g., .XLS, .XLSX, .CSV),

ii. Access and other personal (non-enterprise) database files,

iii. Audio and video files, and

iv. Other Documents of a type which cannot be reasonably converted to useful TIFF images as determined by the Parties after meeting and conferring.

2. Documents produced natively shall be produced with the native link (i.e., the link between the native and TIFF file) provided. Each Native File shall be named after its Bates number

including any confidentiality designation and shall have a corresponding ".tiff" placeholder indicating "File Produced in Native Format."

3. All other Electronic Documents or Data or ESI will be produced as single page Group IV TIFF images, 300 dpi quality or better, and 8.5" x 11" page size, except for Documents requiring different resolution or page size. The Document's original orientation should be maintained (i.e., portrait-to-portrait and landscape-to-landscape), and Documents or ESI containing color used to convey information shall be produced as set forth in the Color section below. All PowerPoints not produced in Native Format are to be imaged with speaker notes, with all hidden content visible, to the extent technically feasible. Metadata to be included is specified in Attachment A. A Requesting Party may nonetheless identify specific Electronic Documents, Data, or ESI that it believes should be reproduced in Native Format, upon which identification the Parties agree to meet and confer in good faith on whether files in Native Format can be produced.

4. TIFFs of ESI shall convey the same information and image as the original Document, including all comments or commentary, speaker notes, tracked changes (deletions and revision marks, including the identity of the person making the deletion or revision and the date and time thereof), hidden text, embedded Documents or images or other user-entered data, and formatting that is visible in the Native Format version of the file. All hidden content will be expanded, extracted, and rendered in the TIFF file and to the extent possible, the Producing Party will instruct its vendor to force off auto date. Nothing in this Section shall be interpreted to require a Party to produce any hidden information protected by the attorney-client privilege, work product protection, or other applicable privilege or privacy protection.

## XVII. PARENT-CHILD RELATIONSHIPS

1. The Parties agree that if any part of a Document or its attachments is responsive, the entire Document and attachments will be produced, except that any attachment withheld in its

entirety on the basis of privilege or work-product protection shall be replaced in the production with a slipsheet, in its original sequence within the family, indicating that the attachment has been withheld on the basis of privilege, and identifying it on the applicable privilege log. Nothing in this paragraph permits an attachment to be withheld on the basis that it requires redaction; any responsive attachment that is not subject to privilege or work-product protection shall be produced with appropriate redactions rather than withheld.

2. The Parties shall take reasonable steps to ensure that parent-child relationships within a Document family (the association between an attachment and its parent Document) will be preserved. The child Document(s) should be consecutively produced immediately after the parent Document. Each Document shall be produced with the production number for the first and last page of that Document in the "BegBates" and "EndBates" fields of the data Load File and with the "BegAttach" and "EndAttach" fields listing the production number for the first and last page in the Document family.

3. Parties are not required to produce Documents merely referenced in responsive Documents. The treatment of any such Documents shall be governed by the Hyperlinks Section (Section XVIII) of this Protocol.

## XVIII. HYPERLINKS

1. To the extent practicable, ESI containing internal hyperlinks pointing to other ESI within a Producing Party's custody, possession, or control shall be produced as part of the same family as the Document containing the hyperlink. The Producing Party shall use reasonable efforts to produce the version of that ESI as it existed at the time the hyperlink was transmitted; where doing so is not reasonably feasible, the Producing Party shall instead produce the most recent version reasonably available and disclose that the version produced may not reflect the ESI as it existed when transmitted. The Producing Party's obligations under this Paragraph are limited to

hyperlinked ESI that its systems and processing tools are reasonably capable of collecting and associating with the transmitting Document. Nothing in this Paragraph requires a Producing Party to acquire or deploy collection tools or processes that are not commercially available to it. Where the Producing Party lacks that capability, the Parties shall meet and confer regarding a reasonable alternative. If the Requesting Party identifies hyperlinked ESI that has not been produced, it may provide the Producing Party with a list identifying such ESI by the Bates number of the transmitting Document, and the Producing Party shall use reasonable, good faith efforts to locate and produce up to 200 such Documents, unless the Parties agree otherwise or the Court orders otherwise for good cause shown, to the extent not already produced and not subject to an applicable privilege or protection.

2. A Producing Party is not required to produce Documents or ESI accessible via hyperlinks to publicly available internet sources.

3. The Parties shall meet and confer regarding the production format and applicable Metadata fields for Documents or ESI referenced by hyperlinks, including any platform-specific Metadata associated with Cloud-based or collaboration platforms (e.g., Google Drive, SharePoint, Office 365).

## XIX. EMBEDDED OBJECTS

1. Embedded files shall be produced as attachments to the Document that contained the embedded file, with the parent-child relationship preserved. To the extent the Producing Party's processing software extracts the information, and to the extent such information is available, embedded files will be marked with a "Yes" in the Load File under the "Embedded Objects" Metadata field. The Parties agree that logos need not be extracted as separate Documents as long as they are displayed in the parent Document.

## XX. COLOR

1. Hard Copy Documents or ESI that contain color necessary to understand and/or utilize the Document (e.g., color coding and highlighting versus merely decorative use) shall be produced as single-page, 300 dpi JPG images with JPG compression set to the highest-quality setting to avoid degrading the utility of the original image. This Section governs the Group IV TIFF default specified in the Forms of Production: Hard Copy Documents and Forms of Production: Electronic Documents, Data, and ESI sections above wherever color is necessary to understand and/or utilize the Document.

## XXI. FOREIGN LANGUAGE DOCUMENTS

1. All Documents shall be produced in their original language. Where a requested Document exists in a language other than English and the Producing Party also has an English-language version of that Document that it prepared for non-litigation purposes prior to filing of the lawsuit, the Producing Party shall produce both the original Document and all English-language versions. In addition, if the Producing Party has a certified translation of a non-English language Document that is being produced (regardless of whether the translation was prepared for litigation purposes), the Producing Party shall produce both the original non-English Document and the certified translation. Nothing in this Protocol shall require a Producing Party to prepare a translation, certified or otherwise, for non-English language Documents that are produced in discovery.

## XXII. FILE NAMES

1. Each TIFF image should have a unique file name corresponding to the Bates number of that page with a ".tiff" file extension. The file name should not contain any blank spaces and should be zero-padded (e.g., ABC-00000001), taking into consideration the estimated number of pages to be produced. If a Bates number or set of Bates numbers is skipped in a production, the

Producing Party will so note in a cover letter or production log accompanying the production. Bates numbers will be unique across the entire production and prefixes will be consistent across all Documents produced.

2. The Producing Party will brand all TIFF images in the lower right-hand corner with its corresponding Bates number without obscuring any part of the underlying image.

## XXIII. EXTRACTED TEXT FILES

1. For each Document, a single Unicode text file containing extracted text shall be provided along with the image files and Metadata. The text file name shall be the same as the Bates number of the first page of the Document. File names shall not have any special characters or embedded spaces. Electronic text must be extracted directly from the native electronic file to the extent reasonably feasible unless the Document is an image file or contains redactions, in which case, a text file created using OCR should be produced in lieu of extracted text.

2. Extracted text shall include all comments, revisions, tracked changes, speaker's notes, and text from Documents with comments or tracked changes, and hidden and very hidden worksheets, slides, columns, and rows. Text extracted from e-mails shall include all header information that would be visible if the e-mail was viewed in Outlook including: (1) the individuals to whom the communication was directed ("To"); (2) the author of the e-mail communication ("From"); (3) who was copied and blind copied on such e-mail ("CC" and "BCC"); (4) the subject line of the e-mail ("RE" or "Subject"); (5) the date and time of the e-mail; and (6) the names of any attachments.

## XXIV. LOAD FILES

1. Productions will, as applicable, include image Load Files in Opticon or IPRO format as well as Concordance format data (.dat) files with the applicable Metadata fields identified in Attachment A.

2. All Metadata will be produced in UTF-8 format.

3. Production volumes shall only include one image Load File per production volume. The name of the image Load File shall mirror the name of the delivery volume. The volume names shall be consecutive.

4. All Native Format files shall be produced in a folder named "NATIVE."

5. All TIFF images shall be produced in a folder named "IMAGE," which shall contain sub-folders named "0001," "0002," etc. Each sub-folder shall contain no more than 10,000 images. Images from a single Document shall not span multiple sub-folders.

6. All extracted Text and OCR files shall be produced in a folder named "TEXT."

7. All Load Files shall be produced in a folder named "DATA" or at the root directory of the production media.

## XXV. REDACTIONS

1. Any redacted material must be clearly labeled on the face of the Document with the reason for the redaction (e.g., "Redacted—Attorney-Client Privilege," "Redacted—PII"), and such reason shall also be captured in the "RedactionReason" field of the Load File provided with the production. Each redacted Document shall be produced with an OCR ".txt" file containing only the visible, non-redacted text. A Document's status as redacted does not relieve the Producing Party from providing all the Metadata required herein unless the Metadata withheld contains privileged content or other information that may be redacted under Paragraph 3 of this Section. Nothing in this Order requires the production of unredacted extracted text, OCR text, Metadata, hidden content, or a native file that would reveal redacted information.

2. Where Excel-type spreadsheets, delimited text files, or audio/visual files require redaction, the Producing Party shall produce such files in Native Format, with redactions applied using appropriate tools (such as Blackout or Audacity), such that the unredacted portions are

produced in a reasonably usable form.

3. A Producing Party may not redact any portion of a Document based upon any objection related to the relevance or responsiveness of a Document, except that a Producing Party may redact: (a) information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or protection; and (b) Personally Identifying Information ("PII"), Protected Health Information ("PHI"), each as defined in the Protective Order, personal financial or authentication information, cybersecurity information, and other sensitive personal, medical, employee, or third-party information (including, without limitation, social security numbers and dates of birth), where such information is not relevant and not responsive, is outside the permissible scope of discovery, or can be redacted without materially impairing the Requesting Party's ability to understand or use the responsive information.

## XXVI. PRIVILEGE LOGS

1. Disclosure of privileged or protected information is governed by Section VI of the Protective Order, which constitutes an order under Federal Rule of Evidence 502(d).

2. The Parties agree to provide a log of all withheld Documents on December 2, 2026, February 4, 2027, and April 9, 2027. The log shall contain sufficient information to allow the Requesting Party to understand, evaluate, and test the basis for the privilege claim for each Document.

3. Privilege logs shall be produced as Excel spreadsheets allowing text searching and organization of data. The privilege log shall include for each withheld Document a Bates number or other unique privilege log identifier, the type of privilege asserted, the date and time of sending, the author or sender, the last recipients in time to receive the Document (separated into primary recipients, courtesy copy recipients, and blind courtesy copy recipients to the extent they are available), and a narrative description sufficient to explain the basis for the privilege or protection

claimed.

4. All attorneys appearing on the log will be identified as such wherever they appear in the log, whether by an asterisk or some other consistent marking or designation. All individuals will be identified by first and last name and e-mail address, wherever they appear in the log, consistent with the information contained in the Metadata. Parties may use reasonable technological processes to identify ESI or Electronic Documents likely to be privileged or protected, but nothing in this Protocol relieves a Party of its duty to actually review a Document to determine whether it is privileged or protected before including it on a privilege log produced to other Parties.

5. Certain privileged communications or Documents need not be included in a privilege log unless otherwise agreed to by the Parties or ordered by the Court: (a) communications to or from outside legal counsel or in-house counsel (or persons acting at their direction) after the commencement of, and related to, this Action; (b) work product of counsel and the Parties after the commencement of, and related to, this Action; and (c) any communications regarding litigation holds or preservation, collection, or review of discoverable information in this Action, unless and until one or both Parties raise issues concerning the preservation, collection, or production efforts of the other Party. For privileged communications or work product not concerning the above-captioned action that are dated after February 14, 2025, a categorical privilege log shall be provided that is sufficient to identify the people or entities sending and receiving such communications, the date range of such communications, and the legal action, inquiry, or investigation at issue in the communications.

6. Communications between Defendants and their legal counsel and forensic accounting firm seeking or giving legal advice or rendering services to assist in seeking or giving

legal advice, or work product concerning the investigation conducted by Kirkland & Ellis LLP ("Kirkland"), as disclosed on Exhibit 99.1 to TransMedics' Form 8-K on February 27, 2025, need not be included in a privilege log. For the avoidance of doubt, a Document that was otherwise not privileged when created will not be deemed privileged merely because it was collected by or given to Kirkland in the course of its investigation; provided, however, that the selection, compilation, organization, and assembly of Documents by or at the direction of Kirkland in the course of its investigation, including the identity of the particular Documents it chose to collect, request, or review and any grouping or ordering of those Documents, reflects counsel's mental impressions, opinions, and legal theories and shall remain protected as attorney work product. Plaintiffs reserve all rights to challenge whether such material is privileged or work product; however, nothing in this paragraph shall be construed to require the production or disclosure of any such selection or compilation, or to waive any protection attaching to it.

## XXVII. DEDUPLICATION

1. The Parties shall make reasonable efforts to de-duplicate ESI. The Producing Party may horizontally (globally) de-duplicate only exact duplicate Documents based on the individual file or file family's MD5-Hash, SHA-1 hash, e-mail duplicate spare messages (as defined by Relativity), or SHA-256 values at the Document level or by Message ID, EDRM MIH or other agreed-upon standard methodology for e-mail deduplication within the collection of a Custodian or a data source in a manner that does not break up Document families (such as e-mails and attachments). Near-duplicate Documents shall not be removed. The original exact duplicate ESI shall continue to be preserved. A Producing Party may use email thread suppression to suppress lesser-included emails, provided that the full content, recipients, hyperlinks, and all attachments of the suppressed email are contained in a produced, more inclusive email in the same thread. Notwithstanding the foregoing, the Requesting Party reserves the right to request production of

any lesser-included email(s), together with associated Metadata, where reasonably warranted, including where necessary to establish the date, time, sender, recipients (including any BCC recipients), custodian, or sequence of a particular communication. Upon such a request, the Parties shall promptly meet and confer in good faith, and the Producing Party shall not unreasonably withhold production of the requested email(s).

2. Attachments to parent Documents may not be deduplicated against a duplicate standalone version if the attachment exists, and standalone versions of Documents may not be suppressed if a duplicate version exists as an attachment.

3. As to custodial files, a Producing Party may de-duplicate globally or only within a Custodian's file, but the produced Metadata shall identify each and every Custodian in whose files the Document was found in the "AllCustodians" field. If a Producing Party intends to de-duplicate within non-custodial files, or between custodial files and non-custodial files, the Metadata provided with the produced Documents shall indicate the other source(s) for the de-duplicated Documents.

4. The Producing Party will track all deduplicated files and provide the names of all Custodians of these duplicates in the Load File. If the duplicates are e-mails, the Producing Party must detail the process of creating the Hash Value, e.g., the names and order of concatenated fields by which the deduplication hash was calculated.

## XXVIII. DE-NISTING

1. System and application files without user-created content (as identified by matching to the NIST National Software Reference Library database) need not be produced.

## XXIX. PRODUCTION MEDIA

1. The preferred means of production is via secure FTP or secure file share.

Productions shall remain available for download for no less than fourteen (14) calendar days.

2. If there is a reasonable concern regarding confidentiality or the size of the production, the Producing Party may use appropriate electronic media (DVD, thumb drive, or hard drive) for its ESI production and will endeavor to use the highest capacity suitable media. The Producing Party will label the production media with the name of the Producing Party, production date, media volume name, and Bates number range(s). Productions on physical media shall be encrypted for transmission to the Requesting Party.

3. At the time of production and under separate cover, the Producing Party shall furnish decryption credentials to the Requesting Party.

4. The Producing Party shall accompany all Document productions with a production cover letter describing by Bates number the Documents and ESI being produced.

## XXX. PROCESSING

1. The Parties will use reasonable efforts and standard industry practices to address and resolve exception issues for items that present processing, imaging, or form of production problems (including encrypted, corrupt, and/or protected files identified during the processing of ESI). The Parties will meet and confer regarding procedures that will be used to identify, access, process, and resolve any exception issues.

2. Parties shall normalize times and dates to conform to UTC. If a Producing Party cannot process ESI with UTC, the Parties shall meet and confer to determine a reasonable alternative.

3. For archive files (.zip, .jar, .rar, .gzip, .tar, etc.), all contents should be extracted from the archive with source pathing and family relationships preserved and produced. The fully unpacked archive container file does not need to be included in the production.

## XXXI. PRIOR PRODUCTIONS

1. To the extent a Party produces Documents in this Action that were produced in prior or contemporaneous litigation, investigations, or other proceedings, such Documents may initially be produced in the same format and order that they originally were produced, accompanied by the same Metadata. The Producing Party shall provide information sufficient to identify prior productions by specifying the Bates range and source of the litigation, investigation, or other proceeding. Should the Requesting Party believe there is a good faith basis for previously produced Documents to be produced in a format other than as originally produced, including additional Metadata, the Parties will meet and confer regarding the feasibility and burden of any such requests.

## XXXII. PROCESSING NON-PARTY DOCUMENTS

1. A Party that issues a non-Party subpoena ("Issuing Party") shall include a copy of this Protocol with the subpoena and request that the non-Party produce Documents in accordance with the specifications set forth herein.

2. The Issuing Party is responsible for producing to all other Parties any Document(s) obtained pursuant to a subpoena to any non-Party, in the same form the Document(s) was/were produced by the non-Party. To the extent practical given the data volume and load time, productions by a non-Party should be produced by the Issuing Party to all other Parties within fourteen (14) calendar days of the non-Party's production to the Issuing Party.

3. For the avoidance of doubt, nothing in this Protocol is intended to or should be interpreted as narrowing, expanding, or otherwise affecting the rights of the Parties or non-Parties to object to a subpoena.

## XXXIII. MODIFICATION

1. This Protocol may be modified by stipulation of the Parties or by the Court for good

cause shown.

**IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.**

Dated: November 10, 2026

Respectfully submitted,
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

/s/ Amanda Lawrence
Amanda F. Lawrence (BBO# 568737)
Daniella Chuka (*pro hac vice*)
156 S. Main St., P.O. Box 192
Colchester, CT 06415
Tel.: (860) 537-5537
Fax: (860) 537-4432
alawrence@scott-scott.com
dchuka@scott-scott.com

Lana V. Levin (*pro hac vice*)
**SCOTT+SCOTT**
**ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 24th Floor
New York, NY 10169
Tel.: (212) 223-6444
Fax: (212) 223-6334
llevin@scott-scott.com

Joshua H. Saltzman (*pro hac vice*)
**SAXENA WHITE P.A.**
10 Bank Street, Suite 882
White Plains, New York 10606
Tel.: (914) 437-8551
Fax: (888) 631-3611
jsaltzman@saxenawhite.com

*Plaintiffs' Counsel*

/s/ Michael G. Bongiorno
Michael G. Bongiorno (BBO # 558748)
Timothy J. Perla (BBO # 660447)
Margaux Malasky (BBO # 705494)
Dan Willey (BBO # 693924)
Emily K. O'Hara (BBO # 713506)
**WILMER CUTLER PICKERING**
**HALE AND DORR LLP**

60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-5000
michael.bongiorno@wilmerhale.com
timothy.perla@wilmerhale.com
margaux.malasky@wilmerhale.com
dan.willey@wilmerhale.com
emily.ohara@wilmerhale.com

Tamar Kaplan-Marans (*pro hac vice*)
**WILMER CUTLER PICKERING**
**HALE AND DORR LLP**
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: (212) 230-8800
Fax: (212) 230-8888
tamar.kaplan-marans@wilmerhale.com

*Counsel for Defendants TransMedics Group, Inc., Waleed Hassanein, and Stephen Gordon*

**SO ORDERED this 23 day of November, 2026.**

/s/ Leo T. Sorokin

LEO T. SOROKIN
UNITED STATES DISTRICT JUDGE

# ATTACHMENT A

| **ESI Metadata Fields[1] Field Name** | ***Populated For*** *(Email, eDoc, or All)* | **Field Description** |
|---|---|---|
| BegBates | All | First Bates identifier of item |
| EndBates | All | Last Bates identifier of item |
| PgCount | All | Number of pages in the Document |
| Production Volume | All | Production Volume Name. |
| FileName | All | Original name of file as appeared in location where collected |
| FileSize | All | Size of Native File Document/e-mail in KB. |
| FileExt | All | File extension of the Document. |
| FileType | All | The application or software type associated with the file (e.g., Microsoft Word, Adobe Acrobat, Microsoft Excel) |
| LogicalPath | All | The directory structure of the original file(s). Any container name is included in the path. |
| Source | All | The system or platform from which the item was collected (e.g., Exchange Online, Slack workspace, OneDrive, mobile device). |
| TimeZoneUsed | All | Time zone used to process data during collection and processing. |
| AttRange | All | Bates identifier of the first page of the parent Document to the Bates identifier of the last page of the last attachment “child” Document |
| BegAttach | All | First Bates identifier of attachment range |
| EndAttach | All | Last Bates identifier of attachment range |
| AttachCount | Email | Number of attachments to an e-mail |
| HasAttachments | Email | Indicates that an e-mail has attachments (Y/N) |
| ParentBates | All | First Bates identifier of parent Document/e-mail message (will not be populated for Documents that are not part of a family). |
| ChildBates | All | First Bates identifier of “child” attachment(s); may be more than one Bates number listed depending on number of attachments (will not be populated for Documents that are not part of a family). |
| Custodian | All | Name of the individual custodian from whose files the Document was collected. |

[1] To the extent the Parties require production of Metadata fields not identified in Attachment A (ESI Metadata Fields), the Parties shall meet and confer regarding the appropriate fields to be produced.

| **ESI Metadata Fields[1]Field Name** | ***Populated For*** *(Email, eDoc, or All)* | **Field Description** |
|---|---|---|
| AllCustodians | All | All custodians who were in possession of a de-duplicated Document besides the individual identified in the Custodian field, separated by semicolons. |
| From | Email | The name and email address of the sender of the email. |
| To | Email | Recipient(s); separated by semicolons |
| CC | Email | Carbon copy recipient(s); separated by semicolons |
| BCC | Email | Blind carbon copy recipient(s) separated by semicolons |
| SentDateTime<br>(mm/dd/yyyy hh:mm:ss AM/PM) | Email | Date and time the e-mail was sent |
| ReceivedDateTime<br>(mm/dd/yyyy hh:mm:ss AM/PM) | Email | Date and time email was received. |
| EmailSubject | Email | Subject line of e-mail. |
| MsgID | Email | "Unique Message ID" field |
| Importance | Email | High Importance - indicates high priority e-mail; Null if no value selected |
| Sensitivity | Email | "Normal," "Private," "Personal," or "Confidential"; Null if no value selected |
| ReadStatus | Email | Read or Unread |
| Email ThreadID | Email | Unique identification number that permits threading of email conversations. |
| Email Thread Group | Email | Initial nine characters of the Email Threading ID. This value is the same for all members of an Email Thread Group which are all of the replies, forwards, and attachments following an initial sent email. |
| MeetingStart | Email | Start date and time of a calendar/meeting entry |
| MeetingEnd | Email | End date and time of a calendar/meeting entry |
| Title | eDoc | Title provided by user within the Document |
| Subject | eDoc | Any value populated in the Subject field of the Document properties. |
| Author | eDoc | Any value populated in the Author field of Document properties. |

| **ESI Metadata Fields[1]Field Name** | ***Populated For*** *(Email, eDoc, or All)* | **Field Description** |
|---|---|---|
| CreatedDateTime<br><br>(mm/dd/yyyy hh:mm:ss AM/PM) | eDoc | Create Date and time |
| ModifiedDateTime<br><br>(mm/dd/yyyy hh:mm:ss AM/PM) | eDoc | Last Modified Date and time |
| LastModifiedBy | eDoc | Person who last modified a Document |
| LastAccessedDateTime<br><br>(mm/dd/yyyy hh:mm:ss AM/PM) | eDoc | Last Accessed Date and time |
| NativeLink | All | Relative file path location to the Native File |
| TextLink | All | Relative file path of the text file associated with the extracted text |
| Hash | All | MD5 or SHA-1 Hash Value of the item |
| Embedded Objects | All | Denotes that the item is embedded within another Document (Y/N) |
| HiddenContent | All | Denotes presence of Tracked Changes/Hidden Content |
| RedactionReason | All | Identifies the reason for each redaction. |
| Redacted | All | Denotes that item has been redacted (Y/N). |
| Confidential | All | Denotes the confidentiality designation assigned to the item pursuant to the applicable confidentiality agreement or protective order. |